United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OPEN TEXT S.A.,

             Plaintiff,

    v.

BOX, INC., et al.,

             Defendants.

Case No.  13-cv-04910-JD

**CLAIM CONSTRUCTION ORDER**

Re: Dkt. Nos. 190, 202, 212 in Case No.
3:13-cv-04843-JD

       The parties in this patent infringement action seek construction of nine groups of claim terms found in eight patents, which fall into two families.  The Court issues this order after reviewing the parties' claim construction briefing and holding a claim construction hearing.

## I.   BACKGROUND OF THE PATENTS

       The first family of patents asserted by Open Text is known as the "Groupware patents," and consists of five patents:  U.S. Patent Nos. 6,223,177; 6,917,962; 7,287,055; 7,299,258; 7,320,018.  These patents, whose specifications are nearly identical, deal with "collaborative computing environments" that allow users to work together on projects.  *See* '177 patent, 1:1:11-14.  They explain that prior art systems involved software running on a host server that, among other things, interfaced with messaging systems like email and allowed users to track project plans and priorities using a database.  *See id.* 1:21-36.  They claim, however, that these prior art systems required trained system administrators to add functionality to the system, and required users to have specialized software installed on their computer.  *See id.* 1:37-45.  The patents purport to eliminate at least some of these disadvantages through the use of collaborative computing

1   environments that make use of an intranet site that can be accessed through a web browser.  *See*

2   *id.*, Abstract.

3        The second family of patents consists of three patents:  U.S. Patent Nos. 7,062,515;

4   7,590,665; and 8,117,152.  The parties do not agree on a shorthand for these patents:  Open Text

5   calls them the "Client-Side Update patents," while Box prefers the term "File Synchronization

6   patents."  Since the latter nomenclature is more closely tied to the title of the patents ("System and

7   Method for the Synchronization of a File in a Cache"), the Court will adopt it here and in future

8   orders.

9        The File Synchronization patents deal with systems where multiple users access a

10   centralized database consisting of files using various client computers.  *See* '515 patent, 1:14-28.

11   It points out that users must have some way of accessing and modifying the files associated with

12   the database, but claims that prior art methods of doing so had various disadvantages.  *See id.*

13   2:12-3:18.  Instead, it proposes a system where each user has a software program that pulls down

14   files from the database.  *See id.* at 3:32-33.  Users can then access the files as if they were local

15   files, while the program (using, for example, functionality provided by the operating system)

16   monitors the files for changes made by users and synchronizes the local files with the database if it

17   detects any.  *See id.* 3:34-49.

18   **II.  LEGAL STANDARD**

19        Generally, claim terms should be given their ordinary and customary meaning to a person

20   of ordinary skill in the art at the time of the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303,

21   1312-13 (Fed. Cir. 2005) (en banc).   There are only two circumstances where a claim is not

22   entitled to its plain and ordinary meaning: when a patentee sets out a definition and acts as his or

23   her own lexicographer, or when the patentee disavows the full scope of the claim term either in the

24   specification or during prosecution.  *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362,

25   1365 (Fed. Cir. 2012).

26        A claim construction must not import limitations from the specification into the claims.

27   *Phillips*, 415 F.3d at 1323.  On the other hand, the distinction between "construing the claims in

28   light of the specification and improperly importing a limitation from the specification into the

United States District Court
Northern District of California

2

United States District Court
Northern District of California

claims" is a fine one.  *See Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (limiting syringe body to one-piece structure because "while the claims leave open the possibility that the recited 'body' may encompass a syringe body composed of more than one piece, the specifications tell us otherwise").  This is because the patent's specification is "the single best guide to the meaning of a disputed term."  *Phillips*, 415 F.3d at 1315 ("[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive . . . .'"); *see also Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) ("[C]laims must be construed so as to be consistent with the specification . . . .").

District courts may revisit claim construction as the case progresses.  *See Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002).  To the extent that disputes later develop over the scope of the claims -- or the constructions set forth in this order -- it may become necessary for the Court to revise its constructions, or to construe additional terms. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.").  This is not an open-ended invitation for the parties to ask the Court to revise the constructions.  Any revision requested by a party must strictly conform to the rules governing motions for reconsideration in this district.  *See* Civil L.R. 7-9.  But the Court will on its own revise the constructions here if further development of the evidence warrants that.

**III.DISCUSSION**

The terms discussed in subsections A-F below are drawn from the Groupware patents, while those discussed in subsections G-I are from the File Synchronization patents.

**A.   "dedicated network site" and "collaborative workspace" terms**

| Term | Asserted Claims | Open Text's Construction | Box's Construction |
|---|---|---|---|
| "dedicated site"/"dedicated network site" | '177 patent: 5 (1), 7 (6, 1), 11 (10, 2) '962 patent: 6 (1) '055 patent: | No construction necessary | "virtual private office suite corresponding to a primary user and at least one secondary user including all application software required to |

| | 22 (19) | | permit group activity between a primary user and at least one secondary user" |
|---|---|---|---|
| "collaborative workspace"/"collaborative online space" | '177 patent: 5 (1), 7 (6, 1) '962 patent: 6 (1) '055 patent: 22 (19) '258 patent: 27 (19) '018 patent: 5 (1) | No construction necessary | *See above.* |
| "dedicated network site defining said collaborative workspace"/"dedicated site defining said collaborative workspace" | '962 patent: 6 (1) '055 patent: 22 (19) | "unique network site defining said collaborative workspace" | Construed in accordance with the constructions above |

The crux of the parties' dispute over this group of terms is whether the construction should (1) define the terms to mean a "virtual private office suite"; and (2) specify that the "dedicated site" and "collaborative workspace" (and variations thereof) include all application software required to permit group activity.[1] Box's answer to both questions is "yes"; Open Text's is "no."

**1. Should the claim term be defined to mean "virtual private office suite"?**

Box's argument that the dedicated site should be defined to mean "virtual private office suite" is premised on the fact that the patent specifications say that "[t]he dedicated site created in response to the initiate request can be thought of as a private office suite" -- and then continue to refer to the "private office suite" subsequently. *See* '177 patent, 4:19-33; 4:43. According to Box, this language "provide[s] clear evidence of the intent to equate 'dedicated site' with 'a private office suite.'" Box's Responsive Claim Construction Brief at 5, Case No. 3:13-cv-04843, Dkt. No. 202. The word "virtual" -- which, as Box acknowledges, does not appear in the claims or

---

[1] Open Text proposed construing "dedicated" to mean "unique" only as a fallback position; its primary argument is that the term needs no construction. Open Text's Opening Claim Construction Brief at 8, Case No. 3:13-cv-04843, Dkt. No. 190. Because Open Text does not point to any evidence defining "dedicated" to mean "unique," the Court will not adopt that construction.

United States District Court
Northern District of California

specification -- is tacked on to ensure that the jury will not think the "private office suite" refers to a physical office.

The problem with Box's proposed construction is that the language it points to is obviously not a definition. The words "can be thought of" are typically used to introduce an analogy or metaphor, rather than to equate two concepts. Consider the following example: "The brain can be thought of as an extremely complex computer. The computer takes input in the form of sense data and produces output in the form of thoughts, actions, and utterances. But the computer also suffers from some bugs, like the gambler's fallacy." It is clear that defining "brain" to mean "an extremely complex organic computer" on the basis of this passage would mistake its meaning entirely. In the same way, the patent specifications may compare the dedicated site to a private office suite, but they do not define one in terms of the other.

### 2.  Must the network site include all application software?

Box's claim that the dedicated network site or collaborative workspace -- which it contends are synonymous -- must include "all application software required to permit group activity between a primary user and at least one secondary user" presents a closer question. It is true, as Box points out, that the patent claims one of the shortcomings of prior art systems is that they "require[d] each user to have specialized software installed on their computer." '177 patent, 1:43-45. In addition, the specification goes on to explain that "[a]ll the specialized software which provides the functional requirements to give primary user **30** and secondary user **40** these abilities is provided by server **10** via dedicated site **25**," *id.* 3:55-58, and that "[t]he private office suite comes complete with all the application software required to permit group activity within the office," *id.* at 4:25-27. Arguably, then, the patent's alleged advance over the prior art is providing all the application software via the dedicated network site, which can be accessed using a standard web browser, *see id.* 3:39-49, instead of requiring each user to have specialized software applications. *See MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1256 (Fed. Cir. 2012) (holding that "in construing a claim there are two limiting factors -- what was invented, and what exactly was claimed," with the former determined by looking to "the entire patent, with particular attention to the specification").

United States District Court
Northern District of California

United States District Court
Northern District of California

Closer examination reveals, however, that the patent claims are not limited to embodiments where all the application software is available on the dedicated network site. Although prior art technologies are criticized in the patent for requiring specialized software, the patent specification is careful to note that "[i]t is an object of the present invention to obviate and mitigate *at least one* of the disadvantages of the prior art" -- leaving open the possibility that the invention (or at least certain embodiments of it) does not overcome this particular disadvantage. '177 patent at 1:46-47 (emphasis added); *see also Retractable Techs.*, 653 F.3d at 1306 ("In general, statements about the difficulties and failures in the prior art, without more, do not act to disclaim claim scope.").  The other portions of the specification that Box points to are found in a section entitled "Detailed Description of the Preferred Embodiment," *id.* at 3:19-20, rather than in the summary of the invention.  It would be a mistake to import limitations from an exemplary embodiment -- even if it is preferred -- into the claims.  *See, e.g.*, *Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1341 (Fed. Cir. 2014) ("it is improper to read limitations from a preferred embodiment described in the specification -- even if it is the only embodiment -- into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."); *PSN Illinois, LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1165-66 (Fed. Cir. 2008) (reversing district court for "holding that the description of a preferred embodiment had more bite than the description in the summary of the invention").  True, the Federal Circuit held in *Edwards Lifesciences LLC v. Cook Inc.* that an express definition should not be ignored just because it appears in the context of a preferred embodiment.  582 F.3d 1322, 1333-34 (Fed. Cir. 2009).  But we are not dealing here with an instance in which the inventor is acting as his or her own lexicographer, as *Edwards Lifesciences* did.  *See id.* (noting express definition of "malleable" to mean "not resilient to any substantial extent").

Consequently, the Court finds that Box has not shown any reason to depart from the plain and ordinary meanings of these claim terms.  Moreover, the Court finds that their meaning would be easily understood by a lay jury, and that there is therefore no need to construe the terms unless it later becomes apparent that the parties disagree about the scope of these terms.  *O2 Micro*, 521 F.3d at 1362 (holding that "district courts are not (and should not be) required to construe every

limitation present in a patent's asserted claims" unless "the parties present a fundamental dispute

regarding the scope of a claim term").

### B.   "access level" and "predefined working relationship" terms

| Term | Asserted Claims | Open Text's Construction | Box's Construction |
|---|---|---|---|
| "levels of access"/"access level" | '055 patent: 22 (19) '258 patent: 27 (19) '018 patent: 5 (1) | "predefined set of access rights that a primary user can assign to one or more secondary users" | "different levels of information which can be accessed within the virtual private office suite by each secondary user" |
| "access control choices" | '055 patent: 22 (19) | No construction necessary -- defined in claims | "options to specify different levels of information which can be accessed within the virtual private office suite by each secondary user" |
| "[pre]defined working relationship" | '177 patent: 5 (1), 7 (1), 11 (2) | No construction necessary | "specification of different levels of information which can be accessed within the virtual private office suite by the primary user and each secondary user" |

As a preliminary matter, Box's constructions each include the phrase "virtual private office

suite."  For the reasons explained by the Court with respect to the "dedicated network site" terms,

this phrase has no place in the proper construction of the asserted claims.

The first dispute over this term concerns whether the access levels or levels of access must

be assigned by a primary user.  Open Text claims they must, pointing to claim 10 (which is no

longer asserted) and claim 19 of the '055 patent, which specify that the "access control choices

[are] selectable by said primary user and defin[e] the one or more levels of access afforded said

secondary users of said collaborative workspace."  But the fact that these claims elsewhere specify

that the primary user selects the level of access means that there is no need to incorporate that

limitation into the construction of the "level of access" term itself.  Incorporating this limitation

into the construction of "access level" would be especially inappropriate given the fact that it is

unclear whether claim 1 of the '018 patent includes this limitation:  it requires that the secondary

users be nominated by a primary user, but does not suggest that the secondary users' access level

7

is determined by the primary user.  *See* '018 patent, claim 1 ("store information received from user interaction with the workgroup creation template, wherein the information represents one or more groups of secondary users nominated by a primary user for a particular collaborative workspace including a name for a workgroup and a corresponding access level to the collaborative workspace for each group and secondary user").  The requirement that the "access level" be assigned by the primary user will not be included in the claim construction.  Neither will the term "secondary user," as the relationship between access levels and the secondary users is clear from the remainder of the claim language.

The second dispute is whether the "access levels" refer to levels of information (as Box claims) or to sets of access rights (as Open Text claims).  Determining the answer is made more difficult by the fact that the specification does not refer to either "access levels" or "levels of access."  In fact, the only portion of the specification that is even arguably related to this claimed functionality is a single paragraph in the "Detailed Description of the Preferred Embodiment" discussing security features of the invention.  *See* '177 patent, 5:55-6:7.  Box bases its construction on a single sentence from that paragraph.  *Id.* 5:64-6:2.  ("Providing each secondary user with a unique password also permits primary user to set up different levels of information which can be accessed within the workgroup by each secondary user, i.e., the workgroup can be created on a 'need to know' basis.")  But, as is apparent from the full sentence, this portion of the specification is simply describing one possible benefit that can be achieved by giving each secondary user a unique password, rather than discussing the meaning of "access levels" in general.

A better guide to the meaning of "access level" is provided by the claim language itself -- specifically claim 19 of the '258 patent.  That claim recites "providing a plurality of user applications selected to be included in the collaborative workspace with which the users can interact via a web browser based on their access level."  '258 patent, claim 19.  That language indicates that the access level may determine whether and to what extent a user can interact with an application, rather than simply limit access to information.  This suggests that the meaning of "access level" is closer to a "set of access rights" than "levels of information."  True, claims 1 and

2 of the '177 patent specify that "stored *information* is accessible to the users in accordance with the [pre]defined[2] working relationship." '177 patent, claims 1 and 2 (emphasis added). But, as explained below, it is not clear that "[pre]defined working relationship" is synonymous with "access levels," so there is no reason to refer to "information" in the construction of "access levels."

The remaining disputes regarding this term group are easily disposed of. First, Open Text wishes to specify that the "access levels" must be "predefined," based on the fact that claim 10 of the '055 patent (like claim 19, which remains in the case) specifies that "access control choices" are stored in memory and "define[e] the … levels of access." This particular claim may include limitations that require the access levels to be predefined, but that is no reason to incorporate that requirement into the construction of "access levels" across all the claim elements. Second, Box suggests construing "access control choices" in accordance with its construction of "access levels." But the one claim at issue that includes the term "access control choices" is easily understandable given the construction of "access level." *See* '055 patent, claim 19 ("access control choices selectable by said primary user and defining the one or more levels of access"). Third, Box seeks to construe the terms "defined working relationship" and "predefined working relationship" in the claims of the '177 patent consistent with its constructions of "access control choices." There is no indication in the claims or specification that a relationship between users means the same thing as "access levels," aside from the fact that both may determine what a user is able to access. The term "working relationship" -- and the role it plays in the patent claim -- appears to be easily understandable by a lay jury, and the Court finds that it need not be construed.

Accordingly, the Court construes "access level" and "level of access" to mean "set of access rights." The Court does not construe at this time "access control choices," "predefined working relationship," or "working relationship."

### C. "primary user"

| Asserted Claims | Open Text's Construction | Box's Construction |
| --- | --- | --- |

United States District Court
Northern District of California

---

[2] Claim 1 uses the term "predefined"; claim 2 uses "defined."

| '177 patent: 5 (1), 7 (6, 1), 11 (10, 2) '962 patent: 6 (1), 15 '055 patent: 22 (19) '018 patent: 5 (1) | "user other than a system administrator" | "creator of a virtual private office suite" |
|---|---|---|

Open Text argues that a primary user cannot be a system administrator, despite conceding that this limitation may not be apparent from the claim language itself.  Open Text's Opening Claim Construction Brief at 12, Case No. 3:13-cv-04843, Dkt. No. 190.  The two portions of the specification Open Text cites in support of introducing this limitation into the claims -- both from the "Detailed Description of the Preferred Embodiments" -- do not make its case.  Open Text first cites a portion of the specification that states that "neither primary user **30** nor secondary user **40** need specialist computer knowledge to make use of the system.  There is no requirement for the primary user to have an in-house technology specialist."  '177 patent, 4:35-38.  But this language simply states that there is no requirement that the primary user be knowledgeable; it does not say that the primary user cannot have specialist computer knowledge or be the system administrator.  Open Text then cites more language describing this embodiment:  "a number of general sites … are automatically accessible to [the] primary user," while others "can only be accessed by a system administrator."  *Id.* 3:61-65.  Again, nothing in this language prevents a primary user from being a system administrator, and thereby being able to access both the general sites and the additional sites that can only be accessed by the system administrator.

Box attempts again to include the language "virtual private office suite," which the Court has previously rejected.  Box also seeks to define the primary user in terms of its role in creating the network site -- and Open Text agreed at the hearing that the primary user is the creator of the network site.  But other limitations of each of the asserted claims explain the primary user's involvement in creating the network site; incorporating those limitations into the very definition of "primary user" would render these additional limitations redundant.  The term "primary user"

simply denotes a specific user of the system, whose role is adequately described by the asserted claims.  Consequently, the Court declines to construe "primary user" at this time.

### D.  "workgroup creation template"/"collaborative workspace template"[3]

| Asserted Claims | Open Text's Construction | Box's Construction |
|---|---|---|
| '018 patent: 5 (4, 1) | "electronic form that contains fields for primary user input and allows a primary user to create a collaborative workspace" | "user screen which permits the primary user to define parameters" |

The term "workgroup creation template" -- which the parties agree is synonymous with "collaborative workspace template" -- is briefly discussed in "Detailed Description of the Preferred Embodiment," which states that in that embodiment, the primary user "is provided with a workgroup creation template (**170**) which permits the primary user to define parameters of the workgroup, such as the name of the workgroup and the site to be created, the scope of the project being undertaken, the number of team members, etc." *See* '018 patent, 5:1-14, 7:54-55.  Both parties agree that the term needs construction.

Open Text proposes defining the "workgroup creation template" as an "electronic form," which it clarifies in its briefing means a type of web page.  Open Text's Opening Claim Construction Brief at 13:12-13, 20-21.  Open Text bases this limitation on claim 11 of the '055 patent -- a no-longer-asserted dependent claim -- which recites: "The method of claim 10 wherein the configuring further comprises configuring the computer to provide a workgroup creation template via a web page displayed to the primary user."  But claim 11 triggers the opposite inference to the one Open Text wishes to draw:  by adding a limitation that requires the workgroup creation template be provided via a web page, it implies that the workgroup creation template is not necessarily provided via a web page.  *See Nazomi Comm'ns, Inc. v. Arm Holdings, PLC.*, 403 F.3d 1364, 1370 (Fed. Cir. 2005) ("[C]laim differentiation 'normally means that limitations stated in dependent claims are not to be read into the independent claim from which they depend.'").

---

[3] The parties proposed "collaboration workspace template" for construction, but the asserted claims contain only the term "collaborative workspace template."  The Court assumes the parties meant the latter.

United States District Court
Northern District of California

Box characterizes the template in terms of a "user screen." Open Text claims that such a construction would be misleading, because (it argues) in the context of the patents, "screen" is used to refer to a physical device. But the portion of the specification it points to shows the opposite. The referenced paragraph from the specification explains that Figs. 3a-3e of the patent show "display screens" of the system, while cautioning that "the style of screen display is not limited to this personal organizer style of display." '018 patent, 7:19-28. Other portions of the specification similarly refer to Figs. 3a-3e as "reproductions of user screens from a communication network created in accordance with the present invention." *Id.* 3:20-22. The cited figures clearly show the contents of the display provided by the system to the user, rather than a physical device. *See id.* Figs. 3a-3e. Thus, the paragraph support's Box's proposed construction, which defines the template in terms of a general "screen" rather than a specific "form." Moreover, as noted earlier, and as reflected in Box's construction, the specifications' sole characterization of the "workgroup creation template" provides that it is used by the primary user "to define parameters of the workgroup." *See id.* 5:3-4. The Court will therefore adopt Box's proposed construction, with one minor modification to reflect the fact that -- as Box agreed at the claim construction hearing -- the "workgroup creation template" is used to create the workgroup or collaborative workspace: "workgroup creation template" and "collaborative workspace template" are construed to mean "user screen which permits the primary user to create a collaborative workspace and define its parameters."

### E.   "receiving an initiate instruction from a primary user"

| Asserted Claims | Open Text's Construction | Box's Construction |
|---|---|---|
| '962 patent: 6 (1), 15 | No construction necessary | "receiving a user instruction to create a dedicated site sent by a primary user via a web browser on a client computer" |

The parties' dispute regarding this claim term is simple:  must the instruction sent by the primary user to create the dedicated site be sent from a web browser?  (Box states in its briefing that the additional language specifying that the web browser be "on a client computer" is non-substantive and that it has no objection if that language is removed.)

United States District Court
Northern District of California

United States District Court
Northern District of California

The parties' dispute over this claim term echoes the dispute about the "network site" terms. Like that dispute, the construction of this claim term presents a close question. Box points to a number of places where the specification indicates that an advantage of the inventive system is that it does not require the use of specialized software because it permits using the system with a web browser. *See, e.g.*, '962 patent, 3:50-52 ("there is no requirement that either primary user **30** or secondary user **40** have access to specialized software applications in order to utilize the system of the present invention"); 4:47-52 ("The system of the present invention is further understood … with reference to FIG. **2**. In order to create a private office suite, a primary user uses his/her web browser **110** to contact the intranet connected server.") But the fact that the invention does not require specialized software (which apparently means software beyond a generic web browser) does not mean that systems that do use such software are outside the scope of the invention. Other portions of the specification Box points to are explicitly characterized as exemplary. For example, Fig. 2 of the '962 patent does show a flowchart with the first step being "Use web-browser to contact server." But the patent specification explains that the figures show "[a]n embodiment of the present invention … by way of example only." '962 patent, 3:7-10.

Box's strongest argument is that some of the cited portions of the specification characterize "the present invention." The Federal Circuit has held that "when the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment." *Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1379 (Fed. Cir. 2005). But this alone is not dispositive where, as here, the invention is described elsewhere in the intrinsic record -- like the "Summary of the Present Invention" -- with no "web browser" limitations. *See Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136-37 (Fed. Cir. 2011) (collecting cases and explaining that "we have found that use of the phrase 'present invention' or 'this invention' is not always so limiting, such as where the references to a certain limitation as being the 'invention' are not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent").

The cases Box cites in support of its claim that the specification limits the claims to creating the dedicated site using a web browser are distinguishable. *Wang Labs, Inc. v. America*

*Online, Inc.*, held that a claim that encompassed both character-based and non-character-based systems could be limited to the former, because the latter was not enabled by the patent's written description.  197 F.3d 1377, 1382-83 (Fed. Cir. 1999).  But the Federal Circuit has pointed out that the inventors in *Wang* disclaimed a claim construction that would include non-character-based display modules during prosecution, and has held that the case does not stand for the proposition that "if a patent specification describes only a particular embodiment, the claims must be limited to that subject matter."  *Liebel Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 907 (Fed. Cir. 2004); *see also Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1326-27 (Fed. Cir. 2002).  Here, Box's argument is based on the argument rejected by the Federal Circuit in *Liebel Flarsheim* -- that the patent specification only describes embodiments that use a web browser -- rather than the argument endorsed by the Federal Circuit in *Wang* -- that the use of specialized software is not enabled.  Indeed, Box states that the use of specialized software *is* one of the two ways to create the dedicated site disclosed by the specification.  Box's Responsive Claim Construction Brief at 14, Case No. 3:13-cv-04843, Dkt. No. 202.

  *Edwards Lifesciences*, as explained above in Section III.A.2, dealt with an express definition of a term that was found in the context of the preferred embodiment, and, like *Wang*, involved statements by the patentee in prosecution disclaiming a broader construction of the claims.  *See* 582 F.3d at 1333-34.  Neither circumstance is present here.  *Inpro II Licensing S.A.R.L. v. T-Mobile USA, Inc.* did hold that a claim was limited to direct parallel bus interfaces based on statements in the specification disparaging the use of alternatives, like the statements criticizing prior art systems requiring specialized software here -- but the Federal Circuit also based its conclusion on statements in the "Summary of the Invention," as well as statements by the inventor during prosecution to avoid prior art, neither of which are present here.  450 F.3d 1350, 1353-57 (Fed. Cir. 2006).  Finally, in *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, the specification limited the claims in part through characterizing "all embodiments of the present invention."  242 F.3d 1337, 1341-45 (Fed. Cir. 2001).  No such language appears here.

  The Court will not include a "web browser" limitation in the construction of this claim term, and concludes that the term is self-explanatory and needs no construction at present.

United States District Court
Northern District of California

14

**F.   "executable … to run in user space"**

| Term | Asserted Claims | Open Text's Construction | Box's Construction |
|---|---|---|---|
| "a software program, **executable to run in user space** on a client computer" | '515 patent: 10 (1), 27 | "operable to run in the portion of computer memory allocated to user applications" | "computer program executes in computer memory area reserved for user applications" |
| "a cache manager program, stored by the client memory **executable by the client processor to run in user space**" | '055 patent: 15 (14) | *See above.* | *See above.* |

United States District Court
Northern District of California

To begin with, the parties have submitted constructions for slightly different terms:  Open Text has construed only the text bolded in the table above, while Box has construed the entire quoted phrase.  To avoid confusion, the Court will construe just the bolded portion in light of the fact that the parties appear to have no disputes over the meaning of either "a software program" or "a cache manager program."  Moreover, at the claim construction hearing, Box agreed to change its proposed construction to use the adjective "executable" in place of "executes," to match the claim term itself.

The parties additionally disagree about whether user space is memory "allocated to" user applications or "reserved for" user applications.  Open Text cites a book -- published several years after the priority dates of the '515 and '055 patents -- that defines "user space" as "[a] mode of system operation that is used for application processing" and "kernel space" as "[a] mode of system operation that is typically reserved for system services and is not used for application processing."  Marc Farley, *Storage Networking Fundamentals: An Introduction to Storage Devices, Subsystems, Applications, Management, and File Systems* 421, 428 (2005), Case No. 3:13-cv-04843, Dkt. No 190, Ex. O.  But this excerpt does not mention memory, and does not clearly support either proposed construction.

Rather than look to this extrinsic evidence, the Court will choose a construction more in keeping with the File Synchronization patents' written description.  While the specification does not provide a detailed explanation -- explaining that that "[t]he concept of user-space is well-known to those of ordinary skill in the art,"  '515 patent, 5:5-7 -- it does distinguish programs running in user space from "operating system level programs," *id.* 8:22-25, distinguishes "user

15

space" from "operating space," *id.* 11:44-48, and refers to "user space" as the "file system level,"

*see id*. Fig. 1 of the '515 patent additionally shows the cache manager -- which runs in user space

-- as being in the computer's memory.  Furthermore, the patents explain that the fact that the cache

manager runs in user space means that it is "much less likely to destabilize client computer **22**, as

would an operating system level program."  *Id.*  8:23-25.  That benefit could only be achieved if

user level programs were unable to access memory associated with operating system level

programs; in other words, the space associated with operating system level programs must be

reserved for those programs. In light of this disclosure, the Court construes "executable to run in

user space" and "executable by the client processor to run in user space" as "executable to run in

the portion of memory that is not reserved for operating system level programs."  While the term

"operating system level programs" may require some explanation to be understandable by a jury,

it is more likely to be understood than "user space."

### G.  "cache" and "local cache"

| Term | Asserted Claims | Open Text's Construction | Box's Construction |
|------|-----------------|--------------------------|---------------------|
| "cache" | '515 patent: 15 (14) '665 patent: 4 (1) | "cache on a client computer" | "storage area on a computer for storing a file" |
| "local cache" | '515 patent: 10 (1), 27 '152 patent: 2 (1), 11 (8), 15 | *See above.* | "local storage area on a user's computer for storing a file" |
| "cached file" | '515 patent: 10 (1), 15 (14), 27 '665 patent: 4 (1) '152 patent: 2 (1), 11 (8), 15 | No construction necessary | "file stored in a storage area on a user's computer" |

The main dispute between the parties is whether "cache" should be defined to mean

"storage area."  As Box's construction for "cached file" and Open Text's construction for "cache"

indicate, the parties agree that the cache is on the client, or user computer, a fact clear from the

specification.  *See, e.g.*, '515 patent, Fig. 1,

United States District Court
Northern District of California

1   Open Text expressed two objections to construing "cache" to mean "storage area." The

2   first is that construing the "cache" to mean "storage area" would effectively eliminate it from the

3   claims. Open Text suggests that the only way to account for the claim drafter's use of "cache"

4   rather than "storage area" is to assume that a "cache" has characteristics different from a generic

5   storage area.

6   The Court disagrees. The File Synchronization patents use "cache" to refer to a specific

7   portion of the client computer's memory. *See* '515 patent, Fig. 1. That does not mean that the

8   cache has any special characteristics above and beyond a generic storage area. Rather, the patent

9   simply uses "cache" to make clear that it is referring to a certain portion of the memory -- that

10  denoted by the number 40 in Fig. 1 -- rather than other portions. Of course, construing "cache" to

11  mean "storage area" does not mean that every storage area is a cache, any more than (for example)

12  the fact that the Federal Circuit, in *Z4 Techs., Inc. v. Microsoft Corp.*, construed "user" to mean "a

13  person or a person using a computer" means that any "person or a person using a computer" is a

14  user in the context of those claims. *See* 507 F.3d 1340, 1347-49 (Fed. Cir. 2007).

15  Open Text's second objection was that the term "cache" is limited to a specific type of

16  memory used for transient storage. When asked, however, Open Text was unable to point to any

17  evidence that a cache is so limited.

18  The Court is unable to find any such evidence either. The intrinsic record contains no

19  suggestion that a cache must necessarily be used for transient storage. On the contrary, one of the

20  references cited on the face of the patents explains simply that "[a] cache is a storage area." U.S.

21  Patent No. 6,026,413 at 6:60. As a cited reference, this definition constitutes intrinsic evidence.

22  *See V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) (collecting

23  cases).

24  Extrinsic evidence also supports the lack of any "transience" limitation. *See* Alan

25  Freedman, *The Computer Glossary* 61 (6th ed. 1993) (defining "cache" as "[a] reserved section of

26  memory used to improve performance."); IBM Corp., *IBM Dictionary of Computing* 80 (10th ed.

27  1993) (defining "cache" to mean, among other things, "[a] buffer storage that contains frequently

28  accessed instructions and data; it is used to reduce access time."). Although the parties did not cite

these dictionaries -- or indeed, any evidence, intrinsic or extrinsic, as to the meaning of "cache" -- the Court can and does consult these technical dictionaries to determine the term's ordinary meaning as long as they do not contradict the intrinsic evidence.  *See Williamson v. Citrix Online, LLC*, 770 F.3d 1371, 1379 (Fed. Cir. 2014) (consulting technical dictionaries to determine the meaning of "module" despite the fact that the parties had not cited any dictionaries).  Here, the extrinsic and intrinsic evidence are consistent.

Although these definitions contain further detail on what the cache may contain or be used for, they need not be incorporated into the construction of the claim term because the claims and specifications themselves provide that information.  The Court therefore construes "cache" to mean simply "storage area on a client computer."  Given this construction, the additional terms "local cache" and "cached file" need no further explanation to be understandable by a lay jury, and the Court does not construe them at this time.

**H.  "database asset"**

| Asserted Claims | Open Text's Construction | Box's Construction |
|---|---|---|
| '515 patent: 10, 27<br>'665 patent: 4 (1)<br>'152 patent: 2 (1), 11 (8), 15 | No construction necessary | "computer file stored on a computer server" |

At the hearing, Box agreed that the portion of its construction requiring the computer file to be "stored on a computer server" was unnecessary:  certain claims specify that the computer file is on a server while others do not.  Hearing Tr. 62:21-63:3, Dkt. No. 292.  The Court therefore omits this language from the construction of the term.

The Court will, however, construe "database asset" to mean "computer file stored in a database," in light of the fact that the specification appears to explicitly define it as an "electronic file" stored in a database -- which, as the parties do not appear to dispute, refers to what is more usually known as a computer file.  '515 patent, 1:14-15 ("Centralized databases are becoming increasingly popular for storing electronic files or 'database assets.'").

United States District Court<br>Northern District of California

18

### I.  "file type"

| Asserted Claims | Open Text's Construction | Box's Construction |
|---|---|---|
| '515 patent: 10 (1), 15 (4), 27<br>'665 patent: 4 (1)<br>'152 patent: 2 (1), 11 (8), 15 | No construction necessary | "description of a type of computer file, i.e. text document, image, spreadsheet, etc." |

The Court expressed its view at the hearing that this claim term would be easily understood by a jury, and Box confirmed that its construction was solely intended to aid the jury and was not based on any substantive objection to leaving the term unconstrued.  The Court therefore declines to construe "file type" at this time.

### IV. CONCLUSION

The Court repeats its constructions for the convenience of the parties:

| Term | Asserted Claims | Construction |
|---|---|---|
| "dedicated site"/"dedicated network site" | '177 patent: 5 (1), 7 (6, 1), 11 (10, 2)<br>'962 patent: 6 (1)<br>'055 patent: 22 (19) | No construction necessary |
| "collaborative workspace"/"collaborative online space" | '177 patent: 5 (1), 7 (6, 1)<br>'962 patent: 6 (1)<br>'055 patent: 22 (19)<br>'258 patent: 27 (19)<br>'018 patent: 5 (1) | No construction necessary |
| "dedicated network site defining said collaborative workspace"/"dedicated site defining said collaborative workspace" | '962 patent: 6 (1)<br>'055 patent: 22 (19) | No construction necessary |
| "levels of access"/"access level" | '055 patent: 22 (19) | "sets of access rights"/"set of access rights" |

United States District Court
Northern District of California

| | | |
|---|---|---|
| | '258 patent: 27 (19) '018 patent: 5 (1) | |
| "access control choices" | '055 patent: 22 (19) | No construction necessary |
| "[pre]defined working relationship" | '177 patent: 5 (1), 7 (1), 11 (2) | No construction necessary |
| "primary user" | '177 patent: 5 (1), 7 (6, 1), 11 (10, 2) '962 patent: 6 (1), 15 '055 patent: 22 (19) '018 patent: 5 (1) | No construction necessary |
| "workgroup creation template" | '018 patent: 5 (4, 1) | "user screen which permits the primary user to create a collaborative workspace and define its parameters" |
| "receiving an initiate instruction from a primary user" | '962 patent: 6 (1), 15 | No construction necessary |
| "executable to run in user space" | '515 patent: 10 (1), 27 | "executable to run in the portion of memory that is not reserved for operating system level programs" |
| "executable by the client processor to run in user space" | '055 patent: 15 (14) | *See above.* |
| "cache" | '515 patent: 15 (14) '665 patent: 4 (1) | "storage area on a client computer" |
| "local cache" | '515 patent: 10 (1), 27 '152 patent: 2 (1), 11 (8), 15 | No construction necessary |
| "cached file" | '515 patent: 10 (1), 15 (14), 27 '665 patent: 4 (1) '152 patent: 2 (1), 11 (8), 15 | No construction necessary |
| "database asset" | '515 patent: 10, 27 '665 patent: 4 (1) | "computer file stored in a database" |

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | | |
|---|---|---|
| | '152 patent: 2 (1), 11 (8), 15 | |
| "file type" | '515 patent: 10 (1), 15 (4), 27 '665 patent: 4 (1) '152 patent: 2 (1), 11 (8), 15 | No construction necessary |

**IT IS SO ORDERED**.

Dated:  December 1, 2014

_____
JAMES DONATO
United States District Judge