John P. Bovich (SBN 150688)
Email:    jbovich@reedsmith.com
Scott D. Baker (SBN 84923)
Email:    sbaker@reedsmith.com
Jonah D. Mitchell (SBN 203511)
Email:    jmitchell@reedsmith.com
Adaline J. Hilgard (SBN 173213)
Email:    ahilgard@reedsmith.com
REED SMITH LLP
101 Second Street
Suite 1800
San Francisco, CA  94105-3659
Telephone: +1 415 543 8700
Facsimile: +1 415 391 8269

Attorneys for Defendants
BOX, INC. and CARAHSOFT TECHNOLOGY
CORPORATION

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| OPEN TEXT, S.A.,<br><br>              Plaintiff,<br><br>   vs.<br><br>BOX, INC. and CARAHSOFT TECHNOLOGY CORPORATION,<br><br>          Defendants. | No.: C 13-04910 JD<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT**<br><br>Date:  January 14, 2015<br>Time:  9:30 am<br>Place:  Courtroom 11<br><br>Compl. Filed:  June 5, 2013<br>FAC Filed:  December 23, 2013<br>Trial Date:  February 2, 2014<br><br>Hon. James Donato |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that in the above-entitled courtroom as soon as the matter may be heard on January 14, 2015 at 9:30 am or another time set by the Court, Defendants Box, Inc. ("Box") and Carahsoft Technology Corporation ("Carahsoft") (collectively, "Defendants"), by and through their counsel, will and hereby do move as follows:

A. Summary judgment of invalidity as to each of the asserted claims of the patents-in-suit under 35 U.S.C. § 102 and/or 103, or, in the alternative,

B. Partial summary judgment of:

1. No willful infringement of the patents-in-suit;

2. Invalidity of claim 22 of the '055 patent and claim 27 of the '258 patent under 35 U.S.C. § 101;

3. Invalidity of claim 5 of the '018 patent for obviousness-type double patenting; and

4. No pre-suit damages as to the Groupware Patents.

This Motion is made pursuant to Federal Rule of Civil Procedure 56(a), and is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declarations of Kirin K. Gill, Peter McGoff, Srinivasan Jagannathan, and Colin White and any Exhibits thereto, the Proposed Order submitted herewith, all pleadings and paper on file in this action, and such further evidence, argument, demonstrations, demonstratives, and exhibits that may be submitted to the Court at or before the hearing.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## **TABLE OF CONTENTS**

                                                                                                        Page

I.   INTRODUCTION ........................................................................................................ 1

II.  OVERVIEW OF ASSERTED PATENTS ................................................................... 2

III. OVERVIEW OF THE PRIOR ART............................................................................ 2

     A.   Background Of Invalidating Groupware Prior Art:  BSCW And WebShare ............. 2

     B.   Background Of Invalidating File Synch Patent Prior Art: Coda And
          WS_FTP................................................................................................................ 5

IV.  LEGAL STANDARDS FOR PRIOR ART INVALIDITY......................................... 7

V.   THE FIRST AND SECOND GROUNDS OF INVALIDITY:  BSCW AND
     WEBSHARE EACH ANTICIPATE THE GROUPWARE PATENTS ................................. 8

     A.   BSCW And WebShare Disclose Each Element Of Each Asserted Claim................. 8

     B.   BSCW And WebShare Also Disclose The Remaining Elements Of The
          Asserted  Claims ................................................................................................ 16

     C.   Open Text's Positions Do Not Refute Anticipation By The Prior Art And,
          If  Adopted, Would Compel Summary Judgment of Non-infringement ................. 17

VI.  THE THIRD GROUND OF INVALIDITY:  BSCW AND WEBSHARE
     RENDER THE GROUPWARE PATENTS OBVIOUS ........................................ 21

VII. THE FOURTH AND FIFTH GROUNDS OF INVALIDITY:  CODA AND
     WS_FTP EACH ANTICIPATE OR RENDER OBVIOUS THE FILE
     SYNCHRONIZATION PATENTS.................................................................... 22

VIII. PARTIAL SUMMARY JUDGMENT ON CERTAIN CLAIMS AND ISSUES,
     AT A MINIMUM, IS REQUIRED TO STREAMLINE THE LITIGATION  34

     A.   No Willful Infringement ..................................................................................... 34

     B.   The "Computer Readable Medium" Claims Are Invalid........................................ 36

     C.   Claim 5 Of The '018 Patent Is Invalid For Obviousness-Type Double
          Patenting .......................................................................................................... 37

     D.   No Pre-Suit Damages As To The Groupware Patents ........................................ 38

IX.  CONCLUSION.......................................................................................................... 40

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3
*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,
   24 F.3d 178 (Fed. Cir. 1994)..................................................................38
4
*Astrazenca AB v. Apotex Corp.*,
   No. 01-cv-09351, 2010 WL 2541180..........................................................34
5
*Asus Computer Int'l v. Round Rock Research, LLC*,
   2014 U.S. Dist. LEXIS 50728 (N.D. Cal. Apr. 11, 2014) ..................................31
6
*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
   682 F.3d 1003 (Fed. Cir. 2012)...............................................................34
7
*Boehringer Ingelheim Int'l GmbH v. Barr Labs., Inc.*,
   592 F.3d 1340 (Fed. Cir. 2010)...............................................................37
8
*Clancy Sys. Int't, Inc. v. Symbol Tech., Inc.*,
   953 F. Supp. 1170 (D. Colo. 1997)............................................................38
9
*Crown Packaging Tech. v. Ball Metal*,
   *Bev.*, 635 F. 3d 1373 (Fed. Cir. 2011)........................................................8
10
*Devices for Med., Inc. v. Boehl*,
   822 F.2d 1062 (Fed. Cir. 1987)...............................................................38
11
*Eli Lilly & Co. v. Barr Labs., Inc.*,
   251 F.3d 955 (Fed. Cir. 2001)................................................................37
12
*Emblaze Ltd. v. Apple Inc.*,
   No. 11-cv-01079, 2014 WL 1652226 (N.D. Cal. Apr. 24, 2014)............................35
13
*Ex Parte Mewherter*,
   No. 2012-007692, 2013 WL 4477509 (P.T.A.B. May 8, 2013)............................36
14
*Geneva Pharms. v. GlaxoSmithKline, PLC*,
   349 F.3d 1373 (Fed. Cir. 2003)...............................................................37
15
*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   769 F.3d 1371 (Fed. Cir. 2014)...............................................................35
16
*In re Nuijten*,
   500 F.3d 1346 (Fed. Cir. 2007)...............................................................36
17
*In re Seagate Tech., LLC*,
   497 F.3d 1360 (Fed. Cir. 2007).........................................................34, 35, 36
18
*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007)........................................................................7, 21
19
*Lee v. Mike's Novelties, Inc.*,
   543 F. App'x 1010 (Fed. Cir. 2013)..........................................................34
20
*LG Elecs., Inc. v. Hitachi Am. Ltd.*,
   655 F. Supp. 2d 1036 (N.D. Cal. 2009)........................................................31
21
*Logic Devices, Inc. v. Apple Inc.*,
   No. C 13-02493, 2014 WL 5305979 (N.D. Cal. Oct. 16, 2014)............................37
22
*Loral Fairchild Corp. v. Victor Co. of Japan*,
   906 F. Supp. 813 (E.D.N.Y. 1995) ...........................................................38
23
*MEHL/Biophile Intern. Corp. v. Milgraum*,
   192 F.3d 1362 (Fed. Cir. 1999)................................................................7
24
*Microsoft Corp. v. i4i Ltd. P'ship*,
   131 S. Ct. 2238 (2011)......................................................................7, 8
25
*Nova Measuring Instruments Ltd. v. Nanometrics, Inc.*,
   417 F. Supp. 2d 1121 (N.D. Cal. 2006)........................................................31
26
*Ohio Willow Wood Co. v. Alps South, LLC*,
   735 F.3d 1333 (Fed. Cir. 2013)...............................................................22
27
*Ormco Corp. v. Align Tech., Inc.*,
   498 F.3d 1307 (Fed. Cir. 2007)................................................................8

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

*Spine Solutions, Inc. v. Medtronic Sofamore Danek USA, Inc.*,
    620 F.3d 1305 (Fed. Cir. 2010)..................................................................34
*Sun Pharms. Indus, Ltd. v. Eli Lilly & Co.*,
    611 F.3d 1381 (Fed. Cir. 2010)..................................................................37
*U.S. Ethernet Innovations, LLC v. Acer, Inc.*,
    No. C 10-3724 CW,2013 WL 4456161 (N.D. Cal. Aug. 16, 2013) ......................... 38, 39

**Statutes**

35 U.S.C. § 102(a)-(b) ...................................................................... 8
35 U.S.C. § 103(a) .......................................................................... 21
35 U.S.C. § 287 ............................................................................. 38

**Rules**

Fed. R. Civ. Proc. 56(c) ..................................................................... 7

**Other Authorities**

SUBJECT MATTER ELIGIBILITY OF COMPUTER-READABLE MEDIA, 1351 Off. Gaz. Pat. Office 212
    (Feb. 23, 2010).......................................................................... 36

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**TABLE OF ABBREVIATIONS**

| Abbreviation | Refers to |
|---|---|
| Ex. __ | Exhibits to the Declaration of Kirin K. Gill, submitted herewith |
| Jag. ¶; Jag. Ex.__ | Paragraphs in or Exhibits to the Declaration of Srinivasan Jagannathan, submitted herewith |
| White ¶; White Ex.__ __ | Paragraphs in or Exhibits to the Declaration of Colin White, submitted herewith |
| POSITA | Person of ordinary skill in the art |
| Box | Defendant Box, Inc. |
| Carahsoft | Defendant Carahsoft Technology Corporation |
| Defendants | Defendants Box, Inc. and Carahsoft Technology Corporation, collectively |
| '177 patent | U.S. Patent No. 6,223,177 |
| '962 patent | U.S. Patent No. 6,917,962 |
| '055 patent | U.S. Patent No. 7,287,055 |
| '258 patent | U.S. Patent No. 7,299,258 |
| '018 patent | U.S. Patent No. 7,320,018 |
| Groupware Patents | U.S. Patent Nos. 6,223,177; 6,917,962; 7,287,055; 7,299,258; and 7,320,018, collectively |
| '515 patent | U.S. Patent No. 7,062,515 |
| '665 patent | U.S. Patent No. 7,590,665 |
| '152 patent | U.S. Patent No. 8,117,152 |
| File Synchronization Patents | U.S. Patent Nos. 7,062,515; 7,590,665; and 8,117,152, collectively |
| Patents-in-Suit | U.S. Patent Nos. 6,223,177; 6,917,962; 7,287,055; 7,299,258; 7,320,018; 7,062,515; 7,590,665; and 8,117,152, collectively |
| Dkt. No. | Docket entry number in Case No. 13-4910 JD |
| WebShare | Radnet WebShare |
| BSCW | Basic Support for Cooperative Work |
| Appelt | Wolfgang Appelt et. al, "The BSCW System: A WWW-Based Application to Support Cooperation of Distributed Groups," Proceedings of the 5th Workshops on Enabling Technologies: Infrastructure for Collaborative Enterprises, June 19-21, 1996, Stanford, CA |
| Coda Manual | Coda File System User and System Administrators Manual |
| Braam | The Coda Distributed File System by Peter J. Braam |
| WS_FTP | WS_FTP Pro Users Guide Software Version 5 |
| Open Text or Plaintiff | Plaintiff Open Text S.A. |
| OTC | Open Text Corporation |
| OTDP | Obviousness-type double patenting |

*Unless otherwise indicated, all emphasis is supplied

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

Box has offered its accused "cloud-based" storage and content management products and services since its inception nine years ago and is now recognized as a market leader.  By contrast, Open Text's parent and sister companies are late-comers to the market, and are now attempting to play "catch-up" by bringing this lawsuit, asserting patents which are clearly invalid. The Court should reject Open Text's attempt to use invalid patents to capture in the courtroom what it has been unable to achieve in the market.

The Groupware and File Synchronization Patents broadly claim the concepts of collaboration and synchronization using standard computer components.  These patents would never have issued had they received the scrutiny now encouraged in the patent system.  By analyzing references not considered during prosecution, this Court will be performing an important function: proper scrutiny on a proper record. Although Defendants identified more than six invalidating prior art references per patent family, in this motion they seek summary judgment based on only two of those references per family.  The uncontroverted evidence establishes that: (1) the Groupware Patents are invalid based on either of two software programs, BSCW or WebShare; and (2) the File Synchronization Patents are invalid based on either the WS_FTP Pro manual or the Coda software.

Indeed, when considering Open Text's preliminary injunction motion, the Court's determination that the Groupware Patents likely are invalid as anticipated was based on a single article ("Appelt") describing the BSCW system.  Since then, Box has obtained the actual BSCW software and presents it here along with Appelt.  Similarly, the Court determined that the File Synchronization Patents likely are invalid as obvious in light of the WS_FTP Pro manual, presented again here.  And the actual BSCW software, as well as the WebShare and Coda references, which were not discussed in the Court's order, further confirm invalidity.

If a full summary judgment is not granted, however, Defendants alternatively request that the Court streamline the litigation and grant partial summary judgment of: (1) no willful infringement; (2) invalidity under Section 101 of the asserted '055 and '258 patents "computer readable medium" claims; (3) invalidity of the '018 patent for obviousness-type double patenting;

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

and (4) no pre-suit damages for failure to comply with marking requirements as to the Groupware Patents.

## II. OVERVIEW OF ASSERTED PATENTS

This Motion addresses the fifteen asserted patent claims from two patent families. The Groupware Patents include the '177, '055, '018, '258, and '962 patents.[1] All the Groupware Patents claim priority to U.S. Patent Application No. 08/955,569, filed on October 22, 1997. The File Synchronization Patents include the '515, '665, and '258 patents.[2] The File Synchronization Patents are continuations of, and claim priority to, the '515 patent, which was filed on December 28, 2001.

The Groupware Patents deal with "'collaborative computing environments' that allow users to work together on projects." Dkt. 294 at 1:20-21 (citing '177 patent, 1:11-14); *see* Dkt. 192 at 4:12-22. The patents claim collaborative computing environments that make use of an intranet site that can be accessed through a web browser." Dkt. 294 at 1:26-2:2 (citing '177 patent Abstract). According to the invention, a primary user selects the parameters of the collaborative workspace, including a list of secondary users and a working relationship between users. Ex. 1, cl. 1. In response to instructions, a computer creates a collaborative workspace. *Id.*; Dkt. 192 at 4:16-18. Users are also able to select the types of user applications to be included in the workspace. Ex. 1, cl. 11.

The Synchronization Patents claim a software program, described as a "cache manager", which allows users to retrieve a file from a remote database, edit the file locally, and then save it back to the database. Ex. 6, cl. 1; Dkt. 192 at 3:27-4:3; *see* Dkt. 294 at 2:9-17. The cache manager stores the file as a local cached copy and determines if it has been modified based on a notification from the file management system of an operating system. Dkt. 192 at 3:27-4:3.

## III. OVERVIEW OF THE PRIOR ART

### A. Background Of Invalidating Groupware Prior Art: BSCW And WebShare

"Groupware" (software that allows users to collaborate) was already well known by 1996,

---

[1] Open Text asserts infringement of claims 5, 7 and 11 of the '177 patent, claim 5 of the '018 patent, claim 22 of the '055 patent, claim 27 of the '258 patent, and claims 6 and 15 of the '962 patent.
[2] Open Text asserts infringement of claims 10, 15, and 27 of the '515 patent, claim 4 of the '665 patent, and claims 2, 11, and 15 of the '152 patent.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    over a year before the original patent application. Ex. 9 at 263:4-15, 264:22-266:16, White ¶¶ 15-24.

2    The inventors of the Groupware Patents concede that they did not invent, for example, project

3    collaboration, sharing information on a collaborative website, or the use of: workgroup user

4    applications (such as calendar, workflow, and project management applications); security measures

5    such as access control choices; web pages and forms; messaging systems; or contact databases. Ex.

6    10 at 59:11-14, 63:7-64:7, 66:12-69:17, Ex. 11 at 38:1-23, 128:12-129:15; Ex. 12 at 17:25-19:6.

7    64:20-65:2; Ex. 13 at 92:22-95:4, 134:4-140:24.  Multiple groups (including the developers of the

8    most famous groupware at the time, Lotus Notes) also had already integrated powerful groupware

9    tools with web browsers, thereby removing any need for specialized client software to be installed

10   on each user's computer.  *See* Ex. 1 at 1:42-51, 3:36-67; Ex. 14 at 14:7-23; Ex. 15 at 45:22-47:1; Ex.

11   18 at 12:21-15:17, 35:22-36:4, 54:24-56:19; 80:15-81:9.

12        For example, in the mid-1990s, a German research institute developed BSCW[3], a browser-

13   based groupware system which freed users from the need to install specialized software. *See* Ex. 16

14   at 306; Ex. 14 at 14:7-23; Ex. 15 at 45:22-47:1.  The following screenshot, for example, shows the

15   display that a user sees after the workspace is created, including the ability to add other members and

16   set access rights:



28   [3] Basic Support for Cooperative Work.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

White Ex. 4 at 7.   Neither the BSCW software nor the Appelt article were before the Examiner during prosecution.  White ¶¶ 67-68.  BSCW versions 2.0 and 2.1 were released and made freely available for download to the public in June 1996 and September 1996, respectively, more than a year before October 27, 1997, when the applicants filed the earliest of the Groupware Patents.  Ex. 14 at 34:15-36:9, 41:21-44:20, 41:21-44:20, 49:7-20; Ex. 17; Ex. 15 at 21:9-20; 29:23-30:15, 32:13-18.  Several BSCW users, including NASA, used the software at the time, and BSCW is still available today in version 5.0.  Ex. 14 at 20:9-21:8, 45:16-24; Ex. 15 at 16:9-12.  The operation and architecture of the BSCW system are described in the June 1996 Appelt article.  Version 2.1 was merely a bug fix for version 2.0, and the Appelt article and BSCW software together are appropriately considered a single reference for purposes of anticipation.  *See* Dkt. 247; Ex. 14 at 36:10-16; 38:14-19.  Open Text's expert, Dr. Nathanial Polish, concedes that BSCW version 2.1 is prior art to the Groupware Patents.  Ex. 9 at 272:16-23.

Similarly, in 1995, former Lotus employees founded a company called Radnet and developed WebShare, which offered groupware via a standard Web browser.  Ex. 18 at 12:21-15:16, 35:22-36:4, 54:24-56:19, 80:15-81:9, Ex. 20; Ex. 27.  The following screenshot of WebShare shows a collaborative workspace on a network site and a WebShare Desktop display that collaborators see (including applications):

MEMORANDUM OF POINTS AND AUTHORITIES



REED SMITH LLP

A limited liability partnership formed in the State of Delaware

White Ex. 3 at 2.

     WebShare was demonstrated publicly in the spring of 1996, and sold as early as June 1996 – more than a year before the original patent application filing.  Ex. 18 at 33:13-35:11, 39:18-42:7, 46:12-48:9, 49:14-50:9; Exs. 20-27.  Dr. Polish also concedes that WebShare is prior art.  Ex. 9 at 272:16-23.  WebShare was not before the Examiner during prosecution.

**B.**    **Background Of Invalidating File Synch Patent Prior Art: Coda And WS_FTP**

     The File Synchronization Patents likewise disclose nothing that was not already known in the art at the time of the invention.  Indeed, many prior art references had already disclosed a "cache manager" executing on the client computer.  *See, e.g.*, Ex. 28; Jag. ¶¶ 56-59; Jag. Ex. 3.  Similarly, many operating systems also already operated to open a file using the applications associated with that file's file type, which is a general functionality the claims recite.  Jag. ¶¶ 60-65.  And the applicants expressly acknowledged in the specification that the recited element of "receiving a notification from a file management system that a file has been modified" was, in fact, an "inherent feature" of many operating systems, including Windows.  Ex. 6 at 7:20-29.  Against this backdrop, it is no surprise that Coda and WS_FTP Pro anticipate and/or render obvious the asserted File Synchronization Patents.

     The WS_FTP Pro User's Guide ("WS_FTP") is a manual that describes a computer program,

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

WS_FTP Pro, based on the File Transfer Protocol ("FTP"), a method of inter-computer communication developed for the Internet. Dkt. 192 at 8. WS_FTP is prior art because it was published and distributed to customers along with the WS_FTP Pro Version 5.0, which was offered for sale and sold at least as early as May 28, 1998.[4] During the Preliminary Injunction proceedings, the Court agreed with Box that WS_FTP operates "exactly like the Synchronization Patents: a local cached file is received by the user, the user edits the file in a locally associated application, the cache manager determines if the file has been modified, the cache manager saves the cached file back to the remote database." Dkt. 192 at 17; *see also id.* at 15. The following WS_FTP excerpt, for example, illustrates relevant editing/synchronization functionality recited in the asserted claims:

> Editing Remote Files
>
> You can edit a remote file using a shell command to open the file on the remote system in its associated application. Then you can edit the file and save it on the remote system, provided you have permission to edit files on the remote system
>
> To do this, make sure Remote Edit uses ShellExecute is checked (on the General Tab of Program Options)
>
> To edit a remote file:
>
> 1    Select the file
>
> 2    Select **Edit file** from the right-mouse menu. WS_FTP copies the file to the local system and opens it in its associated application.
>
> 3    Edit the file
>
> 4    Choose Save from the File menu of the application that opened the file
>
>      The file is saved on the remote host with the original name
>
>      ....
>
> See "Setting Associations" later in this chapter for information on determining which application opens a specific file type.

Ex. 39 at BOX_TP_IP_000011.0038.

An independent third party witness has confirmed that her company, Ipswitch, sold and delivered to customers WS_FTP, including the prior art manual, years before the claimed priority date of the File Synchronization Patents. Ex. 37. WS_FTP was not before the examiner during

---

[4] Jag. ¶ 93; *see, e.g.,* Ex. 33; Exs. 37-38; Exs. 40-42.

1  prosecution.  Jag. ¶ 119.

2         Coda, developed at Carnegie Mellon University in the 1990s, is a system whereby files are

3  maintained on servers and available to a collection of client computers.  Ex. 35 at 27:9-23.  The

4  client-side Coda cache manager permits users to retrieve a file from a remote database on the server,

5  edit it locally, and save the edited file directly back to the remote database.  Ex. 30 at 1; Jag. ¶¶ 74-

6  76.  Coda version 5.3.10 is prior art because it was released, available for download, publicly

7  available, and in public use at least as early as Oct. 6, 2000.[5]  Similarly, the "Coda Manual" was

8  originally published in 1995 and updated along with each release of Coda, including in 2000. Ex. 35

9  at 36:13-38:5.  Coda was also described in an article entitled, "The Coda Distributed File System" by

10 Peter J. Braam ("Braam"), which is prior art based on its June 1998 publication date.  Ex. 36; Ex. 35

11 at 31:7-34:6.  Braam and the Coda Manual accurately reflect the architecture and operation of Coda

12 5.3.10, and with the software, constitute "one reference" for purposes of anticipation.  Dkt. No. 247,

13 Ex. 35 at 31:3-38:5; Exs. 30 & 36.  These Coda publications and software were not before the

14 Examiner during prosecution.

15 **IV. LEGAL STANDARDS FOR PRIOR ART INVALIDITY**

16        Summary judgment is appropriate if no genuine issues of material fact exist such that the

17 moving party is entitled to judgment as a matter of law.  Fed. R. Civ. Proc. 56(c).  Patent invalidity

18 must be established by clear and convincing evidence, but where, as here, the defendant relies on

19 prior art references that the Examiner did not consider during prosecution, the standard may be

20 easier to meet, and the "rationale underlying the presumption [of validity] seems much diminished."

21 *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2249 (2011); *citing KSR Int'l Co. v. Teleflex Inc.*,

22 550 U.S. 398, 426 (2007)).  The presence of purportedly conflicting expert testimony does not bar

23 summary judgment on invalidity or non-infringement grounds, specifically where, as here, it does

24 not give rise to a genuine dispute of fact on the import of the prior art.  *See KSR Intern. Co., supra*,

25 550 U.S. at 426-7 (expert's conclusory affidavit on obviousness did not preclude summary judgment

26 of invalidity because "the content of the prior art, [and] the scope of the patent claim [] are not in

27 material dispute"); *MEHL/Biophile Intern. Corp. v. Milgraum*, 192 F.3d 1362, 1367 (Fed. Cir. 1999)

28 ─────────────────────
[5]  *See, e.g.*, Ex. 35 at 39:4-45:7, 45:20-48:20; Exs. 31-32.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   (affirming summary judgment of anticipation despite patentee's expert testimony to the contrary,

2   and stating "MEHL/Biophile's expert testimony contradicting the plain language of the reference

3   does not create a genuine issue of fact.").

4        In support of this motion, Box presents screen shots of operating prior art software programs

5   (or in the case of WS_FTP, the undisputable language of the manual).  In response, Open Text will

6   attempt to create disputes of facts through its experts.  But those opinions cannot overcome what the

7   prior art establishes and they are further negated by Open Text's own discovery responses, in

8   conflict with Open Text's own infringement allegations, and unsupported by the record.

9   Notwithstanding Open Text's efforts to create a factual dispute, its patents are in fact and in law

10  invalid and summary judgment is appropriate here.

## V.  THE FIRST AND SECOND GROUNDS OF INVALIDITY:  BSCW AND WEBSHARE EACH ANTICIPATE THE GROUPWARE PATENTS

13       Summary judgment of anticipation is appropriate where the defendant shows by clear and

14  convincing evidence that the invention was known or used by others before the applicants'

15  invention, or described in a publication more than a year before the application.  35 U.S.C. § 102(a)-

16  (b); *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011); *Ormco Corp. v. Align Tech.,*

17  *Inc.*, 498 F.3d 1307, 1319 (Fed. Cir. 2007).  Anticipation under section 102 requires that a prior art

18  reference disclose, either expressly or inherently, every limitation of the claim.  *See Crown*

19  *Packaging Tech. v. Ball Metal Bev.*, 635 F. 3d 1373, 1383 (Fed. Cir. 2011).

### A.  BSCW And WebShare Disclose Each Element Of Each Asserted Claim

21       As set forth in more detail in the accompanying Declaration of Colin White, in use, BSCW

22  and WebShare clearly and convincingly disclose each element of the asserted Groupware Patent

23  claims.  (To be sure, both of the accompanying expert declarations are thorough, but many of the

24  elements of the 30+ asserted patent claims are redundant.)  This brief addresses the representative

25  '177 asserted claims elements, in order, together with related elements of the other asserted claims,

26  and then addresses additional remaining asserted claim elements.  For ease of reference, Appendix 1

27  lists, and numbers, all elements of all asserted Groupware Patent claims and the claims from which

28  they depend.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**1.**     '177, cl. 1 (pre) and 1(a): A system for providing **a collaborative workspace,** comprising:(i) **a network connected server** having input and access capabilities;

The "collaborative workspace" and "dedicated network site" limitations are common to multiple asserted claims and may be analyzed together.[6]  *See* (Polish) at 290:3-293:6 ("If we're working on the same dedicated network site, we are working in the same collaborative workspace.") BSCW and WebShare each disclose these limitations under the Court's ordinary meaning construction.  In each reference, a primary user uses a client computer to input information to instruct a server to create a workspace in which multiple users collaborate.  For BSCW, *see* Ex. 15 at 14:19-25; Ex. 45 at 1 ("BSCW supports group work over the Internet by providing *shared workspaces [that] allow[] storage and retrieval of documents and sharing information within a group.*"); Ex. 16 at 305; White Ex. 4 at 10 (BSCW illustr. No. 8).  For WebShare, *see* White Ex. 3 at 1-3, 6-9, 12-13 (WebShare screenshots 2-6; 11, 12, 14-17); *see also* White Ex. 3 at 12-13 ("What is WebShare" portion of help documentation ("Using WebShare applications, *large and small teams alike can share knowledge and expertise, keep track of customers, collaborate to solve problems . . . and much more.*").

In response to the primary user's instructions, the BSCW and WebShare server software creates the workspaces that include, for example, the users, access levels and user applications required to permit group activity.[7]  The server stores this information and makes it accessible through the "dedicated network site" or "dedicated network site defining the collaborative workspace." *See* Ex. 1, cl. 1; Ex. 3, cl. 19.

**2.**     '177, cl. 1(b): (ii) a **workgroup creator on the server** for receiving instructions from a **primary user** and for creating a dedicated network site in response to the received instructions, the instructions including a list of secondary users and a **working relationship defined between the users;**

This claim element includes three limitations repeated throughout the asserted claims, all of

---

[6] The following identical or closely related limitations are also disclosed by WebShare and/or BSCW for the same reasons: '177 cl. 1(pre, a), 2(pre, a) , 5, 6, 7; '018, cl. 1(pre), 4, 5; '055, cl. 19 (pre, a), 22; '258 cl. 19 (pre, b-c), 27(b-c); and '962 cl. 1(pre, a, b-e), 15(pre, a, b-e). The similar preamble of the '177, cl. 2, which recites "A system for providing a team of users with network-based groupware application functionality," is also disclosed based on the analysis above.
[7] It also is undisputed that BSCW and WebShare include "a network connected server having input and access capabilities." *See* White Ex. 3 at 12-13 (WebShare Help File at WebShare Server diagram, "The WebShare Product Suite" and "WebShare Features" (describing and depicting the WebShare Server)); Ex. 45 at 3; Ex. 16 at 305.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

which BSCW and WebShare disclose.  First, it is undisputed that BSCW and WebShare disclose the

"**workgroup creator**" limitation (and related limitations).[8]  Both systems include servers that

receive and execute instructions from a primary user, and in response, create a collaborative

workspace on a dedicated site.  White Ex. 4 at 1 (BSCW illustr. No. 1); White Ex. 3 at 2-5

(WebShare screenshots 3-10); *see also* Ex. 9 at 297:3-301:8 (conceding that the BSCW reference

discloses a collaborative workspace and a dedicated site).  Second, BSCW and WebShare disclose

the "**primary user**" limitation.  White ¶ 125, 198-199.  The primary user fills out templates to create

the workspace, which the primary user also uses.  White Ex. 4 at 1 (BSCW illustr. No. 1); White Ex.

3 at 2-5 (WebShare screenshots 4-10); Ex. 9 at 297:3-301:8 (conceding that the BSCW reference

discloses a collaborative workspace and a dedicated site).  Third, the "**working relationship**"-

related limitations (also including "pre-defined working relationship," "defined working

relationship," and "hierarchy between the primary user and said secondary users limitations")[9] are

related to, and may be analyzed with, the "**access level**"-related limitations (including "levels of

access" and "access control choices") of the '018 and '055 patent asserted claims.  *See* Ex. 9 at

195:7-10, 196:10-15 (corresponding access levels work like predetermined working relationship and

hierarchy).  The representative "levels of access" elements in the '055 patent recite:

> a list of secondary users nominated by said primary user that have one or more **levels of
> access** to said collaborative workspace;
>
> **access control choices** selectable by said primary user and defining the one or more **levels of
> access** afforded said secondary users of said collaborative workspace;
>
> wherein access to said **levels of access** includes access via a web browser
>
> Each of these limitations relate to permissions and access controls well known in the art.

Whether the claim language refers to "levels of access" (i.e., a set of access rights), "pre-defined

working relationship," "defined working relationship," "access control choices," or a "hierarchy"

between users, BSCW and WebShare expressly disclose them.  *See* Ex. 9 at 195:7-10, 196:10-15.

Thus, in BSCW, the "Access rights table" template (excerpt depicted below on the left)

---

[8] The same analysis applies for the "site builder" limitations of the '962, cl. 1(b) and 15(b).
[9] The "pre-defined working relationship" and "defined working relationship" limitations appear in
'177 1(e), cl. 2(a)(e)), and the "hierarchy between the primary user and said secondary users"
limitations appear in _____.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   allows the primary user to set access levels for each group and user type, and the "Access details"

2   screen (excerpt below on the right) shows that different user types may be given different access

3   levels:



19  White ¶ 199, Ex. 4 at 2-3.

20      Specifically, the "Access rights table" includes, at the top, a list of twelve access levels called

21  "Actions" (such as "delete," "add doc" and "cut"), and at that the bottom, four user types – "owner,"

22  "member," "anonymous," and "others".  When users are added to the workspace, the primary user

23  may select their user type and the permissions for such user type, thereby reflecting a working

24  relationship or hierarchy between users.

25      WebShare likewise has permissions functionality that is more powerful than any

26  functionality that the patents disclose or claim.  WebShare includes group, object, **and** user-type

27  "access levels", and even different access levels to application's forms, views, and fields.  White Ex.

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  3 at 4-5.  As just one example of user-type permissions, it is undisputed that the software can be used

2  such that the "Primary User" is assigned user type "System Administrator"; "Secondary User" is

3  assigned user type "Trusted"; and "Third User" assigned user type "Registered User." "Registered"

4  and "Trusted" users are then provided different levels of access to the Calendar application, for

5  example: "Third User" (as a "Registered User") is just given permissions to "Create New

6  Document", "Read Own Document" and "Read All Document"; and "Secondary User" (as a

7  "Trusted" user) is given all permissions for the application, except System Administration privileges.

8  For example, various permissions screens, including the "Add Group -- Permissions" and

9  "Application Permissions" screens, present "access control choices" selectable by the primary user,

10  as shown below on the left, and the "Add User – User Type – System Administrator – Trusted -

11  Registered" display the selected user access levels, as shown below.



White ¶¶ 101-103; Ex. 3 at 3-5.

The WebShare help files disclose these limitations.  *See* White ¶ 101; Ex 3 at 15 (describing

Access Control Lists, including ability to "associate a set of access permissions with a group of

individuals" and "User Types", which allow different types of users to have different permissions

and privileges); (discussing various "Access Permissions" including whereby users can view, view

and modify, and/or remove (delete documents).

BSCW and WebShare's access levels are stored in memory on the server and define the

"working relationship" and "hierarchy" between the users, e.g., the primary user may have more

access to information in the workspace than the secondary users.  White ¶¶ 126, 236, Ex. 3 at 3-5,

Ex. 4 at 2-8.  In satisfaction of the other related limitations, it is undisputed, for example, that the

"access level" information is stored on the WebShare and BSCW servers and database, the

workspaces are created in accordance with such access levels, and the access levels are provided by

the primary user, and accessed by the users, via a web browser.  *See* Ex. 5, cl. 1 (b-c); Ex. 3, cl. 19

(b-d); Ex. 4, cl. 19(b-c), 27; *see also* White Ex. 3 at 3-5, 10-11, Ex. 4 at 2-8.

> **3.** '177, cl. 1(c): (iii) a **messaging system** for communicating existence of the dedicated network site to a selected ones of the list of secondary users;

Both the BSCW and WebShare systems include email messaging for communicating the

existence of the dedicated network site to secondary users.[10]  *See* White Ex. 4 at 10-11; White Ex. 3

at 6-7.  The BSCW system includes a messaging system whereby after adding a user, the system

automatically e-mails to the added user the existence and address of the dedicated network site:

"(Primary) has invited you to register with the BSCW server at: http//mail.fun.com."  White Ex. 4 at

10-11.  Similarly, WebShare provides email functionality, and BSCW provides additional email

functionality, whereby a user may communicate the existence of (and the address for) the dedicated

site.  White Ex. 3 at 6-7; White Ex. 4 at 10-11; Ex. 1 at 5:9:14 ("the details of the web-site may be

sent in the form of an E-mail message…").

> **4.** '177, cl. 1(d): (iv) a network for accessing contents of the dedicated network site by the primary and secondary users **via a web-browser**; and

Open Text does not attempt to refute that the BSCW and WebShare systems disclose the

---

[10] This "messaging system" analysis also applies to '177 cl. 2(c) (requiring sent information to include "an address of the dedicated site") and '962 cl. 1(c) and 15(c) (reciting "a transmitter for sending information about the existence of said dedicated site to said at least one secondary user nominated by said primary user").

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

"web browser" limitations. Indeed, both systems are web browser-based.[11] White ¶¶ 106; 205-06.

     **5.**    '177, cl. 1(e): (v) **memory** associated with the dedicated network site for storing information submitted by the primary and the secondary users, wherein the stored information is accessible to the users in accordance with the pre-defined working relationship.

There is no dispute that WebShare and BSCW disclose the "memory" limitations of the asserted patent claims.[12] *See, e.g.*, Ex. 45 at 3; White ¶¶ 107-08.

     **6.**    '177, cl. 2(a): a network-connected server having an input for receiving an **initiate instruction from a primary user, the initiate instruction including a list of secondary users and a working relationship defined between the users;**[13]

The "initiate instruction" limitation relates to a primary user's use of the system to instruct the server to create the collaborative workspace. Open Text's expert, Dr. Polish, conceded that WebShare and BSCW both satisfy these limitations. Ex. 9 at 251:3-255:1.

     **7.**    '018, cl. 1(b), 1(c): display **a workgroup creation template** with which primary users can interact using a web browser to create one or more collaborative workspaces: store information received from user interaction with the **workgroup creation template**, wherein the information represents **one or more groups of secondary users** nominated by a primary user for a particular collaborative workspace **including a name for a workgroup and a corresponding access level to the collaborative workspace for each group and secondary user**

The "workgroup creation template" limitations also relate to the creation of the collaborative workspace. Open Text's expert conceded that BSCW discloses a workgroup creation template. Ex. 9 at 328:19-330:20. Likewise, the WebShare templates present a "user screen which permits the primary user to create a collaborative workspace and define its parameters." Dkt. No. 294 at 12:18-19. The screens include, for example, "Group Manager" and "Group Member" fields, as well as boxes next to applications and access levels to provide information to be included in the instructions. *See e.g.*, White Ex. 3 at 2-5; 7 [WebShare screenshots at 4-6, 7-10, 11, 14].

     **8.**    '177, cl. 2(d): (iv) **a receiver for receiving information** at the dedicated site sent by the secondary users using a web-browser;
2(f)    (vi) **a processor for processing the information** stored at the dedicated site by the primary and the secondary users; and
2(g)    (vii) **a transmitter for downloading stored and processed information** to the primary user and secondary users for display via a web-browser.

It is undisputed that WebShare and BSCW disclose *a receiver*, a *processor* and a *transmitter*

---

[11] *See* '177 cl. 2(d)(g); '018 cl. 1 (e); '055, cl 19(e); '258, cl. 19(c).
[12] *See* '177, cl. 2(e); '055, cl 19(b); '962, cl. 1(e), 15(e).
[13] The "initiate instruction" limitation is also in the '962, cl. 1(a). _

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

for receiving, processing and downloading information provided by the users.  White ¶¶ 113; 115-16; 213-14; 216-17; Ex. 3; Ex. 4.

        **9.**    '177, cl. 5: The system according to claim 1, wherein the server has a **unique URL address.**

The BSCW and WebShare systems also disclose a server that has a unique URL address.  *See, e.g.,* White Ex. 4 at 7-8; White Ex. 3 at 1 (revealing unique URL server addresses).

        **10.**    '177, cl. 6.    The system according to claim 1, wherein the server contains an **address database of communication addresses** for users connected to the network.
            '177, cl. 7.    The system according to claim 6, wherein **an external user's address can be added to the address database.**

It is also undisputed that WebShare and BSCW servers contain an address database for network users, and allow for an external user's address to be added to such database.  White ¶¶ 118-19; 220-23; White Ex. 4 at 29-30; Ex. 45 at 4, p. 17; White Ex. 3 at 6-8.

        **11.**    '177, cl. 10.  The system according to claim 2, wherein the processor comprises providing the primary user **with a work group activity application.**
            '177, cl. 11.  The system according to claim 10, wherein the work group activity application is selected from the **group comprising bulletin board, chat room, calendar, contact database, change control, event planner, group discussion, issue management, project collaboration, presentation library, decision survey in a box, NGS proposal development and document management.**

These claim elements, and several others concerning user applications, are appropriately analyzed together because they deal with what may be in a "collaborative workspace."  See Ex. 3, cl. 22; Ex. 5, cls. 4, 5 (reciting "configuring said collaborative workspace" and "wherein said collaborative workspace is configured" "**to include a plurality of [distinct] user applications selected by one of the users to be included in that collaborative workspace**".); Ex. 4, cl. 19 (reciting "**providing a plurality of user applications selected to be included in the collaborative workspace . . . .**").  Workgroup activity applications were well known at the time of the alleged invention.  Thus, based on Open Text's broad infringement read against Box's accused products, it is no surprise that both BSCW and WebShare systems provide the primary user with work group activity applications to select, include and use in the workspace, including at least one identified in claim 11.[14]  For example, BSCW's available "Add Folder" and "Add Doc" applications are "document management" applications, and the "Add Article" application is a threaded conversation,

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

---

[14] Claim 11 is drafted as a "Markush" claim, which requires an anticipatory prior art system to disclose just one of the many types of application listed in the group.

1  or "group discussion", application.[15] *See also* Ex. 14 at 24:3-26:6 (BSCW developers also

2  prototyped a chat facility for multiple users). In the preliminary injunction proceedings, the Court

3  determined that the applications disclosed in the patents and the discussion forum, member

4  administration features, and uploading features disclosed in Appelt were the same. Dkt. 192 at

5  23:28-24:6. Similarly, WebShare includes various "group discussion" applications (such as

6  "moderated discussion" and "discussion"), as well "calendar" and "contact database" applications

7  (such as "marketing calendar", "calendar" and "contact manager.")[16] As set forth above, BSCW and

8  WebShare disclose all the elements of the asserted '177 patent claims, as well as the identical and

9  related elements of the other asserted Groupware Patent claims.

**B.     BSCW And WebShare Also Disclose The Remaining Elements Of The Asserted Claims**

11      The '962 and '258 asserted claims each include an additional element with no corollary in

12  the asserted '177 asserted claims. BSCW and WebShare also disclose these elements:

**1.**     '962, cl. 6: The system according to claim 1, wherein said primary and said at least one secondary users accessing said network are assigned a **unique personal workspace** for providing said primary and said at least one secondary users with access to features of said network designated for said primary and said at least one secondary users.

      BSCW and WebShare each disclose this element of the '962 patent claim 6 because the

16  primary and at least one secondary user can be assigned their own displays of the workspaces

17  viewable from their client computers, and the relevant screenshots also reveal personal workspace

18  functionality available within each system. To the extent that Open Text and Dr. Polish incorrectly

19  interpret this limitation as requiring the creation of a separate individual folder (Ex. 48 at 58), BSCW

20  and WebShare still meet the claim elements. In BSCW, a user can create a personal workspace, and

21  in addition, the "bag" functionality (described in White Ex. 45 at 10-12) operates as a personal folder

22  to which only the user has access. White ¶ 244. Similarly, in WebShare, the primary user may

23  create a group, and then use the "delete" function to remove him- or herself from the workspace,

24  leaving the secondary user "assigned a unique personal workspace" with access to the features of the

---

[15] BSCW's "Add URL" functionality also allows users to link to other websites, applications, and files, which permit further inclusion of desired applications, including those from the group recited in Claim 11. White ¶ 232-33.

[16] Claim 15 of the '962 patent also requires "a calendar and event planner, wherein said calendar and event planner include a list of tasks to be done and a list of upcoming events," which both BSCW and WebShare disclose. *See* White ¶ 250; Ex. 4 at 30-31; Ex. 3 at 8-9; 11.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

network.  White ¶ 134; White Ex. 3 at 7-11.

    **2.**    '258, cl. 27: The computer readable medium of claim 19, the steps further comprising allowing **the primary user to assign the primary user's administrative rights to one or more of the secondary users.**

It is also undisputed that BSCW and WebShare disclose computer readable medium that allows primary users to assign their administrative rights to secondary users.  White ¶ 156-59; 266; White Ex. 4 at 8-9; White Ex. 3 at 11; Ex. 18 at 27-28; White Ex. 4 (177 claim chart) at 124.

    **C.**    **Open Text's Positions Do Not Refute Anticipation By The Prior Art And, If Adopted, Would Compel Summary Judgment of Non-infringement**

Unable to deny the operation of the BSCW and WebShare systems, as captured in actual screenshots, Open Text nevertheless attempts to challenge the disclosure of four claim limitations through its expert, Dr. Polish.  But his opinions fail to raise any issue of material fact concerning invalidity.  Several of his opinions also are inconsistent with Open Text's infringement allegations against Defendants' products, and, if adopted to defeat invalidity, would mandate summary judgment of non-infringement.  Literal infringement is all Open Text's experts opine on.

    **1.**    Open Text Fails To Raise Any Material Factual Disputes Concerning Disclosure Of The "Collaborative Workspace" And "Dedicated Network Site"

As a preliminary matter, Open Text concedes that BSCW discloses the "collaborative workspace" and "dedicated network site" limitations with respect to all asserted claims.  White ¶ 194; Ex. 9 at 290:3-293:6.  Dr. Polish, however, argues that WebShare fails to disclose them.  He asserts that in WebShare, there is "no dedicated place on the server that stores applications and documents that only one group can access" and that there is no "unique site on the server that hosts applications and documents for a group."   Yet, as an initial dispositive matter, the claims do not require any "unique site on the server."  Dkt. No. 294 at n.1 ("Because Open Text does not point to any evidence defining "dedicated" to mean "unique," the Court will not adopt that construction.")  Instead, information about workspaces is stored in software, which has no "unique" or even physical location.  *See* White ¶¶ 107-108, 207-209.  And it is undisputed that each WebShare system can be set up so that the members of the same group have access to the same applications for collaboration.  *Id.* The software on the server corresponding to the collaborative workspace is the dedicated site, and this element is met as a matter of law.

Dr. Polish erroneously assumes that the claims require creation of *more than one*

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  collaborative workspace, such that users of two different groups must be able to access different

2  applications without overlap.  The claims, however, do not require the creation of multiple

3  workgroups, instead reciting only "a collaborative workspace" (singular) and "a dedicated network

4  site" (also singular).  And, as set forth above, the WebShare system plainly operates to create a

5  collaborative workspace and dedicated site, as recited. Moreover, WebShare, when used to permit a

6  workgroup user to view and access applications, is the same as the accused Box product in

7  operation.  In Box, a user in one group that has access to an application can also access that same

8  application when working in *any other group* in which they are a member.  White Decl. ¶¶ 170-174.

9  Box assigns applications by Box *account*, not by particular workgroups (the accused Box folders).

10  Dkt. No. 69 ¶ 32.  Therefore, if the prior art did not anticipate, then Box would not infringe.  Open

11  Text cannot legitimately read the claims one way for alleged infringement and another to avoid prior

12  art, and its expert's arguments fail as a matter of law

13        **2.**     Open Text Also Fails To Raise Any Genuine Fact Disputes Regarding Disclosure Of The Access Level, Working Relationship, And Hierarchy Limitations

14        Open Text also tries to manufacture a factual dispute by arguing, through its expert, that in

15  BSCW, access is only "controlled on an object-by-object basis" and in WebShare, access levels are

16  set only per group and per object.  By comparison, according to Open Text, the claimed invention

17  requires a user role-based access control system.  This is wrong for three reasons.  First, as shown

18  above in BSCW and WebShare, access levels *can* be set per user, as well as per object and per

19  group.  Second, nothing in the specification or claims requires, discloses, or teaches, that user type

20  "role-based" permissions, as opposed to object-based permissions, are required to meet these

21  limitations.  Moreover, Open Text surrendered this argument during the *Markman* hearing,

22  conceding that the patents do not exclude setting access levels and the other access variations

23  claimed in the patents on an object-by-object basis. Ex. 49 at 22:11-28:8.  Third, object-based

24  permissions establish a set of access rights, a working relationship, and/or a hierarchy between a

25  primary and secondary users – there is no meaningful distinction between "user-based" and "object-

26  based" permissions.  Accordingly, Open Text cannot distinguish BSCW and WebShare on that basis.

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

3. **Open Text Fails To Raise Any Genuine Factual Disputes Concerning The "Messaging System" Limitations**

BSCW discloses an integral email notification system, as well as email functionality as part of the integrated web browser. Nevertheless, Dr. Polish has opined that both the WebShare and BSCW systems do not meet the "messaging system" limitations purportedly because the web-client-based email systems they use are part of a web browser's "separate" email system. Ex. 47 ¶¶ 180, 286. Yet, as a matter of law, the claim scope does not require that the recited system send the communication ***automatically***. In fact, the specification teaches that the user may send notifications in many different ways, including by email, pager, or facsimile. Ex. 1 at 5:21-22. Nor is there any requirement that the messaging system / transmitter be separate and apart from browser-based email messaging. To the contrary, the asserted "messaging system" claims ***expressly recite*** a web browser, and the specification teaches a preferred embodiment using a Netscape or Microsoft browser – both of which included email messaging at the time of the invention. *Id.* at 3:38-49. The browser – an integral part of the prior art (and claimed) systems – can supply the recited "messaging system" and "transmitter" limitations.

4. **Open Text's Arguments Concerning The "User Application" Limitations Fail To Defeat Summary Judgment, And If Adopted, Mandates Non-Infringement**

Open Text, through Dr. Polish, next attempts to raise disputes as to whether BSCW discloses user applications selectable for inclusion in the workspace, but its attempts fail because it cannot credibly dispute how the prior art software actually works. In particular, Dr. Polish contends that BSCW fails to disclose the "user applications"-related claim elements for three legally flawed reasons. First, Dr. Polish argues that because the "add folder", "Add Doc", "Add URL", and "Add Article" functionality "appears to be always included in a BSCW workspace," the applications are never "selected" to be included by the primary user. However, it is uncontroverted that although the "add folder", "Add Doc", "Add URL" and "Add Article" icons are viewable on the screen, these icons themselves are not the applications "included in" the collaborative workspace. An application is not included in the workspace unless and until it is selected by a user. For example, to collaborate in a group discussion, the primary user must first include the application in the workspace by clicking on the "Add Article" icon and uploading an article to begin the conversation thread. White

¶ 228.

Second, in an argument squarely rejected in the preliminary injunction proceedings, Dr. Polish again asserts that the Word documents, Adobe Framemaker, folder and article thread in the BSCW workspace (which the Appelt article discloses) are "objects," and not applications. *See* Dkt. 192 at 23:9-24:17; Ex. 48 ¶ 210. But it is undisputed that by clicking on these "objects" (or files), the user applications associated with such "objects" and file types are triggered and activated. Indeed, in the accused Box system, the accused "collaborative workspaces", i.e., the Box folders, include the same type of files or "objects", for example, documents, pdf's and the like, and when the user double clicks to open such files, the applications are triggered. Dkt. No. 151 ¶ 37-41; Dkt. No. 95-10 at 305, 306. And, notably, the accused applications in Box are found *outside* the accused Box folder, and are thus not "included" in the workspace and do not literally meet the claims. Dkt. No. 69-2 at 28; *see also* Dkt. No. 107-2 ¶ 131 (stating that "More than 600 applications are available to Box users **through the Box website (https://app.box.com/apps/)**" – not through the accused Box folder); 29 (stating that the example user application was added by default "**to my Nathaniel Polish Box account**" – not specifically to the accused "firstfolder" (see id. at 25)). Thus, if the BSCW collaborative workspace does not include the "plurality of user applications", then neither do Box's folders, and Box seeks, in the alternative, summary judgment of non-infringement as to these claims. Ex. 3, cl. 22; Ex. 4, cl. 27; Ex. 5, cl. 5).

Third, Dr. Polish argues that BSCW's "Add URL" functionality, by which a user may select any application to link into the workspace, "does not allow a user to include an application that is integrated with the BSCW system." Not only is this position based on an unsupported and undisclosed claim construction whereby the application must be "integrated with the system," but his position is also inconsistent with Open Text's infringement contentions. Indeed, the Box user applications that Open Text accuses of meeting the "plurality of applications" limitations are available *from Box's website's* "Applications tab" of a Box account's "administration console," not from within the accused "collaborative workspace." Dkt. No. 69-2 at 28; *see also* Dkt. No. 107-2 ¶ 131. And when a Box user downloads one of the accused user applications (such as Box Edit or a third party application) that application is added to a Box account and resides and executes locally

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  (or, for some applications, on third party servers) and *not* within any user's shared worksite/ folder.

2  *See* Dkt. No. 69-2 at 29.  Like the Box system, the BSCW system allows a user to download any

3  variety of third party applications which will reside and execute locally.  As a matter of law, BSCW

4  discloses these limitations in least one of a variety of ways.

5       For WebShare, Dr. Polish asserts that these limitations are not disclosed for the same reasons

6  he advances concerning the "collaborative workspace" and "dedicated site" limitations, which fail as

7  set forth above.  But it is uncontroverted that WebShare "allows a user to select applications from a

8  pre-existing set . . . [and] that a group is assigned to applications" and that "groups either have

9  access or do not have access to [WebShare] applications."  Ex. 48 ¶¶ 236, 247.  In this way, the

10  WebShare user experience regarding user applications is not unlike the Box system, where a user

11  may be able to view many different applications (via their icons, or by name in a drop down menu,

12  for example) from their group folder (the accused "collaborative workspace"), but the user cannot

13  necessarily access those applications unless they have been selected and downloaded.  White ¶ 122;

14  Ex. 3 at 7, 10.

15       In sum, a full and fair review of the prior art establishes that it anticipates all the asserted

16  Groupware claims.  Nothing in Dr. Polish's opinion contradicts that conclusion.  Summary judgment

17  is appropriate on this ground.

18

19  **VI. THE THIRD GROUND OF INVALIDITY:  BSCW AND WEBSHARE RENDER THE GROUPWARE PATENTS OBVIOUS**

20       A patent is also invalid where the claimed invention would have been obvious to one of

21  ordinary skill in the art.  35 U.S.C. § 103(a).  "Summary judgment of obviousness is appropriate

22  where the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the

23  art are not in material dispute, and the obviousness of the claim is apparent in light of these factors."

24  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007).  At a minimum, BSCW and WebShare,

25  each in combination with the knowledge of one of skill in the art, and BSCW and WebShare in

26  combination with each other, render the asserted Groupware Patent claims invalid for obviousness.

27       For example, if there was any legitimate question about WebShare's disclosure of the

28  "collaborative workspace" and/or "dedicated network site" elements, it would have been obvious to

a POSITA to combine the dedicated network site and collaborative workspace elements of BSCW (which Open Text concedes) with WebShare to reach the alleged inventions. White ¶ 275-277. Similarly, to the extent that it is determined that WebShare does not disclose the recited "messaging system" limitations, it would have been obvious for the same reasons to combine WebShare with BSCW's integrated messaging system component. White ¶ 278. A POSITA would have been motivated to combine these references because, like the patents, both relate to providing known groupware functionality via a web browser with the same objective to remove any need for specialized client software. In addition, BSCW, through its "URL" links in the shared workspaces, and WebShare, through its designer tool, *expressly* contemplate expansion and customization as part of the programs themselves, and thus provide specific teachings, suggestions and/or motivations to combine. At a minimum, WebShare in combination with BSCW, renders the asserted claims obvious. White ¶ 275-77.

Secondary considerations of non-obviousness, to the extent they even need to be considered, also support an obviousness finding . *See Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1344, (Fed. Cir. 2013) ("[W]here a claimed invention represents no more than the predictable use of prior art elements according to established functions, as here, evidence of secondary indicia are frequently deemed inadequate to establish non-obviousness." For example, the simultaneous work of others to solve the same problems in the same manner support a finding of obviousness. White ¶ 290-91.

## VII. THE FOURTH AND FIFTH GROUNDS OF INVALIDITY: CODA AND WS_FTP EACH ANTICIPATE OR RENDER OBVIOUS THE FILE SYNCHRONIZATION PATENTS

### A.     Coda And WS_FTP Disclose Each Element Of Claim 10 Of The File Sync Patents

Coda's undisputed operation anticipates, and WS_FTP combined with the knowledge of a person skilled in the art, renders obvious the asserted claims of the File Synchronization Patents. This brief addresses representative asserted claim 10 of the '515 patent (and the claims from which it depends), analyzing the elements, in order, together with identical and related elements from the

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

other asserted claims, and then addresses remaining claim elements. Appendix 2 lists and numbers all elements of all asserted File Synchronization Patent claims.

        **1.**    '515 cl. 1: A system for synchronizing a cached file with a database:
              1(a)    a computer processor
              1(b)    a network connection device operable to establish a connection with a database;
              1(c)    a computer readable memory containing a local cache; and

      Coda and WS_FTP disclose these basic elements common to client/server file synchronization systems.[17] Ex. 30 at 1, 2; Ex. 36 at 46, 47; Jag. Ex. 8 at 1, Ex. 11 at 1-5; Ex. 39 at 1-2; 6, 32-33.

        **2.**    '515 cl. 1(d): a software program, **executable to run in user space on a client computer**, stored on a computer medium and executable by the computer processor to:

      This element relates to the claimed "software program" (or "cache manager" in other claims), reciting that such program is "executable to run user space," which the Court has construed to mean "executable to run in the portion of memory that is not reserved for operating system level programs." Coda and WS_FTP both disclose this limitation. As the patents recognize, "the concept of user-space [was] well known to those of ordinary skill in the art," and the Coda Manual, using precisely the same language as the patents, expressly describes:

> files. Coda's kernel support is minimal and works in conjunction with the userspace cache manager Venus. User requests enter the kernel, which will either reply directly or ask the cache manager venus to assist in service.

Ex. 30 at 2. Figure 3 in Braam also shows that the Venus cache manager operates at the "User level" in the Coda system, -- i.e., not in the portion of memory reserved for operating system level programs. Ex. 36 at 47. Finally, and not surprisingly, Coda's developer, Dr. Satyanarayanan, also confirmed that Venus executes in user space and "is not integrated with the operating system." See Ex. 35 at 24:17-27:6

---

[17] These basic elements of a computer with a processor and memory containing a local cache and a network connection to a server database are identical and/or related to limitations across the elements of the asserted claims, which are also disclosed for the same reasons. See '515 cl. 14(h)-(j), 27(a)-(c); '152 cl. 1(a), 8(a), 15(b). The undisputed evidence establishes that Coda and WS_FTP likewise disclose the basic server-side aspects of the alleged invention, e.g. the "database server" or "database server computer", a "server processor", and "server memory" limitations of '515 cl. 14(a)-(c), '665 cl. 1(a) and '152 cl. 15(a). Ex. 30 at 2-3, 16, 30; Ex. 39 at 1-2, 6.

MEMORANDUM OF POINTS AND AUTHORITIES

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    WS_FTP also discloses this limitation by specifically showing an executable file named

2    "FTPPRO95.exe" which executes in user space on the local computer. Ex. 39 at 3, 7-9.  One of

3    ordinary skill also would understand that ".exe" files refer to files that can be executed by users in

4    computer memory not reserved for operating system level programs. Jag. ¶ 115.  Indeed, the Court

5    agreed during the preliminary injunction proceedings that the screenshot "clearly show[s] [that

6    FTP95Pro.exe is] being installed as a file on the local system." Dkt. 192 at 3.

7        **3.**      '515 cl. 1(e):   send a request to the **database** for a file;
                    1(f)    receive the file at the client computer directly from a **database**;

8

9        Many elements across all asserted claims include "database" limitations and related

10   limitations, such as "database server", a "connection with a database server", a "database

11   management program", a "database management application", a "connection [with or to] the

12   database",  and  a "database asset".  Open Text does not attempt to refute that Coda discloses the

13   database-related limitations.  The uncontroverted evidence also establishes that WS_FTP discloses

14   the recited server-side database limitation by teaching, among other things, that when a user chooses

15   a file, WS_FTP receives and "copies the file to the local file system" from the remote FTP server,

16   which holds the files in a repository of files, i.e., a database. Ex. 39 at 32-33.  Notably, the patent

17   describes a database as "a general repository of files," and requires no particular characteristics to

18   meet this basic limitation. Ex. 6 at 1:23 ("Having a general repository of information such as a

19   database"); *see also id.* 1:14-15, 5:27-29.  Dr. Mayer-Patel also admitted that FTP servers with file

20   systems generally, and WS_FTP specifically, can perform the database functions of storing and

21   retrieving files disclosed in the specification. Ex. 6 a 1:14-23; Ex. 58 at 216:8-217:16; 219:1-19;

22   242:19-243:10.  The communication between the client software and the FTP server is direct.  Ex. 6

23   at 1.  WS_FTP also discloses other database-related claim elements in the asserted claims, for

24   example, by teaching that the client computer running the WS_FTP software is connected to FTP

25   servers which include a database stored on the server memory. Ex. 39 at 1-2, 6; Jag. ¶¶ 90, 113, 117.

26

27

28

WS_FTP also teaches a server program that is the database management program stored on the

server memory and executed by the FTP server computer processor.[18] *Id.*

    **4.**    '515 cl. 1(g): store the file as a cached file in the local cache;

It is undisputed that Coda and WS_FTP disclose storing the file as a cached file in a local

cache, i.e., a "storage area on a client computer".[19]  Ex. 30 at 2; Ex. 39 at 32-33; Jag. ¶¶ 116; Ex. 58

at 250:1-251:15.

    **5.**    '515 cl. 1(h): **notify the operating system to open the cached file** using a locally
running application associated with the file type for the cached file;

This element (and similar elements in the other asserted claims)[20] recite functionality well

known at the time of the invention – i.e., the ability to open a cached file with an application

associated with that file's type, (i.e., basic file type association).  It is undisputed that WS_FTP

discloses this element.  Ex. 39 at 32, 46-47. The uncontroverted evidence also demonstrates that

Coda discloses this element.  With Coda, using the Linux graphical user interface, a user can

navigate to a remote folder, and select an icon representing a remote file to open the file for editing.

Jag. ¶ 81; Ex. 15 at 6-9.  When the user double-clicks on the icon representing the file (or database

asset), the Venus cache manager receives a notification to open the file, and communicates a request

to the database for the database asset.  Jag. Ex. 82; Ex. 15 at 6-9 ; *see also* Ex. 36 at 47 & Fig. 3.

The file is received and stored in the cache, and Venus prompts the Linux operating system to open

the file using the application which is associated with it.  Ex. 36 at 47. Jag. Ex. 81-82; Ex. 15 at 6-9.

The cache manager forwards the client request for the file to the server prior to receiving the

database asset.  *Id.*

    **6.**    '515 cl. 1(i): determine if the cached file at the client computer has been modified by
a user using the locally running application based on a **notification from a file
management system of an operating system**; and

This element, and similar elements, relate to the software program (or "cache manager")

determining that a user has modified a file based on a notification.[21]  Coda meets these limitations

---

[18] The following asserted claim elements contain identical or related limitations, which can be
properly analyzed together and are also disclosed for the reasons set forth above:  '515 cl., 14(l)-(n),
27(e)-(f), 27(k)-(l); '665 cl. 1 (b); '152 cl. 1(a), 2(a), 8(b), 15(c).
[19] See the identical and related claims, which are likewise disclosed in '515 cl. 14(o), 27(g), 27(m),
'665 cl. 1(c), '152 1(b), 8(c), 15(d).
[20] See Ex. 6, cl. 2, 14(p), 27(h), and (n), Ex. 7, cl. 1(d), and Ex. 8, cl. 1(c), 8(d), and 15(e)
[21] *See* Ex. 6, cl. 14(q), 27(i), 27(o); Ex. 7, cl. 1(f); & Ex. 8, cl. 1(d)-(e), 8(e), 15(f)-(g).

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    because when a user edits a file in the local application and attempts to save the file, the file

2    management system of the operating system receives the save command and notifies the Venus

3    cache manager of the save. Jag. ¶ 74; Ex. 36 at 47. Venus thus determines that the user saved the

4    file and automatically saves the modified cached file to the database. *Id.*

5         WS_FTP, combined with the knowledge of one of skill in the art, also renders this element

6    obvious. Indeed, WS_FTP teaches that when a user chooses "Save" from the File menus of the

7    application that opened the file, the file is saved on the remote host. Ex. 39 at 32-33. This teaches

8    one of ordinary skill in the art that a notification from a file management system of an operating

9    system can be used to determine that the cached file has been modified by a user using the locally

10   running application. Jag. ¶ 122. As the Court recognized in its preliminary injunction order, the

11   specification of the File Synchronization Patents expressly discloses that the Windows operating

12   system existing at the time of alleged invention supported, as an "inherent" feature, a notification

13   from a file management system that a file has been modified, which causes the cache manager to

14   determine same. Dkt. 192 at 15-16; Ex. 6 at 7:20-29. Thus, as the Court found, to the extent this

15   element is not expressly disclosed by WS_FTP, one of ordinary skill in the art clearly would know

16   how to incorporate this "inherent" feature of the Windows operating system with WS_FTP,

17   especially since WS_FTP was specifically written to execute on the Windows operating system.

18   Dkt. 192 at 15.

19       **7.**    '515 cl. 1(j): if the cached file has been modified, **save the cached file from the cache directly to the database**.

20       Coda and WS_FTP also save the modified cached file back to the database, and thus satisfy

21   all elements of claim 1 of the '515 patent. [22]  Ex. 36 at 47; Jag. ¶¶ 83, 116, 123; Ex. 39 at 1-2, 32-33.

22

23

24

25

26   _____
     [22] These elements are identical or related to elements in the other asserted claims, including claim

27   elements reciting "communicating" the cached file to the database, which are also disclosed for the
     same reasons. See Ex. 6, cl. 14(r), 27(j), 27(p); Ex. 7, cl. 1(g); '152 cl. 1(f), 8(f), 15(h). There is

28   also no legitimate dispute that Coda and WS_FTP support more than one file type which are opened
     by different locally running applications. *See* Ex. 6, cl. 27(p).

8.      '515 cl. 9: The system of claim 2, wherein the software program is further executable to receive a database notification from a database management program that **an additional user has modified the database asset**.

10      The system of claim 9, wherein the software program is further executable **to provide a notice to a first user that the additional user has modified the database asset**.

The uncontroverted evidence establishes that Coda and WS_FTP also disclose these limitations, which relate to notifying a first user that an additional user has modified a "database asset" (a "computer file stored in a database"). Dkt. 294 at 20.  Specifically, the Coda database management program provides a notification to the Coda client that an additional user has modified the database asset, and the Coda client then provides notice to the first user of that the additional user has modified the database asset. Jag. ¶¶87-88; Ex. 35 at 39:18-41:14 ("[W]hen it tried to write the file, it received a return code from the Coda File System that warned it that it was about to overwrite a file that had been updated by another user. And the application, in turn, warns the user of this fact.").   The Coda documentation confirms that the Coda database management program first attempts to resolve the local/global conflict (*i.e.* a modification that has occurred to the database asset by an additional user) automatically, and then if unable to do so, notifies the Coda client (and the user) that the files require manual merging to resolve the conflict. Ex. 36 at 49.

WS_FTP also discloses an optional functionality that, when enabled, displays to the first user a prompt screen when that user attempts to store a file for which there is the same or a newer version (by date and time) in the destination database directory. Ex. 39 at 47-48; Ex. 58 at 264:17-21; 265:17-266:6.  The WS_FTP software therefore receives a notification that an additional user has modified the database asset and provides notice to the first user.

**B.      Coda And WS_FTP Also Disclose The Remaining Elements Of The Asserted Claims**

The asserted claims include additional discreet limitations with no clear corollary in, but significant overlap with, the asserted '515 patent claim 10 analysis above.  Coda and WS_FTP also disclose these elements as well.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

MEMORANDUM OF POINTS AND AUTHORITIES

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1.     '665 cl. 1(a): providing a system comprising **a client computer running an operating system, a cache manager and one or more applications** and a **database server** running **a database management application** managing a database;

Coda and WS_FTP disclose the limitations that the client computer is running an operating system, a cache manager, and one or more applications.[23] Ex. 36 at 46-47, Fig. 3; Ex. 39 at 1-2, 6, 32-33; Jag. ¶¶74-81; 111-124.  Furthermore, Coda and WS_FTP disclose a database server running a database management application managing a database.[24]  Ex. 30 at 3, 16, 30; Ex. 39 at 1-2; Jag. ¶¶ 87-88, Fig. 14, 111-124.

2.     '665 cl. 2     The method of claim 1, further comprising associating the **cached file with a connection**.
        '665 cl. 3     The method of claim 2, further comprising **establishing the connection** with the database.
        4(a)    determining if the connection with the database has become disconnected; and
        4(b)    if the connection with the database has become disconnected, **reestablishing the connection** to the database.

It is undisputed that WS_FTP discloses these elements in that the cached file is associated with a connection to the FTP server and database, and if the connection with the database becomes disconnected, then it is re-established such that editing and synchronization proceeds smoothly.  Ex. 39 at 14-15, 20-24, 32-33.  Similarly, for Coda, because the client software saves a modified cached file to the database from which it was copied, the client software associates the cached file with a connection to the Coda server, and the remote database.  Coda also reestablishes the connection to the database.  Ex. 36 at 47, Ex. 30 at 49, Jag. ¶¶ 71, 74, 84-85, Fig 13.  Coda and WS_FTP thus invalidate the asserted claims of the File Synchronization Patents by disclosing or rendering obvious each of their elements.[25]

---

[23] The following claim elements contain identical or related limitations, which can be properly analyzed together and are also disclosed for the reasons set forth above: '152 patent cl. 1(a), 8(a), 15(b).
[24] The following claim elements contain identical or related limitations, which can be properly analyzed together and are also disclosed for the reasons set forth above: '515 patent cl. 14(e)-g; 15(a).
[25] Secondary considerations of non-obviousness, to the extent they even need to be considered, also support an obviousness finding. Dkt. 192 at 16 (addressing factors in Defendants' favor).

**C.**   **Open Text's Positions Do Not Refute Invalidity On Grounds Of Anticipation Or Obviousness And If Adopted, Would Compel Summary Judgment Of Non-Infringement**

**1.**   **Open Text's "User-space" Arguments Fail As A Matter Of Law**

Since the Coda documents expressly disclose that the cache manager Venus executes in user space, and WS_FTP likewise discloses a user space cache manager, Open Text goes to great lengths to offer distractions from these clear anticipatory disclosures. Open Text has argued that a system (like Coda) that includes a cache manager in user space (like Coda's Venus cache manager), and also discloses a different kernel module component (*i.e.*, a module that is not running in user space but as part of the operating system), fails to disclose the "executable to run in user space" limitation. *See* M Ex. 50 ¶ 212; Dkt. No. 107-4 ¶¶ 90-91. Specifically, Open Text asserts that to meet this limitation, a system must operate without any "specialized driver," (like a kernel component of an operating system) that interacts with the cache manager. This position, however, is contradicted by the claim language, which requires that only the ***cache manager*** run in user space – not that the entire system include no operating system components – and it is undisputed that Venus itself runs in user space (as does the WS_FTP cache manager). Ex. 50 ¶ 199. Moreover, the patent claims not only do not preclude reliance on a driver or kernel of the operating system, they expressly require reliance on the operating system. *See, e.g.*, Ex. 6, cl. 1(h) and (i) (cache manager interacting with OS to open files and receive notifications)) Similarly, the specification does not exclude, but in fact, discloses as a preferred embodiment, the use of additional software, including at the driver/operating system (or kernel) level, to display on the client computer files located on the server – i.e., as "an additional drive in a directory tree of the Windows Explorer display." Ex. 6 at 6:5-14. Plainly, the claimed user-space cache manager, as a matter of law, can rely on additional software and the operating system and still meet and disclose the claims.

Open Text's baseless position also has forced it to take wildly inconsistent positions with respect to its own embodying products. First, Open Text argued the "user-space" limitation precluded the use of a driver/kernel component, and at the same time, all through discovery, Open Text asserted in its patent local rule disclosures and verified discovery responses, that its own

MEMORANDUM OF POINTS AND AUTHORITIES

product "Office Editor 10.5" practiced the claims, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Ex. 52; *see also* Open Text PLR 3-1 Disclosures (same); Ex. 55

at 12, 28, 43.  Then, when Open Text learned from *Defendants' expert* that, in fact, Open Text's

embodying product *also* used a user space cache manager that relied on a driver, Open Text was

forced to contradict itself.  Open Text's expert opined in his rebuttal expert report just weeks ago,

that he "understand[s] Open Text erred in identifying Office Editor 10.5 as software that embodies

the Asserted Claims in an interrogatory response."  Ex. 50 ¶ 549.  Open Text's shifting sands

approach fails to create any genuine issue of material fact.  Rarely does a prior art reference disclose

an element so clearly – in terms identical to the recited limitation – as Coda's explicit disclosure of

Venus as a "userspace cache manager." Ex. 30 at 2.  And as demonstrated by both Coda and

WS_FTP, the disclosed cache managers are clearly executable to run in user space – whether or not

they also rely on the operating system (as required by the claims).

### 2.   Open Text Fails To Refute WS_FTP's Disclosure Of The "Database"-Related Limitations

Open Text concedes that Coda discloses the "database"-related limitations, but asserts for the

first time through Dr. Mayer-Patel, that WS_FTP does not disclose a "database" and related

elements.  This position, however, is based on a new, narrow, and legally improper construction of

"database" – advanced after claim construction and discovery, and even after his opening report,

that includes limitations found nowhere in the broad specification disclosures.  For example, under

Dr. Mayer-Patel's new theory, the recited "database" must be "responsible for maintaining any

metadata about the files" and "enforcing organizing principles associated with files." Ex. 50 ¶ 52. In

another 21-word version of this specialized construction, Dr. Mayer-Patel opines, based on an

extrinsic dictionary (as opposed to the patent specification), that a "database" is a specialized

component consisting of "a file composed of records, each containing fields together with a set of

operations for searching, sorting recombining, and other functions."  Id. ¶ 120.   Dr. Mayer-Patel, in

his rebuttal report only, applies this complex narrow construction to opine that the WS__FTP server,

which plainly has a general repository that stores files, nevertheless fails to disclose a "database."

Ex. 50 ¶ 123-25.  Open Text's late-proposed construction and position, however, is contrary to the

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  patent disclosures and at odds with Open Text's prior litigation positions which, until rebuttal expert

2  reports, were properly and expressly aligned with the broad, patent "database"-related disclosures.

3       Specifically, the patent describes the "database" broadly as a repository located in server

4  memory for storing files – there is no mention of metadata, searching, sorting, recombining, or

5  "enforcing organizing principles." *See, e.g.*, 6 at 1:14-15 ("Centralized databases are becoming

6  increasing popular **for storing electronic files**"); 1:23 ("Having **a general repository of**

7  **information such as a database**"); and 5:27-29 (Server "memory" can also include a **database**

8  **"which can include various database assets**"). Throughout this litigation, Open Text embraced

9  this broad understanding (at least until rebuttal expert reports). For example, Open Text stated

10 simply in its infringement contentions, and Dr. Mayer Patel repeated in his Opening Expert Report,

11 that "[t]he Box account is a database within the meaning of the '515 patent," reasoning that "the

12 specification of the '515 patent describes databases generally as centralized repositories of

13 information, files, or database assets, including for example Microsoft Word documents." Ex. 51 ¶

14 253

15      As such, according to Open Text's contentions, Box met the database element because,

16 similar to the database described in the specification, "Box provides a centralized repository that

17 stores files, such as the Microsoft Word file Demo Document.docx, remotely in the cloud [and]

18 [t]hese files are accessible from Box accounts." Ex. 75 at 15. Similarly, during claim construction,

19 Open Text never sought the particularized construction of "database" it advances now, and proposed

20 only a plain meaning construction for "database asset." 4843 Dkt. No. 176-2 at 64. The Court's

21 order is in accord, finding that "WS_FTP Pro operates exactly like the Synchronization Patents: a

22 local cached file is received by the user, the user edits the file in a locally associated application, the

23 cache manager determines if the file has been modified based on a notification from file

24 management system of the operating system, and if the file has been modified, the cache manager

25 saves the cached file back to the remote database." Dkt. 192 at 17:6-10.

26      Defendants (and the public) were and are entitled to rely on the broad patent disclosures

27 concerning database. Defendants were also entitled to rely on Open Text's infringement contentions

28 to locate, analyze, and prove-up, the invalidating prior art. *Asus Computer Int'l v. Round Rock*

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  *Research, LLC*, 2014 U.S. Dist. LEXIS 50728, at *5 (N.D. Cal. Apr. 11, 2014) ([Patent Rule 3] is

2  "designed to require parties to crystallize their theories of the case early in the litigation and to

3  adhere to those theories once they have been disclosed.") (citing *Nova Measuring Instruments Ltd. v.*

4  *Nanometrics, Inc.*, 417 F. Supp. 2d 1121, 1123 (N.D. Cal. 2006).)  Open Text may not legitimately

5  use Dr. Mayer-Patel's new and conflicting positions to create any genuine issue of material fact – the

6  construction of database is a matter of law, and the specification, along with Open Text's own prior

7  litigation positions, are dispositive on the issue.[26]  See *LG Elecs., Inc. v. Hitachi Am. Ltd.*, 655 F.

8  Supp. 2d 1036, 1044 (N.D. Cal. 2009) ("LGE is bound by its contentions, and those contentions

9  assert that the accused products infringe the patents-in-suit based on nothing more than the fact that

10  they contain licensed Intel parts in combination with other unspecified standard parts.").

      **3.**     **Open Text Fails To Raise Any Legitimate Dispute Concerning Coda's Disclosure Of Notifying The Operating System To Open The Cached File Using A Locally Running Application**

13        Open Text concedes that WS_FTP discloses, but argues that Coda does not disclose, the

14  element (and related elements) reciting "notify the operating system to open the cached file using a

15  locally running application associated with the file type for the cached file."  Dr. Mayer-Patel asserts

16  that the Coda Venus cache manager only communicates with the kernel component, not the

17  operating system, and thus the notification is not sent to the operating system as recited in the

18  claims.  This argument should be rejected as a matter of law because the kernel is a part of the

19  operating system, as plainly illustrated in Braam.  Ex. 36 at Fig. 3; Ex. 35 at 32:14-33:16.   Dr.

20  Mayer-Patel also asserts that Coda does not notify the operating system "*which* local application

21  should be used to open the cached file," but of course, the claims only require that the cache

22  manager (or software program) notify the operating system "*to* open a file using a locally running

23  application associated with the file type."  In fact, Dr. Mayer-Patel admitted that Box Edit does not

24  notify the operating system which application to use yet it satisfies the claims. Ex. 58 at 154:4-

---

[26] Even if the Court was to adopt Open Text's latest construction of "database," then summary judgment of non-infringement is appropriate because Dr. Mayer-Patel's infringement report advances no infringement opinions whatsoever based on the "database" construction he advanced in his rebuttal validity report, and Open Text faces a complete failure of proof on these elements under this new construction.  Thus, Defendants are entitled to summary judgment of invalidity or, in the alternative, of non-infringement of all claims containing the "database" term.

155:19. Therefore, Dr. Mayer-Patel's argument fails in light of the claim language and his own admissions.

### 4. Open Text Fails To Raise Any Genuine Disputes Concerning The "Notification" And "Determination" Elements

In an effort to refute the "notification" and "determination" elements, Open Text advances arguments contrary to the patent disclosures and its prior litigation positions. Dr. Mayer Patel, for example, asserts (again, for the first time, in his rebuttal expert report) that the recited "determination" of whether a file has been modified cannot occur based upon receipt of the "notification" that the file has been modified, and that "something more" must occur to meet the determination step. Ex. 50 ¶ 229-30; Ex. 58 at 260:9-24. To the contrary, as explained above in connection with the obviousness combination of WS_FTP and the knowledge of one of skill in the art, the specifications explain that if the file management system supports automatic notification (the "inherent feature" of Windows which is incorporated into the invention), then the cache manager can exploit this "inherent feature" of the file management system to determine when the cached file is saved – i.e., the actions are connected and notification prompts and provides the determination. Ex. 6 at 7:20-23, cl. 1(i). In its infringement contentions, and Dr. Mayer-Patel's opening expert report, Open Text acknowledged and endorsed the disclosure that notification leads to the determination of a file modification, without any particular additional activity, step, or operation involved. *See* Ex. 75 at 25. ("When a user updates a file in the local application on the client computer, the file management system *notifies* Box Edit and Box Edit then *determines* if the cached file at the client computer has been modified by a user using the locally running application based on a notification from a file management system of an operating system as required for this limitation.") Ex. 51 ¶¶ 292-296. The Court Order denying the preliminary injunction is in accord. Dkt. 192 at 14-15.[27]

---

[27] Specifically, the Court reasoned:
> Here, WS_FTP Pro teaches each and every element of the claimed invention except that WS_FTP Pro does not disclose *how WS_FTP Pro determines a change has been made* by the user. Tellingly, the patent specification described the state of the art at the time of the patent filing: *that a notification from a file management system is an inherent feature* of the well-known Microsoft Windows operating systems. '515 patent 7:20-23. . . Thus, a person skilled in the art would likely know that WS_FTP Pro, utilizing Microsoft as its operating systems, would support the *same notification from a file management system of Windows to inform WS_FTP Pro to save the file back to the remote host*. . . . WS_FTP Pro operates exactly like the

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    Indeed, it was not until his rebuttal report, that Dr. Mayer-Patel first changed his position in a failed

2    effort to avoid WS_FTP.

3           The fallacy in this new position is also demonstrated by Dr. Mayer-Patel's deposition, in

4    which he conceded that the patent specification lacks any enabling disclosure for the alleged

5    "something more" (beyond receipt of the notification and the fact that the specification repeats the

6    claim term "determining") that, under his new theory, must occur to meet the determination

7    limitation.  Ex. 58 at 2260:16-261:4.  Open Text cannot have it both ways.  Either the patents

8    disclose that receipt of the notification results in a determination of file modification, and the prior

9    art discloses these limitations, or the patents require "something more" and are therefore invalid for

10   failure to enable the "something more" under 35 U.S.C. § 112.

## VIII.    PARTIAL SUMMARY JUDGMENT ON CERTAIN CLAIMS AND ISSUES, AT A MINIMUM, IS REQUIRED TO STREAMLINE THE LITIGATION

13          To the extent this case is not disposed of based on prior art invalidity, Defendants request

14   that the Court grant partial summary judgment as follows:

### A.    No Willful Infringement

16          To prove willfulness, a patentee must meet a two prong test, demonstrating by clear and

17   convincing evidence that:  (1) "the infringer acted despite an objectively high likelihood that its

18   actions constituted infringement of a valid patent" and (2) "that this objective defined risk [] was

19   either known or so obvious that it should have been known to the accused infringer."  *In re Seagate*

20   *Tech., LLC*, 497 F.3d 1360, 1370-71 (Fed. Cir. 2007).  The first prong  "is best decided by the judge

21   as a question of law."  *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003,

22   1006-07 (Fed. Cir. 2012).  If the patentee cannot meet the first prong, there is no need to reach the

23   second prong, and the court a "cannot send the question of willfulness to the jury."  *See Lee v.*

24   *Mike's Novelties, Inc.*, 543 F. App'x 1010, 1017 (Fed. Cir. 2013).

25

26

27

28

---

Synchronization Patents: . . the cache manager ***determines if the file has been modified based on a notification from file management system of the operating system,*** and if the file has been modified, . . . saves the cashed file back to the remote database. Dkt. 192 at 15, 17.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Under *Seagate*, a patentee is not entitled to damages for post-suit willfulness without first moving for a preliminary injunction on its asserted claims. *Seagate*, 497 F.3d at 1374. And even where a patentee has moved for a preliminary injunction, the objective prong of the willfulness inquiry is not satisfied as a matter of law where, as here, defendants have raised "substantial questions" as to the invalidity of the claims. *See, e.g.*, *Spine Solutions, Inc. v. Medtronic Sofamore Danek USA, Inc.*, 620 F.3d 1305, 1319 (Fed. Cir. 2010). Indeed, a "substantial question about invalidity or infringement is likely sufficient not only to avoid a preliminary injunction, but also a charge of willfulness based on post-filing conduct." *Seagate*, 497 F.3d at 1374; *see also Astrazenca AB v. Apotex Corp.*, No. 01-cv-09351, 2010 WL 2541180, at *6 (judgment on the pleadings of no willfulness where defendant "raised substantial question of invalidity"). Likewise, a reasonable defense of invalidity, even if ultimately unsuccessful, defeats a finding of objective recklessness. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371 (Fed. Cir. 2014) (no willfulness because of objectively reasonable defense); *Emblaze Ltd. v. Apple Inc.*, No. 11-cv-01079, 2014 WL 1652226, at *13 (N.D. Cal. Apr. 24, 2014) (summary judgment of no willfulness because defense objectively reasonable).   Partial summary judgment of no willfulness is appropriate based on the following undisputed facts:

- Defendants learned of the Patents-in-Suit upon service of this suit in June 2013, and they answered asserting invalidity and non-infringement. Dkt. Nos. 1, 44, 45 & 161; McGoff ¶¶4-5 . Open Text's claims of willful infringement are based on post-filing conduct. Dkt. 161 ¶¶ 59 & 62.

- Open Text moved for a preliminary injunction against Box arguing infringement of the certain claims of the Groupware and File Synchronization Patents. Dkt. No. 65 at 5. Other than claim 10 of the '515 patent, Open Text did not move for a preliminary injunction on any of the currently asserted Groupware or File Synchronization Patent claims. Box opposed the preliminary injunction, submitting substantial evidence that the asserted claims were invalid. Dkt..No. 85.

- The Court denied the preliminary injunction motion, stating that Box raised "***substantial questions concerning the validity***" of the Groupware and File Synchronization Patents. Dkt. No. 192 at 5. The Court found that the File Synchronization Patents were likely invalid based on WS_FTP Pro and the Groupware Patents were likely invalid based on the Appelt article. *Id.* at 17, 24. The claims at issue in the preliminary injunction motion overlap with, and are substantially similar to, the claims that Open Text currently asserts.

- The Court found claims of the Marketing Dialogue Patents invalid for unpatentability 35 U.S.C. § 101. 4843 Dkt. No. 204.

MEMORANDUM OF POINTS AND AUTHORITIES

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- Since the April 9th Order, Defendants served detailed invalidity contentions identifying additional grounds for invalidity, asserted credible non-infringement defenses, provided detailed expert reports on both invalidity and non-infringement, and moved for summary judgment of invalidity and/or non-infringement. *See, e.g.*, Ex. 75; Ex. 73 at 7-19; *see also* Declarations of White and Jagannathan submitted herewith; Sections II-VII, *supra*. For example, Defendants secured working executable versions of invalidating software systems and testimony from the designers of those invalidating systems, several of which are the subject of this objectively reasonable (and indeed, meritorious) motion for summary judgment. *See* Sections II-VII, *supra*.

On the record, Open Text cannot meet its heavy burden to show that Defendants were objectively reckless under the first prong of the *Seagate* test. Because Open Text failed to move for a preliminary injunction on the majority of the currently asserted claims, its claim for post-suit willful infringement based on those claims fails. *Seagate*, 497 F.3d at 1374. Moreover, the Court expressly found that Box raised "substantial questions of validity" concerning patent claims that overlap with, and are closely related to, those currently at issue, thereby demonstrating Defendants' lack of objective recklessness. *Id.* And since the preliminary injunction proceedings, Defendants' defenses have only strengthened. No reasonable juror could conclude otherwise, and Defendants are entitled to partial summary judgment of no willfulness.

## B.   The "Computer Readable Medium" Claims Are Invalid

Asserted claim 22, which depends from claim 19, of the '055 patent and asserted claim 27, which depends from claim 19, of the '258 patent are "computer readable medium" claims. Ex. 3, cls. 19 and 22; Ex. 4, cls. 19 and 27. It is well-settled that where, as here, "computer readable medium" claims are not drafted to specifically exclude transitory signals, they are invalid as a matter of law under 35 U.S.C. § 101 for claiming unpatentable subject matter.[28] *See In re Nuijten*, 500 F.3d 1346 (Fed. Cir. 2007) (finding transitory embodiments not directed to statutory subject matter); *Ex Parte Mewherter*, No. 2012-007692, 2013 WL 4477509, at *3-*7 (P.T.A.B. May 8, 2013) (holding "machine readable storage medium" encompasses transitory signals and are therefore unpatentable). "[T]ransitory electrical and electromagnetic signals propagating through some medium, such as wires, air, or a vacuum" do not fall within the four categories of patentable subject matter enumerated under Section 101: process, machine, manufacture, or composition of matter. *Nuijten*,

---

[28] Because Open Text also asserts some "computer readable medium" claims that specifically exclude transitory signals, those claims are not the subject of this partial summary judgment motion. *See, e.g.*, Ex. 8, cl. 11 (reciting a "***non-transitory*** computer readable storage medium including")

1   500 F.3d at 1352.  SUBJECT MATTER ELIGIBILITY OF COMPUTER-READABLE MEDIA, 1351 Off. Gaz.

2   Pat. Office 212 (Feb. 23, 2010)).  To avoid invalidity under Section 101, computer readable medium

3   claims ***must*** be drafted to expressly exclude transitory signals, and where, as here, they are not,

4   summary judgment of Section 101 invalidity is appropriate.  *See, e.g., Mewherter*, 2013 WL

5   4477509, at *7.

6       **C.    Claim 5 Of The '018 Patent Is Invalid For Obviousness-Type Double Patenting**

7           Claim 5, the only asserted claim of the '018 patent, is an obvious variant of the other

8   Groupware Patent claims, and its expiration date should thus align with them.[29]  Under OTDP,

9   which is a question of law, a patent is invalid where, as here, it is patentably indistinct from an

10  earlier-expiring patent.  *See, e.g., Sun Pharms. Indus, Ltd. v. Eli Lilly & Co.*, 611 F.3d 1381, 1384

11  (Fed. Cir. 2010).  OTDP thus serves as "an important check on improper extension of patent rights

12  through the use of divisional and continuation applications."  *Boehringer Ingelheim Int'l GmbH v.*

13  *Barr Labs., Inc.*, 592 F.3d 1340, 1346 (Fed. Cir. 2010); *see also Sun Pharm.*, 611 F.3d at 1384

14  (affirming summary judgment of OTDP); *Logic Devices, Inc. v. Apple Inc.*, No. C 13-02493, 2014

15  WL 5305979, at *4 (N.D. Cal. Oct. 16, 2014) (Alsup, J.) (granting summary judgment of OTDP).

16  Courts determine OTDP by first construing the claim in the earlier patent and the claim in the later

17  patent and determining whether the differences between the claims render them patentably distinct.

18  *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 968 (Fed. Cir. 2001).  Partial summary judgment of

19  invalidity of claim 5 of the '018 patent for OTDP is appropriate here in view of the following

20  undisputed facts:

21  •   The '018 and '258 patents, both filed on the same day—June 22, 2004—share the same
        inventors and specification and claim priority as continuations in part to the earlier issued

22      '177 patent, which expires on October 22, 2017.  Exs. 4-5.

23  •   As their specifications and claims reflect, the '018 and '258 patents are directed to the
        same invention and/or obvious variants of each other.  Exs. 4-5.  Any differences

24      between claim 5 of the '018 patent and the claim 5 of the '258 patent are insubstantial.
        *See* Ex. 74.[30]

25

26  [29] Defendants understand that the Court has yet to issue a ruling on their pending Motion for Leave
    to Amend Answers to Assert the OTDP Defense (Dkt. No. 274), but nevertheless move for partial

27  summary judgment on this issue for purposes of efficiency.
    [30] Claim 5 of the '018 patent is also an obvious variant of the '177 claims (discussed in previous

28  sections of this brief) as well as the '055 patent which issued before the '018 patent.  *See also* Dkt.
    No. 293 at 7-10.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- The '258 patent issued on November 20, 2007.  Ex. 4.  The '018 patent issued on January 15, 2008.  Ex. 5.  The applicants filed a terminal disclaimer for the '258 patent (and all the other asserted Groupware Patents).  The applicants, however, did not file a terminal disclaimer for the '018 patent.

- Open Text asserts that the '018 patent expires on November 11, 2018, over one year after all of the other asserted Groupware Patents.  Dkt. No. 288 at 2.

- The '258 and '018 patents (and all the Groupware Patents) are commonly owned.  Exs. 4-5.

The chart attached hereto Exhibit 74 compares claim 5 of the '018 patent (and claims 1 and 4 from which it depends) to claim 5 of the '258 patent (and claims 1 and 3 from which it depends).  This comparison demonstrates that the claims share identical, or closely related limitations, and any minor differences reflect, at most obvious variations of claim 5 of the '258 patent.  *See, e.g., Geneva Pharms. v. GlaxoSmithKline, PLC*, 349 F.3d 1373, 1382-83 (Fed. Cir. 2003) (using chart to compare claims).  Partial summary judgment of invalidity under OTDP is appropriate.

**D.     No Pre-Suit Damages As To The Groupware Patents**

As a matter of law, Open Text cannot recover pre-suit damages for alleged infringement of the Groupware Patents, because it is undisputed that Open Text failed to provide Defendants any actual or constructive notice of the patents, for example, by meeting the marking requirements of 35 U.S.C. Section 287 ("Section 287").  *See* 35 U.S.C. 287; *U.S. Ethernet Innovations, LLC v. Acer, Inc. ("USEI")*, No. C 10-3724 CW, 2013 WL 4456161, at *4-5 (N.D. Cal. Aug. 16, 2013) (Wilken, J.); *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 186-187 (Fed. Cir. 1994).  For Open Text to recover pre-suit damages absent actual notice of infringement, Section 287 mandates that, for the period that began June 5, 2007 and ended on the date Open Text filed suit, June 5, 2013, Open Text must demonstrate that it, ***and its licensees*** marked substantially all of the patented articles they distributed ***and*** that once marking began, the marking was substantially consistent and continuous.  *See, e.g., USEI*, 2013 WL 4456161, at *5, *9-10; *Clancy Sys. Int't, Inc. v. Symbol Tech., Inc.*, 953 F. Supp. 1170, 1172 (D. Colo. 1997) (granting summary judgment where patent failed to meet "burden to respond affirmatively with evidence of appropriate marking" by licensees); *Loral Fairchild Corp. v. Victor Co. of Japan*, 906 F. Supp. 813, 818 (E.D.N.Y. 1995) (same); *see also Devices for Med., Inc. v. Boehl*, 822 F.2d 1062 (Fed. Cir. 1987); *USEI*, 2013 WL 4456161, at

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

MEMORANDUM OF POINTS AND AUTHORITIES

*7.   Partial summary judgment of no pre-suit damages for the Groupware Patents is appropriate based on the following undisputed facts:

- Open Text never provided and Defendants had no actual notice of the Groupware Patents until the filing of the lawsuit.  McGoff ¶¶_4-5; Dkt. No. 161 ¶¶ 56 & 60.

- [redacted]

- [redacted]

- OTC licensed IBM [redacted]

- The IBM License contains *no marking obligation* [redacted]

- [redacted]

- Mr. Stuebing provided no evidence of Open Text's efforts to ensure that IBM marks its licensed products with the Groupware Patents.  Ex. 59 at 24:22-25.

---

[31] [redacted]

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1      Thus, there is no evidence showing that Open Text substantially consistently and

2 continuously marked its own embodying products during the relevant period.  And even if did, Open

3 Text included no marking requirement in its IBM license, thereby authorizing the largest player in

4 the ECM market ████████████████████ to sell an unlimited number of unmarked

5 products.  *See, e.g.*, *USEI*, 2013 WL 4456161, at *1, 7 (considering similar IBM license and granting

6 summary judgment of no pre-suit damages).  Partial summary judgment of no pre-suit damages for

7 alleged infringement of the Groupware Patents is appropriate.  *Id.*

8 **IX.    CONCLUSION**

9      For the foregoing reasons, Defendants respectfully request that the Court grant Defendants'

10 Motion for Summary Judgment of Invalidity, or, in the alternative, grant Defendants' Motion for

11 Partial Summary Judgment of no willfulness, invalidity of claim 22 of the '055 patent and claim 27

12 of the '258 patent under 35 U.S.C. § 101, invalidity of claim 5 of the '018 patent for OTDP, and  no

13 pre-suit damages as to the Groupware Patents.

14

15      Dated:     December 5, 2014                    Respectfully submitted,

16

17                                                     /s/ John P. Bovich
                                                       John P. Bovich (SBN 150688)
18                                                     Email: jbovich@reedsmith.com
                                                       REED SMITH LLP
19                                                     101 Second Street, Suite 1800
                                                       San Francisco, CA 94105-3659
20                                                     Telephone: +1 415 543 8700
                                                       Facsimile: +1 415 391 8269

21

22                                                     *Attorneys for Defendants Box, Inc. and*
                                                       *Carahsoft Technology Corporation*

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

No.: C 13-04910 JD                                  – 40 –