UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OPEN TEXT S.A.,

    Plaintiff,

  v.

BOX, INC., et al.,

    Defendants.

Case No. 13-cv-04910-JD

**ORDER GRANTING MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF KRISTA HOLT**

Re: Dkt. No. 430-1

Defendants Box and Carahsoft (which the Court will refer to collectively as "Box") seek to exclude the patent damages testimony of plaintiff Open Text's expert, Ms. Krista Holt, based on, among other things, her reliance on non-comparable licenses and the "black box" nature of her damages opinions. After carefully considering Holt's qualifications and expert report, and after holding a *Daubert* hearing in which the parties and the Court questioned Holt extensively on her opinions, the Court excludes Holt's opinions.

## LEGAL STANDARD

### A.   Reasonable Royalty

Upon a showing of infringement, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. A "reasonable royalty" usually derives from a hypothetical negotiation between the patentee and the infringer when the infringement began. *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868 (Fed. Cir. 2010). The hypothetical negotiation is a construct that "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). Often, in determining the

reasonable royalty, experts consider one or more of a non-exhaustive list of fifteen factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). But the Federal Circuit "do[es] not require that witnesses use any or all of the *Georgia-Pacific* factors when testifying about damages in patent cases." *WhitServe, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012).

The reasonable royalty can take the form of a running royalty paid out over time, or a lump sum that discharges the accused infringer's obligations at one go. In situations where the expert believes the hypothetical negotiation would have yielded a running royalty paid by the alleged infringer to the patent owner, "the classic way to determine the reasonable royalty amount is to multiply the royalty base, which represents the revenue generated by the infringement, by the royalty rate, which represents the percentage of revenue owed to the patentee." *Id.* at 27. When the accused technology does not make up the whole of the accused products, and the patented feature does not drive the demand for the entire product, "the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *see also VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (citing *Garretson v. Clark*, 111 U.S. 120, 121 (1884)). In addition, as a prudential concern to avoid "skew[ing] the damages horizon for the jury," *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011), the patentee must choose a royalty base that is not too high, and in no event higher than the smallest salable patent-practicing unit, even if it is offset by a "low enough royalty rate." *Ericsson*, 773 F.3d at 1227 (citing *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67, 68 (Fed. Cir. 2012)); *VirnetX*, 767 F.3d at 1327-28.

**B.     Admissibility of Expert Opinions**

Federal Rule of Evidence 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Following the Supreme Court's ruling in *Daubert v. Merrell Dow Pharms., Inc.* that expert testimony must be both relevant and reliable to reach the jury, *see* 509 U.S. 579, 589 (1993), Rule 702 was amended to provide that expert testimony is

admissible only if "(b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

"Under *Daubert*, the district judge is 'a gatekeeper, not a fact finder.'" *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010). Thus, "[w]hile questions regarding which facts are most relevant for calculating a reasonable royalty are properly left to the jury, a critical prerequisite is that the underlying methodology be sound." *VirnetX*, 767 F.3d at 1328. When it is not, exclusion of the expert's opinion is proper. *Id.*

## HOLT'S PROPOSED OPINIONS

Holt's damages report attempts to come up with a reasonable royalty for the patents asserted by Open Text against Box, which then consisted of two families: the Groupware patents[1] and the File Synchronization patents.[2] The Court has since held the Groupware patents invalid. *See* Dkt. No. 454. Holt and Open Text refer to the remaining family as the Client-Side Update patents, but the Court declined to use this nomenclature for the reasons explained in its claim construction order. *See Open Text, S.A. v. Box, Inc.*, No. 13-cv-04910-JD, 2014 WL 6766018, at *1 (N.D. Cal. Dec. 1, 2014). In this order, the Court focuses on Holt's analysis of the File Synchronization patents -- the only patents that remain in the case -- while noting that her opinions concerning damages for the Groupware patents are essentially identical.

Holt's report discusses a number of techniques for calculating a reasonable royalty. It includes three "quantitative valuation methods" followed by what Holt calls "qualitative valuation methods," which consist of a discussion of the hypothetical negotiation and the *Georgia-Pacific* factors. But by the time Holt reaches her final opinions, none of these techniques or considerations ends up playing a meaningful role in the royalty rate determination.

### A.   Quantitative Valuation Method and the "3% to 45%" Royalty Range

Holt first claims to apply three "quantitative valuation methods" that she calls the "income approach," the "market approach," and the "cost approach." *See* Holt Expert Report, Dkt. No.

---

[1] U.S. Patent Nos. 6,223,177; 6,917,962; 7,287,055; 7,299,258; and 7,320,018.
[2] U.S. Patent Nos. 7,062,515; 7,590,665; and 8,117,152.

3

430-2 at 48, 73. The income approach looks to the income or profits associated with the patented invention, *id.* at 45-47; the market approach looks to transactions involving the patents or similar technologies, *id.* at 47; and the cost approach looks to the cost of obtaining the same benefits through alternative technologies, *id.* at 47-48.

As Holt testified at the *Daubert* hearing before the Court, only the market approach yields actual numbers, and none of those numbers form part of her final damages opinion. The other two approaches are presented in merely descriptive terms. For example, Holt's discussion of the income approach notes that Box's use of a "freemium" strategy -- making versions of its accused products available for free -- means that its profit margins would be understated, and that any additional value that Box was able to generate by adding the accused Box Edit add-on to its offerings would be indicative of the value of the patented technology. *See id.* at 74. While that might be right, Holt makes no effort to quantify either the amount by which the profit margins are understated or the additional income associated with Box Edit. *See id.* Similarly, Holt's analysis with respect to the cost approach consists solely of noting that she is unaware of any acceptable non-infringing alternatives to the patents-in-suit. *See id.* at 76.

An effort at quantitative analysis appears only in the market approach. Applying that approach to the File Synchronization patents, Holt considered (1) a software licensing agreement between Vignette (the former owner of the File Synchronization patents) and Manugistics; (2) four third-party documents; and (3) the cost of acquiring the patented technology. *See id.* at 74-76.

The first item Holt discusses was an agreement allowing the integration of Vignette Business Integration Studio, a product allegedly similar to the accused Box Edit, into Manugistics' products, which provided for royalties ranging up to 45% with a per-license floor and cap. *See id.* The second item consists of four documents, none of them involving the patents-in-suit: (1) an SEC filing by Stellent, claiming that it valued some software it had acquired as being equivalent to a 20% royalty; (2) an agreement between BackWeb Technologies and Baan Development in which BackWeb agreed to develop software called "BackWeb Sales Accelerator" for Baan in exchange for, among other things, royalties of 35% of net sales of the BackWeb software; (3) a license agreement between Brigham Young University and Redstone Publishing for the

4

intellectual property rights for "WordCruncher" technology, providing for a 3% royalty to BYU; and (4) a license between Union Information System and TransGlobe Internet and Telecom, providing for payments from TransGlobe of 40% of net income in exchange for Union's intellectual property.  *See id.* 53-55.

But after describing these items, Holt states that they do not "provide evidence of an established royalty." *Id.* at 81, 62.  Open Text, in its briefing, goes farther and states that Holt "concluded that the four industry agreements [one of which was not an agreement at all] and the Vignette agreement were <u>not</u> comparable licenses for the Client-Side Update patent family" and that "she did not rely on them."  *See* Open Text's Opposition, Dkt. No. 446-1 at 5.  And at the hearing, Holt testified that her final royalty rate was not "driven in any way, shape, or form" by the numbers discussed in the market approach.

Despite these clear and unequivocal statements of non-reliance, Open Text nevertheless says Holt treated the numbers as "suggestive of a range" for a reasonable royalty.  *See id.*  Holt goes on to take the 3% royalty from the BYU license and the 45% upper royalty from the Vignette license to create a "3% to 45%" range, which she says is the reasonable royalty zone for the File Synchronization patents.  *See* Holt Expert Report at 81, 91.  This range mysteriously reflects only the BYU and Vignette licenses (leaving out any role for the Stellent statement and the Backweb and Union agreements) and then immediately exits the stage, never to play a role in Holt's final damages number.

Holt's thinking here is hard to follow.  She identifies five documents as the core of the market analysis approach, then disclaims any reliance on them, then says they are nevertheless suggestive of a reasonable royalty range, and then discards that range from use in her final damages number.  This "I like it -- I like it not" petal-plucking exercise is hardly the grist of admissible expert opinion.

For the third item -- the amount paid for the patents-in-suit -- Holt notes that when Open Text bought Vignette, the previous owner of the File Synchronization patent, a portion of the purchase price was reportedly attributed to the value of Vignette's "technology assets" as opposed to its "customer assets."  *See id.* at 76; *Daubert* Hrg. Pltf. Ex. 2 at 76.  Holt makes no effort,

5

however, to quantify the amount attributable to the patents-in-suit, and says only that her research shows Open Text may have paid a depressed price for Vignette. *See id.*

### B.     Royalty Base

Holt turns next to the royalty base. In an effort to apportion between accused and non-accused technology, as required by Federal Circuit precedent, Holt first starts with the number of installations of the accused Box Edit add-on from August 2011 until the time of her report. *See id.* at 79. As Holt testified at the hearing, a business or personal user must download Box Edit to be able to use it. Although Box apparently does not collect data on what proportion of its installations are by paid users, Holt assumes that the ratio of free to paid users among those who installed Box Edit reflected the ratio among all of Box's users, and thereby estimates the number of paid users who had installed Box Edit in the given timeframe. *See id.*; *Daubert* Hrg. Pltf. Ex. 2 at Exs. 8.0, 8.1. Holt then compares that number to the total number of paid users, and finds that it makes up about 16% of the latter number. *See id.* (At the hearing, she said 14%; the difference is immaterial to the admissibility of her opinions.) She then applies that to Box's entire business subscription revenue earned after the release of Box Edit Beta at the end of March 2012, which yields a royalty base of $36 million or $27 million (depending on whether Box prevails on its separate patent marking defense). *See id.* The upshot is that Holt's royalty base excludes some users who have installed Box Edit (e.g., free users), but includes the entire revenue from business subscription users who have chosen to install Box Edit, even if they use it only rarely or not at all.

Holt blames the roughness of this approach on Box, claiming that it did not provide sufficient data to determine which of its accounts actually utilize Box Edit and the revenues generated from those accounts. *See id.* at 80-81. But Holt made no effort to refine the data in other conventional ways. At the hearing, Holt admitted, for example, that she did not undertake a survey of Box Edit usage.

### C.     Royalty Rate

The final piece of Holt's opinion is her proposed royalty rate, which purports to be based on the *Georgia-Pacific* factors and an analysis of the parties' bargaining positions. *See id.* at 81. Holt's discussion of the 15 *Georgia-Pacific* factors consists of one to three paragraphs per factor,

followed by a line indicating whether she thinks the impact of the factor on the royalty rate is "Upward," "Downward," or "Neutral." Upward or downward from what starting point is never stated, and at the hearing, Holt testified that she had no numerical starting point. In Holt's view, the first, second, fourth, and thirteenth factors are neutral, the third has a downward impact, and the remainder are positive. *See id.* at 89. (The twelfth, fourteenth, and fifteenth factors are omitted as being considered elsewhere.) Holt testified at the hearing that she made no attempt to quantify the effect of each factor, apart from the qualitative direction it would push the royalty rate.

Holt contends that Box's bargaining position would have been relatively weak because Box would have (1) found it difficult to target large enterprise customers without products like Box Edit; (2) accepted large sums in venture financing that would exert pressure for it to release the best possible products; and (3) been willing to accept a higher royalty rate to account for the alleged infringement of its free users. *See id.* at 89-90. Open Text's bargaining position would conversely have been relatively strong according to Holt because of the competitive threat to Open Text from Box's products and because of Open Text's knowledge of Box's weak bargaining position. *See id.* at 90.

From this completely impressionistic and qualitative mix Holt extracts a precise quantitative measure of a reasonable royalty rate: "Thus, based on my experience and the facts of this case, the royalty rate agreed upon in the hypothetical negotiation would be 15%." *Id.* at 91. No formula, method, or calculation, however approximate, is presented to explain or justify this figure. Instead, Holt simply announces it and proceeds to apply it to her royalty base data.

## DISCUSSION

The Court turns first to Box's challenge to the portions of Holt's report that rely on her survey of licenses in the ECM sector, arguing that the licenses are non-comparable. Ordinarily, the Court would not exclude reliance on those licenses unless the licenses shed no light on the hypothetical negotiation, for "the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility." *Ericsson*, 773 F.3d at 1227.

But here, both Open Text and Holt agree that she affirmatively rejected the licenses as non-comparable. *See* Open Text's Opposition at 4-6. Because of this and the fact that the 3% to 45% "bargaining range" is unquestionably based on inappropriate licenses, the range cannot be admitted into evidence or used in any way to determine a royalty rate. *See LaserDynamics*, 694 F.3d at 79 (holding in context of excluding damages expert opinion that "[w]hen relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice."); *ResQNet*, 594 F.3d at 869 ("This court has long required district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies other than the patent in suit."); *Lucent*, 580 F.3d at 1329 (noting that plaintiff has "the burden to prove that the licenses were sufficiently comparable" to support damages award). Holt cannot testify about the licenses or the 3-45% royalty range at trial.

This testimony bar applies across the board, including any attempt to mention the non-comparable licenses as "background" evidence. Open Text's and Holt's unwillingness to say that she relied on the licenses -- apparently based on a recognition that they would not qualify as comparable licenses under the Federal Circuit's precedents -- leaves no room for some sort of soft or "suggestive" reliance. *See TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1016 (N.D. Cal. 2013) (rejecting attempt to opine on non-comparable licenses "for the limited purpose of noting that they 'support' [expert's] royalty rate"); *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F. Supp. 2d 424, 433 (D. Del. 2007) (excluding expert's testimony regarding evidence that he conceded did not affect his reasonable royalty, but which he included because it was "a fact in the record"). If, as Open Text and Holt concede, the licenses are non-comparable, they are "irrelevant" and "simply [have] no place in this case." *LaserDynamics*, 694 F.3d at 80 (quoting *ResQNet*, 594 F.3d at 871).

Box also argues that Holt's 15% royalty opinion is conclusory. Open Text tries to cast the challenge as directed to the weight rather than the admissibility of the opinion. Open Text says the 15% figure is based on the tried-and-true *Georgia-Pacific* factors, and that Box's concerns may make for a good cross-examination but do not support exclusion.

8

It is true of course that the Federal Circuit's precedents leave room for "more than one reliable method for estimating a reasonable royalty": the expert can, for example, "use the royalty rate from sufficiently comparable licenses, value the infringed features based upon comparable features in the marketplace, or estimate the value of the benefit provided by the infringed features by a comparing the accused product to non-infringing alternatives" -- or other methodologies still. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014). But a "superficial recitation of the *Georgia-Pacific* factors, followed by conclusory remarks" is not enough. *See WhitServe*, 694 F.3d at 31. "[W]hile mathematical precision is not required, some explanation of both why and generally to what extent the particular factor impacts the royalty calculation is needed." *Id.*

Holt's *Georgia-Pacific* discussion fails under these rules. Holt's analysis echoes the damages expert opinion excluded in *GPNE Corp. v. Apple, Inc.*, 12-cv-02885-LHK, 2014 WL 1494247, at *2-*6. (N.D. Cal. Apr. 16, 2014). There, as here, the damages expert offered a number of qualitative reasons why the accused technology would be important to the accused infringer: for example, just as Holt suggests that Box needed to expand beyond simple storage and file-sharing using the patented technology in order to get more customers, the expert opinion excluded in *GPNE* emphasized Apple's need to use the patented technology in order to comply with the relevant cellular standards. *Compare* Holt Expert Report at 68-69 *with GPNE*, 2014 WL 1494247, at *3. Similarly, Holt argues that Box would have been willing to negotiate a higher royalty rate to account for the alleged infringement of its free users, just as the excluded expert opinion in *GPNE* argued that Apple's follow-on sales from its accused products would militate in favor of a higher royalty rate. *Compare* Holt Expert Report at 71 *with GPNE*, 2014 WL 1494247, at *3. And, like Holt, the expert whose opinion was excluded in *GPNE* followed up these qualitative measures with a royalty rate but no methodology. Holt's 15% number is "based on [her] experience and the facts of this case," just as the excluded damages opinion in *GPNE* was "based on all of the evidence in the record and [the expert's] years of licensing and doing this" and "under the circumstances in this case." *Compare* Holt Expert Report at 73 *with GPNE*, 2014 WL 1494247, at *4. The reasons the *GPNE* court excluded the problematic damages opinion before it thus apply with considerable force to Holt's report. *See also TASER Int'l, Inc. v. Karbon Arms,*

9

*LLC*, No. 11-426-RGA, 2013 WL 6773663, at *1 (D. Del. Dec. 19, 2013) ("Mr. Gallagher offers almost no basis as to how he arrived at his royalty rate other than that he considered the above numbers and factors. This is the quintessential *ipse dixit* justification."); *ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 815 (E.D. Va. 2011) (excluding expert opinions based in part on claims that certain *Georgia-Pacific* factors "would suggest some unarticulated quantum of 'higher' royalty rate"), *aff'd in relevant part*, 700 F.3d 509 (Fed. Cir. 2012).

What mandates exclusion here, rather than simply subjecting the opinions to cross-examination, is not that the qualitative factors Holt discusses are improper considerations in determining a royalty, or that the reams of evidence that she claims she considered are beyond the pale. Exclusion is required because the link, if any, between those inputs and Holt's final royalty is written in invisible ink. Rather than spelling out the steps she took to go from the data to the royalty rate opinion, Holt cites her "experience" -- an abstraction not visible to the eyes of the Court, the jury, and opposing counsel, or testable in the crucible of cross-examination  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Holt's method is a "black box into which data is fed at one end and from which an answer emerges at the other," and the jury cannot see how the pieces fit together or how the data drives the conclusion. *Lawrence v. Raymond Corp.*, No. 09-cv-1067, 2011 WL 3418324, at *7 (N.D. Ohio Aug. 4, 2011), *aff'd*, 501 F. App'x 515 (6th Cir. 2012). Cross-examination cannot fix that problem. *See GPNE*, 2014 WL 1494247, at *6 ("Apple cannot cross-examine Mr. Dansky on his assertions, all of which fundamentally reduce to taking his opinion based on 30 years of experience for granted.").

In addition, decisions from the Federal Circuit and this district have rejected deriving a royalty rate by picking a starting point based on industry-wide data (rather than facts specific to the case at hand) and varying it upwards or downwards using the *Georgia-Pacific* and other factors. *See Uniloc*, 632 F.3d at 1313-18; *VirnetX*, 767 F.3d at 1331-34; *Digital Reg of Texas, LLC v. Adobe Systems, Inc.*, No. C 12-1971 CW, 2014 WL 4090550, *2-*3 (N.D. Cal. 2014); *Dynetix Design Solutions, Inc. v. Synopsys, Inc.*, No. C 11-05973 PSG, 2013 WL 4538210, at *4-

*5 (N.D. Cal. Aug. 23, 2013); *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1119-21 (N.D. Cal. 2011).  It follows even more strongly that varying upwards and downwards without any starting point at all -- even an arbitrary one -- is impermissible.  If Ms. Holt's methodology were allowed to stand, experts could simply resurrect the methodologies rejected in *Uniloc* and *VirnetX*, but refrain from mentioning the initial arbitrary starting point.  Such a rule would kick sand in the face of those cases.

A final flaw in Holt's proposed opinions involves apportionment.  A patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features," except when the patented feature is the driver of demand for the end products. *Uniloc*, 632 F.3d at 1318 (quoting *Garretson*, 111 U.S. at 121); *see also LaserDynamics*, 694 F.3d at 67-68; *VirnetX*, 767 F.3d at 1326-28 ("a patentee must take care to seek only those damages attributable to the infringing features"); *Ericsson*, 773 F.3d at 1226 ("The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product.").

The opacity of Holt's damages methodology makes it impossible to verify whether she has properly apportioned away the non-accused portions of the accused products or services, as required.  The apportionment Holt performed in arriving at her royalty base consisted only of isolating the full value paid by Box's business enterprise customers who had Box Edit installed, regardless of how often they used Box Edit, or the importance they placed on Box Edit as compared to the product as a whole.  Holt testified at the *Daubert* hearing that her royalty base reflected sufficient apportionment because she "conservatively" excluded some infringing users (e.g., Box's free users) that Open Text otherwise should get paid for.  But making arbitrary cuts to a portion of the royalty base does not give an expert a free hand to use the remaining revenue without apportionment.  Such purportedly "conservative" gestures do not come with the reward of using over-inclusive calculations elsewhere.

Holt's incomplete apportionment may be enough for the royalty base (though the Court is skeptical), for the royalty base need only be sufficiently apportioned to avoid skewing the jury's

11

damages horizon with too high a number. *See Ericsson*, 773 F.3d at 1226-27; *LaserDynamics*, 694 F.3d at 67-68. But it does not apportion down to the usage and importance of the accused features themselves, which is what the final royalty figure must reflect. *Lucent*, 580 F.3d at 1327, 1332-35 (holding that damages had to be tied to infringing date-picker feature rather than Microsoft Outlook as a whole, and that jury verdict was problematic because "no evidence of record establishe[d] the parties' expectations about how often the patented method would be used by consumers"). In such an instance, "the royalty rate would need to do the work," *Ericsson*, 773 F.3d at 1227, but at the *Daubert* hearing Holt was unable to explain whether or how her royalty rate did that, despite repeated inquiry by the Court. *See LaserDynamics*, 694 F.3d at 69 (rejecting apportionment that was "plucked out of thin air based on vague qualitative notions of the relative importance of [the accused technology]"); *GPNE*, 2014 WL 1494247, at *5 (excluding expert testimony on similar grounds for lack of apportionment). That Box may not track the requisite data itself is no excuse. *VirnetX*, 767 F.3d at 1329 ("VirnetX cannot simply hide behind Apple's sales model to avoid the task of apportionment."); *LaserDynamics*, 694 F.3d at 70 (holding that there is no "necessity-based exception to the entire market value rule").

## CONCLUSION

The Court excludes any testimony or opinions by Holt based in whole or in part on the non-comparable licenses and agreements. The Court also excludes any testimony or opinions by Holt on the 15% royalty rate or her views of the royalty base.

While the Court appreciates that trial is set for February 2, 2015, just a week away, the Court's duty to ensure that the damages testimony presented to the jury complies with the Federal Rules of Evidence and the Federal Circuit's precedents requires striking this testimony. *See, e.g.*, *Cornell University v. Hewlett-Packard, Co.* 609 F. Supp. 2d. 279, 283-84 (N.D.N.Y. 2009) (Rader, J., sitting by designation) (noting that the court excluded damages expert opinion in the middle of trial); *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 522-23 (Fed. Cir. 2012) (holding that district court was permitted to prevent patentee from presenting any evidence of damages after damages expert was excluded shortly before trial).

At the pretrial conference on January 21, 2015, Open Text suggested that if the Court were inclined to grant Box's motion, Open Text might nevertheless present Holt at trial for other testimony. The Court has serious concerns that this "other testimony" will, intentionally or not, turn into an end run around the exclusions ordered here. But the Court will allow Open Text to make a proffer of possible testimony before ruling on this request. If Open Text decides to do that, it must submit a detailed and specific written proffer to the Court at least 2 court days in advance of calling Holt so that the Court can review and rule on it.

The Court also suggests that the parties consider stipulating to the fully paid-up lump sum of $250,000 that Dr. Leonard opines to be a reasonable royalty for the File Synchronization patents, obviating the need for his testimony. That might solve the damages issues here in a reasonable way. *Cf. Promega Corp. v. Applied Biosystems, LLC*, No. 13-cv-2333, 2013 WL 9988881, at *6 (N.D. Ill. May 28, 2013) (Posner, J., sitting by designation) (considering treating defendant's expert's reasonable royalty number as a concession). The Court leaves it to the parties to decide what to do with this idea.

**IT IS SO ORDERED**.

Dated: January 23, 2015

_____
JAMES DONATO
United States District Judge