UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPEN TEXT S.A.,<br><br>    Plaintiff,<br><br>    v.<br><br>BOX, INC., et al.,<br><br>    Defendants. | Case No. 13-cv-04910-JD<br><br>**ORDER RE MOTIONS TO EXCLUDE OPINIONS AND TESTIMONY OF GREG LEONARD, SRINIVASAN JAGANNATHAN, AND SAM GHODS**<br><br>Re: Dkt. No. 428, 434, 299-3 |

This patent case involves four patent claims directed at bi-directional synchronization of a cache.[1] The patents are together known as the "File Synchronization patents." Open Text has moved to exclude the damages opinions of a number of experts offered by defendants Box and Carahsoft (both subsequently referred to as just "Box"), as well as some Box employees whom Defendants intend to offer as lay witnesses. In light of the Court's prior rulings, the only experts whose opinions remain at issue are Box's damages expert, Dr. Gregory Leonard, and its technical expert, Dr. Srinivasan Jagannathan; the only Box employee whose testimony remains at issue is Sam Ghods. The Court denies the motion with respect to Leonard, grants in part and denies in part the motion with respect to Jagannathan, and denies the motion with respect to Ghods.

## LEGAL STANDARD

### A. Admissibility of Expert Opinions

Federal Rule of Evidence 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "help the trier of fact to understand the

---

[1] Specifically, claims 10 and 27 of U.S. Patent No. 7,062,515; claim 4 of U.S. Patent No. 7,590,665; and claim 11 of U.S. Patent No. 8,117,152.

evidence or to determine a fact in issue." Following the Supreme Court's ruling in *Daubert v. Merrell Dow Pharms., Inc.* that expert testimony must be both relevant and reliable to reach the jury, *see* 509 U.S. 579, 589 (1993), Rule 702 was amended to provide that expert testimony is admissible only if "(b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

"Under *Daubert*, the district judge is 'a gatekeeper, not a fact finder.'" *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010). "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* at 564 (quoting *Daubert*, 509 U.S. at 597). "After an expert establishes admissibility to the judge's satisfaction, challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge." *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014).

### B. Reasonable Royalty

Upon a showing of infringement, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. A "reasonable royalty" usually derives from a hypothetical negotiation between the patentee and the infringer when the infringement began. *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868 (Fed. Cir. 2010). The hypothetical negotiation is a construct that "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). Often, in determining the reasonable royalty, experts consider one or more of a non-exhaustive list of fifteen factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). But the Federal Circuit "do[es] not require that witnesses use any or all of the *Georgia-Pacific* factors when testifying about damages in patent cases." *WhitServe, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012). The reasonable royalty can take the form of a running royalty paid out over time, or a lump sum that discharges the accused infringer's obligations at one go.

# DISCUSSION

## I. MOTION TO EXCLUDE OPINIONS OF DR. GREGORY LEONARD (DKT. NO. 434)

Open Text moves to exclude Dr. Leonard's opinions on four grounds (excluding those disposed of by the Court's previous orders): (1) the limitation of the damages period to April 30, 2014, despite the fact that Box produced financials through July 31, 2015; (2) the use of the cost of implementing non-infringing alternatives to determine a royalty; (3) the lack of evidentiary basis for non-infringing alternatives to the File Synchronization patents; (4) and reliance on allegedly non-comparable licenses. The Court addresses each in turn.

### A. Limitation of Damages Period

Open Text's first argument is that Leonard undercounted Box's potential damages by using a damages period that ended on April 30, 2014, despite the fact that Box produced financial data through July 31, 2014, and that (according to Open Text) he could have projected Box's allegedly infringing revenues through October 2014. Open Text contends this decision "improperly reduce[d] Box's potential damages." Dkt. No. 434 at 1.

As an initial matter, the damages period discussed by Leonard does not appear to have limited his final damages number. His opinion is that if Box is found to infringe a valid patent, appropriate damages would not be more than a fully paid-up lump sum amount based on the cost of implementing a non-infringing alternative to the patents-in-suit. *See* Leonard Expert Report ¶¶ 77, 225-31, 279, Dkt. No. 332-5. The discussion of Box's accused revenues comes in play when Leonard, discussing the first *Georgia-Pacific* factor, criticizes Open Text's damages expert, Krista Holt, for her analysis of a settlement agreement between Open Text and a company called Alfresco that involved a lump sum payment. *See* Leonard Expert Report ¶ 141, Dkt. No. 427-2. Leonard says that the Alfresco agreement extended through the expiration date of the licensed patents (November 11, 2018), despite the fact that Holt believes that damages in this case should be restricted to past sales. *Id.* He therefore attempted to estimate the portion of the settlement amount attributable to those past sales by determining the share of Box's past and projected future revenues through November 11, 2018, that is comprised of allegedly infringing revenue for past sales through April 30, 2014. *See id.* If there are additional past revenues that Leonard did not

consider, as Open Text says, then the adjusted lump sum associated with the Alfresco settlement would be higher. But the transparency of Leonard's methodology means that it would be straightforward to cross-examine him on the discrepancy, or even for Open Text to calculate what it believes would be the proper adjusted lump sum for the Alfresco license. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). There is no warrant for excluding Leonard's entire opinion on this ground, particularly since his final damages figures are not based on the Alfresco settlement agreement.

Overall, Open Text's challenge goes to the facts Leonard used or omitted rather than the validity or reliability of his methods. These "questions regarding which facts are most relevant for calculating a reasonable royalty are properly left to the jury." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014). Open Text is free to cross Leonard on these issues but the Court will not bar his opinions from trial.

**B. Use of the Cost of Non-Infringing Alternatives**

Open Text also attacks Leonard's report for opining that Box would not be willing to pay more than the difference between the incremental profits associated with the patented technology and the incremental profits associated with the next-best non-infringing alternative. *See* Leonard Expert Report ¶¶ 77, Dkt. No. 332-5.

Open Text relies on *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1373 (Fed. Cir. 2008). In that case, the district court held a bench trial on damages, and determined that a reasonable royalty for the two asserted patents would be 7%. *Id.* at 1364. The defendant appealed, arguing that the district court erred as a matter of law by awarding a reasonable royalty higher than the cost of implementing acceptable non-infringing alternatives. *See id.* at 1372-73. The Federal Circuit affirmed, holding that there was no legal prohibition on an award of damages higher than the cost of implementing an acceptable non-infringing alternative. *Id.* at 1373 ("Coinco is wrong as a matter of law to claim that reasonable royalty damages are capped at the cost of implementing the cheapest available, acceptable, noninfringing alternative.").

4

*Mars* stands for the proposition that damages cannot be capped as a matter of law at the cost of implementing the cheapest available non-infringing alternative. Box, whether through Leonard's testimony or any other channel, is barred from taking that position before the jury. But *Mars* is not a blanket prohibition on expert testimony about non-infringing alternatives as a damages measure. As the Federal Circuit has held, and as made abundantly clear in a decision that Open Text itself extensively cites in its reply, basing a reasonable royalty estimate on the cost of implementing non-infringing alternatives is an allowable methodology. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014) ("[T]here may be more than one reliable method for estimating a reasonable royalty. For example, a party may … estimate the value of the benefit provided by the infringed features by a [sic] comparing the accused product to non-infringing alternatives …") (citations omitted); *see also Brandeis Univ. v. Keebler Co.*, Nos. 1:12-cv-01508, 1:12-cv-01509, 1:12-cv-01511, 1:12-cv-01513, 2013 WL 5911233, at *6 (N.D. Ill. Jan. 18, 2013) ("Keebler would not have paid a royalty higher than the cost to it of switching to a noninfringing substitute for the plaintiffs' margarine in its cookies or otherwise reworking its manufacturing process to avoid making the infringing margarine."). That *Mars* only forbids "*courts*, not experts, imposing caps based on expected profits as a matter of law" is a reading endorsed by other district courts. *Ergotron, Inc. v. Rubbermaid Commercial Products, LLC*, No. 10-2010 ADM/JJG, 2012 WL 3733578, at *12 (D. Minn. Aug. 28, 2012) (declining to exclude expert who stated that design-around costs would be a "cap" on the royalty rate); *see also Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, No. 1:09-cv-1685, 2013 WL 6036029, at *2 (M.D. Penn. 2013) (declining to exclude expert who stated that the defendant "would not pay a royalty rate higher than the cost associated with forgoing use of the infringing products and instead using available, noninfringing alternatives").

Leonard's opinion is that Box would not have been willing to pay more than the cost of implementing a non-infringing alternative. Leonard Expert Report ¶¶ 77, 84, 266. That is an acceptable opinion and method about damages at this *Daubert* stage, and not a legal claim. *See Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2012 WL 877125, at *4 (N.D. Cal. Mar. 15, 2012) (permitting Leonard to testify about how much "Google would have decided … it was

1  willing to pay"). Open Text again is free to cross Leonard on this point to show the jury that a
2  different measure is a superior approach.

### C. Evidentiary Basis for Opinions on Acceptable Non-Infringing Alternatives

Open Text's third concern about Leonard's opinions overlaps with its objections to Jagannathan. Leonard relied on Jagannathan to identify non-infringing alternatives to the asserted patents that would result "in comparable performance to the current client implementations, and would have been imperceptible to Box's end users." Leonard Expert Report ¶ 225. Open Text argues that any alternatives must be "market acceptable," citing *Stryker Corp. v. Intermedics Orthopedics, Inc.*, 96 F.3d 1409, 1418 (Fed. Cir. 1996), a case that analyzed the requirement that a patentee show the "absence of acceptable non-infringing substitutes" in order to obtain lost profits instead of a reasonable royalty. According to Open Text, neither Leonard nor Jagannathan is qualified to assess whether the alternatives Jagannathan proposes would be acceptable to Box's customers, as neither of them has any background in marketing and neither gathered information from Box's customers regarding whether the proposed alternatives would be acceptable to them.

That objection might have legs if Jagannathan had opined that his proposed alternatives had certain disadvantages, like the alternatives at issue in *Stryker*, but nevertheless concluded that they would be acceptable to consumers. But here, his opinion was that the alternatives would result in performance that was imperceptible to Box's end users. That is clearly a technical opinion within Jagannathan's expertise, despite the fact that, if true, it also means that the substitutes would necessarily be acceptable to Box's customers. The *Keebler* opinion that Open Text discusses at length is not at all to the contrary. That case permitted the defendant's damages expert, Michael Keeley, to rely on non-infringing alternatives proposed by its technical expert, Eric Decker, despite the lack of any indication that Decker had a marketing background and the absence of testing to determine whether his alternatives would result in a "commercially viable cookie." *See Keebler*, 2013 WL 5911233, at *8-9. *Keebler* is of a piece with other opinions allowing estimates of design-around costs based on talking to technical experts and engineers. *See Apple*, 757 F.3d at 1321 ("Overall, outside of litigation, it would be reasonable, and quite common, for Napper to rely on technical information provided by Apple or one of its experts in

1  order to value the cost to design around Apple's technology."); *Oracle Am., Inc. v. Google, Inc.*,
2  C 10-03561 WHA, 2011 WL 5914033, at *1-2 (N.D. Cal. Nov. 28, 2011); *TQP Devel., LLC v.*
3  *Merrill Lynch & Co., Inc.*, No. 2:08-CV-471-WCB, 2012 WL 3283354, at *3 (E.D. Tex. Aug. 10,
4  2012) (allowing expert to estimate design-around costs using technical expert and a "senior
5  manager of network engineering").

6  Moreover, it is unclear whether the test for lost profits, which calls for a binary, yes-no
7  determination as to whether an alternative is "acceptable" or not, applies in the context of a
8  reasonable royalty. *See Carnegie Mellon Univ. v. Marvell Tech. Grp.*, No. 09-290, 2012 WL
9  3686736, at *4 (W.D. Penn. Aug. 24, 2012) (distinguishing case law on lost profits from
10 reasonable royalty). If a plaintiff cannot show the absence of acceptable non-infringing
11 alternatives, it may not be entitled to lost profits at all. But for a reasonable royalty, problems with
12 a non-infringing alternative that limit its attractiveness to consumers would simply reduce the
13 profits associated with the alternative relative to the profits associated with the patented
14 technology, and would end up being accounted for in the reasonable royalty number itself. *Cf.*
15 *Mars*, 527 F.3d at 1373 (holding that district court did not commit clear error in reducing royalty
16 rate based on "potential availability" of non-infringing alternatives that were not actually
17 available).

18 One of the Box employees from whom Leonard obtained estimates of the time needed to
19 implement some of the non-infringing alternatives, Ryan Knotts, has already been excluded for
20 being disclosed too late. *See* Jan. 14, 2015, Transcript of Proceedings at 42:17-48:5, Dkt. No. 451.
21 But Leonard can rely on estimates of design-around costs that do not require Knotts's testimony,
22 like those that rely on the testimony of Sam Ghods (whose testimony the Court is allowing for
23 reasons given in Section III below), or the fact that Box paid $250,000 to develop Box Edit. *See*
24 Leonard Expert Report ¶ 229-31.

25 **D. Use of Box License Agreements**

26 Finally, Open Text objects to Leonard's discussion of four license agreements entered into
27 between Box and various third parties under the rubric of *Georgia-Pacific* factor 2, which looks to
28 "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit." *See*

*Georgia-Pacific*, 318 F. Supp. at 1120.  Leonard relies on Jagannathan's opinion that "the technology covered in all four Box patent licenses is technically comparable to the claimed technology of the File Synchronization patents-in-suit." Leonard Expert Report ¶ 251; Jagannathan Expert Report ¶¶ 187-91, Dkt. No. 434-2.

Open Text first argues that Jagannathan did not opine on the "similarities and differences in scope between the claims of the patents at issue" in Box's agreements and that "he admits that he did not study the claims of the patents in the Box settlement licenses." *See* Open Text's Reply in Support of Motion to Exclude Leonard at 9, Dkt. No. 371.  In fact, the cited deposition testimony indicates only that for one of the patents that were the subject of the Box license, Jagannathan believes that he "probably" reviewed the claims, but couldn't "specifically recall going through every single claim." Jagannathan Dep. Tr. 12:14-13:13, Dkt. No. 332-19.  Open Text cites no law requiring a technical expert to discuss the similarities and differences in scope between the scope of the licensed claims and the patents-in-suit or to go through every claim of the licensed patent in order to reliably opine that the licensed patents are "comparable" to the patents-in-suit, as *Georgia-Pacific* factor 2 requires, and the Court sees no reason why that should be required to render an expert's testimony on this issue admissible.  The portions of the Federal Circuit's opinions in *ResQNet* and *LaserDynamics* that Open Text refers to do not establish such a requirement; they have to do with *Georgia-Pacific* factor one and the admissibility of settlement agreements under Federal Rule of Evidence 403, respectively.  *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869-73 (Fed. Cir. 2010); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77-78 (Fed. Cir. 2012).  Any differences between the licensed patents and the patents-in-suit can easily be pointed out to the jury, either through cross-examination of Jagannathan or through the direct testimony of Open Text's own experts.

Open Text next argues that Leonard's assessment of the comparability of Box's license agreements is deficient.  Perhaps the most serious charge is that, as Leonard acknowledges, three of the four agreements were settlement agreements, because the Federal Circuit has expressed "longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages," though without establishing a per se rule against the use of such settlements.  *See*

*LaserDynamics*, 694 F.3d at 77; *ResQNet*, 594 F.3d at 870-72 (noting that "litigation itself can skew the results of the hypothetical negotiation" but permitting reliance on license that arose out of litigation). (Open Text argues that Leonard mischaracterizes the fourth license, between Box and IPMG/LodsysGroup, as a "non-litigation license" given the fact that Lodsys filed a number of lawsuits, *see* Dkt. No. 434 at 15, but in fact it is Open Text that is mistaken. Leonard never calls the license a "non-litigation license," despite Open Text's quotation marks; he simply says it is not a "settlement agreement," which Open Text does not dispute, *see* Leonard Expert Report ¶ 254.) But the license agreement that the *LaserDynamics* court held should not be considered contained specific indicia that suggested it was inflated: it was "executed shortly before a trial" in which the party who entered into the license was sanctioned and it was "six times larger than the next highest amount paid for a license to the patent-in-suit." *LaserDynamics*, 694 F.3d at 77-78. Open Text points to no evidence suggesting that the royalties associated with the settlement agreements were depressed because they were entered into in the context of litigation. And it points to no other licenses that it claims are more comparable, making this case like *ResQNet*, which admitted a settlement agreement when it was "the most reliable license in [the] record." *See* 594 F.3d at 872; *LaserDynamics*, 694 F.3d at 77. Once again, Open Text is free to grill Leonard at trial about these issues, but has not established that Leonard should be barred from testifying about them under *Daubert*.

While the Court will not bar this testimony, it will listen with particular closeness to Leonard's opinions relating to it. The Court is mindful, and advises Box to be equally mindful, of the Federal Circuit's teachings on misuse of settlement agreements for royalty determinations. The Court will be quick to shut off or strike testimony that crosses the line, and expects Box to ensure that that does not happen.

The other points Open Text makes about the comparability of the Box license agreements -- such as his lack of data on the extent of Box's infringement in those cases -- also go to weight, not admissibility, like most challenges to the comparability of license agreements. *See VirnetX*, 767 F.3d at 1330 (permitting reliance on licenses "drawn to related technology" despite differences in breadth and timing between licenses and hypothetical negotiation); *Apple*, 757 F.3d

9

1   at 1326 ("Here, whether these licenses are sufficiently comparable such that Motorola's

2   calculation is a reasonable royalty goes to the weight of the evidence, not its admissibility.");

3   *ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir.

4   2012) (permitting reliance on licenses involving, among other things, patents other than the

5   patents-in-suit); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211-12 (Fed. Cir. 2010)

6   (permitting testimony about licenses despite differences such as the competitive position of the

7   licensee compared to defendant).  The differences between the Box licenses and the hypothetical

8   negotiation that Open Text points to (like the timing of the licenses, or the fact that the patent

9   office had issued a non-final rejection of the licensed claims in one of the licenses) would be

10  easily understandable to a jury.

11  Consequently, subject to the bar on Box arguing that there is an alternatives cap as a matter

12  of law, the Court denies Open Text's motion to exclude the opinions and testimony of Leonard.

## II. MOTION TO EXCLUDE OPINION OF DR. SRINIVASAN JAGANNATHAN (DKT. NO. 428)

15  Open Text moves to exclude Jagannathan's opinions on two grounds, but one of them --

16  his opinions regarding the comparability of the technology claimed in Box's licenses -- was dealt

17  with in the Court's discussion of Leonard's opinions, above, and is denied for the reasons given

18  there.  The remaining ground is Jagannathan's use of an allegedly incorrect claim construction of

19  the term "directly" to render a non-infringement opinion.

20  Claim 1 of the '515 patent (from which asserted claim 10 depends) and claim 27 of the

21  '515 patent both require receiving a file or database asset "directly from a database" and saving a

22  cached file "directly to the database."  '515 patent, claims 1, 27.  Jagannathan purports to apply

23  the plain and ordinary meaning of "directly" to support his opinion that if a connection is mediated

24  by an intermediary, such as a second software program, a proxy server, or another server, it is not

25  "direct."  Jagannathan Dep. Tr. 205:8-206:25.  Jagannathan argues that since Box's client

26  software's communication with a MySQL database is mediated by a web server, such

27  communications are not "direct."  Jagannathan Rebuttal Expert Report ¶¶ 98, 133, 155 Dkt. No.

28  428-1.

As Open Text points out, however, that definition of "directly" would be inconsistent with a preferred embodiment of the '515 patent described in the specification. "[A] claim construction that excludes a preferred embodiment ... is rarely, if ever correct and would require highly persuasive evidentiary support." *See Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003) (citations omitted). In the section entitled "Detailed Description of the Invention," the File Synchronization patents say, "cache manager **38** can communicate a copy of cached file **42** directly (e.g., without the use of an intermediate synchronization program) to server **24**." '515 patent, 7:48-51; *see also id.* 11:11-13. Box attempts to characterize this as specifying only an example of a way in which the connection can be indirect, i.e., the use of an intermediate synchronization program. But in fact, it specifies an example of a way that a connection can be direct. It says that one way to establish a direct connection is to omit an intermediate synchronization program, but there may be other ways as well.

Far from limiting the claims using the specification, as Box suggests, this construction gives the claim its full scope by making clear that receiving from and saving to the database can be "direct" in multiple ways, one of them being omitting any intermediate programs. It is Box that would improperly limit the claims by claiming that the very example of a direct connection given in the specification -- a connection without a mediating software program -- could potentially fall outside the scope of the claims, for example if a server intervenes. Whatever other ways there are to receive from or save to a database "directly," receiving or saving without an intermediate synchronization program is direct.

Any non-infringement opinions by Jagannathan inconsistent with this construction will be excluded.

**III. MOTION TO EXCLUDE TESTIMONY OF SAM GHODS (DKT. NO. 299-3)**

Sam Ghods is an "Architect and Co-Owner" at Box whom Leonard relied on to confirm that a particular non-infringing alternative would be technically feasible and to estimate how long it would take Box to implement it. *See* Leonard Expert Report ¶¶ 87, 227, 229-30. According to Open Text, such testimony is not admissible "lay opinion," which is permitted by Rule 701 of the

11

Federal Rules of Evidence only if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." And because Ghods was not disclosed as an expert, Open Text that he cannot offer his opinions as expert testimony pursuant to the provisions of Rule 702.

As noted above in Section I.C with respect to Leonard, however, courts regularly permit experts to rely on lay witnesses for estimates of design-around costs. And properly so. The advisory committee notes that accompanied the amendment that added Rule 701(c) made clear that "particularized knowledge that the witness has by virtue of his or her position in the business" is not "scientific, technical, or other specialized knowledge," even if it involves knowledge that the average person would have to consult an expert about, like the "value or projected profits of a business" or that a substance "appeared to be a narcotic." Fed. R. Evid. 701, advisory committee's note to 2000 amendment. Thus, "just because the underlying facts and data are technical in nature does not transform the information into 'expert testimony' when those facts are within the personal knowledge and experience of the company's employee." *See In re Google AdWords Litig.*, No. 5:08-CV-3369 EJD, 2012 WL 28068, at *5 (N.D. Cal. Jan. 5, 2012) (collecting cases and permitting lay witness to testify on what Google AdWords "does when certain variables are changed"). Ghods has both managed engineers at Box and worked on Box's products himself; whether Box's products could be modified to include a certain non-infringing alternative and how long it would take to do so thus fall within the "particularized knowledge" that he has "by virtue of his or her position in the business" and is admissible under Rule 701. *See* Ghods 30(b)(1) Dep. Tr. 5:7-6:13, Dkt. No. 347-5.

Ghods did not come up with the non-infringing alternatives himself; those came from Box's technical experts. The Court understands that he is not being offered to testify that the design-arounds he was presented with are actually non-infringing, and he is not being offered to testify that Box is working on implementing design-arounds. Box will not be permitted to solicit such testimony from him. Ghods may testify that, based on his work on Box's products, certain

12

technical changes could be made to them, and may also say how long making those changes would take.

**IT IS SO ORDERED**.

Dated: January 29, 2015

_____
JAMES DONATO
United States District Judge