Volume 5

Pages 724 - 940

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO, JUDGE

OPEN TEXT S.A.,                )
                               )
          Plaintiff,           )
                               )
  VS.                          )   **No. C 13-4910 JD**
                               )
BOX, INC. and CARAHSOFT        )
TECHNOLOGY CORPORATION,        )
                               )
          Defendants.          )
_____)   San Francisco, California
                                    Monday, February 9, 2015

TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

For Plaintiff:          COOLEY LLP
                        101 California Street, 5th Floor
                        San Francisco, California 94111
                   BY:  **THOMAS J. FRIEL, JR., ATTORNEY AT LAW**

                        COOLEY LLP
                        380 Interlocken Crescent, Suite 900
                        Broomfield, Colorado  80021
                   BY:  **WAYNE O. STACY, ATTORNEY AT LAW**
                        **ORION ARMON, ATTORNEY AT LAW**
                        **SARAH J. GUSKE, ATTORNEY AT LAW**

                        COOLEY LLP
                        11951 Freedom Drive
                        Reston, Virginia  20190
                   BY:  **FRANK PIETRANTONIO, ATTORNEY AT LAW**

 (Appearances continued on next page)

Reported By:  Katherine Powell Sullivan, Official Reporter
              Joanne Farrell, Court Reporter Pro Tempore

**APPEARANCES CONTINUED:**

For Defendants:          REED SMITH LLP
                         101 Second Street, Suite 1800
                         San Francisco, California 94105
                 BY:     **JOHN P. BOVICH, ATTORNEY AT LAW**
                         **SCOTT DAVID BAKER, ATTORNEY AT LAW**
                         **JAMES A. DAIRE, ATTORNEY AT LAW**
                         **JONAH D. MITCHELL, ATTORNEY AT LAW**
                         **ADALINE J. HILGARD, ATTORNEY AT LAW**
                         **SETH BENJAMIN HERRING, ATTORNEY AT LAW**

**I N D E X**

Monday, February 9, 2015 - Volume 5

| DEFENDANTS' WITNESSES | PAGE | VOL. |
|---|---|---|
| **JAGANNATHAN, SRINIVASAN** | | |
| Direct Resumed Examination by Mr. Bovich | 734 | 5 |
| Cross-Examination by Mr. Pietrantonio | 743 | 5 |
| Redirect Examination by Mr. Bovich | 798 | 5 |
| Recross-Examination by Mr. Pietrantonio | 805 | 5 |
| Further Redirect Examination by Mr. Bovich | 812 | 5 |
| | | |
| **BOUCK, WHITNEY** | | |
| (SWORN) | 814 | 5 |
| Direct Examination by Mr. Baker | 814 | 5 |
| Cross-Examination by Mr. Friel | 841 | 5 |
| Redirect Examination by Mr. Baker | 859 | 5 |
| | | |
| **GHODS, SAMUEL** | | |
| (SWORN) | 861 | 5 |
| Direct Examination by Ms. Hilgard | 861 | 5 |
| Cross-Examination by Mr. Friel | 879 | 5 |
| Redirect Examination by Ms. Hilgard | 882 | 5 |
| | | |
| **YEH, CHRISTOPHER BINCHI** | | |
| (SWORN) | 882 | 5 |
| Direct Examination by Mr. Daire | 883 | 5 |
| Cross-Examination by Mr. Stacy | 892 | 5 |
| Redirect Examination by Mr. Daire | 895 | 5 |
| | | |
| **MCGOFF, PETER** | | |
| (SWORN) | 897 | 5 |
| Direct Examination by Mr. Mitchell | 898 | 5 |
| Cross Examination by Mr. Friel | 906 | 5 |
| | | |
| **HAWA, RAJA** | | |
| (Videotaped Testimony) | 911 | 5 |
| | | |
| **KAARID, JOHN** | | |
| (Videotaped Testimony) | 911 | 5 |
| | | |
| **MANNIE, JEFFREY** | | |
| (SWORN) | 912 | 5 |
| Direct Examination by Mr. Herring | 912 | 5 |
| | | |
| **LEONARD, GREGORY** | | |
| (SWORN) | 917 | 5 |
| Direct Examination by Mr. Mitchell | 917 | 5 |

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 32 | | 848 | 5 |
| 40 | | 840 | 5 |
| 263 | | 844 | 5 |
| 335 | | 919 | 5 |
| 603 | | 735 | 5 |
| 658 | | 731 | 5 |
| 663 | | 731 | 5 |
| 668 | | 731 | 5 |
| 669 | | 731 | 5 |
| 670 | | 731 | 5 |
| 671 | | 731 | 5 |
| 742 | | 903 | 5 |
| 743 | | 904 | 5 |
| 744 | | 904 | 5 |
| 745 | | 904 | 5 |
| 757 | | 831 | 5 |
| 852 | | 888 | 5 |
| 2150 | | 911 | 5 |

```
 1   Monday - February 9, 2015                        8:39 a.m.

 2                        P R O C E E D I N G S

 3        (Proceedings were heard out of presence of the jury:)

 4            THE COURT:  Good morning.

 5            ALL PRESENT:  Good morning, Your Honor.

 6            COURTROOM DEPUTY:  Please be seated.  Calling civil

 7   13-4910, Open Text S.A. versus Box, Inc.  Counsel.

 8            MR. FRIEL:  Good morning, Your Honor.  Good morning,

 9   everyone.  Tom Friel for the plaintiff.  We are ready.

10            MR. BOVICH:  Good morning, Your Honor.  John Bovich

11   for the defendants.

12            THE COURT:  All right.  Let's deal with the weekend's

13   flurry of motions.

14        Okay.  Come up.

15            MR. FRIEL:  Your Honor, Mr. Stacy is going to address

16   the Dr. Leonard issues and I'm going to address the licenses

17   and patents, if that's all right.

18            THE COURT:  Okay.  All right.  So the stipulations for

19   the trial exhibits is fine.  Those will all be deemed admitted.

20        Okay.  I'm not taking argument.  I've got arguments.

21   Here's what we are going to do.  The motion to strike is

22   denied, but Dr. Leonard is going to be allowed to address the

23   Office Editor and LiveLink Pro testimony by -- is it

24   Mr. Howatson?

25            MR. FRIEL:  Yes, Your Honor.
```

**PROCEEDINGS**

1      **THE COURT:**  So he can rebut that.  That's perfectly

2    fair at this point.

3         Dr. Jagannathan is allowed to testify about the

4    comparability of the patents in the Box licenses.  And

5    Dr. Leonard not only is allowed, but must establish a

6    foundation about the circumstances of the settlement

7    agreements.  Okay?  That was clear in my prior order about

8    Dr. Leonard.  He has to do it.  And he has to show that they

9    are not in the laser dynamics problem range.  Okay?  So I

10   expect that to happen.

11        The others are options.  Dr. Jagannathan doesn't have to

12   do it, but if you want to, you can.  Okay?  All right.

13        **MR. BOVICH:**  Your Honor, may I ask one question on the

14   other patents?

15        **THE COURT:**  Yes.

16        **MR. BOVICH:**  We've had some disputes about

17   preadmitting.  Now that you're allowing them in, he has clearly

18   seen them and we are trying to get them preadmitted because

19   there's a whole slew of patents that we'd otherwise have to

20   admit on the fly, and I don't think there's any objections.

21        **THE COURT:**  You're talking about the license patents?

22        **MR. BOVICH:**  The patents that are the subject of those

23   other licenses.

24        **THE COURT:**  Sure.

25        **MR. BOVICH:**  I do have the trial exhibit numbers.

PROCEEDINGS

```
 1              THE COURT:  Is there any objection to that, Mr. Friel?

 2              MR. FRIEL:  Subject to our objection under FRE 403,

 3    no.

 4              THE COURT:  Subject to what objection?

 5              MR. FRIEL:  Our objection under Federal Rule of

 6    Evidence 403.

 7              THE COURT:  What's the objection?

 8              MR. FRIEL:  Prejudice would outweigh the probative

 9    value, and I don't think that --

10              THE COURT:  Prejudice from the licenses -- the

11    patents?  What's the prejudice from the patents?

12              MR. FRIEL:  I believe that Mr. Bovich is talking about

13    the four nonpracticing entity or patent troll licenses that

14    they are trying to use --

15              THE COURT:  You're talking about the patents; right?

16              MR. BOVICH:  I am.

17              THE COURT:  He's talking about the patents, not the

18    licenses.

19              MR. FRIEL:  I'm sorry.

20              THE COURT:  The patents couldn't possibly be

21    prejudicial.  So there's no objection from Open Text?

22              MR. FRIEL:  That's correct.

23              THE COURT:  403 withdrawn by Mr. Friel.  Yes?

24              MR. FRIEL:  No objection to the three patents-in-suit

25    being admitted.
```

**PROCEEDINGS**

 1          **THE COURT:**  Not the licenses, the patents.

 2          **MR. FRIEL:**  Yes.

 3          **MR. BOVICH:**  I can read the numbers.

 4          **THE COURT:**  During a break or something.  Go ahead.

 5   That's fine.

 6          **MR. BOVICH:**  Trial Exhibit 658, 663, 668, 669, 670,

 7   671.  Thank you.

 8          (Trial Exhibits 658, 663, 668, 669, 670 and 671 received

 9   in evidence)

10          **THE COURT:**  Okay.  Are we all set?

11          **MR. DAIRE:**  Can we have two very quick housekeeping

12   matters, Your Honor?

13          **THE COURT:**  Yes.

14          **MR. DAIRE:**  We were able to prepare a new Exhibit 2788

15   over the weekend, if you'd like to take a look.  And we've also

16   got extra copies in case you wanted to add it to the jury

17   binders, but I can hand it to Ms. Clark so you can take a look

18   at it whenever you get a chance.

19          **THE COURT:**  Thank you.  Oh, is this the agreed-upon

20   chart?

21          **MR. DAIRE:**  Yes, Your Honor.

22          **THE COURT:**  Okay.  So everybody is happy with this,

23   Mr. Friel?

24          **MR. FRIEL:**  Yes, Your Honor.  Exhibit 2788 is fine

25   with us.

PROCEEDINGS

1          THE COURT:  Okay.  So the X's mean everybody agrees

2    who is present?

3          MR. DAIRE:  That's correct, Your Honor.

4          THE COURT:  All right.  Okay.  Do you have copies for

5    the jury?

6          MR. DAIRE:  Yes, Your Honor.

7          THE COURT:  Why don't you give those to Ms. Clark?

8          MR. DAIRE:  Two other very quick matters?

9          THE COURT:  You all want these -- okay.  We will put

10   them -- because it's a stipulated exhibit, we will put them in

11   the trial binders.  Okay.

12       Yes?

13         MR. DAIRE:  As we did Friday, we may be getting,

14   depending on time, to a couple deposition clips.  There's one

15   in which the exhibit will be displayed along with the video.  I

16   understand plaintiffs have no objection to that.

17         THE COURT:  That's fine with me.

18         MR. DAIRE:  And then there are a couple witnesses who

19   may be recalled who were called previously adversely as part of

20   the plaintiff's case.  Would you like additional photos for

21   them?

22         THE COURT:  No, that's fine, if they've already been

23   in once.

24         MR. DAIRE:  Thank you, Your Honor.

25         THE COURT:  All right.  Let's bring them in.

PROCEEDINGS

1                    (Pause in the proceedings.)

2          **COURTROOM DEPUTY:**  All rise for the jury.

3     Please be seated.

4     (Proceedings were heard in the presence of the jury:)

5          **THE COURT:**  Okay.  Good morning, Ladies and Gentlemen.

6     So Ms. Clark, do you remember on Friday we had those

7     charts up there with the X's on it.  We now have the parties'

8     agreed-upon discussion of all of those materials.

9          So you should have this exhibit.  It's stipulated.  So

10    consider it carved in stone.  These are facts the parties have

11    agreed you can consider as being 100 percent rock solid.  Okay?

12         And the way the chart works is there's each patent and

13    each claim that's in dispute, and the green box means the

14    parties agree that that element is present in whatever is

15    labeled on the right-hand side.

16         So if you look at the first page, '665 patent Claim 4, the

17    parties agree, for example, that -- I'll just pick one

18    randomly -- Claim 4-B is practiced in Box Edit for Mac and

19    Box Edit for Windows.  That's what the "X" means.  It's there.

20         And then if you look at the prior art pages, you can see

21    them in the back, they're a couple pages in.  The first one is

22    claim '665 -- sorry, '665 patent, Claim 4 prior art.

23         And then just picking one randomly again, Number 4,

24    parties agree that the WS_FTP Pro user's guide mentions that

25    element.  Okay?  So this will make life a lot easier for you.

```
 1          All right.  Let's call our first witness.

 2              MR. BOVICH:  Your Honor, we'd like to resume the

 3   testimony of Dr. Srinivasan Jagannathan.

 4              THE COURT:  All right.

 5                    SRINIVASAN JAGANNATHAN,

 6   called as a witness for the Defendants, testified as follows:

 7                    DIRECT EXAMINATION (Resumed)

 8   BY MR. BOVICH

 9   Q.   Welcome back, Doctor.

10              THE COURT:  Yes, actually, Dr. Jagannathan, remember

11   you're still under oath and have been over the weekend.

12              THE WITNESS:  Yes, sir.

13              MR. BOVICH:  Thank you.

14   BY MR. BOVICH

15   Q.   Just a reminder to speak slowly today as we go on and I'll

16   try to do the same.

17   A.   I will.

18   Q.   Okay.  Some housekeeping matters.  I just wanted to admit

19   some evidence.  We were talking about Magellan.

20          And Beau, please do not publish these.

21          But if you turn to the stack in front of you, if you could

22   take a look at Exhibit 603?

23   A.   I do.

24   Q.   And the question is, do you recognize that?

25   A.   I do.
```

**JAGANNATHAN - DIRECT / BOVICH**

1  Q.   And are those the screenshots for Magellan that you took?

2  A.   They appear to be the screenshots that I took.

3          MR. BOVICH:  Move to admit, Your Honor.

4          THE COURT:  Any objection?

5          MR. PIETRANTONIO:  No objection, Your Honor.

6          THE COURT:  Admitted.

7      (Trial Exhibit 603 received in evidence)

8  BY MR. BOVICH

9  Q.   Please take a look at Exhibit 606.  Do you recognize it?

10  A.   Yes, I do.

11  Q.   Are those sales records --

12          THE COURT:  I do have that on.  Is it on, Lisa?

13          COURTROOM DEPUTY:  You told them not to display it.

14          THE COURT:  It's in now.  Are you putting it up?

15          MR. BOVICH:  I'm not putting it up.  I wanted to make

16  sure that it was in.  I wasn't sure if it was in, but if it's

17  in, I'll move on.

18          THE COURT:  Isn't it in?  All right.  Go ahead.

19  BY MR. FRIEL

20  Q.   Do you recognize Exhibit 606?

21  A.   I do.

22          MR. BOVICH:  Move to admit.

23          MR. PIETRANTONIO:  No objection, Your Honor.

24          THE COURT:  Admitted.

25

1   BY MR. BOVICH

2   **Q.**   And lastly, Exhibit 10, please.  Is that a CD with the

3   Magellan software?

4   **A.**   That does appear to be the case.

5           **MR. BOVICH:**  Move to admit, Your Honor.

6           **MR. PIETRANTONIO:**  No objection.

7           **THE COURT:**  Admitted.

8   BY MR. BOVICH

9   **Q.**   To give us some context to where we were, Beau, please

10  pull up Slide 4.

11          So I believe when we broke on Friday, we had gone through

12  your opinions and we are on the second bullet from the bottom,

13  and we were discussing -- you don't see that?

14  **A.**   I don't see that.

15  **Q.**   Okay.  Beau, could we have the witness monitor?

16  **A.**   I see it now.

17  **Q.**   Thank you.  I believe we are on the second bullet up from

18  the bottom, "Noninfringing Alternatives."  Is that where we

19  left off?

20  **A.**   Yes.

21  **Q.**   Okay.  And let's go to Slide 265.  I think we had

22  discussed four -- we were discussing four options, and I

23  believe we had discussed the dialogue box in the top left.  Do

24  you recall that?

25  **A.**   Yes, I do.

1  **Q.**   Okay.  And I think there's a second option just below

2  that, which is a driver.

3  **A.**   Yes.

4  **Q.**   So I'd like to talk about that.  And let's go to Slide

5  267, please.

6      Did you hear Dr. Mayer-Patel's testimony regarding Office

7  Editor and the driver?

8  **A.**   I did.

9  **Q.**   And did he testify that that product has a driver in it?

10  **A.**   Yes, he did.

11  **Q.**   Okay.  And was it his opinion that because of that driver,

12  the product did not practice the claims of the '515 and/or that

13  he was unable to render an opinion as to whether it practiced

14  the claims of the '665 and the '152 patents?

15  **A.**   I believe he said something to that effect, yes.

16  **Q.**   Okay.  And do you agree with him that the Office Editor

17  product did not practice the claims of any of these patents?

18  **A.**   I do not agree with him.

19  **Q.**   Okay.  Now, if we assume that his opinion is true, would

20  that mean that there's no evidence that having a driver in a

21  product such as Box Edit, in other words, if it were

22  redesigned, would it be a noninfringing alternative?

23  **A.**   I believe it would be a noninfringing alternative if

24  Dr. Mayer-Patel is correct.  But as I said, I do not agree with

25  his opinion.  But if his opinion is correct, this would be a

 1   noninfringing alternative.

 2   **Q.**   Okay.  And would such a design have been technically

 3   feasible in 2012?

 4   **A.**   It would have been technically feasible in 2012 for an

 5   environment such as Windows.

 6   **Q.**   Okay.  Now, looking at Office Editor 10.5, was it the

 7   testimony that that had a driver, as well?

 8   **A.**   Would you say that again, please?

 9   **Q.**   Office Editor 10.5, was it testified that that had a

10   driver, as well?

11   **A.**   Yes.

12   **Q.**   Okay.  And was that a real commercial product?

13   **A.**   That's my understanding, yes.

14   **Q.**   Okay.  Let's go to Slide 268, please.  And we will talk

15   about Box Sync.

16       Would Box Sync be a noninfringing alternative to Box Edit?

17   **A.**   Yes.

18   **Q.**   Okay.  Now, at a very, very high level, tell me just about

19   some of the differences in functionality between Box Edit and

20   Box Sync.

21   **A.**   So the way Box Sync operates is that is a designated

22   folder on the user's -- on the client computer, and every file

23   that is in there is synchronized with the box in the cloud.

24       And in the Box Edit software, which is at issue which has

25   been accused of infringement here, the user visits the Box Web

1    site, clicks on a document or selects it for editing, and then

2    that file gets downloaded to some location, and then the user

3    edits it.  So Box Sync operates in a different way.

4    **Q.**    Did you hear testimony from Dr. Mayer-Patel that Box Sync

5    does not infringe the patents?

6    **A.**    I believe he said that, yes.

7    **Q.**    So if we assume that's true, would it be a noninfringing

8    alternative?

9    **A.**    He's saying it does not infringe.  It would be a

10   noninfringing alternative, yes.

11   **Q.**    And is there a way, when we are talking about one document

12   at a time, that a user could use Box Sync as a substitute for

13   Box Edit?

14   **A.**    I believe we heard testimony as well to that effect, as

15   yes, that's correct, you could use it that way.

16   **Q.**    Okay.  All right.  Let's take a look at Slide 269.  I

17   believe this is a fourth noninfringing alternative.  And the

18   functionality here is called "Upload on Application Close."

19   Again, very high-level question.  Can you explain that

20   functionality, please?

21   **A.**    So let's say that the user visits the Box Edit -- sorry,

22   the Box Web site and selects a document for editing.  The

23   document gets downloaded to the client computer.  It is opened

24   in this application.

25        Here we're showing it in the Notepad application.  The

 1   user can finish editing and then, when the user exits the

 2   application or closes the file, the file will get uploaded

 3   whether or not the user has done anything.

 4        So in this case, let's say that I'm sitting in the

 5   courtroom, it's downloaded, but the user does not make any

 6   edit.  But when the user exits, the file is still uploaded.  So

 7   there's no determining of modification.  There's no

 8   determination of modification.  That would be noninfringing.

 9   **Q.**   And do you and Dr. Mayer-Patel agree on this subject about

10   it being noninfringing?

11   **A.**   I think we do.  And he did testify to that effect when he

12   was here.

13   **Q.**   Now, would that be -- if Box Edit had been redesigned to

14   work in that manner, would that have been technically feasible

15   in 2012?

16   **A.**   Yes, it would have been technically feasible.

17   **Q.**   Let's move on to Slide 270.  This is, I believe, the last

18   issue that you were asked to look into in this case.

19        It says, "Other Patents Licensed by Box."  Were you asked

20   to do an analysis of some other patents that had been licensed

21   by Box to see if they were similar in a technological manner?

22   **A.**   Yes, I was asked to do such an analysis.

23   **Q.**   And again, at a very high level, could you tell us --

24   we'll get to them in a minute, but just tell them how you

25   conducted your analysis, please.

**JAGANNATHAN - DIRECT / BOVICH**

1  **A.**   So some patents were identified to me.  I reviewed them,

2  the specification at a high level and to see if there were any

3  similarities in the general technology described in these

4  patents and with respect to the file synchronization patents.

5  So that is what I did.

6  **Q.**   And what was the purpose of this analysis?

7  **A.**   My understanding is there's an economist who wanted to

8  know if these patents fall in the same technology landscape as

9  the file synchronization patents.

10  **Q.**   Slide 271, please.  Does this identify two patents that

11  you analyzed for similarity?

12  **A.**   Yes, it does.

13  **Q.**   And is this the Prust '623 and '968 patent?

14  **A.**   Yes, these are two patents I analyzed.

15  **Q.**   And I believe that's Trial Exhibit 658 and 663.

16      As a result of your analysis, did you determine that these

17  patents are at least similar to the file synchronization

18  patents?

19  **A.**   There are some aspects that are described in the

20  specification of these patents which are similar in some

21  respects to the file synchronization patents.

22  **Q.**   Let's go to Slide 273.  This describes the Connor '686

23  patent, which is Trial Exhibit 668.  Did you analyze this

24  Connor patent?

25  **A.**   Yes, I did.

1  Q.   And as a result of your analysis, did you come to the

2  opinion that it is similar, in terms of the technology, to the

3  file synchronization patents?

4  A.   There are some aspects that are described in the patent

5  specification of the Connor patent which I believe are at least

6  similar in some respects to the file synchronization patents.

7  Q.   Let's go to Slide 275.  This describes the Abelow '908 and

8  Abelow '078 patents, which are Trial Exhibit 669 and 670.  Did

9  you analyze these patents as well?

10 A.   I did analyze these patents.

11 Q.   And did you come to an opinion whether or not the

12 technology was similar to that in the file synchronization

13 patents?

14 A.   There are some aspects of the technology described in

15 these two patents that have -- that share some similarities

16 with the technology in the file synchronization patents.

17 Q.   Let's go to Slide 277.  This describes the Payne '816

18 patent, which is trial Exhibit 671.  Did you analyze this

19 patent?

20 A.   I did.

21 Q.   And as a result of your analysis, did you come to any

22 opinion as to whether the technology in that patent is similar

23 to the technology in the file synchronization patents?

24 A.   There are some aspects of the technology described in this

25 Payne patent which are also similar to the technology in the

JAGANNATHAN - CROSS / PIETRANTONIO

 1   file synchronization patents.

 2   **Q.**   Thank you.

 3            **MR. BOVICH:**  Pass the witness, Your Honor.

 4            **THE COURT:**  Okay.  Mr. Friel?

 5                        <u>**CROSS-EXAMINATION**</u>

 6   **BY MR. PIETRANTONIO**

 7   **Q.**   Frank Pietrantonio for Open Text S.A.

 8         Good morning, Doctor.

 9   **A.**   Good morning.

10   **Q.**   How are you this morning?

11   **A.**   I'm good.

12   **Q.**   Nice to see you again.

13         I don't know if you recall, but I was one of the attorneys

14   at one of your depositions back in November.

15   **A.**   I do remember you.

16   **Q.**   My questioning is going to be a little bit different than

17   Mr. Bovich's.  I'm going to try to narrow the focus of the

18   questions, try to make them kind of shorter answer, basic

19   questions; maybe yes, no, do you agree, and so forth.

20         If you have some additional explanation that you'd like to

21   give, I'd love for the jury to hear it, but given the time

22   constraints, I'd like Mr. Bovich to actually follow up on that.

23   Can we agree on --

24   **A.**   I will try my best to answer your questions as accurately

25   as possible.

1   Q.   That would be terrific.   Thanks.

2        So let's start really at the beginning.

3   A.   Sure.

4   Q.   You were asked to look at the File Sync patents; correct?

5   A.   Yes.

6   Q.   And you were asked to look at the file histories for those

7   patents?

8   A.   Yes.

9   Q.   And you were asked to look at a number of Box products as

10  well; weren't you?

11  A.   Yes, I did.

12  Q.   The Box Edit for Mac, Box Edit for Windows and Box for

13  Android; correct?

14  A.   I also believe I looked at Box Sync, as well.

15  Q.   Okay.   And you looked at certain prior art, as well; is

16  that correct?

17  A.   That is correct.

18  Q.   And you were hired by Box through Reed Smith to provide an

19  independent opinion about whether Box products infringed the

20  patents; right?

21  A.   I believe that's correct, yes.

22  Q.   And you were asked to provide an independent opinion as to

23  whether the File Sync patents are valid; right?

24  A.   I believe that's correct.

25  Q.   Would you agree with me that to develop an independent

1    opinion, an expert has to approach his or her analysis without

2    any preconceived ideas about what the outcome should be?

3    **A.**    That is correct, yes.

4    **Q.**    And that independent expert should be prepared to provide

5    an answer the requester might not like; right?

6    **A.**    That is correct, yes.

7    **Q.**    And that independent expert should be able to look at

8    whatever documents they want to look at; right?

9    **A.**    Yes.

10   **Q.**    And that independent expert should get access to whatever

11   they need to render a complete and accurate opinion no matter

12   the outcome; is that correct?

13   **A.**    Yes, that is correct.

14   **Q.**    Okay.  Great.

15        Let's turn to infringement.

16        Chris, could you put up Slide 260, please, from

17   Dr. Jagannathan's presentation?

18        I believe you spoke about this slide, Dr. Jagannathan,

19   when we were talking -- when you were talking about

20   infringement and Mr. Bovich was asking the questions.

21   **A.**    Uh-huh.

22   **Q.**    Just to be clear, the only dispute between the parties is

23   over a single element that appears in each of the asserted

24   claims; is that correct?

25   **A.**    Presently that is correct, yes.

1   Q.   And that single element is the determination step that's

2   shown here in Slide 260 in its four different forms; is that

3   right?

4   A.   That is correct, yes.

5   Q.   You don't dispute that Box Edit determines whether the

6   cached file has been modified; do you?

7   A.   I do not dispute that the Box Edit software and the

8   Android software can detect that the file that has been -- that

9   the file that has been cached has been modified.

10  Q.   So you don't dispute that in operation, Box Edit for Mac

11  can determine whether the cached file has been modified; is

12  that correct?

13  A.   I do not dispute that.

14  Q.   And you don't dispute whether the same can be said for

15  Box Edit for Windows and Box for Android; is that correct?

16  A.   That is correct.  I do not dispute that.

17  Q.   Okay.  Could we put up Slide 263, please?

18       So I think you used this slide as part of your

19  explanation.  I just want to make sure that we are all clear on

20  what the slide shows, if we could.

21  A.   Okay.

22  Q.   So Steps 3 to 5 at the bottom --

23  A.   Uh-huh.

24  Q.   -- across each of these --

25  A.   Uh-huh.

**JAGANNATHAN - CROSS / PIETRANTONIO**

1   **Q.**   -- are identical to one another; is that correct?

2   **A.**   The English statements that are identical, the source code

3   implementing them -- they are effectively the same, but they

4   are implemented in different languages.

5   **Q.**   So the source code may be different in how it says it, but

6   the functions that the source code carries out for each one of

7   these three products are the same as you wrote it here on your

8   slide; is that correct?

9   **A.**   Effectively they are the same, yes.

10  **Q.**   Okay.  And for Box Edit for Mac -- let's start with the

11  first one on the left.

12      For Box Edit for Mac, it is correct that the determination

13  of whether the cached file has been modified will not happen

14  unless there is a first -- unless there is first a folder

15  notification; is that right?

16  **A.**   There must be a folder notification before the hash

17  values -- the hash value is calculated and the hash values are

18  compared.  That is correct.

19  **Q.**   Okay.  And let's turn to Box Edit for Windows.

20      It is correct that the determination of whether the cached

21  file has been modified happens only if, in Step 2(a), the time

22  stamps that are compared are different; right?

23  **A.**   That is correct.

24  **Q.**   And for the editing feature of Box for Android, the

25  determination of whether the cached file has been modified only

1  happens if there is either a file close event or a file move

2  event; is that correct?

3  **A.**   That is correct.

4  **Q.**   In developing your infringement opinions, you extensively

5  tested each one of these products; didn't you?

6  **A.**   I did.

7  **Q.**   You generated screenshots about them; didn't you?

8  **A.**   I did.

9  **Q.**   And you looked at the source code; didn't you?

10  **A.**   I did.

11  **Q.**   Where did you get the source code?

12  **A.**   The source code was provided on a laptop in Reed Smith's

13  office.  I believe it's the same laptop that Dr. Mayer-Patel

14  got access to.  I looked at the source code over there.

15      And I also got Bates-stamped copies, printouts that he had

16  requested.  And I also requested some printouts of the software

17  source code.

18  **Q.**   Did you request printouts in addition to the ones that

19  Dr. Mayer-Patel requested?

20  **A.**   I did.  And I believe I cited to those in my reports, as

21  well.

22  **Q.**   Okay.  Were there any restrictions placed on your access

23  to the source code?

24  **A.**   Yes.  I was in a room that was closed -- I mean, it was

25  the same type of circumstances as Dr. Mayer-Patel, as far as I

 1  understand it.  It was on that same laptop; it was not

 2  connected to the network, and I looked at that laptop.

 3  **Q.**  About how many hours did you spend looking at the source

 4  code?

 5  **A.**  This would have been a few days that I was there.  I

 6  spent -- I don't know how many days, but it was a few days I

 7  spent at Reed Smith's office looking at the source code.

 8  **Q.**  So would you agree with me looking at the source code was

 9  important to understand how the accused Box products work?

10  **A.**  In this context, yes.  They did provide additional context

11  and steps that are performed in the source code, which I would

12  have found out by looking at the source code.

13  **Q.**  Okay.  Very good.  Actually, we can take down this slide,

14  please.

15       Now I want to talk about some of the work that you did in

16  addition to looking at the source code.

17  **A.**  Okay.

18  **Q.**  Now, you didn't work alone in preparing your analysis of

19  the File Sync patents; did you?

20  **A.**  I had a team of people assisting me, but they were working

21  under my direction.

22  **Q.**  Now, in your deposition in November, I think you listed a

23  number of those people.  I just want to double check that these

24  people actually were people who worked with you --

25  **A.**  Yes.

1  **Q.**   -- on the project, if you don't mind.

2  **A.**   Sure.

3  **Q.**   I don't want to turn it into a memory test.  I'll just run

4  the names by you.

5       So. Dr. Kevin Graf, did he work on the project?

6  **A.**   Yes, he did.

7  **Q.**   And Dr. Adam Sorini, did he work on the project?

8  **A.**   Yes.

9  **Q.**   Dr. Elizabeth Groves, did she work on the project?

10 **A.**   Yes.

11 **Q.**   Did Adam Rowell, did he work on the project?

12 **A.**   Yes, he did.

13 **Q.**   Dr. Ernesto Staroswiecki?

14 **A.**   Staroswiecki.

15 **Q.**   Staroswiecki?  He worked on the project, as well?

16 **A.**   Yes, he did.

17 **Q.**   How about Dr. John Varsanik?

18 **A.**   He did.

19 **Q.**   How about Dr. Jared Starman?

20 **A.**   He did.

21 **Q.**   How about Jerry Stepan?

22 **A.**   He did, as well.

23 **Q.**   Is he a Ph.D.?

24 **A.**   No, he's a "Mr."

25 **Q.**   Do you recall whether Mr. Timothy Chevalier worked on the

 1   project, as well?

 2   **A.**   He may have.  I'm not sure.  I don't recall.  He may have

 3   worked on some aspects, but I don't recall off the top of my

 4   head.

 5   **Q.**   Do you remember that -- excuse me -- just prior to your

 6   deposition or around the time of your deposition, invoices were

 7   produced --

 8   **A.**   Yes.

 9   **Q.**   -- from your company, Exponent, to Reed Smith that we were

10   able to get access to; is that correct?

11   **A.**   Yes.

12   **Q.**   I'd like to just show on the Elmo just to confirm

13   Mr. Chevalier's participation.

14   **A.**   Sure.

15   **Q.**   It might be a little bit hard to see, but under the title

16   "Manager"?

17   **A.**   Yes.

18   **Q.**   Do you see that?  Mr. Chevalier was a participant in

19   connection with the analysis?

20   **A.**   Yes.  It does look like he did do some analysis, yes.

21   **Q.**   And how about Christopher MacGriff?  Did he work on the

22   project, as well?

23   **A.**   Looking at this invoice, yes, I believe he did.

24   **Q.**   Okay.  Very good.  Thanks.

25        So Doctor, the analysis presented here by you is the work

1   of 11 Exponent employees; isn't that right?

2   **A.**   The work that I specifically presented here I wouldn't

3   attribute to all 11 that we just went through.  Some of them,

4   like this invoice that you just showed is from April, and we

5   were involved in producing about 70 or 80 claim charts, often a

6   number of prior art references.  Out of these, four we are

7   using here today.  So I don't know whether everyone worked on

8   these specific ones that we presented to the jury.  But overall

9   in the project, they definitely participated.

10  **Q.**   So maybe put a different way, you would agree with me that

11  11 Exponent employees have worked on this project for Box;

12  isn't that correct?

13  **A.**   Yes, they worked as part of this project, yes.

14  **Q.**   Okay.  Let's talk a little bit more about your work.  I

15  just mentioned Exponent.  I believe that you testified that

16  you're an employee of Exponent; is that correct?

17  **A.**   I am.

18  **Q.**   Can you pull up a copy of the Web bio, please?

19       The print's a little small in terms of describing your

20  professional profile, but is that a copy of the profile that

21  appears for you on the exponent Web site?

22  **A.**   Yes.

23  **Q.**   And if you -- you can see down on the left side underneath

24  your photograph, there's a link that mentions "Full CV;" is

25  that correct?

**JAGANNATHAN - CROSS / PIETRANTONIO**

1   **A.**   That is correct.

2   **Q.**   So if I go there, I'll get the most up-to-date version of

3   your CV; is that correct?

4   **A.**   Yes.  Yes.

5   **Q.**   Could you put up the Doctor's CV, please?

6        Now, if you could flip to the next page, please.

7        And I see under Academic Ph.D. -- I think you mentioned

8   this before, but I just wanted to clarify.  You earned a Ph.D.

9   from UCSB; is that correct?

10  **A.**   I did, yes.

11  **Q.**   And you earned that in 2003?

12  **A.**   Yes, I did.

13  **Q.**   So in 2001 you were a grad student; is that correct?

14  **A.**   I was, yes.

15  **Q.**   And who was your faculty adviser?

16  **A.**   Dr. Kevin Almeroth.

17  **Q.**   And once you earned your Ph.D. in 2003, did you go to work

18  for Kelley Computing immediately thereafter?

19  **A.**   I did, yes.

20  **Q.**   Okay.  So that was your first job after getting your Ph.D;

21  is that right?

22  **A.**   Yes, it was.

23  **Q.**   Now, in addition to your job at Exponent, if we could just

24  go -- if we could close that, "Prior Experience," there's an

25  entry here which seems to overlap with your time at Exponent.

JAGANNATHAN - CROSS / PIETRANTONIO

1    "CEO of Accurate Trends LLC."

2    **A.**    Yes.

3    **Q.**    What does Accurate Trends do?

4    **A.**    So outside of work I started a company to commercialize my

5    research in predicting stock markets.  So I came up with some

6    research algorithms which used daily stock ticker data to

7    predict whether they would go up or go down.  And I did that

8    outside of work.

9          And I actually implemented a very sophisticated database

10   of stock.  You know, I would call it time CDs data which looks

11   at daily stock market values and does some predictions.  And I

12   commercialized that and that is Accurate Trends.  And so I did

13   that outside of work.

14   **Q.**    Is Accurate Trends still an active entity?

15   **A.**    I stopped doing anything active with that as of early

16   next -- early 2014, but I'll officially close it beginning of

17   the tax year, or something, but I'm not actively doing anything

18   with that right now.

19   **Q.**    And when you used these algorithms, how did you

20   commercialize the notion of these algorithms?

21   **A.**    So what I did was there was a research software which

22   would look at the stock market data and make predictions, and

23   then these would get uploaded with -- to another database that

24   is on a Web site which also I developed, and it would generate

25   daily e-mail alerts to subscribers.

1      And then there were different levels of service, basic

2  gold -- basic, silver, gold and platinum, I think.  And the

3  platinum came with a guarantee if it doesn't meet certain

4  criteria, I would refund the money.  So it involved basically

5  sending out these alerts.

6  **Q.**  Do you have any recollection of what your guarantee was?

7  **A.**  The money back.  So the guarantee -- it would be on the

8  Web site.  It would be something like if the -- so the idea of

9  the way the algorithm worked was if I make a prediction today,

10 I would use tomorrow's closing price, the next trading day's

11 closing price as what you would call the basis price.

12     And from that, the stock -- so if I say the stock will go

13 up in the next 21 days, I think there was some clause that at

14 least 70 percent of them would go up by at least 1.5 percent at

15 any time during the trading day from the basis price, or if

16 60 percent of them go above three percent, and there was

17 something about five percent.  I don't recall the exact.

18     But it was a very precise way of measuring things that

19 anyone could verify.  And if it did not meet that criteria, we

20 would refund the money.

21 **Q.**  Okay.  But you're not running the company anymore?

22 **A.**  I'm not running that anymore.

23 **Q.**  I think in your prior testimony in your deposition you

24 indicated that you received a salary from Exponent; is that

25 correct?

JAGANNATHAN - CROSS / PIETRANTONIO

1   **A.**   That is correct.

2   **Q.**   And in addition to your salary -- by the way, let's just

3   leave this, I guess, for just a moment.

4        Also in your deposition you testified that in addition to

5   your salary, you have been paid a bonus; is that correct?

6   **A.**   Yeah, there are annual bonuses, yes.

7   **Q.**   Is your compensation based, then, on a review of your

8   performance?

9   **A.**   Yes.

10  **Q.**   If we could go back to the Web site bio, please.

11       There's a link up here up on the far right in the green.

12  It mentions "Careers."  Do you see that?

13  **A.**   Yes.

14  **Q.**   Does that describe career opportunities for Exponent?

15  **A.**   I believe it does, yes.

16  **Q.**   Do you know if we go to that site, that page, you'll

17  notice on the left-hand side it's a little bit hard to see

18  under "Careers," there's a tab "Benefits and Compensation."

19  **A.**   Uh-huh.

20  **Q.**   And if we click on "Benefits and Compensation," we see, if

21  we bring it all up, "Recognition and Reward System."

22       Are you familiar with that phrase, "Recognition and Reward

23  System"?

24  **A.**   I am.  We are actually going through the process right

25  now.

1  **Q.**   And is that how -- your performance, is that judged

2  against the Recognition and Reward System for determination of

3  what your total compensation is?

4  **A.**   The Recognition and Reward System is the way of looking at

5  everyone's performance in the company and bonuses are

6  determined based on that process.

7  **Q.**   Okay.  So if we could go to what pops up on the Exponent

8  Web site for "Recognition and Reward" and blow up what it is

9  that we see there, it's divided into three categories of

10  performance; is that right?

11  **A.**   Yes.

12  **Q.**   "Professional"?

13  **A.**   Yes.

14  **Q.**   "Business Client" and "Leadership Teamwork;" is that

15  correct?

16  **A.**   That is correct.

17  **Q.**   Could you read for us what are some of the -- what the

18  factors are that are listed under Business/Client?

19  **A.**   The first is "Client Relations."  The second is "Project

20  Management."  Number 3 is "Productivity".  Number 4 is

21  "Business Development."  Number 5 is "Cost Control."  And

22  Number 6 is "Client Perception."

23  **Q.**   So is it accurate to say that when Exponent is making

24  decisions about an employee's compensation, one of the things

25  it might take into account is the extent to which that employee

1  is able to generate repeat business?

2  **A.**   Yeah.   Yes.

3  **Q.**   Do you recall the engagement letter that started this

4  project for Box?

5  **A.**   I don't recall the details, but it was sometime in 2013.

6  **Q.**   Let's just show on the Elmo, please.

7       And I'd like you to take a quick look at this document.

8  And does this look like what the engagement letter might be?

9  **A.**   It's too tiny, but it does look like -- it does look like

10 the engagement letter.

11 **Q.**   Is that a little better?

12 **A.**   Yes.

13 **Q.**   And the letter was directed to Mr. Bovich of Reed Smith;

14 is that correct?

15 **A.**   That is correct.

16 **Q.**   And do you know who from Exponent signed it?   Did you sign

17 it?

18 **A.**   I signed this one.

19 **Q.**   Very good.

20      So that was September of 2013; correct?

21 **A.**   That is correct.

22 **Q.**   And I'll represent to you that the suit was filed in June

23 of 2013.   So this was about three months after the lawsuit was

24 filed; right?

25 **A.**   That is correct.

JAGANNATHAN - CROSS / PIETRANTONIO

1    **Q.**    Now, I believe the other day that you said that you had

2    worked with the Reed Smith firm before this case; is that

3    right?

4    **A.**    That's correct.

5    **Q.**    How many times?

6    **A.**    Before this case?

7    **Q.**    Before this case, yes.

8    **A.**    Twice, I would say.

9    **Q.**    And did you represent the patent owner or the accused

10   infringer in those circumstances?

11   **A.**    In one matter that I worked on I don't think it was a

12   patent case, but I believe it may have been plaintiff.  I don't

13   recall specifically.  I don't think it was a patent case,

14   though.

15       The second one was a patent case and I was -- my report

16   was used by the defendant.

17   **Q.**    And did you work with Mr. Bovich on either of those two

18   cases?

19   **A.**    No.

20   **Q.**    So you worked with other Reed Smith attorneys on those two

21   cases?

22   **A.**    Specifically one.

23   **Q.**    Who was that?

24   **A.**    Brian Roche.

25   **Q.**    And were all of the -- were all of these cases that you've

1   worked with Reed Smith started after you started your

2   employment at Exponent?

3   **A.**    No.  These two that I just talked about, they were when I

4   was at my previous company.

5   **Q.**    When you were at Kelley?

6   **A.**    Kelley Computing, yes.

7   **Q.**    And so you had the two prior at Kelley and now you have

8   this one while you're at Exponent; is that correct?

9   **A.**    Yes; yes.

10  **Q.**    Do you know if Exponent has been hired by Reed Smith for

11  any other work since this case began?

12  **A.**    Yes.  They were -- there was -- there were two cases which

13  are related to each other because it's -- it's called Kroy IP

14  v. Safeway and Kroy IP v. Kroger.  So that's two projects.

15      And there's one other project that Exponent was hired in

16  that I cannot disclose for confidentiality reasons.  Those are

17  the projects.

18  **Q.**    The two that you could disclose, are those projects that

19  you were worked on with Reed Smith?

20  **A.**    Yes.  In those, I am working on with Reed Smith.  Oh, I

21  forgot to mention, there may be other cases, other projects

22  that Reed Smith is involved in which I do not know about.

23      I mean, Exponent is a big company.  There are about a

24  thousand employees.  So there may be other projects that

25  Reed Smith is involved in which I do not know about.  But these

1    are the ones that I am aware of.

2    **Q.**   So you worked with them a couple of times before you came

3    over to Exponent?

4    **A.**   Yes.

5    **Q.**   You started working on this case --

6    **A.**   Yes.

7    **Q.**   -- while at Exponent?

8    **A.**   Yes.

9    **Q.**   And you're working with them on three other cases since

10   this case started, two of which you could describe and one of

11   which you can't really talk about; is that right?

12   **A.**   That is correct.

13   **Q.**   Now, do you know about how much Exponent has billed Box

14   through Reed Smith for the work done so far in this case?

15   **A.**   Must be somewhere in the range of $700,000.  I do not know

16   the exact number, but somewhere in that range.

17   **Q.**   I'm sorry, I didn't hear.

18   **A.**   700,000.

19   **Q.**   700?

20   **A.**   Yes.

21   **Q.**   So we received invoices that were, as I mentioned before,

22   from the time period of September of 2013 through November of

23   2014.

24   **A.**   Uh-huh.

25   **Q.**   Would it surprise you that as of November 12th, 2014,

1  Exponent had billed Box approximately $637,000?

2  **A.**   No, it would not.

3  **Q.**   Has Exponent submitted any additional invoices to

4  Reed Smith since November?

5  **A.**   Probably.  Probably one went out in January, I think.

6  **Q.**   And have you been actively preparing for this trial since

7  November?

8  **A.**   I have been active since sometime mid-December.  Yeah,

9  yeah, I would say that's correct, actively since November or

10  after.

11  **Q.**   And could you estimate for us about how much time, hours

12  it is that, perhaps, you've worked since mid-December in

13  preparing for this trial?

14  **A.**   In January, I spent a number -- I do not know how to

15  estimate the number of hours.  In December I did not do much,

16  but my team was involved in helping prepare the videos.

17       In January, towards the end, I did a lot of work,

18  especially with the presentation and especially last week when

19  I was putting together this presentation that we showed the

20  jury.  So -- but I don't know how to estimate the number of

21  hours.  But significant hours, definitely.

22  **Q.**   And Exponent bills out your time at $450 an hour; is that

23  right?

24  **A.**   Presently it is $490 an hour since January.

25  **Q.**   Billing rate went up as of January 1st?

JAGANNATHAN - CROSS / PIETRANTONIO

1  A.   Yes.

2  Q.   Okay.  With respect to the invoices that were produced, do

3  you have any idea how many hours the total Exponent team had

4  worked between September of 2013 and November of 2014?

5  A.   It would easily have been thousands of hours.  There were,

6  like, many prior art references we analyzed.  And, as I said,

7  we produced something like 80 claim charts with detailed

8  analysis of every single claim element.  So easily thousands of

9  hours.

10  Q.   So it wouldn't surprise you if it was 1700 or more?

11  A.   I wouldn't be surprised.

12  Q.   Could you estimate for me what percentage of those hours

13  were your hours?

14  A.   I wouldn't know.  That's a lot of hours.  But a

15  significant chunk because I was directing the work.  So I do

16  not know how to estimate that.

17  Q.   So I just want to show a couple of invoices.

18  A.   Sure.

19  Q.   So let's just put up the April 18th invoice.  And you see

20  here down at the bottom it shows a total of 630 hours?

21  A.   Yes.

22  Q.   And your hours that month were 104 hours?

23  A.   That is the time that we produced 80 claim charts, and me

24  doing 80 claim charts alone in that time frame would have been

25  impossible, so yes.

1   **Q.**   Right.  But, I'll ask the questions.  I appreciate the

2   explanation, but -- so in this particular instance, kind of

3   roughing the math, it's about 16 percent of the total time that

4   was spent that month is time that you spent; is that correct?

5   **A.**   For that invoice.  I don't know the --

6   **Q.**   I asked about this month.  Is that right?

7   **A.**   Sure.

8   **Q.**   I'm just asking about a couple of months.

9   **A.**   Sure.

10  **Q.**   How about we look at the invoice for May of 2014.

11  **A.**   Uh-huh.

12  **Q.**   And on this one, we see it's 369 hours total?

13  **A.**   Yes.

14  **Q.**   And your total hours are 52 hours; is that right?

15  **A.**   That is correct.

16  **Q.**   So roughing -- a rough approximation, at least for that

17  month, almost about 14, maybe 15 percent of the time; correct?

18  **A.**   Yes.

19  **Q.**   So it wouldn't be a surprise to you, then, given numbers

20  like that, if your total hours, component of all of the hours

21  that Exponent has billed Box would be less than 30 percent;

22  would it?

23  **A.**   I do not know how to come up with a number.  Maybe.  I do

24  not know.  But in these two months that we showed, I would

25  agree with you, those are the numbers.  I do not know.

1  **Q.**  But you can agree with me that given that 10 other people

2  have worked on this project besides yourself, that you've only

3  done a fraction of all of the work for Box on this project; is

4  that right?

5  **A.**  I've certainly done a fraction of the work.  But as to

6  what the numbers are and how many hours at what time period, I

7  do not know.

8  **Q.**  All right.  Let's go, before we go into any of your

9  invalidity opinions, let's go to Slide 270, which I think you

10  just talked about this morning from your presentation.

11  **A.**  Sure.

12  **Q.**  And you talked about other patents licensed by Box; is

13  that right?

14  **A.**  Yes.

15  **Q.**  I think I might have heard you, but I just want to be

16  clear.  So I believe you talked about having looked at six

17  other patents; is that correct?

18  **A.**  Here I presented, yeah, probably six.

19  **Q.**  Okay.

20  **A.**  There were a couple, I think, additional ones in the

21  expert report that for some reason --

22  **Q.**  But this morning you only talked about six patents?

23  **A.**  Yes.

24  **Q.**  Mr. Bovich asked you about six patents; is that right?

25  **A.**  Uh-huh.

1  Q.   And I think, when you were answering his question, you

2  said that you reviewed the specifications at a high level; is

3  that right?

4  A.   That is correct.

5  Q.   Okay.  So you have not formed any opinion as to whether

6  Box infringes any of those six patents; have you?

7  A.   I have not formed opinions as to whether Box infringes

8  those patents, no.

9  Q.   And you have not compared Box's technology to the claims

10  of any of those patents; have you?

11  A.   Say that again, please?

12  Q.   You haven't compared Box's technology to the claims of any

13  of those patents; have you?

14  A.   No, I have not.

15  Q.   Okay.  Now, we can take that slide down, please.

16      I just want to confirm that when you were working on your

17  opinions, you noted that the level of proof needed for

18  infringement is different from the level of proof needed for

19  invalidity; is that correct?

20  A.   That is correct.

21  Q.   And you understand that a patent is presumed valid; is

22  that right?

23  A.   Yes, that's correct, but that presumption can --

24  Q.   I'm sorry.  I'm sorry.  I ask the question.  I'm sure to

25  have Mr. Bovich further explain.

1          My question was:  You understand that a patent is presumed

2     valid; is that correct?

3     **A.**    The patent is presumed valid, but it can be ruled out.

4     **Q.**    Excuse me.  It's a "yes" or "no" question.  Is it presumed

5     valid?

6     **A.**    Yes.

7     **Q.**    Thank you.  And you would agree that the burden of proof

8     for invalidity is higher than the burden of proof for proving

9     infringement; wouldn't you?

10    **A.**    That is correct.

11    **Q.**    And you would agree that there has to be clear and

12    convincing evidence to prove invalidity; is that right?

13    **A.**    That is correct.

14    **Q.**    And in your validity report, you described what you

15    believed clear and convincing meant, didn't you?

16    **A.**    That is correct.

17    **Q.**    And you would agree that in your opinion, "clear and

18    convincing evidence" is evidence that produces an abiding

19    conviction that the truth of the fact is highly probable?

20    **A.**    That is correct.

21    **Q.**    And so the analysis for invalidity should be as thorough

22    as possible to prove invalidity, given that higher burden;

23    shouldn't it?

24    **A.**    That is correct.

25    **Q.**    Now, would you agree with me that if the prior art that

1   was being used to invalidate the patent had already been

2   considered by the Patent Office prior to issuance of the

3   patent, that it would be more difficult to show invalidity with

4   that art?

5   **A.**   Please say that again.

6   **Q.**   If the prior art that's being used to try to prove up

7   invalidity --

8   **A.**   Uh-huh.

9   **Q.**   -- was actually in front of the Patent Office --

10  **A.**   Uh-huh.

11  **Q.**   -- and the Patent Office allowed the patent over that

12  prior art --

13  **A.**   Uh-huh.

14  **Q.**   -- would you agree with me that it should be more

15  difficult to prove that the patents are invalid using that art?

16  **A.**   It is certainly one of the factors that plays in, but the

17  standard is clear and convincing evidence, as far as I know.

18  **Q.**   So you would agree with me that that would be one of the

19  factors; is that right?

20  **A.**   Yes.

21  **Q.**   Okay.  Let's start talking about some of the prior art

22  that you looked at.

23  **A.**   Sure.

24  **Q.**   Let's turn to WS_FTP.  And if we could put up Slide 24

25  from Dr. Jagannathan's report, please.

1          Now, your opinion about invalidity with regard to the

2    claims using WS_FTP Pro are solely reliant on the user guide;

3    is that correct?

4    **A.**    That is correct.

5    **Q.**    You never analyzed the software that corresponds to

6    Version 5; did you?

7    **A.**    I analyzed the software that corresponds to Version 6.

8    **Q.**    I asked about Version 5.

9    **A.**    I don't recall I analyzed the functioning software for

10   Version 5.

11   **Q.**    Okay.  So you don't recall having analyzed Version 5

12   software; is that correct?

13   **A.**    The running software, I don't think I analyzed it.

14   **Q.**    Okay.  And no one on the project team analyzed the

15   software corresponding to Version 5 as part of this project;

16   did they?

17   **A.**    Not to my knowledge.

18   **Q.**    And so you and your team did not run any experiments to

19   see how Version 5 software actually operated; did you?

20   **A.**    Not to my knowledge, no.

21   **Q.**    And you did not generate any screenshots to show how the

22   software operates; did you?

23   **A.**    I don't think I did.

24   **Q.**    And none of the images in your slides about WS_FTP Pro are

25   actually screenshots, is that right, that you've generated?

1   A.   I didn't generate those screenshots.  They are directly

2   from the manual.

3   Q.   They are pictures that you've taken from the manual?

4   A.   Yes.

5   Q.   But they are not screenshots that you generated; is that

6   correct?

7   A.   That's correct.

8   Q.   And you never studied the source code for Version 5; did

9   you?

10  A.   For relying on the manual?  No.

11  Q.   So you didn't have access to the source code for Version

12  5; did you?

13  A.   For WS_FTP Pro Version 5, no.

14  Q.   Okay.  In fact, let me step back.

15       So you couldn't look under the hood to see how the source

16  code operated to carry out the functions that the user saw;

17  could you?

18  A.   For this -- for this version of software that is described

19  in the manual?  No.

20  Q.   Okay.  You didn't speak to anyone who developed the

21  Version 5 of the WS_FTP product to get an understanding of how

22  it worked; did you?

23  A.   I did not.

24  Q.   And with respect to your opinions, you would agree with me

25  that the manual, which is what you are relying on for WS_FTP,

1  does not anticipate any of the asserted claims; right?

2  **A.**   That's -- my personal opinion is that the determining step

3  is not explicitly this close.  I believe that when one of

4  ordinary skill reads that when you do the save in this other

5  application, that file is transferred to the remote database.

6  So what that tells me is the application must determine.

7  Otherwise, it's not possible to transfer it.

8  **Q.**   Dr. Jagannathan, in your slides themselves about WS_FTP

9  and the opinions that you presented here, you don't use the

10  word "anticipated", do you?

11  **A.**   In the slides I presented, I did not.

12  **Q.**   So you have not presented an opinion to the jury that

13  WS_FTP anticipates the claims that are asserted here?

14  **A.**   I have not presented such an opinion to the jury.

15  **Q.**   You solely relied on the notion that that particular

16  element is found by obviousness; is that correct?

17  **A.**   In the presentation to the jury, yes.

18  **Q.**   That's all we are talking about here; right?

19  **A.**   Yes.

20  **Q.**   That's the only evidence that we are presenting here?

21  **A.**   Okay.

22  **Q.**   That's all we are discussing here; right?

23  **A.**   Yes.

24  **Q.**   Is what's here?

25  **A.**   Yes.

1    **Q.**   And what you've presented is an obviousness rejection or

2    invalidity argument with respect to these claims based on

3    WS_FTP?

4    **A.**   That is correct.

5    **Q.**   Okay.  Now, would you agree with me that the WS_FTP manual

6    describes a program for transferring files to and from an FTP

7    server?

8    **A.**   It describes a program for transferring files to and from

9    an FTP server, that's correct.

10   **Q.**   Very good.  And your slides show excerpts from the WS_FTP

11   manual; is that correct?

12   **A.**   That is correct.

13   **Q.**   In your testimony on Friday about the manual, you kept

14   mentioning the phrase "database server."  Do you remember that?

15   **A.**   Yes, because that's called out in the claims, yes.

16   **Q.**   Okay.  Now, none of the excerpts of the manual that you

17   put on the slides actually use the words "database server;" do

18   they?

19   **A.**   The word "database" I don't think was explicitly

20   identified in the manual, but --

21   **Q.**   Excuse me.  That, I think, is all I need to know.

22   **A.**   Okay.

23   **Q.**   They're not in the slides; right?

24   **A.**   They are not -- well --

25   **Q.**   The excerpts from the manual that you used in connection

1   with your analysis do not include the words "database server;"

2   is that correct?

3   **A.**   The excerpts do not explicitly use the word "database."

4   **Q.**   They don't have the words in there at all; right?

5   **A.**   That's more difficult for me to say here from memory, but

6   that's probably correct.

7   **Q.**   Okay.  Now, those excerpts don't even use the word

8   "database," do they?

9   **A.**   The excerpts that are there in the slides?  I don't think

10  they mention the word "database."

11  **Q.**   Okay.  Now, in your opinion, the only thing that you point

12  to as the database server is the FTP server; is that right?

13  **A.**   That is correct, yes.

14  **Q.**   Okay.  So is it your opinion that every FTP server is a

15  database server?

16  **A.**   Under the -- applying the Court's construction, yes.

17  **Q.**   And you rely on that same FTP server as including the

18  database management program of the claims; right?

19  **A.**   Okay.  So there is a little bit of confusion here.  Let me

20  clarify.  I'm answering your question.

21       So when we use the word "FTP server," it can refer to the

22  software running on that computer, which is the FTP server, or

23  it can be the software itself.

24       And what -- or the computer itself because generally, we

25  use the word "server computer."  So that that computer, the FTP

 1  site, if you will, has a computer which is a server computer

 2  that runs the FTP server software, which I'm calling as the

 3  database management program, according to the claims.

 4      The files that are organized and stored over there, that

 5  is the database.

 6  **Q.**  Very good.  Thank you.

 7  **A.**  Uh-huh.

 8  **Q.**  Now, you agree that in your presentation --

 9  **A.**  Uh-huh.

10  **Q.**  -- as you set forth for the jury on Friday --

11  **A.**  Uh-huh.

12  **Q.**  -- the FTP manual does not expressly disclose the

13  determination step of the claims; is that right?

14  **A.**  That is correct.

15  **Q.**  Okay.  And the manual doesn't disclose determining if the

16  file has been modified; is that correct?

17  **A.**  It -- I think it implicitly discloses it.

18  **Q.**  In your presentation on Friday, you didn't present any

19  testimony describing how the manual describes that the file is

20  determined to have been modified from the manual; did you?

21  **A.**  I did not answer the word "how," but I'm saying it must,

22  based on that disclosure.  It is -- the disclosure in the

23  manual says when one of ordinary skill reads that particular

24  language where it says when the user clicks "save" in the

25  third-party application, WS_FTP Pro is able to send that file

1   to the remote database, that means there was a determination.

2       How that determination is done I don't think is spelled

3   out.  But definitely, it does disclose some sort of

4   determination is performed.

5   **Q.**   There was a determination that the file should be saved;

6   right?

7   **A.**   That determination is by the user.  The user is going and

8   saying "save."  After that point, according to the manual, the

9   file is transferred to the server, which means it had to detect

10  that the file has been saved.

11  **Q.**   Right.  So it detects that the file has been saved?

12  **A.**   Yes.

13  **Q.**   Okay.  But without the source code, you have no idea how

14  Version 5, which is supposed to correspond to the manual,

15  actually carries out the operations of deciding to send the

16  cached file back to the server; right?

17  **A.**   I would say that --

18  **Q.**   It's "yes" or "no."

19  **A.**   No, I don't think the answer is "yes" or "no."

20  **Q.**   I think it is.

21  **A.**   I'll explain why.

22          **THE COURT:**  One at a time.  Hold on.  Let the witness

23  have a chance to answer.

24          **THE WITNESS:**  The reason it's not a "yes" or "no"

25  is --

1          **THE COURT:**  Let's start from the top.  What's the

2   question?

3   **BY MR. PIETRANTONIO**

4   **Q.**   So without the source code, you have no idea how Version 5

5   software --

6   **A.**   Uh-huh.

7   **Q.**   -- which is supposed to correspond to the manual --

8   **A.**   Uh-huh.

9   **Q.**   -- actually carries out the detailed operations of

10  deciding to send the cached file back to the server; right?

11  **A.**   I think we could also use the actual software itself to

12  answer that question, but the source code alone is not

13  necessary to do that.  You could also use the operating

14  software.  But it is correct I did not have the software or the

15  source code.

16  **Q.**   So you could use the operating software, the executable --

17  **A.**   Uh-huh.

18  **Q.**   -- or you could use the source code or you could use it in

19  combination to figure that out --

20  **A.**   Yes.

21  **Q.**   -- but you didn't have either?

22  **A.**   I did not need to use either.

23  **Q.**   It's your opinion that in 2001, it would have been obvious

24  to one of ordinary skill in the art to add this determining

25  step to the WS_FTP Pro manual; is that correct?

1  A.    I believe it was obvious to one of ordinary skill reading

2  this manual that it was obvious that that step could have been

3  performed using the determination that's called out in the

4  claims.

5  Q.    Could we put up Slide 45 from Dr. Jagannathan's

6  presentation, please?

7        So I believe this is where it is that you're saying that

8  the determining step is obvious; is that correct?

9  A.    Yes, because I'm relying on this disclosure here to say

10 this is an inherent feature of the Windows operating system,

11 and one of ordinary skill could have used this feature to

12 implement the determining set.

13 Q.    And you're pointing to an excerpt from one of the

14 patents-in-suit; is that correct?

15 A.    That's correct.

16 Q.    And that's in the specification in the patent; right?

17 A.    This is in the specification of the patent.

18 Q.    This is an excerpt from the patent itself?

19 A.    That is correct.  That is correct.

20 Q.    Okay.  And you would agree with me that the patent

21 specification was in front of the examiner at the time that the

22 examiner reviewed this case and decided to grant the patent;

23 wouldn't you?

24 A.    The specification was in front of the examiner, yes.

25 Q.    And the examiner then subsequently granted the patent;

1    didn't they?

2    **A.**    Yes.

3    **Q.**    Okay.  If we could go to Slide 52, please.

4        Do you remember your testimony about the claim limitations

5    that are down at the bottom where the WS_FTP receives a

6    database notification that an additional user has modified the

7    database asset?

8    **A.**    Yes.

9    **Q.**    Okay.  And in your opinion, WS_FTP satisfies these

10   limitations when an option is activated where WS_FTP receives

11   information that the file on the server has a newer time stamp;

12   is that correct?

13   **A.**    When the file has the same or newer, yes.  When the file

14   has a newer time stamp, the user would know that somebody else

15   has modified it, that is correct.

16   **Q.**    So this excerpt that we see on the right-hand side --

17   **A.**    Uh-huh.

18   **Q.**    -- titled "Prompt for Overwrite of Same or Newer Files,"

19   taken together with a check in the box above of "Prompt for

20   Overwrite of Same or Newer Files" is what you're relying on for

21   your opinion that WS_FTP satisfies these last two elements of

22   the claim; is that right?

23   **A.**    These are two portions from that manual which says this.

24   There's one more screenshot, I believe, in that manual that I

25   didn't use.  There's a screenshot actually showing the time

1  stamp be used.

2  **Q.**  But the only material we have in front of us for

3  consideration is what you have in your slide, which are what

4  appears to be a picture of a screenshot that appeared in the

5  manual --

6  **A.**  Uh-huh.

7  **Q.**  -- as well as an excerpt from the manual itself; is that

8  right?

9  **A.**  Yes, this is what I presented to the jury.  That is

10  correct.

11  **Q.**  I want to ask you a hypothetical question based on your

12  understanding of WS_FTP, if that's okay?

13  **A.**  That's okay.

14  **Q.**  Let's assume a situation where you are a user --

15  **A.**  Uh-huh.

16  **Q.**  -- and you have decided to edit a remote file using the

17  feature of Step 2.

18  **A.**  Yes.

19  **Q.**  Okay.  Are you with me so far?

20  **A.**  Yes.

21  **Q.**  Okay.  Now, let's put up Slide 37, if we could, please.  I

22  want to make sure I've got the -- this is a description here

23  that you've put as to the four steps involved to edit a remote

24  file; right?

25  **A.**  Yes.

1  Q.   So let me set up that again because I mentioned Step 2,

2  and I don't think it was in front of anybody.

3       So let's assume a situation where you are a user and you

4  have decided to edit a remote file using the feature of Step 2.

5  A.   Uh-huh.

6  Q.   Then you edit the file as in Step 3?

7  A.   Yes.

8  Q.   And then you choose "save" as in Step 4?

9  A.   Yes.

10 Q.   After you selected "save," is there a copy saved locally

11 at the client?

12 A.   Yes.

13 Q.   Okay.  And is the time stamp of that local copy updated to

14 the time that you did the save?

15 A.   When you do a "save," the file is saved to disk and the

16 last modified time would reflect the time in the computer

17 system, yes.

18 Q.   Okay.  Now, if we could go to Slide 56, please.

19      You presented an alternative theory for these two

20 elements, too; is that right?

21 A.   That is correct.

22 Q.   Okay.  And you rely on DocuShare for that alternative

23 theory; is that correct?

24 A.   That is correct.

25 Q.   Could we go to Slide 57, please?

1        And this is part of the explanation it is that you

2   provided about DocuShare as to why you believe it satisfies

3   those two elements; is that right?

4   **A.**   That is correct.

5   **Q.**   Now, while WS_FTP is an FTP client, DocuShare was not an

6   FTP client; is that right?

7   **A.**   DocuShare, my understanding is it does not use FTP.

8   **Q.**   And you ran the DocuShare software; is that right?

9   **A.**   I did.

10  **Q.**   Okay.  When a user accesses an asset to edit --

11  **A.**   Uh-huh.

12  **Q.**   -- and they've got it locally for them in DocuShare --

13  **A.**   Uh-huh.

14  **Q.**   -- can a second user access the same asset and edit it at

15  the same time?

16  **A.**   Say that again, please?

17  **Q.**   So let's say you and I are looking at the same -- I guess

18  would you say DocuShare offers you access to a database?

19  **A.**   Yes.

20  **Q.**   Okay.  So let's say you see a particular file and you want

21  to edit it.

22  **A.**   Yes.

23  **Q.**   An hour later I look at the database and I want to try to

24  edit the same file while you're editing it.

25  **A.**   Uh-huh.

1   Q.   Can I?

2   A.   You cannot edit it because I have checked out the file.

3   What you will see is when you go to the server, you see a lock

4   icon saying somebody else is editing it.  And you will be

5   allowed to, what is it called -- it's called preview -- I might

6   be wrong about the name, but it's basically saying someone else

7   has opened it.  You can see the file, the contents of the file,

8   but you cannot edit it because I have checked it out.

9   Q.   Okay.  So you've essentially locked it to you, and I can't

10  get to it until you put it back; is that right?  When you check

11  it in, then I can get access to it?

12  A.   That is correct.

13  Q.   Okay.  Now, we can take the slide down.

14       I believe in your deposition you testified that you had

15  never heard of WS_FTP prior to the institution of this lawsuit;

16  is that right?

17  A.   No, I think my precise words were I have used numerous FTP

18  software, but WS_FTP doesn't stand out.

19  Q.   Okay.

20  A.   So I probably had heard of it or even used it, but I

21  didn't recall it specifically.

22  Q.   So you didn't recall ever using it.  You think you may

23  have, but you don't actually recall having used it; is that

24  right?

25  A.   That is correct.

1    **Q.**   Okay.  Do you understand that to qualify as prior art,

2    it's not enough that the WS_FTP manual is just printed?

3    **A.**   I think it must be publicly available.  That's my

4    understanding.

5    **Q.**   Okay.  Now, do you have any memory of seeing this document

6    before 2001?

7    **A.**   I don't have a memory of what I saw before 2001, no.

8    **Q.**   Do you have any memory of seeing this document before you

9    actually even got involved in this case?

10   **A.**   No, I don't think so.

11   **Q.**   You don't know personally whether this manual was provided

12   to any of WS_FTP's customers; do you?

13   **A.**   I believe I saw a sworn declaration.

14   **Q.**   From your own personal knowledge, do you know whether or

15   not this manual was distributed with the software?

16   **A.**   So I'm a bit confused about that if I read somebody's

17   sworn declaration --

18          **THE COURT:**  No, do you personally know, regardless of

19   any documents you've seen, do you personally know that this

20   manual has been dished out to customers?

21          **THE WITNESS:**  No, I do not.

22   **BY MR. PIETRANTONIO**

23   **Q.**   Could you put up Slides 25, 26 and 27 right after the

24   other, please?

25          Let's just start with 25.  I'm sorry.  Let's go to 26,

JAGANNATHAN - CROSS / PIETRANTONIO

1  please.  I got the number wrong.

2       Okay.  So I believe that you referred to, in your slides

3  on 26 and then 27, please, there's a second, again a Web -- I

4  think it's one of those way-back machine sites.  And then 28.

5  You've referred to these three different things that were

6  pulled off the Web; right?

7  A.  Yes.

8  Q.  Now, those articles don't make any mention of the manual;

9  do they?

10  A.  They make mention of the WS_FTP Pro 5 software being

11  available as of those dates, and the manual comes with that.

12  Q.  Well, you just told me you don't know if it was

13  distributed with that.

14  A.  Um --

15  Q.  That you didn't have any personal knowledge that the

16  manual was distributed with the software; right?

17  A.  I don't have personal knowledge that the manual was given

18  with the software, but it's a manual for the software.  So --

19  Q.  I asked you a question.  You answered that you didn't have

20  personal knowledge that it was, in fact, distributed with the

21  software; right?

22  A.  I --

23  Q.  And these articles simply referred to the software; right?

24  A.  These articles definitely refer to the software, that's

25  correct.

1    Q.    Now -- and your invalidity claim charts don't cite to

2    these articles at all to support your opinions, do they?

3    A.    Say that again, please?

4    Q.    Your invalidity claim charts with regard to WS_FTP --

5    A.    Uh-huh.

6    Q.    -- do not provide any citations to these three Web

7    articles, do they?

8    A.    I believe these were cited in my -- the body of my report.

9    There's a Bates range.  I don't specifically recall whether I

10   cited this particular page or not, but I gave a section in the

11   body of my report talking about availability, but the claim

12   charts themselves do not identify these.

13   Q.    You did not present your report to the jury, did you?

14   A.    No, I did not.

15   Q.    You presented testimony on Friday; right?

16   A.    Yes.

17   Q.    And in the testimony that you provided setting forth your

18   opinion --

19   A.    Uh-huh.

20   Q.    -- about these claims --

21   A.    Uh-huh.

22   Q.    -- you relied exclusively on the manual and not these

23   three articles; is that right?

24   A.    I relied on these to say I believe these were publicly

25   available, but I didn't rely on these Web pages to say this is

 1   how -- this is what is described in the manual.

 2   **Q.**   You didn't use any excerpts from these three Web

 3   articles --

 4   **A.**   Uh-huh.

 5   **Q.**   -- in your analysis of the specific claim elements that

 6   you say are found in the prior art; did you?  They don't appear

 7   in your claim charts; do they?

 8   **A.**   These do not describe the technical details with respect

 9   to the claims.  I'm relying on these to say the software was

10   available as of the date.  I'm not sure what you're asking.

11   **Q.**   That's fine.  Let's go back to Slide 24, please.

12        I believe, in your testimony on Friday, you talked about

13   the manual being prior art based on the marking of "Copyright

14   1998" and its printing history; is that correct?

15   **A.**   That was part of the statements I made, yes.

16   **Q.**   You didn't mention the copyright date at all in your

17   report; did you?

18   **A.**   I don't recall exactly what I said in the body of my

19   report, but I had a section that said it was publicly available

20   and I had a paragraph --

21   **Q.**   But you didn't mention the copyright date in your report,

22   or at least you don't remember having mentioned it in your

23   report, do you?

24   **A.**   I don't recall the specification.

25   **Q.**   And you're not a copyright lawyer, are you?

1  **A.**   I'm not.

2  **Q.**   And you don't hold yourself out as a copyright expert?

3  **A.**   I'm -- I do -- I have performed analysis of software with

4  respect to copyrights, but I don't talk about the legal side of

5  things, so I do not know the law -- I mean the legal details,

6  sure.

7  **Q.**   You don't know what any legal effect of actually putting

8  this copyright mark with the "C in the circle" is; do you?

9  **A.**   I think when I see C 1998, that symbol, I assume it says

10  Copyright 1998, but I'm not a copyright lawyer.

11  **Q.**   Okay.  Let's just sum up for WS_FTP.  You did not examine

12  any WS_FTP software; is that correct?

13  **A.**   That isn't correct.  I did examine WS_FTP 6 software.

14  **Q.**   You didn't -- you didn't examine version 5, which

15  supposedly corresponds to what's in the manual in connection

16  with rendering your opinion about these asserted claims; is

17  that correct?

18  **A.**   That is correct.

19  **Q.**   And you never studied the source code for version 5 of

20  WS_FTP for this project; right?

21  **A.**   For this project I did not.  That is correct.

22  **Q.**   And the WS_FTP manual for version 5 does not anticipate

23  any of the asserted claims; is that right?

24  **A.**   Yes.  I did not present a presentation argument to the

25  jury.  That's right.

1  Q.   And your obviousness argument for these claims relies, at

2  least in part, upon a feature of Windows that was described in

3  the patent specification itself; is that correct?

4  A.   That is correct.

5  Q.   Okay.  Let's move on to Coda.

6       You and your team only examined some documents in the

7  executable code for Coda; is that right?

8  A.   My team and I examined the documents, the executables, the

9  log messages, and as well as deposition testimony of

10 Professor Satya, which tied those documents and the

11 architecture to the executables.

12 Q.   You didn't get a chance to look at any of the Coda source

13 code, did you?

14 A.   I did not look at the source code.

15 Q.   Okay.  Now, the Box lawyers provided Coda software to you

16 before you and your team found a second copy; is that right?

17 A.   That is correct.

18 Q.   Okay.  And no one on your team obtained a copy of the Coda

19 source code; is that right?

20 A.   I believe I said we did obtain a copy of the Coda

21 software.

22 Q.   I'm sorry.  Maybe I misspoke.

23      No one on your team obtained a copy of the source code for

24 Coda; is that right?

25 A.   Yeah, we did not.

1   Q.   Okay.  And no one from Reed Smith provided Exponent with a

2   copy of the Coda source code; right?

3   A.   That's right.

4   Q.   And you relied on Dr. Satya's -- and I'll use the

5   shortened form for fear of misstating his name.  And you relied

6   on Dr. Satya's deposition testimony in connection with your

7   opinion, didn't you, as you just said?

8   A.   Correct.

9   Q.   And you did not base any of your opinions on any

10  conversations with -- personal conversations with Dr. Satya,

11  did you?

12  A.   I did not.

13  Q.   Okay.  Your report does not mention any discussion with

14  Dr. Satya in connection with this litigation, does it?

15  A.   It does not.

16        MR. PIETRANTONIO:  Could you put up slide 80, please.

17     (Document displayed)

18  BY MR. PIETRANTONIO:

19  Q.   Looking at slide 80, you cite two documents for Coda and

20  the Coda software that you ran; is that correct?

21  A.   That's correct.

22  Q.   And the version of the software that you ran was version

23  5.3.10; is that right?

24  A.   That is correct.

25  Q.   Okay.  These two documents, the user manual and the

1    article -- right? --

2    A.    Uh-huh.

3    Q.    -- they don't specifically identify version 5.3.10 of Coda

4    at all, do they?

5    A.    No.  They are dedicated to generally the Coda installing

6    and using the Coda software for the user manual.  And the

7    article talks about the Coda -- general architecture of Coda.

8    They don't specifically call out version 5.3.10.

9    Q.    And it's your opinion that version 5.3.10 of the Coda

10   software, as you tested it, meets every element of the asserted

11   claims; correct?

12   A.    That is my opinion, yes.

13   Q.    But your claim analysis does not cite anything from the

14   user manual to support your invalidity opinion based on Coda,

15   does it?

16   A.    I believe I did cite to the portion where it says it's in

17   the user space.  I believe I did cite to the manual, to my

18   recollection.

19   Q.    Okay.  But that would be the only portion it is that you

20   used?

21   A.    There is at least one.  But it's a long claim chart.  I

22   wouldn't -- I wouldn't claim to recall every single detail.

23   Q.    And the drawing figure that you wrote on, on the big

24   board, that came from the article; is that right?

25   A.    That is correct.  That is correct.

JAGANNATHAN - CROSS / PIETRANTONIO

1    Q.    Now, you previously testified in deposition that you don't

2    recall whether you had heard of Coda prior to the institution

3    of this lawsuit; is that right?

4    A.    That's correct.

5    Q.    And you also previously testified in deposition that you

6    had never used Coda prior to the institution of this lawsuit;

7    is that right?

8    A.    That is correct.

9    Q.    Okay.  Now, you installed the executable code for Coda on

10   a machine running Linux Red Hat 5.1; is that right?

11   A.    That's my understanding, yes.

12   Q.    Did you install it or did one of your team install it?

13   A.    One of my team members installed it, but I was there when

14   he did the installation.

15   Q.    Do you remember who that was?

16   A.    Adam Rowell.  Rowell, Rowell.

17   Q.    I have had same difficulty.  In the process of installing

18   Coda, it was necessary to install Coda FS into the kernel,

19   wasn't it?

20   A.    That is correct.

21   Q.    Did you try to run your experiments with Coda without

22   installing Coda FS?

23   A.    No.

24   Q.    It wouldn't work if you didn't install Coda FS; is that

25   right?

1    **A.**    You needs the Coda FS module.

2    **Q.**    And Coda FS was not in the user space; is that right?

3    **A.**    That is not in the user space.  That's inside the kernel

4    as I told the jury the other day.

5    **Q.**    Now, you previously testified that Coda FS is part of the

6    operating system, didn't you?

7    **A.**    Yes.

8    **Q.**    And the operating system is not in user space; right?

9    **A.**    The portions of the operation system may be in the user

10   space, but the kernel is not in user space.

11   **Q.**    Okay.  And Coda doesn't work without the Coda FS

12   component; right?

13   **A.**    That's correct.

14   **Q.**    In your opinion, a kernel component is necessary for the

15   claimed invention to operate; isn't it?

16   **A.**    Yes, that is correct.

17   **Q.**    And in your opinion, no file system notifications can be

18   received without a kernel component; is that right?

19   **A.**    Yes.  The file system is part of the kernel.  So you need

20   the kernel in order for the invention to work.

21            **MR. PIETRANTONIO:**  The ELMO, please.

22        (Document displayed)

23   **BY MR. PIETRANTONIO:**

24   **Q.**    So this is a glossary that I believe appears in the juror

25   notebook.

1          You see down at the bottom where it talks about operating

2    system, and it describes operating system and provides an

3    example of some operating systems.

4          You would agree with those as being examples of operating

5    systems, wouldn't you?

6    **A.**    Yes.

7    **Q.**    So Windows is an operating system?

8    **A.**    Yes.

9    **Q.**    Linux is, Apple Mac OS?

10   **A.**    Uh-huh.

11   **Q.**    Okay.  Now, is it your opinion that when Coda FS was

12   installed in the kernel that it actually became part of the Red

13   Hat operating system?

14   **A.**    Yes.  It's running as part of the kernel, yes.

15   **Q.**    So is it your opinion that everything in the kernel is

16   part of the operating system?

17   **A.**    Yes.

18   **Q.**    And if I was a user and I had my computer and I install a

19   printer driver on the system --

20   **A.**    Yes.

21   **Q.**    -- right? --

22   **A.**    Yes.

23   **Q.**    -- I have a computer that's a Window operating system,

24   when I install that driver does that driver become part of

25   Windows?

1  **A.**   It depends on what type of driver it is.  There may be

2  drivers that are user-mode drivers, and there may be drivers

3  that are kernel-mode.

4      So for example, if you give an example of a printer, like

5  if you stick in a USB flash drive, nowadays, some portions are

6  done in the user space, but in the olden days it would have

7  become part of the kernel, yes.

8  **Q.**   So if I had a kernel-type driver --

9  **A.**   Yes.

10  **Q.**   -- in that instance, would you say that when I installed

11  that driver for that printer, that driver would be part of the

12  operating system of Windows?

13  **A.**   Yes.

14  **Q.**   In your opinion, I believe in your invalidity report, you

15  mentioned that Office Editor is analogous to Coda.

16      Do you remember that?

17  **A.**   Yes, I did.

18  **Q.**   Do you maintain that opinion today?

19  **A.**   Yes, I do.

20  **Q.**   And in your opinion, Coda and Office Editor 10.5 use

21  similar components that are utilized in the same way, don't

22  they?

23  **A.**   They are analogous, yes.

24  **Q.**   Let's talk a little bit about the file history.  You've

25  read the file sync patents, haven't you?

1   **A.**   I have.

2   **Q.**   And you've read the file history for each one of the

3   patents, haven't you?

4   **A.**   I have.

5   **Q.**   And you would agree with me that the file histories can be

6   important to understanding the patents; right?

7   **A.**   That is correct.

8   **Q.**   And would you agree that the file histories would be

9   important in any analysis concerning validity as well; right?

10   **A.**   Yes.

11   **Q.**   Okay.  Now, when you'd consider the -- I'm sorry.  Let me

12   start over.

13       When you consider the file histories, it would also be

14   important to consider the prior art that was cited in the file

15   histories; is that correct?

16   **A.**   It provides some context, especially if the examiner cited

17   to it in the proceedings and so on, yes, it does provide

18   context.

19   **Q.**   And in your deposition in November, you indicated that you

20   can't say that you reviewed all of the prior art that was

21   before the Patent Office; is that correct?

22   **A.**   I believe I said I reviewed the file history, and whenever

23   the examiner said this patent is not -- this application is not

24   valid for some reference, I reviewed those references.  But I

25   did not review every single reference that is just part of a

 1  search or something like that.

 2          MR. PIETRANTONIO:  Could you pull up the deposition

 3  transcript from November 26, please, and in particular, I

 4  guess, we're looking at pages 16 and 17.

 5          (Document displayed)

 6  BY MR. PIETRANTONIO:

 7  Q.   And we see a questioning beginning on light 17 at the top

 8  there:

 9          "Did you examine all of the prior art that was before

10          the patent examiner during the prosecution of the

11          Client-Side Update patents?"

12          And your answer:

13          "I have looked at the prior art, some of the prior

14          art.  I don't know as I sit here today whether I have

15          reviewed every one of those, but I have glanced through at

16          least some of those prior art references, at least the

17          ones that I do describe something about how these files

18          were -- the patents were issued.  And so some of these

19          prior art references I did review, I believe."

20          Is that your testimony?

21  A.   That's the same as what I just told you a minute ago.

22  Q.   You testified, I believe, earlier -- maybe it was

23  Friday -- about secondary considerations of nonobviousness --

24  A.   Yes.

25  Q.   -- is that correct?

1   **A.**   Yes.

2   **Q.**   In connection with the secondary considerations of

3   nonobviousness, you didn't consider at all the commercial

4   success of Box Edit, did you?

5   **A.**   I did not.

6   **Q.**   So let me sum up before I pass you back to Mr. Bovich.

7          For validity, you cited to four pieces of prior art:

8   WS_FTP; right?

9   **A.**   Yes.

10  **Q.**   You cited to DocuShare; right?  You cited to Coda --

11  **A.**   Yes.

12  **Q.**   -- right?

13         And you cited to what you believed was inherent in Windows

14  that was described in the specification --

15  **A.**   Yes.

16  **Q.**   -- right?

17  **A.**   Yes.

18  **Q.**   And for WS_FTP you looked at the manual, not software;

19  right?

20  **A.**   Uh-huh, that's correct.

21  **Q.**   And there was no source code; right?

22  **A.**   The manual does not come with the source code.

23  **Q.**   Okay.  So you didn't look at the source code for WS_FTP;

24  right?

25  **A.**   I did not.

1  **Q.**   Okay.  And you cited DocuShare.  And you didn't look at

2  any source code for DocuShare either, did you?

3  **A.**   Excuse me.  Just for the previous question, when you said

4  WS_FTP, I want to make sure the record is accurate.  It's

5  WS_FTP version 5, yeah.

6  **Q.**   Very good.  Thank you for correcting me.

7  **A.**   Sure.

8  **Q.**   Okay.  So back to DocuShare.

9  **A.**   Yes.

10  **Q.**   You cited DocuShare, and you did not look at any source

11  code for DocuShare; right?

12  **A.**   I did not.

13  **Q.**   Okay.  And you cited Coda?

14  **A.**   Uh-huh.

15  **Q.**   And you had no source code for Coda; right?

16  **A.**   I did not refer to the source code, that's correct.

17  **Q.**   Okay.  So in the end, you were not able to provide a

18  thorough, independent opinion that the asserted claims are

19  invalid, could you?

20  **A.**   I disagree with that.

21       **MR. PIETRANTONIO:**  Pass the witness.

22                    **REDIRECT EXAMINATION**

23  BY MR. BOVICH:

24  **Q.**   Doctor, in your experience on cases such as this, is it

25  unusual to work with a team?

1    **A.**    It's not.

2    **Q.**    Okay.  A little closer to the microphone.

3         I want to go back to the beginning of the case as

4    originally filed by Open Text.

5         Based on the case that they brought against Box, how many

6    patents and how many claims were you initially obligated to

7    analyze in order to address their allegations?

8    **A.**    There were, I think the original set was -- there were 12

9    patents, I believe, out of which I was working on three of

10   those.  And the number of claims were -- I don't know, pretty

11   much -- I don't think it was every single claim in every patent

12   in each of the three, but a big number of claims, maybe 27 to

13   30 or 35 claims.  I think that's my recollection.

14   **Q.**    And in addressing the claims that were brought by

15   Open Text, did you feel that you were obligated to address all

16   of those patents and all of those claims?

17   **A.**    Yes.

18   **Q.**    Sorry.  Let me rephrase it.  The patents you were asked to

19   analyze.

20   **A.**    That's correct.  So for every -- every patent and every

21   claim which they accused of infringement, I provided analysis

22   for every single element of each of those claims.

23   **Q.**    And in responding to the case that they brought, how many

24   prior art references did you analyze?

25   **A.**    Several.  Dozens.  Maybe more.  As I said, I produced

1   about 80 claim charts.  Just to provide context here, a claim

2   chart is -- it goes through element by element, and you've got

3   to give your analysis as to why it is that element is

4   satisfied.

5       We produced about 80 claim charts for these three patents

6   and which went through every single claim, every single element

7   that was at issue.

8   Q.   And was that part of the work that you and your team

9   needed to do to address the allegations in the case that

10  Open Text initially brought?

11  A.   That's correct.

12  Q.   Okay.  And about roughly how many pages would you say --

13  you can just give me an estimate -- did all of these claim

14  charts total that you and your team prepared to address the

15  allegations that Open Text brought against Box?

16  A.   Several thousands of pages.

17  Q.   Let's talk about the WS_FTP Pro User's Guide.

18      Can a written document, in and of itself, be a prior art

19  reference?

20  A.   That is correct.

21  Q.   Now, in analyzing whether the WS_FTP Pro User's Guide

22  discloses a database, did you apply the Court's claim

23  construction of "database"?

24  A.   I did.  And I also explained to the jury how it meets the

25  Court's claim construction.

1              **MR. BOVICH:**  So, Beau, could we have slide 19 from

2    Dr. Jagannathan's direct examination.

3         (Document displayed)

4    **BY MR. BOVICH:**

5    **Q.**   So at the top there, is that the Court's claim

6    construction of "database"?

7    **A.**   It is.

8    **Q.**   In analyzing the WS_FTP Pro User's Guide, did you find a

9    disclosure regarding a collection of information?

10   **A.**   Yes.

11   **Q.**   Okay.  And what is it?

12   **A.**   It's the -- when I showed the jury, it was on slide 30, I

13   believe.  We went through the files on the right-hand side of

14   that screenshot, on slide 30.  It had all these files that are

15   there in the /pub/win32 folder at the FTP cite.

16        That collection of files is part of the entire collection

17   that's available at the FTP server.  That collection is

18   organized and stored just -- just like it was the Court's

19   construction for databases.  So that is the database.

20   **Q.**   When you look at the user's guide and you see the

21   collection of information, would you agree with me that it's

22   organized and stored in a predetermined manner per the Court's

23   construction of "database"?

24   **A.**   Yes.

25   **Q.**   And does the user guide disclose means of searching for

1   these files and also retrieving them?

2   **A.**   Yes.  When the user right-clicks, it initiates a sequence

3   of commands which basically involves searching and retrieving

4   those files.

5   **Q.**   Now, let's talk just a little bit about the availability

6   of the user's guide.

7        Based on your experience in analyzing software and

8   software packages, is it a reasonable conclusion that the

9   purpose of the WS_FTP Pro User's Guide is to guide the user as

10  to how to use the software?

11  **A.**   That's typically the understanding of how a user's guide

12  or manual is used.

13  **Q.**   And is it your understanding that when software is

14  released, the software companies give the user the user's guide

15  to help guide the user as to how to use the software?

16  **A.**   Typically, the software, when it's distributed, it either

17  comes with the user's guide on the floppy or on the CD.

18  Nowadays it's available -- it's made available on the website.

19  But usually when the software is provided, it comes with the

20  manual or the user's guide.

21  **Q.**   Do you have a car?

22  **A.**   Yes, I do.

23  **Q.**   Did it come with a manual?

24  **A.**   Yes, it did.

25  **Q.**   Why do you suppose the car company provided you with a

JAGANNATHAN - REDIRECT / BOVICH

1    manual?

2    **A.**    To tell me how to use the car.

3    **Q.**    Let's talk about DocuShare for a minute.

4          You were asked hypothetical by counsel.  I think the

5    hypothetical was he edits a document using DocuShare and,

6    therefore, it's checked out; and then you try to use -- you try

7    to edit the document, but it's checked out to you.

8          Do you recall that hypothetical?

9    **A.**    Yes.

10   **Q.**    So let's continue that hypothetical.

11         So counsel edits a document on DocuShare.

12   **A.**    Uh-huh.

13   **Q.**    He makes a change.

14   **A.**    Uh-huh.

15   **Q.**    And he checks it back in.

16   **A.**    Uh-huh.

17   **Q.**    You access the DocuShare database.

18   **A.**    Uh-huh.

19   **Q.**    Can you see notifications that he edited that document?

20   **A.**    Yes.

21   **Q.**    Okay.  Now, let's continue on with the hypothetical.

22   Let's say you now checked that same document out and you make

23   some changes to it.

24   **A.**    Yes.

25   **Q.**    And then you check it back in.

1    **A.**    Yes.

2    **Q.**    Can he now access the DocuShare system and see the

3    modifications that you made?

4    **A.**    Yes.

5    **Q.**    Okay.  Do the claims of these patents require this

6    notification regarding the modifications to occur at any

7    particular time?

8    **A.**    I don't think there's any restriction in the language of

9    the claims itself that says the notification is when someone is

10   editing.  It only says the user receives a notification that

11   another user has edited it.  It doesn't say when it must occur.

12   That's open.  So it can occur at any time.

13   **Q.**    So using the -- what the claims say, does that mean that

14   in my hypothetical you each could see the changes that each

15   other made to the documents?

16   **A.**    Yes.

17           MR. BOVICH:  Let's go to slide 80, please, Beau.

18       (Document displayed)

19   **BY MR. BOVICH:**

20   **Q.**    Now, this is a slide that you used to talk about the

21   various materials you reviewed in analyzing Coda; correct?

22   **A.**    That's correct.

23   **Q.**    Now, did you hear the testimony of Dr. Satya?

24   **A.**    I did.

25   **Q.**    Okay.  Did he testify that the architecture of Coda has

1    not changed over time?

2    **A.**    He did.

3    **Q.**    Okay.  Does the user manual, which is Trial Exhibit 1558,

4    describe the architecture of Coda?

5    **A.**    Yes, generally, yes.

6    **Q.**    Does the article, which is Trial Exhibit -- it's both 1557

7    and 700, does that describe the architecture of the Coda

8    system?

9    **A.**    It does.

10           **MR. BOVICH:**  Pass the witness.

11           **THE COURT:**  Okay.  Very briefly.

12           **MR. PIETRANTONIO:**  Just one question, Your Honor.

13                        <u>**RECROSS-EXAMINATION**</u>

14    BY MR. PIETRANTONIO:

15    **Q.**    So Mr. Bovich just asked you about all the work that your

16    team did in terms of the number of patents and the claims and

17    so forth.  I just want to follow up.

18           In the end, here for this jury, when all was said and

19    done, you've presented one obviousness case based on WS_FTP and

20    you presented one anticipation case based on the Coda software;

21    is that right?

22    **A.**    That's correct.

23           **MR. PIETRANTONIO:**  No further questions.

24           **THE COURT:**  Okay.  Any questions from the jury?  Yes.

25    All right.

```
 1        Tell you what why don't we take our 15-minute break, and
 2   then we'll come back and do that.
 3             THE CLERK:  All rise for the jury.
 4        (Recess taken at 10:15 a.m.)
 5        (Proceedings resumed at 10:32 a.m.)
 6        (The following proceedings were held in open court,
 7   outside the presence of the jury:)
 8             THE COURT:  Okay.  Why don't we go over here, and
 9   we'll discuss the question.
10        (The following proceedings were held at sidebar:)
11             THE COURT:  The question is:
12             "Clarification, does his opinion include findings of
13        other employees that were involved in the case from his
14        team?  He spent 30 percent of the time charged; others
15        spent 70 percent of the time charged.  Don't understand
16        the 'team' concept, how it works."
17        So it's not an unreasonable question.
18             MR. BOVICH:  Could I hear the first one?
19             THE COURT:  "Does his opinion include findings of
20   other employees that were involved in the case from his team?"
21        So she wants to know, he didn't do all the work, and so
22   what does it mean?
23             MR. PIETRANTONIO:  That's fair.
24             THE COURT:  That's a fair question.  Do you just want
25   to do it?  Why don't you just say, "Could you tell the jury a
```

 1    little bit more about how your team works?"

 2            MR. BOVICH:  Sure.  I wasn't sure if you wanted me to

 3    read this literally.

 4            THE COURT:  No, no.  I am going to read this in.  And

 5    the question will be, you know, can you explain how the team

 6    works.

 7            MR. PIETRANTONIO:  That would be fine.

 8            THE COURT:  And if you want to attack his team, you

 9    get one question.  Is that fair?

10            MR. PIETRANTONIO:  That's great.

11            THE COURT:  Okay.

12        (Sidebar concluded.)

13            MR. FRIEL:  Your Honor, there's -- may I renew an

14    objection to the litigation licenses?  Those are TX742

15    through --

16            THE COURT:  Weren't those ruled on minutes ago?

17            MR. FRIEL:  I'm sorry?

18            THE COURT:  Were those the ones I just ruled on this

19    morning?

20            MR. FRIEL:  Well, I think the ones that you ruled on

21    were the patents.

22            THE COURT:  Okay.

23            MR. FRIEL:  Now, we're -- these are the actual

24    licenses themselves.

25            THE COURT:  All right.

1          MR. FRIEL:  And I renewed them because --

2          THE COURT:  Let me get the TX numbers first.

3          MR. FRIEL:  Yes.  742 through 745.

4          THE COURT:  So it was the actual licenses.  Okay.

5          MR. FRIEL:  So there are two parts to allowing them to

6     be used.  One of them is a technical prong; the other is an

7     economic prong.  This witness addressed in his testimony the

8     technical prong.

9          What he said is that there are similarities in general

10    technology between some of the licensed patents and the

11    technology that is embodied in the patents-in-suit.

12         THE COURT:  Okay.

13         MR. FRIEL:  And I know at first he didn't cover all

14    the patents, so I think that alone would be fatal.  But that's

15    not the test.

16         *ResQNet* requires that the litigation licenses, "embody or

17    use the claimed technology or otherwise show demand for the

18    infringed technology."

19         Put another way, they -- hand-waving as to -- there's some

20    similarities to some of the claims.  Similarity was disclosed

21    in the specification is not enough.  The expert must tie the

22    litigation licenses and the patents in them to the claimed

23    technology, not this hand-waving.

24         And I also point out that there is heightened scrutiny

25    here because of the prejudicial aspect of these four licenses.

 1          **THE COURT:**  What's so prejudicial about them?

 2          **MR. FRIEL:**  They're for very low amounts, $25,000 to

 3   $75,000.  Other than that, I don't have a problem --

 4          **THE COURT:**  That's the prejudice.  I get it.

 5          **MR. FRIEL:**  I'm sorry.

 6          **THE COURT:**  Okay.

 7          **MR. FRIEL:**  I focused -- I see --

 8          **THE COURT:**  I understand.  No, no.  I understand what

 9   you're saying.

10       I have to say, Mr. Bovich, I found the similarity to be

11   that glib.  There are no factual statements behind it.  On the

12   other hand, your opponents did not choose to cross him on it.

13   So that may be a waiver issue.

14       But do we actually need the license agreements?  Why do we

15   need them?  Why does the jury need to see them?

16          **MR. BOVICH:**  My understanding is we do need them

17   for -- they do go into Dr. Leonard's economic analysis with

18   regard to the nature of the license that would be entered into.

19   In other words, lump sum.

20          **THE COURT:**  When do you plan to introduce them?

21          **MR. BOVICH:**  I'm sorry.  My colleague Jonah Mitchell

22   will address.

23          **MR. MITCHELL:**  Yeah.  And based on Your Honor's

24   instruction this morning, we're going to lay the foundation

25   just for the agreements themselves through Box's general

PROCEEDINGS

 1    counsel.  We're not introducing them at that time.  We'll wait

 2    until Dr. Leonard comes on, then happy to set them up to have

 3    him introduce them into the case.

 4         THE COURT:  Mr. Friel was making a foundational

 5    challenge.  You haven't laid an adequate foundation.  And

 6    having someone just say they're similar is a little bit light.

 7         So what do you plan to do about that?

 8         MR. MITCHELL:  I think what Your Honor --

 9         THE COURT:  "Similar" means nothing.  I didn't even

10    know what he meant when he said they are similar.

11         MR. MITCHELL:  That was the issue that was raised in

12    the motion to exclude both Dr. Jagannathan and Dr. Leonard's

13    testimony regarding those license agreements --

14         THE COURT:  Yes.  But I said I would listen very

15    closely to the testimony about the licenses.  The sum total --

16    you all can sit down.

17         The sum total of the testimony is they are, quote-unquote,

18    similar.

19         MR. MITCHELL:  What our intent to do is to -- it is

20    for the structure of the --

21         THE COURT:  In fact, I wrote the quote down.  I think

22    what specifically struck me, what your witness said was, "Some

23    aspects of the technology are similar to file sync."  I mean,

24    that's -- that is a good definition of conclusory, nonfactual,

25    vague testimony.

**PROCEEDINGS**

1          **MR. MITCHELL:**  Here's what I would suggest, Your

2     Honor:  What we do want to introduce them for, we aren't

3     actually planning on eliciting the amounts.

4          **THE COURT:**  You're not going to use the dollar values?

5          **MR. MITCHELL:**  We're not going to use the dollar

6     values; we want it for the structure of the agreement.

7          **THE COURT:**  Mr. Friel's problem is cured.

8          **MR. FRIEL:**  I understand that the amounts will be

9     redacted from the exhibits that are shown to the jury; is that

10    right?

11         **THE COURT:**  All right.

12         **MR. MITCHELL:**  Yeah.  And that has not been done, so

13    we will need to undertake that exercise.

14         **THE COURT:**  Sure.  You have time.  Somebody has time.

15       So this should solve your issue; right, Mr. Friel?  The

16    prejudice of the low dollar amounts will be kept from the jury.

17         **MR. FRIEL:**  Yes, Your Honor, that does solve the

18    problem.

19         **THE COURT:**  Is that it?

20         **MR. FRIEL:**  Thank you.

21         **THE COURT:**  Problem solved.  Good.

22         **MR. MITCHELL:**  Thank you.

23         **THE COURT:**  Let's call the jury in, and then we'll do

24    what we talked about with the question.

25         (Jury enters at 10:40 a.m.)

 1          **THE COURT:**  All right.  We have a question from the

 2     jury, which I've discussed with counsel.  We have agreed that

 3     it will be answered.

 4          Let me read the question into the record:

 5               "Clarification, does his opinion include findings of

 6               other employees that were involved in the case from his

 7               team?  He spent 30 percent of the time charged; others

 8               spent 70 percent of the time charged.  Don't understand

 9               the 'team' concept and how it works."

10          And we're going to address that now briefly.  Okay.  So,

11     Mr. Bovich.

12          **MR. BOVICH:**  Thank you, Your Honor.

13                     **FURTHER REDIRECT EXAMINATION**

14     BY MR. BOVICH:

15     **Q.**  At a real high level, Doctor, in working on cases like

16     this, can you explain what it means to work with a team.

17     **A.**  Usually I have a team of people working under my direction

18     to -- in terms of installing the software and so on.  But when

19     it comes to forming opinions and writing a report, these are my

20     opinions.  I wrote the report personally.  And I did the

21     analysis related to that.

22          But there is a lot of set-up that's involved.  So I'll

23     give you an example.

24          So we produced these thousands of pages of claim charts.

25     At some point, the Court ruled that we are limited to, I think,

1   a thousand pages across 12 patents or seven patents or

2   something like that.  So we had to reduce the number of pages

3   down to 500.  So I came up with a system to say this is how we

4   will do it and reduce it.  And I had some help from someone

5   from my team to reduce the number of pages in the claim charts.

6       But doing the analysis itself and saying this claim is

7   invalid because of some reason or not, I personally did that.

8   I wrote the reports.

9   Q.   Did you rely on the team members in both generating the

10  initial charts and then both -- and also working in a way to

11  reduce those charts to comply with the Court's order?

12  A.   Yes.  And my team was also -- for example, Dr. Elizabeth

13  Gross reviewed my report when I finished it and so on.  So they

14  did assist me in that way.  But when it comes to writing the

15  report, forming these opinions and so on, I did that.

16  Q.   Do you review the work of your team members?

17  A.   Yes.  They are working under my direct supervision.

18  Q.   And ultimately are the opinions that you've rendered your

19  personal opinions --

20          THE COURT:  Okay.  I think we've got that.  Any

21  follow-up?

22          MR. PIETRANTONIO:  No, Your Honor.

23          THE COURT:  Okay.  Great.  Okay.  Thank you.

24      All right.  Is that it?

25      You're excused.  Thank you.

 1          (Witness excused.)

 2               THE COURT:  Who do we have next?

 3               MR. BAKER:  Good morning, Your Honor.  Scott Baker.

 4      We're calling Whitney Bouck as our next witness.

 5               THE COURT:  All right.

 6               THE CLERK:  Ms. Bouck, if you would please come

 7      forward to take the witness stand.

 8          Please raise your right hand.

 9                         **WHITNEY BOUCK**,

10      called as a witness for the Defendants, having been duly sworn,

11      testified as follows:

12               THE WITNESS:  I do.

13               THE CLERK:  Please be seated.

14               THE WITNESS:  Thank you.

15               THE CLERK:  Please state your full name for the Court

16      and spell your last name.

17               THE WITNESS:  My name is Whitney Bouck, B like boy,

18      o-u-c-k.

19               THE CLERK:  Thank you.

20                       **DIRECT EXAMINATION**

21      BY MR. BAKER:

22      Q.   Good morning, Ms. Bouck.

23      A.   Good morning.

24      Q.   Where do you work?

25      A.   I work at Box.

1   **Q.**   And how long have you been at Box?

2   **A.**   Coming up on four years this April.

3   **Q.**   And what's your position at Box?

4   **A.**   I hold two titles at the company.   I'm the head of global

5   marketing for the company.   I also have the title GM,

6   enterprise.

7   **Q.**   Now, before we get to the business at hand, where are you

8   from?

9   **A.**   I'm actually a local girl.   So I was born and raised here

10   in the Bay Area.   I grew up in San Jose and now live here in

11   San Francisco.

12   **Q.**   Can you tell us briefly, how did you get started in the

13   software business?

14   **A.**   Yeah.   Sure.

15       So when I graduated from college -- I also went to college

16   in California at Claremont McKenna College -- came back north

17   and -- this is home turf -- and started looking for a job and

18   happened to get very lucky.   And I got a job at Oracle, working

19   for the person who led development for the company, and was

20   able to turn my hand to a lot of different technical things.

21   And that kind of launched my career in software.

22   **Q.**   And just briefly, what types of work did you do during

23   your stint at Oracle?

24   **A.**   Yeah, I was working on building tools for the Oracle

25   developers, to build Oracle products, if that makes any sense.

1   So kind of systems that helped them manage their code and how

2   they wrote their code.

3   **Q.**   And after Oracle, where did you go?

4   **A.**   I went to a company called Sybase, which was a direct

5   competitor, actually, of Oracle in the database industry.  And

6   worked there for a number of years in similar types of roles.

7   Then graduated, kind of, into technical support, where I would

8   pick up the phone and help companies with their problems with

9   our software.  And ultimately as product management, which is

10  helping to define what engineers build, what kind of products

11  to build.

12  **Q.**   And after Sybase?

13  **A.**   Then I went straight to a very small company then, called

14  Documentum.  It was about 50 people.  And I joined as the first

15  product manager there.

16  **Q.**   And how long was your tenure at Documentum?

17  **A.**   Kind of depends on how you count it.  I was there eight

18  years for just the Documentum piece, and then we were acquired

19  by a large company called EMC.  And I stayed for another seven

20  years after that, most of that whole time working with the

21  Documentum product family.

22  **Q.**   And again, generally, what positions did you hold at

23  Documentum/EMC?

24  **A.**   Yeah.  Sure.  Like I said, I started as the first product

25  manager, helping define the requirements for what we were going

1   to build.  And then I graduated into running all of product

2   marketing for the company.  So I got, kind of, more into the

3   marketing side of things and talking more to customers, which I

4   really liked.

5       And then, ultimately, the last job I had at EMC before I

6   left was as the chief marketing officer for that particular

7   division for the company.

8   **Q.**   All right.  And then from EMC/Documentum, you came to Box?

9   **A.**   Straight to Box.  That's right.

10  **Q.**   And how long have you been with Box?

11  **A.**   It will be four years in April, so spring of 2011.

12  **Q.**   And as the global head of marketing, can you tell us, what

13  does that job -- what is that job about?

14  **A.**   Sure.  Well, marketing at its core is really helping to

15  tell people who might buy our product why they want it, what's

16  good about it, how we can help them solve problems, what kinds

17  of problems we can solve, and why we might be the best choice.

18      So my job really is to make sure that those things happen.

19  And I have a team of people that work with me to do that, to

20  make sure that we appropriately convey the value of Box to our

21  prospective customers.

22          **THE COURT:**  Can I just jump in?

23      Just slow down just a little bit.

24          **THE WITNESS:**  Sure.  Sure thing.  Thank you.  I am a

25  fast talker.

1              THE COURT:  Go ahead, Mr. Baker.

2              MR. BAKER:  Sounds like a Seinfeld episode, "A Fast

3     Talker."

4     BY MR. BAKER:

5     Q.   Ms. Bouck, how many people report to you at Box?

6     A.   My current team is approximately 70 people.

7     Q.   All right.  And who do you report to?

8     A.   I, sort of, have two bosses at Box.  Our CEO, Aaron Levie,

9     and our chief operating officer, Dan Levin.

10    Q.   And what organizations or groups within Box do you work

11    with as the head of marketing -- global head of marketing?

12    A.   Well, I work probably with almost all of the groups, but

13    most frequently with our sales organization.  Because, of

14    course, we're trying to, again, convey what it is we do to our

15    prospective customers.  I do go on sales calls occasionally

16    with our sales representatives.  And I also work very closely

17    with our product team so that I understand the products and can

18    represent them adequately to customers.

19         So those are probably the two most common.

20    Q.   All right.  And just some basics about Box.  How many

21    employees does Box have?

22    A.   I think the last count I heard was 1160.

23    Q.   All right.  And how many of those employees are involved

24    in the engineering and product development side of the

25    business?

1  **A.**   I don't know exact numbers, but I think it's roughly a

2  third or so that are in the technical side of the house;

3  roughly a third in sales and marketing; and the rest scattered

4  among the rest of, like, finance and legal and recruiting and

5  things like that.

6  **Q.**   Okay.  Now, you mentioned one of the people you report to

7  is Aaron Levie, who we were able to meet in this case.

8      What is it like to work with Aaron?

9  **A.**   A lot of fun.  If you had him in this courtroom, I'm sure

10  you noticed his energy.  He's extremely high energy.  He's a

11  genius.  He's incredibly smart and probably knows more than

12  somebody of his age and experience has a right to.  But that is

13  what helps lead the company, I think, in a really great way.

14  And he pushes all of us to think bigger and to push for

15  excellence.  And I find that personally very invigorating.

16      So it's a lot of fun to work with Aaron.

17  **Q.**   Now, in its short history, has Box received any public

18  recognition?

19  **A.**   Oh, yes, quite a bit.

20  **Q.**   Can you just tell us about a few of those.

21  **A.**   Sure.  We've been very fortunate to receive a number of

22  awards.  A couple of the more recent ones include the InfoWorld

23  product or technology of the year, which was just last year.

24  Really great honor to receive that.

25      We also had some awards specifically for Aaron.  He was on

1    the cover of *Inc. Magazine*.  If you don't know *Inc. Magazine*,

2    it's a really well-respected business publication.  And he

3    received the entrepreneur of the year award in 2013, I think it

4    was.  So just over a year ago.

5         One other one was actually for both Aaron and Dylan, his

6    cofounder, who received a *Forbes Magazine*, another very

7    well-respected publication.  They awarded them a 30 under 30

8    award, which is 30 individuals under the age of 30 that were

9    recognized for talent and achievement.

10   **Q.**   Was Box reviewed by the *MIT Review*?

11   **A.**   Oh, yeah.  Actually, it was.  There was an *MIT Technology*

12   *Review*.  And it -- Box was awarded one of the 50 best companies

13   or smartest companies in the country.

14   **Q.**   Let's get down, then, to the business of Box.

15        What does Box do?

16   **A.**   We describe Box as being a service for individuals that

17   work mostly at companies -- although we offer a version for

18   personal use as well -- to work more effectively together with

19   each other and with the business information that each person

20   needs to get their job done.

21        So at its core, it's a collaboration and file sharing

22   service that's built for business use.

23   **Q.**   And how many users does Box have approximately?

24   **A.**   About 27 million users at last count.

25   **Q.**   And then how many customers, that is, paying customers,

1  does Box have?

2  **A.**   Yes, we count --

3  **Q.**   Again approximately.

4  **A.**   Yeah.   We count that by individual companies.   So I think

5  logos or names of individual companies rather than individual

6  people.   And we have about 44,000 paying businesses as

7  customers today.

8  **Q.**   Now, are all your customers large enterprises?

9  **A.**   No, not by a long shot.   We sell to companies really of

10  all sizes, both small and large.   So I can give you a couple

11  examples if that would be okay.

12  **Q.**   Sure.

13  **A.**   So for those of us that are local, which I think most of

14  us are, the San Francisco Giants, the baseball team, are a

15  customer of Box.   And they are pretty small, believe it or not,

16  because the players are not the ones using it so much as the

17  team staff.   But they use Box to track and share videos of the

18  players when they're either trying out for the team or during

19  games.   And they share the videos with, like, news agencies and

20  media during games and things so they can share them with fans,

21  all using Box.   So that's a very small example.   I think they

22  have about 60 users of Box.

23      Maybe a mid-size example, another local company:   The Gap.

24  Hopefully, many of us shop there.   So the Gap uses Box to track

25  how they merchandise products in their store.   They even share

 1   photographs around the world amongst Gap stores so that they

 2   can see how they promote and/or put on sales certain items and

 3   be consistent around the globe.  And I think they have

 4   somewhere around 6- or 7,000 users of Box.

 5        And I will just give you one other example on the other

 6   end of the spectrum.  You've probably heard of Procter &

 7   Gamble.  They make a lot of the products that we buy in the

 8   grocery store, cleaning products and the like.  Procter &

 9   Gamble has, I believe today it's about 80,000 users of Box.

10   And they use us in their contracts -- sorry -- their marketing

11   area, with contracts with their agencies and to share large

12   files and photos and videos and advertisements that represent

13   their products.

14        So just a few examples.

15   **Q.**   Ms. Bouck, in your experience, why do business customers

16   buy Box's platform?

17   **A.**   So I guess there's three, four, five-ish -- I'll rattle

18   them off here -- reasons that we tend to stand out and that we

19   tend to win business with our customers.

20        One is that we're, as you pointed out, a young company.

21   So that means we have a better technology.  So that newer

22   technology takes advantage of things like mobile devices, so

23   that our Box product can be used really on any device the user

24   wants.  It could be their corporate laptop or a smartphone or a

25   tablet.  That flexibility and, kind of, modern capabilities are

1    really valued.  Because, let's face it, we all want to do work

2    on our mobile devices these days.  So mobile is a big one.

3        And what comes with that is that we are also what's called

4    cloud-based, which is really important to companies today,

5    particularly from a cost management point of view.

6        The cloud is kind of confusing as a concept, but generally

7    it means that the services run on servers and hardware that we

8    own and manage on behalf of the customer so that they don't

9    have to purchase, install, configure, and manage that hardware

10   themselves anymore.  And that makes it easier for them to use

11   our service at a very cost effective way.

12       Certainly, our strength of capabilities in what's called

13   sync and share, so how business content is synchronized across

14   those devices and shared with coworkers.

15       And I think the last one that I mentioned that really

16   stands out -- and frankly is almost always the winning card for

17   us -- is our security capabilities.

18       Most businesses are very concerned with securing the

19   corporate information that they have their workers working on.

20   It's important that that not get misused or get inappropriately

21   shared.  And so the strength and depth of the security

22   capabilities we offer are really important to our customers.

23   Q.   And do your customers care about integrating with other

24   businesses, other software?

25   A.   They do, yeah.  I mean, ideally any software that's chosen

**BOUCK - DIRECT / BAKER**

1  today to be used in a business should, where appropriate,

2  integrate with other business tools that are already being

3  utilized.

4  **Q.**   And can you give us an example of what customers -- which

5  particular integrations and types of products customers care

6  about?

7  **A.**   Yeah.  There's a couple.

8      One probably most of us are familiar with, something like

9  Microsoft Word or Microsoft Office, where you're often using

10  those kinds of tools to create documents.  And so being able to

11  seamlessly share those or save those back to Box without having

12  to even leave those applications is one example of something

13  that's really important to our customers.

14      And the other kind of category of integrations we do is

15  with other business tools.  So things like Salesforce, which is

16  a big local company and something our customers use in

17  conjunction with Box quite often.

18  **Q.**   Now, you mentioned that -- some of the types of companies

19  that Box works with.  Do the companies that Box serves, do they

20  care about security and compliance?

21  **A.**   A lot.  I would say that's, sort of, table stakes in our

22  conversations these days.

23  **Q.**   And what does Box do to meet those needs?

24  **A.**   I could go on a long time time about that.  I promise I

25  won't.

1    There's a number of security, kind of, controls that we

2    put into the product, so that not mostly an end user or an

3    individual would necessarily have to interact with those, but

4    you might have a system administrator that sets up those rules

5    and permission structures.  And so we give them lots of options

6    about how to do that in a way that befits their business

7    requirements.  So there's, kind of, a security side and

8    settings and flexibility there.

9    And then there's compliance which is a bit of a different

10   animal.  So this is where the government may have regulations

11   that a company has to comply with based on what sort of

12   business they're in.  And so we ensure that we allow our

13   products to be used in compliance with those types of

14   regulations as well, which takes some extra work on our part to

15   make sure that that works.

16   **Q.**   Now, in your experience, who are the people within the

17   customers that make these buying decisions whether to purchase

18   the Box platform?

19   **A.**   Yeah.  So interestingly, even though it's individual

20   people who use the Box product, it's usually somebody in what's

21   called the information technology group; that is, the buyer for

22   the service.

23   And information technology, usually those teams are

24   responsible for the selection, the deployment, if appropriate.

25   If they do have to install something, they're responsible for

1    that on behalf of the employees of the company.  And there's

2    usually a leader of that organization, a chief information

3    officer or CIO.  And more often than not, that's who we're

4    talking to.

5    **Q.**    And what's the experience level of those people?

6    **A.**    Well, they are considered C-level executives.  So on par

7    with other C titles, like COOs or CEO or CFOs.  So they are

8    very senior in the organization and, therefore, would have

9    quite a rich background of experience, typically, in that same

10   information technology space.

11   **Q.**    Now, you mentioned that before you came to Box you worked

12   at EMC/Documentum for quite some time.

13   **A.**    Right.

14   **Q.**    And what product, what principal product did you work with

15   there?

16   **A.**    The product was actually called Documentum.

17   **Q.**    And what is the market that Documentum and EMC were in

18   with respect to that product?

19   **A.**    Yeah, so they would describe themselves, as would

20   third-party experts, as offering an enterprise content

21   management platform or product, or ECM.  Not to be confused

22   with the company EMC.  But enterprise content management is

23   really the business they would say they're in.

24   **Q.**    And, again, at your time there, you were involved in sales

25   and marketing of the Documentum product.

**BOUCK - DIRECT / BAKER**

1        What are the features of the ECM market?

2    **A.**   So ECM, again, as defined by third-party experts.  I think

3    each company might have a slightly different definition, but

4    the generally accepted definition is quite broad.

5        It's viewed as a combination of technologies that include

6    things like web content management, include a lot of focus on

7    business process automation.  So something called business

8    process management.  So how to automate very complicated

9    business processes that may have thousands of steps.

10       Certainly, document management is another area that's

11   really about tracking version history and, kind of, the

12   integrity of documents as they change over time.

13       There are a number of other technologies that are part of

14   ECM, but those are probably three of the most commonly thought

15   of.

16   **Q.**   Okay.  And who are the principal competitors of

17   ECM/Documentum?

18   **A.**   The last time I looked at any of the, kind of, comparative

19   write-ups of these, it's pretty much the same three from when I

20   was at ECM, which are EMC/Documentum; IBM, another well-known

21   company, they have a product called FileNet that competes very

22   effectively in that space; and Open Text.

23   **Q.**   And what was the business model for EMC/Documentum with

24   respect to the product that you were dealing with?

25   **A.**   Yeah.  And EMC has a lot of other products too, so we

1  won't focus on those.  The licensing model is something where

2  basically they sell a license to an individual user or set of

3  users.  And then that company will buy that license once and

4  pay a fee to get upgrades to that service or that product over

5  time.

6       So they only pay for the license at a single point in

7  time.  And, theoretically, the company would amortize the cost

8  of that license over the term of its use.  So it could actually

9  be quite expensive upfront; but over time, of course, assuming

10  they use the product, it would seemingly work out to something

11  less over time.

12  **Q.**   You left Documentum in 2000 -- or EMC at that time --

13  **A.**   Yeah.

14  **Q.**   -- in 2011 to come to Box.  Why?

15  **A.**   One, I had been there a long time.  And to be perfectly

16  frank, I was a little bored.  I didn't feel like I was learning

17  very much any more.  But a lot of it, too, was that I felt like

18  we had really stopped innovating as a company.

19       It's really hard when you've got a product that was

20  designed and built in the early '90s, so built way before we

21  had mobile devices to work with or anything like that.  It's

22  very hard to innovate when you have a product that's that old

23  and designed for such a long-ago set of requirements, and

24  difficult to adapt it, frankly, to meet today's worker

25  expectations.

1    And I just saw that we were really struggling with that,

2  and wanted to be part of something that was a little newer and

3  fresher and more innovative.

4  **Q.**   Who are Box's primary competitors?

5  **A.**   So we have, really, three that we see most frequently as

6  primary.  One is DropBox for Business.  So they, too, have a

7  free product for users.  But they do have one targeted at

8  business users.

9      Microsoft, interestingly enough.  And they have two

10  products that we, kind of, compete with and yet we also

11  integrate with, sort of that coopetition thing, I guess.  And

12  those two products are what's called OneDrive, which is

13  sync-and-share technology that's part of an office suite they

14  offer.  And also Microsoft SharePoint.  So we compete with

15  those two products from Microsoft.

16  And then the third competitor is Google, who has a product

17  called Google Drive, very similar to Microsoft's OneDrive and

18  to DropBox for Business.

19  **Q.**   Let's talk a little bit about Box's business model and

20  pricing.  And to do that might help to --

21      **MR. BAKER:**  Your Honor, I don't know if we had these

22  preadmitted.

23      **THE COURT:**  Is it preadmitted?

24      **MR. BAKER:**  I don't know.

25      **THE COURT:**  You can ask Ms. Clark.  What number is it?

```
 1              MR. BAKER:  It's Exhibit 757.

 2              THE CLERK:  They need to display the exhibits.

 3              MR. BAKER:  I was going to give them to the witness

 4     and to the Judge if --

 5              THE COURT:  It's not in?  It's not in?

 6              MR. BAKER:  It's not in.

 7              THE COURT:  I don't know.  I'm asking you.  Is it in?

 8              MR. BAKER:  No, it's not in.  I'll hand it up to the

 9     witness, Your Honor, and to Your Honor.

10              THE CLERK:  It has not been admitted --

11              MR. BAKER:  Okay.

12              THE CLERK:  -- at this point.  It hasn't been

13     admitted.

14              MR. BAKER:  Thank you.

15     BY MR. BAKER:

16     Q.   Just taking a quick look at Exhibit 757, is this a Box

17     document?

18     A.   It is.

19     Q.   Just answer that for now.

20     A.   Yeah, sure.

21     Q.   Don't explain the exhibit yet.

22     A.   Okay.

23     Q.   Yes?

24     A.   Yes.

25     Q.   Is it depicted, the Box pricing models?
```

BOUCK - DIRECT / BAKER

1   **A.**    Correct.

2          **MR. BAKER:**  I move Exhibit 757 in, Your Honor.

3          **THE COURT:**  Mr. Friel?

4          **MR. FRIEL:**  No objection, Your Honor.

5          **THE COURT:**  Okay.  It's admitted.

6       (Defendants' Exhibit 757 received in evidence.)

7          **MR. BAKER:**  Thank you.

8      Beau, if you could put up the first page of 757 so the

9   jury can take a look too.

10       (Document displayed)

11  **BY MR. BAKER:**

12  **Q.**  So let's talk a bit about Box's pricing.  How does Box

13  price its product?

14  **A.**  So we're a little bit of a different model.  We also sell

15  a license to use Box to an individual person, an employee of a

16  company, or a group of employees.  But in our case we charge

17  based on what's called a subscription model.  So that's a

18  per-user per-month fee.  And, therefore, a customer can buy as

19  they need it and pretty easily buy more or even less if that's

20  what their business needs require.

21      And what you can see here -- this is, I think, a slightly

22  older version of what's published on our website and shows that

23  there are multiple different kinds of plans that offer

24  different functionality at a slightly different price per user

25  per month.

1  Q.   And what is the benefit, in your experience, to the -- to

2  the customer for this pricing structure?

3  A.   Well, clearly, they're paying over a period of time on a

4  per-month basis.  And so that means that they can very, very

5  easily amortize the spend over time.  It's not a lot of cash

6  upfront out of pocket.  And it's also, again, much easier for

7  them to decide to either buy more or less as they need to as

8  opposed to perhaps planning for that upfront.

9  Q.   In terms of just the structure of the pricing model, how

10  does that -- how does Box's model compare with its primary

11  competitors like Microsoft, DropBox, and Google?

12  A.   They all offer a similar model of price per user per

13  month.

14  Q.   Now, let's look at Box's level -- it's called personal

15  level of service on Exhibit 757.

16     And it shows the types of features that are free for --

17  A.   Correct.

18  Q.   -- the user; correct?

19     Explain why Box offers this level of service for free.

20  A.   Sure.  Well, certainly, we're not the only ones.

21  Microsoft, Google, and DropBox all offer a free version of

22  their product as well.

23     But we do it for a couple of reasons, mainly to allow

24  people to try Box before they purchase, to ensure that it

25  actually does fit their needs and that it's something that they

1    want to use and employ.  So it really is a means of educating

2    and exposing people to the Box service before they have to lay

3    out any money to buy it.

4        Those are really the primary reasons.

5    **Q.**   All right.  Now, one of the features that is provided to

6    customers of -- in the personal category is the ability under

7    Mobile Sync and Share to edit documents.  Do you see that?

8    **A.**   Yeah, third from the bottom in that section.  I see it,

9    uh-huh.

10   **Q.**   And what does that refer to?

11   **A.**   Well, when somebody wants to make a change to a document

12   or file that's stored in Box, of course, they're going to have

13   to use an appropriate application with which to do that.  And

14   what we want to do is make that as easy for users as possible.

15       So we offer them multiple ways to do that, all of which

16   are included in this edit documents line, which is made

17   available for free to our free users and is included in every

18   plan we have to offer.

19   **Q.**   I see.  So this particular entry there doesn't refer

20   specifically to Box Edit, does it?

21   **A.**   Correct.  It would refer to all the ways that we enable

22   people to edit documents in Box.

23   **Q.**   Now, since your coming to Box in 2011, what significant

24   new product features or functionalities have been released?

25   **A.**   Ooh, that's a long list.

BOUCK - DIRECT / BAKER

1  Q.   Well, let's hit just the highlights.

2  A.   Sure.  I can give a couple of samples.

3      Just for example, we introduced last spring -- so just

4  about a year ago -- a brand-new look and feel for our mobile

5  applications both on iPhones and on Android phones.  That was a

6  pretty significant release.

7      We introduced something in 2012 called Box Accelerator,

8  which is a high-speed network to make sure that we can deliver

9  files very quickly to users no matter where they are in the

10  world.  That was a pretty big one.

11      We pretty recently announced something called Box Trust,

12  which is a set of security partners that we integrated with,

13  that our customers have asked us to integrate with to make sure

14  that we can meet every aspect of their security requirements.

15  That was also a pretty significant announcement.

16      The integration with Office 365 for Microsoft was another

17  substantial announcement.

18      And I could go on and on and on.

19  Q.   What about search capabilities?  Has that been introduced

20  recently?

21  A.   We've changed what search capabilities were available to

22  end users in the product.  We've had search since the

23  beginning --

24  Q.   Sure.

25  A.   -- but we've made enhancements that are quite good.

1   **Q.**   Now, the types of features that you mentioned, are these

2   the types of features that are discussed with enterprise

3   customers, business customers?

4   **A.**   No, they're -- they can be, but I think more often,

5   especially when we're speaking to an executive like a CIO, the

6   things that we talk about more frequently are the things that I

7   mentioned a while ago that are the reasons people tend to buy

8   Box:  Security; compliance; the mobile support; and our

9   strength of sync and share capabilities.

10      Those are more the topics of conversation, which is not to

11  say that features don't sometimes come up, but usually that's a

12  lower level set of evaluations that happens.

13  **Q.**   Now, in your experience in dealing with Box customers,

14  have those customers expressed interest in the Box Edit feature

15  in particular in connection with decision to buy Box?

16  **A.**   I don't recall having a direct conversation with a CIO or

17  buyer directly from me that talked at all about Box Edit.

18  Again, we're not typically talking about features.  It's

19  usually about higher-order concerns.

20  **Q.**   Let's turn to Box Edit, which is at issue in this case.

21      How much does Box charge its paying customers for

22  Box Edit?

23  **A.**   If it's okay, I would point back to the document that's

24  being shown on the screen.

25      If you again look at Edit Documents as being the third to

1  last line under the Mobile Sync and Share Capabilities, we

2  don't charge anything for it.  It's available in our free

3  version and is included in every plan.  So we don't associate a

4  price with Box Edit at all.  It's free.

5  **Q.**  And that's true for nonpaying customers who use the

6  personal --

7  **A.**  That's right.

8  **Q.**  -- plan?

9       And how does a Box customer obtain Box Edit?

10  **A.**  They can download it from our website.

11  **Q.**  And when Box Edit was released, how did the -- what did

12  the marketing group do about the release of Box Edit?

13  **A.**  Yeah, it's a pretty typical thing that we do for any

14  feature that we announce or any new release we want to

15  announce.

16       Some of them are louder, I guess, than others.  But in

17  this case I believe we published a blog post on the Box blog

18  about it.  And then we would have put it in our end user

19  newsletter to make sure that our users were aware of it.  And

20  that's pretty standard practice for us.

21  **Q.**  What has been user reaction to --

22  **A.**  Positive.  It's viewed as a convenience mechanism, and

23  it's liked by users.

24  **Q.**  How many other ways are there on Box to edit documents?

25  **A.**  There are at least three other ways to edit on Box.  And I

BOUCK - DIRECT / BAKER

1    can describe them if you think that would be helpful or not.

2    **Q.**    Just briefly.

3    **A.**    Yeah, sure.

4         So one way we allow for that -- again excluding Box Edit

5    for a moment -- you can sync documents to your local laptop,

6    after which you can interact with them just like they are any

7    other document on your hard drive.  So you can double click on

8    it, open it in whatever application, make your changes, save it

9    back to your hard drive, and it will automatically get uploaded

10   and synchronized to the Box cloud.  That's one way.

11        Another way is that when you're in a Box application, you

12   can choose to download a file to your hard drive and then open

13   it.  So maybe you're not using sync and you just want to

14   download a unique file.  And, again, double click on it to open

15   it, edit it, save it back, and then you would need to upload a

16   new version.

17        And, also, I think I mentioned earlier that we integrate

18   with things like Microsoft Office.  So right from within those

19   applications you can open and save to and from Box within those

20   applications.  So that would be a third way.  And then Box Edit

21   would be yet another.

22   **Q.**   Now, from a sales and marketing standpoint, has Box Edit

23   had any material impact on Box's business?

24   **A.**   No, because we don't charge for it.

25   **Q.**   And, again, from a sales and marketing standpoint, has

1    Box Edit had any material impact on the level of customer

2    activity on the platform?

3    **A.**    Probably.  I mean, to some degree.  But it wouldn't be the

4    only influencing factor, right.

5        So we do track things -- I'm not intimately familiar with

6    the detailed numbers, but we do track how users use our system.

7    And I know that we've seen activity in all of those ways that

8    I've described to edit documents as well as the usage of other

9    features within the product, not just editing.

10   **Q.**    Let's turn to competition again.  In terms of Box's

11   market, what -- what market is Box considered to be in?

12   **A.**    So third parties would recognize us in a market -- you've

13   heard me use these words already -- called enterprise, file

14   sync and share, which is the same market that the competitors I

15   named -- Microsoft, OneDrive, DropBox for Business, and Google

16   Drive -- are all in also.

17   **Q.**    And are there analysts that cover the enterprise file sync

18   and share market?

19   **A.**    There are.  May I explain what an analyst is --

20   **Q.**    Sure.

21   **A.**    -- in case people are unfamiliar?

22       So if you've heard of financial analysts that validate

23   financial markets and give recommendations and/or performance

24   estimates on stock, things like that, sort of, a similar type

25   of role but in this case not focused on finance, focused on

1  technology providers.

2      And so there are expert analysts at firms.  Some of the

3  most commonly known firms are Gartner Research, Forrester

4  Research, or IDC, Ovum.  Those are probably the best known.

5  They employ experts that evaluate a particular category of

6  technology and are considered the expert and will compare those

7  technologies to make, kind of, an evaluation of who's stronger

8  in what areas.

9  **Q.**   All right.  Is one of the analysts that covers this

10  segment of the market, is it Forrester?

11  **A.**   Yes, Forrester does cover the sync and share market.

12          **MR. BAKER:**  If I may approach, Your Honor.

13          **THE COURT:**  Yes.

14          **MR. BAKER:**  Excuse me, Ms. Clark.  I think one for the

15  Judge too.

16  **BY MR. BAKER:**

17  **Q.**   Just looking at this Exhibit 40, Ms. Bouck, is this a copy

18  of an analyst report that you're familiar with?

19  **A.**   Yes, I am.

20  **Q.**   For now.

21  **A.**   Okay.

22  **Q.**   And this is --

23          **MR. BAKER:**  I'd like to move in Exhibit 40, Your

24  Honor.

25          **THE COURT:**  Objection?

```
 1              MR. FRIEL:  No objection.

 2              THE COURT:  It's admitted.

 3          (Trial Exhibit 40 received in evidence.)

 4              MR. BAKER:  All right.

 5  BY MR. BAKER:

 6  Q.   Now, Ms. Bouck, let's take a look at Exhibit 40.

 7          (Document displayed)

 8  Q.   Can you describe what it is that Forrester is doing here.

 9  A.   Yeah, it goes to what I was just explaining about what

10  analysts do.

11          So in this case the particular market that the analyst is

12  evaluating is enterprise sync and share or file sync and share.

13  And they've defined that market and then evaluated a number of

14  vendors and put them on a graph that helps to illustrate which

15  vendors are stronger than others based on the evaluation

16  criteria.

17              MR. BAKER:  All right.  And if we could go to page 9

18  of this document, Beau.

19          (Document displayed)

20  BY MR. BAKER:

21  Q.   Let's look at the graph that's displayed on page 9.  Can

22  you describe to the jury what this is about?

23  A.   Sure.  So you will notice there are two axes.  On the

24  vertical axis you have, on "Current Offering," either --

25  anywhere from weak to strong.  So that's really based on what
```

1    capabilities that product offers today.

2          And then the horizontal axis along the bottom, you'll see

3    it says "Strategy."  So that's really the company's vision for

4    where the product will go over time and what they are saying

5    they will offer in the not-too-distant future.

6          So if you look, then, at where the vendors are or

7    providers are listed on this graph, clearly the "strong" on

8    both axes would be the ideal place to be.  So further up and to

9    the right is better, and further down, to the left is worse.

10   And that's, kind of, how they plotted these different vendors.

11   **Q.**   Okay.  And where does Box come out?

12   **A.**   We are the leader in this particular ranking or

13   comparison.

14   **Q.**   And has Box been recognized as the leader in this industry

15   by other analysts as well?

16   **A.**   We are fortunate enough to be named a leader by all of the

17   analyst firms that cover the sync and share space.

18          **MR. BAKER:**  Pass the witness, Your Honor.

19                          **CROSS-EXAMINATION**

20   **BY MR. FRIEL:**

21   **Q.**   Good morning, Ms. Bouck.  My name is Tom Friel.

22   **A.**   Good morning.

23   **Q.**   While we're on that last exhibit --

24          **MR. FRIEL:**  Maybe we can put that one back up, Trial

25   Exhibit 40.

1          (Document displayed)

2               **MR. FRIEL:**  Thank you.

3    **BY MR. FRIEL:**

4    **Q.**   Now, this report is about the enterprise file sync and

5    share market; right?

6    **A.**   Correct.

7    **Q.**   And it's not strictly talking about the enterprise

8    management content market; is that correct?

9    **A.**   Enterprise -- no, huh-uh.

10   **Q.**   That's a different segment; right?

11   **A.**   Correct.

12   **Q.**   Thank you.

13        So let's talk about Box Edit a little bit more closely.

14        Do you agree that Box Edit has been a very popular editing

15   feature for Box customers since it was launched in March 2012?

16   **A.**   Not sure how to define "very popular."  I do know it is

17   used by our users, however.

18   **Q.**   Your deposition was taken in this case; correct?

19   **A.**   Yes, it was.

20   **Q.**   And do you remember being asked about Box Edit being a

21   very popular editing feature?

22   **A.**   I do.

23   **Q.**   And you were under oath for your deposition; correct?

24   **A.**   Of course I was.

25               **MR. FRIEL:**  Can we play the clip from your

1    October 2nd, 2014 deposition.

2        Actually, let me strike that.

3    BY MR. FRIEL:

4    Q.   Well, let me ask you this question:  Would you agree Box

5    users love Box Edit?

6    A.   I don't know that I can quote a user but, as I said

7    earlier, I do think they do like it.  We've had a positive

8    response to it.  And, certainly, our usage statistics would

9    show that it gets utilized.

10   Q.   Well, let's turn to Trial Exhibit 263 and show you that.

11       So I'd like you to turn to --

12   A.   Sorry.  Where would I find that?

13           MR. FRIEL:  May I approach, Your Honor?

14           THE COURT:  It should be on your screen.

15           THE WITNESS:  Oh, sure.  Yeah.  Sorry about that.

16   BY MR. FRIEL:

17   Q.   And you can identify this as a Box document; correct?

18   A.   Yes.

19   Q.   All right.

20           MR. FRIEL:  Your Honor, I would like to move to admit

21   this.

22           MR. BAKER:  No objection.

23           THE COURT:  None?

24           MR. BAKER:  No objection.

25           THE COURT:  Admitted.

BOUCK - CROSS / FRIEL

1          (Trial Exhibit 263 received in evidence.)

2               MR. FRIEL:  All right.  And could you turn to page 14.

3          (Document displayed.)

4               MR. FRIEL:  Can you turn to page -- sorry -- page 2,

5     the Box Corporate Overview.

6          (Document displayed.)

7     BY MR. FRIEL:

8     Q.   So this is a Box document that someone in the Box

9     organization wrote; is that right?

10    A.   Yes.

11    Q.   And then I want to turn to another page.  And that's 139

12    of that document.

13              MR. FRIEL:  If we can put that up.

14         (Document displayed.)

15              MR. FRIEL:  And if you could highlight the portion

16    that says "Collaborate."

17    BY MR. FRIEL:

18    Q.   So this says, "Collaborate, share, and discuss directly."

19         So Box for Salesforce, that's a type of product that you

20    provide specialized for Salesforce; is that right?

21    A.   Yeah.  It's an integration to the Salesforce application.

22    Q.   Thank you.  And it "Provides access to all the Box

23    features people love, including uploads, search, commenting,

24    sharing, tagging coworkers, and Box Edit for quick file edits."

25         Do you see that?

1   A.   I do.

2   Q.   So you would agree that this document states that Box Edit

3   is a feature that people love, your customers love; right?

4   A.   The document does say that, yes.

5   Q.   Thank you very much.

6        Now, you're a regular users of Box Edit; right?

7   A.   I'm a regular user of all of the features of Box, yes.

8   Q.   Yes, but you're also a regular user of Box Edit; right?

9   A.   I am.

10  Q.   And you would agree that if you couldn't use Box Edit that

11  it would impact your work not to have it?

12  A.   The way I would describe it is that it would be less

13  convenient.  I could still get my work done, but it would be

14  less convenient than it would if I had Box Edit.

15  Q.   Okay.  So it would impact your work and it would be less

16  convenient if you couldn't use Box Edit; correct?

17  A.   Correct.

18  Q.   And you would agree that if you couldn't use Box Edit in

19  your work that you wouldn't be happy about it, would you?

20  A.   Say that one more time please.  Sorry.

21  Q.   Sure.  If you couldn't use Box Edit in your work, you

22  wouldn't be happy about it?

23  A.   Happy is an emotion.  I don't know if I would feel happy

24  or unhappy, but it would be less convenient.

25  Q.   Well, let's take a look at what you said in your

BOUCK - CROSS / FRIEL

1   deposition.  I'm going to play a clip from October 2nd, 2014,

2   at page 14, lines 4 through 9:

3        (Videotaped recording played as follows:

4        "Q.  If you couldn't use Box Edit, would that impact your

5        work?

6        "A.  It might be less convenient in some cases, but I

7        could still get my work done.  I may not be as happy about

8        it.  It would be a little less convenient.")

9   Q.   That was the answer you gave to the question?

10  A.   Yeah.

11  Q.   Thank you very much.

12  A.   You're welcome.

13  Q.   There are other circumstances in which it would be less

14  convenient to you; isn't that true?

15  A.   I'm not sure I understand the question.

16  Q.   Okay.  So one of the circumstances in which it would be

17  less convenient for you, as you testified, if you couldn't use

18  Box Edit, is when you're working within a Box application;

19  correct?

20  A.   There is only one Box application, so I'm not sure I --

21  Q.   Well, you're working within the Box application and you

22  hit the "edit" button; are you with me?

23  A.   Yes.

24  Q.   So that's one circumstance where it would be less

25  convenient for you; right?

BOUCK - CROSS / FRIEL

1  **A.**   That is Box Edit, so yes.

2  **Q.**   Okay.  And then let me ask you to turn to another

3  document, which is Trial Exhibit 32.  Let me ask you, this is a

4  document you're familiar with?

5  **A.**   I'm very sorry.  I don't have great eyesight and it's a

6  little small for me to read.

7          **MR. FRIEL:**  May I approach the witness, Your Honor?

8          **THE COURT:**  Sure.  Blow it up for the Jury, too.

9          **COURTROOM DEPUTY:**  It has been admitted.

10         **THE COURT:**  32 has been admitted.

11         **MR. FRIEL:**  It has not been admitted.

12         **THE WITNESS:**  Thank you.

13         **MR. BAKER:**  Your Honor, is it being shown or not?

14         **THE COURT:**  No.  You all can't see it.  Jury's fine.

15  BY MR. FRIEL

16  **Q.**   So this is a document you're familiar with?

17  **A.**   It is.

18  **Q.**   And this is a document that was created by a collaboration

19  of Box and Forrester Research; correct?

20  **A.**   No, I don't believe that's correct.

21         **MR. FRIEL:**  Your Honor, I'd like to move to admit

22  Trial Exhibit 32.

23         **THE WITNESS:**  May I clarify what I meant by that

24  answer?

25         **THE COURT:**  No, no, hang on.

1      Mr. Baker?

2              **MR. BAKER:**  I don't know --

3              **THE COURT:**  Is there an objection, Mr. Baker?  Just

4      state the objection.

5              **MR. BAKER:**  No foundation.

6              **THE COURT:**  You should lay a little bit more

7      foundation, Mr. Friel.

8      **BY MR. FRIEL**

9      **Q.**   This is a document you're familiar with from your work at

10     Box; is that correct?

11     **A.**   Correct.

12     **Q.**   And this is a document that Box prepared in part in

13     response to a questionnaire from Forrester Research; is that

14     correct?

15     **A.**   That is correct.

16             **MR. FRIEL:**  Your Honor, I renew my request to admit

17     this document.

18             **MR. BAKER:**  No objection.

19             **THE COURT:**  Admitted.

20         (Trial Exhibit 32 received in evidence)

21     **BY MR. FRIEL**

22     **Q.**   Let me ask you from the meta data, this document was

23     prepared, I'll represent to you, October 2013.  Does that sound

24     about right?

25     **A.**   It's possible.  I apologize.  I don't know the date of

**BOUCK - CROSS / FRIEL**

1   when this was prepared exactly.

2   **Q.**   Okay.  And the title of the document, if we can focus on

3   that, shows that this is a Market Overview Secure Collaboration

4   Questionnaire; right?

5   **A.**   Yes, that is what it says.

6   **Q.**   And underneath it there's a contact who's Kelley Mak, and

7   from the e-mail address we know this is a person with Forrester

8   Research; correct?

9   **A.**   Yes.

10  **Q.**   This is the analyst you mentioned in your earlier

11  testimony; is that right?

12  **A.**   That's right.

13  **Q.**   And these are a series of questions that Mr. Mak, on

14  behalf of Forrester Research, posed to Box; right?

15  **A.**   Yes.

16  **Q.**   And Forrester is not just a research and advisory firm;

17  it's one of the world's largest and most respected; correct?

18  **A.**   Yes, I would agree with that.

19  **Q.**   And Box, in responding to a questionnaire from Forrester

20  Research, would want to make sure that all the answers are

21  accurate; right?

22  **A.**   We do our best in any response to a questionnaire to be

23  accurate.

24  **Q.**   But especially with Forrester; right?

25  **A.**   No, we really believe in accuracy no matter who the

BOUCK - CROSS / FRIEL

1  analyst firm is.

2  **Q.**   All right.  And you also believe in completeness; right?

3  You want to be as complete as possible?

4  **A.**   Sure.

5  **Q.**   Okay.  So let's turn to -- it says at the next highlighted

6  area down where it says "Product Solutions Specific Questions."

7  If you could highlight that.

8       So these are questions that were coming from Mr. Mak;

9  right?

10 **A.**   I don't know if he wrote them, but certainly they were in

11 this particular questionnaire that I assume went to all

12 participating vendors.

13 **Q.**   So the Item 1 is "Product - What Is It?  What is the name

14 of your company's solution for user-driven secure content file

15 sharing and collaboration?"

16      Do you see that?

17 **A.**   I do see that, yes.

18 **Q.**   And if we get the answer to the first line of it, anyway,

19 after the "Our Mission" part.

20      So the answer is, "Box is an enterprise content

21 collaboration software as a service provider," et cetera?

22 That's what you're answering?

23 **A.**   That's what it says, yes.

24 **Q.**   So let's turn to Page 13 of this document.  At the bottom

25 there's another question for you from Forrester.  It states:

1  "Solution Integration.  What other solutions or software does

2  your solution integrate with?"  And it gives some examples;

3  right?

4  **A.**   Yes.

5  **Q.**   So let's turn to the next page for the answer.  And you

6  talked in your direct about Box's desire to want to work with

7  and collaborate with other software environments; right?

8  **A.**   Correct.

9  **Q.**   And other hardware environments as well; right?

10  **A.**   Not so much hardware.  Software.

11  **Q.**   And at the top of the page you state, or this document

12  states -- again, this is Box's answer; right?

13      "Box can connect to all the major content management and

14  collaboration products through ECM Cloud Connect," and then

15  there's a source.  And ECM Cloud Connect, that's a Box product;

16  right?

17  **A.**   Yes, it is.

18  **Q.**   And then underneath that, the next bullet gives an example

19  of the major content management and collaboration products that

20  customers can connect with using ECM Cloud Connect.

21      And it says "We currently have customers connecting Box to

22  SharePoint, Documentum and Open Text.  Is that what it says?

23  **A.**   That is indeed what it says.

24  **Q.**   And that, indeed, is what ECM Cloud Connect is capable of

25  doing; right?

1   **A.**   In part.  As you noted, there are a number of different

2   integrations and connections that Cloud Connect provides.

3   They're listed on the page outside this here.

4   **Q.**   I was more interested in the general principle, but thank

5   you for being precise.

6        So let's go down a little bit.  And in answering this

7   question, there's a major bullet near the bottom of the page

8   that says "Box Notes, Box Edit and integrations with other

9   content creation tools."

10        All right.  So you're answering the question about the

11   components in the product; you're answering Question 13.  And

12   you point to Box Notes, Box Edit, integrations with Microsoft

13   Outlook and Microsoft Office, and integration with Google apps;

14   is that correct?

15   **A.**   Yes, that is correct.

16   **Q.**   And under this section you don't even mention -- or I

17   shouldn't say you -- Box doesn't even mention Box Sync; right?

18   **A.**   It doesn't appear in this section.

19   **Q.**   Okay.  So again, the company was trying to be as complete

20   as possible in answering the Forrester Research questions;

21   correct?

22   **A.**   Certainly we were committed to being complete.

23   **Q.**   So October 2013 you're being complete and you point to

24   Box Edit as one of the content creation tools, but you don't

25   point to Box~Sync; right?

**BOUCK - CROSS / FRIEL**

1   A.   There's a reason for that, though.

2   Q.   That's a "yes" or "no," please.  I have time limits and I

3   can ask questions and you can explain later.  Your lawyer can

4   draw that out.

5   A.   Okay.

6   Q.   So let's see what you say about Box Edit, if we could just

7   blow up the Box Edit bullet.

8       Okay.  So the first sentence says, "A one-click create,

9   edit and save experience with locally installed editors."

10  You'd agree with that; right?

11  A.   Yes, I would.

12  Q.   And you would agree that user just clicks "edit" and the

13  file's opened.  They can then make their edits.  And when they

14  save, the file is saved back in the Box.  That's a correct

15  description of how it works; right?

16  A.   And that's exactly what it says there, yes.

17  Q.   Good.  Excellent.

18      Now, the next sentence states that this eliminates, and in

19  certain steps that it eliminates in traditional downloading and

20  editing; is that right?  You agree with that?

21  A.   It does say that, yes, but really it's an alternate

22  approach.

23  Q.   I understand you have an argument to make.  I'm looking at

24  what you wrote to Forrester Research.  And Box was trying to be

25  complete and accurate in describing its products; okay?

**BOUCK - CROSS / FRIEL**

1   **A.**   To be fair, I did not write this myself.

2   **Q.**   I didn't say you did.  Box did.

3   **A.**   I thought you said --

4   **Q.**   I'm sorry.  Didn't mean to.

5      So what this statement from Box says, this eliminates

6   first the traditional route of downloading a file; right?

7   **A.**   It says that, yes.

8   **Q.**   So that's an advantage; right?

9   **A.**   It's a statement of fact.

10   **Q.**   Thank you.  The second step it eliminates is saving it to

11   your local machine; right?

12   **A.**   Well, I think a download does save it to your local

13   machine, sure.

14   **Q.**   Thirdly, a user can make edits; right?

15   **A.**   Uh-huh.

16   **Q.**   And Box program, fourth, saves the file again; right?

17   **A.**   No, the Box program would not be doing the save operation.

18   The user would.

19   **Q.**   The user would.  Box Edit would?

20   **A.**   No.

21   **Q.**   The user would instruct Box Edit to make the save;

22   correct?

23   **A.**   This is discussing a different way of doing it that isn't

24   Box Edit.

25   **Q.**   Ah.  Excellent.  Thank you.  That's the point I wanted to

**BOUCK - CROSS / FRIEL**

1    make.

2       And then another step that's eliminated is re-uploading

3    that file; right?

4    **A.**   Two different approaches, yes.  You would no longer have

5    to do that if you're using Box Edit.

6    **Q.**   You're telling the world that Box Edit has these

7    advantages; correct?  I'm sorry.  Not you.  Box is telling the

8    world that Box Edit has these advantages over the traditional

9    method; correct?

10   **A.**   I apologize, but I don't believe that it says it's an

11   advantage, but it does certainly say that it eliminates the

12   traditional route of doing it.

13   **Q.**   Okay.  Wouldn't you agree that it is an advantage to

14   eliminate these five steps?

15   **A.**   It's a convenience mechanism, sure.

16   **Q.**   And that's one of the reasons you like to use Box Edit,

17   because it's convenient; right?

18   **A.**   When I'm in the Box application, yes.

19   **Q.**   Thank you.  And then the last sentence of this statement

20   to Forrester Research from Box says "This is a very popular

21   editing feature since its launch in March of 2012."  You don't

22   have any reason to disagree with that; do you?

23   **A.**   No, I think I've said it had good reception.  Users like

24   it.

25   **Q.**   Thank you.  Now, you mentioned in your direct, you talked

1   about Exhibit 757.  So this is the pricing document.  I wonder

2   if we could put that up again.

3   **A.**   The same one we looked at before?

4   **Q.**   Yes.

5   **A.**   Great.

6   **Q.**   And let's turn to the page of it that has "Select a Plan."

7   There we go.

8        Now, you said that Box Edit's free; right?

9   **A.**   Uh-huh.

10  **Q.**   What you meant was that Box doesn't associate a price with

11  Box Edit; that it's included within a bundle; right?

12  **A.**   Which is free at its lowest plan.

13  **Q.**   Sure.

14  **A.**   So it's included in our free plan, yes.

15  **Q.**   In your next plan, Starter, it's not free; is it?  You

16  have to pay for it?

17  **A.**   The plan itself is not free, but it's a collection of

18  capabilities, one of which is the same thing we give away for

19  free.

20  **Q.**   I understand.  The plan you give away, though, has certain

21  limitations and it's used for marketing purposes; right?

22  **A.**   I think I heard two questions there.  I'm sorry, could you

23  just restate that for me?

24  **Q.**   So the plan you're giving away for free you're using for

25  marketing purposes; right?

**BOUCK - CROSS / FRIEL**

1    **A.**   I think I said earlier that we use it as an education tool

2    to expose people to Box to see if they like it before they

3    purchase.

4    **Q.**   That's right.  You're in marketing.  It's no different

5    than giving away a bar of soap, for instance.  You want to

6    educate someone about the soap so they can buy it?

7    **A.**   I think I even used the analogy of Costco samples; get a

8    small taste before you buy.

9    **Q.**   Okay.  We're on the same wavelength then.

10        Now, these other features, you say you give away Box Edit

11   for free.  Does that mean you give away all these other

12   features, too, like Desktop Sync, Mobile Access, et cetera, et

13   cetera?  Are they all free for enterprise users?

14   **A.**   That's correct.  They're all available in the free plan

15   for personal users and there are a number of other features, as

16   you can see by the checkmarks in each column.  This is only

17   showing you about half of the list, by the way, just so you're

18   aware.

19        So clearly, if someone were to pay, it would be for a

20   collection of larger features, inclusive of the ones in the

21   free plan.  But including additional ones, as well.

22   **Q.**   Right.  But for users that are not a part of the

23   promotional plan, the free, they have to pay for all of the

24   features; correct?

25   **A.**   They have to pay for whatever features come in the plan

1    that they wish with the price that's accorded.

2    **Q.**    Thank you.

3         Let me ask you, so free users you don't get any revenue

4    from; right?

5    **A.**    That's correct, unless they choose to buy more storage

6    than is given to them in the free plan.

7    **Q.**    How many free users do you have?

8    **A.**    I'm sorry, I don't know that number off the top of my

9    head.

10   **Q.**    Vast majority; right?

11   **A.**    I'm really sorry.  I just don't know that data.

12   **Q.**    Okay.  So you said you had 44,000 business customers.  Did

13   I hear that right?

14   **A.**    Correct, paying businesses.

15   **Q.**    And of the 44,000 business customers, how many users, how

16   many seats would these 44,000 business users have purchased?

17   **A.**    It completely depends on the company size and what they've

18   bought.  So if you remember some of the earlier examples, I

19   think I described the San Francisco Giants have about 60.  But

20   somebody like Procter and Gamble has tens of thousands.  I

21   think they are at 80,000.  So it just depends on the size of

22   the company.

23   **Q.**    I'm sorry, probably asked a vague question.  I was just

24   hoping, as the head of marketing, that you would know the

25   total.

**BOUCK - REDIRECT / BAKER**

1   **A.**   I'm sorry, the total what?

2   **Q.**   The total number of seats that the 44,000 business --

3   **A.**   Oh, gosh.  I'm sorry.  I don't know that number.

4   **Q.**   And that's a small fraction of the total users; right?

5   **A.**   I'm sorry, I'm just not aware of the number so I can't

6   comment on that.

7   **Q.**   That's fine.  Would you agree that most of the money is in

8   the business customers for Box?

9   **A.**   Certainly, since they are the ones that are paying for the

10   product's use, yes.

11   **Q.**   Thank you.

12        **MR. FRIEL:**  I think with that, I have no further

13   questions and pass the witness.  Thank you.

14        **THE COURT:**  Okay.  Anything else, Mr. Baker?

15        **MR. BAKER:**  A few questions.

16                  **REDIRECT EXAMINATION**

17   BY MR. BAKER

18   **Q.**   Ms. Bouck, in terms of your personal use of editing tools

19   at Box, are there circumstances where you use Box Sync to edit

20   files?

21   **A.**   All the time.

22   **Q.**   And are there circumstances where Box Sync is more

23   convenient to use than Box Edit?

24   **A.**   Yes, there are times when that's the case.

25   **Q.**   And are there circumstances in your work where you

**BOUCK - REDIRECT / BAKER**

1    actually download -- manually upload or download files?

2    **A.**    Absolutely.  I did it this morning.

3    **Q.**    When you're editing documents?

4    **A.**    Uh-huh.

5    **Q.**    And are there circumstances where it's actually more

6    convenient to do that?

7    **A.**    Yes, there are times when it's more convenient.

8    **Q.**    Counsel showed you a 28-page questionnaire that was

9    submitted to Forrester.  That questionnaire contained a whole

10   host of different features and functionalities of the Box

11   platform; did it not?

12   **A.**    I think all 28 pages are in some way describing various

13   functions of Box, yes.

14   **Q.**    Including the security functions that you were talking

15   about?  Yes?

16   **A.**    Yes.

17   **Q.**    And the mobility aspects?

18   **A.**    Correct.

19   **Q.**    And the cloud aspects?

20   **A.**    Yes.

21   **Q.**    And many, many others.

22        Does it surprise you that there is some notation about

23   Box Edit in that questionnaire?

24   **A.**    No.  In fact, in an effort to be thorough and complete, of

25   course we would put Box Edit alongside all of our other long

1  list of capabilities.

2         **MR. BAKER:**  Nothing further, Your Honor.

3         **THE COURT:**  Okay.  Any questions?  All right.  Thank

4  you.  Be careful on the way out.

5         **THE WITNESS:**  Thank you, Your Honor.

6         **THE COURT:**  Who is next?

7         **MS. HILGARD:**  Good morning, Your Honor.  I'm Addie

8  Hilgard for the defendants, and we'd like to call Sam Ghods.

9         **THE COURT:**  Okay.

10         **COURTROOM DEPUTY:**  Please stand and raise your right

11  hand.

12                        **SAMUEL GHODS**,

13  called as a witness for the Defendant, having been duly sworn,

14  testified as follows:

15         **COURTROOM DEPUTY:**  Please be seated.  Please state

16  your full name for the Court and spell your last name.

17         **THE WITNESS:**  Sam Ghods, last name G-H-O-D-S.

18         **COURTROOM DEPUTY:**  Thank you.

19         **MS. HILGARD:**  And I'm Addie Hilgard again, and I was

20  asked to spell my last name, H-I-L-G-A-R-D.

21                      **DIRECT EXAMINATION**

22  BY MS. HILGARD

23  **Q.**  Good morning, Mr. Ghods.  How are you?

24  **A.**  Fine, thank you.

25  **Q.**  So have you ever testified in court before this case?

1    **A.**    Not before this case, no.

2    **Q.**    So it's a new experience for you?

3    **A.**    Yes.

4    **Q.**    It's a far cry from your work at Box?

5    **A.**    Yes.

6    **Q.**    Well, if you don't understand my question or you need me

7    to be more explanatory, just let me know and I'll try and

8    rephrase my question.

9    **A.**    Great.   Thank you.

10   **Q.**    So where do you live?

11   **A.**    I live in San Francisco.

12   **Q.**    And do you have family?

13   **A.**    I do.   I have my parents live in Seattle, Washington and I

14   have two younger brothers that also live in San Francisco, and

15   one of them lives with me.

16   **Q.**    And can you tell us a little bit about where you're from

17   and how you became involved at Box?

18   **A.**    Sure.   So I grew up in Seattle, and I went to Mercer

19   Island Public High School.   And that's where I met the other

20   cofounders of Box.   So Aaron Levie, Dylan Smith and Jeff

21   Queisser.   And we are all pretty good friends.   And we tried to

22   start some businesses in high school, but none of those took

23   off.

24        But then after that, we went to -- all went to different

25   colleges.   Aaron and I went to USC, University of Southern

1  California.  Dylan went to Duke University, and Jeff went to

2  Western Washington University.

3      And after a year or so, Aaron ended up dropping out.  He

4  came up with the idea of Box as a college business product and

5  he was, like, having frustrations, was trying to store and

6  access files, and so he started this company with Dylan,

7  convinced him to drop out as well, and shortly thereafter

8  convinced Jeff and I of the vision, so we all got to work in

9  Berkeley on the company.

10 **Q.**  Okay.  What was Box like in those early days with the four

11 of you?

12 **A.**  It was pretty intense.  It was four of us.  We had our own

13 kind of garage story, but it was actually cottages.  It was two

14 small cottages that we lived and worked in and we were spending

15 probably 13, 14 hours a day just on Box, just all day long.

16     We were really excited about what we were doing, and it

17 was just like four desks pushed up against the wall.  We really

18 didn't have anything except the company we were working on.

19 **Q.**  So what was the vision of the company that you were

20 working on in those early days?

21 **A.**  Yeah.  So we were really focused on trying to make it

22 easier to store and share and access files in a really secure

23 way.

24 **Q.**  Okay.  What was your position at Box in those early days?

25 **A.**  At that time, I was Director of Engineering, and I managed

1    the Development Team.

2    **Q.**    Okay.  And did your position at Box change over the years?

3    **A.**    Yeah.  So shortly after that, I was promoted to Vice

4    President of Engineering.

5          And during all that period or especially early on, I was

6    doing the software development for Box itself as well.

7    Eventually I was, like I said, the Vice President of

8    Engineering, running the Engineering Department.

9          And then I transitioned to Vice President of Technology,

10   where I remained in that position up until about 200 engineers.

11   And in that capacity, I was responsible for the entire

12   technology road map of Box's products, and I participated as a

13   design consultant in just about every product and everything

14   that we released and, in many cases, reviewed designs and gave

15   feedback and advice, technically.  Yeah.

16   **Q.**    Okay.  Great.  So you're a software engineer; right?

17   **A.**    That's right.

18   **Q.**    And have you actually yourself written some of the code

19   for Box?

20   **A.**    Yes; yeah, especially early on I did a lot of the software

21   development.

22   **Q.**    Great.  Let's talk a little bit about Box's overall

23   product offering.  Could you describe what the Box platform is?

24   **A.**    Sure.  So that's a good question.  So when customers buy

25   the Box products, they get full access, essentially, to the Box

GHODS - DIRECT / HILGARD

1    platform.

2        And the Box platform is an underlying set of

3    infrastructure and servers and software that any customer can

4    use to do all kinds of functionalities with their content in a

5    very secure way.

6    **Q.**   Okay.  Can you tell me a little bit about some of the

7    product's features and benefits, just on kind of a high level,

8    please?

9    **A.**   Sure; sure.  So just to clarify, the platform is that

10   underlying set of infrastructure.  And then on top of that, you

11   can have many different applications that use the Box platform,

12   like the Box Web application or Box Sync, or others like that.

13       And then the platform itself comes with a tremendous

14   number of features and functionality.  And I would say, you

15   know, for me what I've seen is the most important over and over

16   again is the security feature.

17       You know, we've invested a lot in making sure that no

18   matter where you are or what device you're using, you can make

19   sure it's only you that's accessing the content that you have

20   in your account.

21       So we have a feature such as if someone logs into your

22   account from somewhere that's thousands of miles away from

23   where you normally log into, we actually alert you and the

24   account owner and even the business that there may be, you

25   know, like a hacker, for example, getting into your data.  So

 1   we have a lot of protections on that front, on the security

 2   front.

 3        Another really big feature, you heard it talked about,

 4   mobility; right?  And security and mobility really go

 5   hand-in-hand because when you're accessing from any device, you

 6   want to make sure no one's getting access to that data that you

 7   don't have access to.

 8        You know, I'd say probably the third big bucket would be

 9   content features, features around your data.  So one is full

10   text search.  We index all the content of all the documents and

11   make it really easy to search those.

12        We also have this feature called Work Flow where it's kind

13   of like "If this, then that," these customer rules that

14   business can write around their data.

15        So an example is if you upload a contract to the contract

16   review folder, a business can say, "Well, any contract that

17   goes in there should be assigned as a task to the Contract

18   Review Team."  And that can all be done automatically, and it's

19   just part of the feature set for the product.

20   **Q.**   Great.  Thank you.

21        So we've heard about applications, various applications,

22   and I'm wondering if you can just give us an example of an

23   application.

24   **A.**   Right.  So Box provides many applications that work with

25   the platform.  But in addition to that, there are, I'd say, on

1   the order of thousands of third-party applications that work

2   with the platform, as well, that you get to use with the

3   platform that you purchase when you purchase the Box product.

4        So one example of that, one I use all the time is called

5   DocuSign.  So most people, like me especially, don't like to

6   print out documents and then sign them and then mail them back

7   to the person who asked for the signature.  Instead, it would

8   be better if I could just click, electronically sign the

9   document, and have that be it.

10        So with the DocuSign application, you can actually sign a

11   document inside the Box platform.  And so you keep all your

12   data in a secure location and yet, use DocuSign to -- the

13   DocuSign application that works with the Box platform to sign

14   the document.

15   **Q.**   Okay.  Are there many applications available to Box users

16   relating to editing documents?

17   **A.**   Yeah.

18   **Q.**   And is Box Edit one of those applications?

19   **A.**   Yes.

20   **Q.**   How many editing applications are there available to Box

21   users?

22   **A.**   I would say on the order of dozens, most likely.

23   **Q.**   Okay.  Can you show me where a Box user would find the

24   editing applications available to them on Box?

25        **MS. HILGARD:**  And for this, Your Honor, we have a

1  demonstrative video that I'd like to play that the witness can

2  go through.

3         THE COURT:  Okay.

4         THE WITNESS:  Yeah, I prepared a video to show that

5  specific case.

6      Okay.  So here let's -- I can kind of break down what we

7  see in this screen before we go ahead with the video.

8      So what you see here is the Box application.  This is the

9  Web application that you've heard discussed.  And it shows

10  you -- right now, it's showing you what's in your account.  So

11  you see a test folder, and that's basically the contents of our

12  account that we made for this video.

13      So what we can do is go ahead and click "Play."  And we

14  are going to go to the page that shows all the apps that a Box

15  user can use.  So here we go to the menu and we click "Apps."

16  And if we pause -- so here you can see all the different apps

17  that Box has available.

18      And if we hit "Play," you can see actually -- and pause

19  right there -- you can see Box Edit is right there along with

20  all the other applications that Box offers to its customers.

21      And this includes applications that we offer, as well as

22  applications that other companies offer that work with the Box

23  platform like the DocuSign example I mentioned earlier.

24      So if we hit "Play" then what we are going to do is go to

25  the bottom right.  Let's pause here.  So in the bottom right

1   you can see "Function."  And that means that we are going to

2   see the apps according to the category or the function that

3   those apps provide.

4        So if you hit "Play," we will go to the editing section

5   just to see all the apps that only have to do with editing

6   versus annotation or collaboration or things like that.

7        So pause here.

8        And this is now showing us all the applications that have

9   to do with editing documents that you can use with the Box

10  platform.

11       So let's go ahead and hit "Play."

12       And you can see these different applications.  And we are

13  going to scroll down to the bottom.  And this is just the first

14  page, I believe.  So if we click the page numbers -- you can

15  pause here -- and that shows that there's 11 pages,

16  essentially, of editing applications.

17       So let's go ahead and hit "Play."

18       And so I think there's about 20 per page on here, so

19  that's roughly about 200 or so applications that all have to do

20  with editing on the Box platform.

21  **BY MS. HILGARD**

22  **Q.**   Okay.  Great.  Thank you.

23       So other than the specific editing applications that you

24  showed us in this video, are there other ways to edit using Box

25  other than those ways?

1    **A.**    Yes, there are.

2    **Q.**    Can you describe a couple of those ways, please?

3    **A.**    Sure.  So a few of the ways that I personally like to use

4    is the Web application upload and download method.  The

5    Box Sync method.  I have Box Sync installed, so I use that a

6    lot.  And also Box Edit.

7    **Q.**    Okay.  So why don't we focus on those three ways of

8    editing.  And you said that you have actually used these all in

9    your own work at Box?

10   **A.**    Yes, absolutely.

11   **Q.**    All right.  Can you explain to us how these three

12   different methods of editing are used?  And again, I'd like to

13   play a demonstrative.

14          **MS. HILGARD:**  And it's been disclosed and we haven't

15   received any objection.

16          **THE COURT:**  Okay.

17   **BY MS. HILGARD**

18   **Q.**    Why don't we start with the manual upload download method

19   that you've described.  I think it's been called the Web app

20   method.

21   **A.**    Sure, sure.  So here's one method you can use when you

22   want to kind of control what kind of edits are being sent to

23   the Box server.  So before we start, let's again go over what

24   we're seeing.

25          We are, again, seeing our account, our Box account and the

 1    contents.  And we are inside the test folder.  And you can see

 2    that there.

 3        And inside that test folder is a testdocument.txt.  So we

 4    are going to download this.  So let's hit "Play."

 5        So we want to edit the document.  So we're going to

 6    download it.  That's going to bring it down to our computer.

 7    So it was on the server and now it's located on the computer on

 8    the local computer ready for us to edit.  So let's hit "Play."

 9        So we are going to open up the file that's on our local

10    computer.  We are going to type "Edit This File" just to show

11    that the file has changed.  And once we've done that, we are

12    going to indicate that we want to upload the file back to Box

13    by dragging it in.  So let's continue.

14        And you'll notice what's going to happen here is when we

15    drag in the file -- let's go ahead and hit "Play."  So we drag

16    in the file, and we can pause here.  It's uploading as a new

17    version to this original document that we were editing.

18        So let's go ahead and hit "Play."

19        And now our changes are successfully uploaded to the

20    server and we've made the edit to this file.  So if we hit

21    "Preview," then we can see -- and this is another functionality

22    of Box where you can see the contents of a file in the web

23    browser instead of having to download it.

24        So here we can see that our change has been successfully

25    committed to the Box server.

1  **Q.**   Okay.   Great.   Why don't you take us through the operation

2  of Box Sync to edit a single document.

3  **A.**   Sure.   So here, to start here, we have a little split

4  screen picture in picture view of what's going on.   So let's

5  start with the top half.   Top half is what we saw in the last

6  video with your Box account and the folder in your account that

7  has that text document, that .txt.

8       And the bottom half is the view of a folder which is on

9  your local computer, the Box~Sync folder.   And anything in this

10 folder automatically gets synchronized to the folder.

11      Let's go ahead and hit "Play" here.

12      So we will first synchronize the folder and here -- yeah,

13 you can hit "Play."

14      And when we click that button, then automatically the

15 contents are going to go down to -- pause here.   Great.

16      So it's going to go down to your local computer.   So you

17 can see in the bottom half of the screen that test folder has

18 appeared.   And now everything in test folder is synchronized to

19 the Box server.   So if we hit "Play," we double click into the

20 local folder.   Hit "Pause" here.   We see our test document.

21      So if there were dozens or hundreds of documents, the same

22 thing would happen.   But when it's just one, one document comes

23 down and from now on, this document is synchronized to the

24 server.   So let's hit "Play."

25      So we are going to do the same operation.   We are going to

 1   type "Edit This File" into this document.  We will go ahead and

 2   save and close the application, and we'll see that Sync has

 3   automatically, in the background, uploaded the changes, and

 4   that edit and any edits I would have made subsequently would --

 5   are automatically going up to the server in the background.

 6       So again, we are previewing the file and we are seeing the

 7   edit -- this file sentence has appeared in the server side

 8   version of the document.

 9   **Q.**  Thank you.  Why don't we go ahead and walk through the

10   Box Edit operation.

11   **A.**  Great.  So now we will see how you might edit a file using

12   Box Edit.

13       So again, we are starting with the account view.  So we

14   are again in a test folder and we see "testdocument.txt."

15       So we are going to want to edit this file as well, so

16   let's hit "Play."

17       What we do is -- let's pause here.  So because we want to

18   edit this document, we can right click on it and click "Edit

19   With Notepad."  There's a few different ways, but this is just

20   one.  And so you can click "Edit with Notepad."

21       Let's hit "Play."  And what that will do -- let's pause

22   here -- it's launching the application in the background to be

23   able to edit the file, the same step as when we double-clicked

24   the file in the upload/download method.

25       Let's go ahead and hit "Play."

1      And we'll bring this Notepad to the front, and we will do

2  the edit here as well.  So we will do the same operation we

3  did, edit this file, and we will go ahead and save it.

4      And then just like in the Sync method -- let's pause -- so

5  any time you save, again, just like in Sync, then the copy on

6  your local computer will go up to the server.  So let's hit

7  "Play."  Yeah.  You can see the little notification there.

8      We can exit the application and we can see in the back --

9  let's pause here -- that the file was successfully uploaded as

10  a new version, like in the other methods.

11      So let's hit "Play."  And we just hit "Preview."  And

12  again, we can -- we have the ability to preview this text file

13  in the browser without opening it.  And we see our changes

14  there.

15  **Q.**  Great.  Thank you.

16      So, Mr. Ghods, do you prefer any one of these methods over

17  any of the others?

18  **A.**  Yeah, I -- I like to use different ones in different

19  situations.  So, for example, when I'm trying to control the,

20  you know, version history, I want to make sure my typos don't

21  necessarily go up to the server, then I use the manual

22  upload/download method.  And I do that quite frequently with

23  most of my documents, I would say.

24      Beyond that, I -- I like to use Box Sync.  I have most of

25  the documents I work with day-to-day synchronized to my

1   computer.  So if I'm on a plane or if I'm without online

2   access, I can very easily get to my documents, edit them.  And

3   once I connect to the Internet again, automatically those edits

4   get synced to the Box.

5       And then only in the case where I don't have the file

6   synchronized and I'm just trying to make, like, a minor change,

7   for example, I do use the Box Edit feature.

8   **Q.**   Great.

9       So obviously, you can use Box Sync to edit one file at a

10  time.  Can Box Sync also be used for other purposes?

11  **A.**   Abso -- I'm sorry, Box Sync?

12  **Q.**   Box Sync.

13  **A.**   Yeah, yeah.  So Box Sync can be used pretty much to manage

14  your entire account.  So if you want to, you can synchronize

15  most of the files you're working with, if not all of the files

16  in your account, down to your computer.  And you can drag and

17  drop folders, you can move things around in your account, you

18  can bring -- you can upload to the server entire -- excuse

19  me -- entire directories of files into your account.

20      So there's a lot of functionality there in Box Sync.

21  **Q.**   Okay.  Switching gears a little bit, are you familiar with

22  the design of Box Edit?

23  **A.**   I am.

24  **Q.**   Okay.  And how are you familiar with the software design

25  of Box Edit?

1    **A.**    So throughout its development, I was Vice President of

2    Technology.  Right now I'm Services Architect.  So just

3    recently I started leading a smaller team just in the last few

4    years or so.  But throughout just about all of its development,

5    I was Vice President of Technology.

6         And so in that role, I participate in lots of design

7    conversations.  I'm fairly well aware of pretty much all of our

8    products and the functionalities, and I get that information

9    through reading PRDs, Product Requirements Documents, or

10   conversations with the engineers.

11        And a lot of the times they will come to me personally for

12   questions or feedback or advice.

13   **Q.**    All right.  In a computer sense, do you know what a

14   "driver" is?

15   **A.**    I do.

16   **Q.**    Can you explain what a "driver" is?

17   **A.**    Sure.  A "driver" is a piece of software that helps the

18   operating system and application communicate.

19   **Q.**    And have you developed software that uses a driver?

20   **A.**    I have.

21   **Q.**    Did you have a conversation in this litigation with one of

22   the experts, Dr. Leonard?

23   **A.**    I did.

24   **Q.**    And do you remember what your conversation was about with

25   Dr. Leonard?

GHODS - DIRECT / HILGARD

1  **A.**    Yeah.  I remember he asked me about the technical

2  feasibility of implementing a driver in Box Edit.

3  **Q.**    And do you remember what you told him about the technical

4  feasibility?

5  **A.**    Yeah.  I said it was definitely technically feasible.

6  **Q.**    And in your conversation with Dr. Leonard, do you remember

7  if he asked you about anything else?

8  **A.**    I do, yes.

9  **Q.**    And what else did he ask you about?

10 **A.**    He asked me also about the design of Box Edit, if it were

11 technically feasible to change Box Edit such that the Box Edit

12 application would only save a file back to the server if the

13 application were closed, the application doing the editing were

14 closed.  Yeah, so he asked me about that.

15 **Q.**    Do you remember what you told him about that?

16 **A.**    Yeah.  I remember I said it was technically feasible and

17 that it probably would only take about one or two weeks to

18 implement.

19 **Q.**    Is there anything else that you recall about your

20 conversation with Dr. Leonard?

21 **A.**    Not that I remember, no.

22 **Q.**    And was Dr. Leonard asking you about infringement or

23 noninfringement of the patents?

24 **A.**    Not at all, no.

25 **Q.**    You're not a lawyer; correct?

1   **A.**    Thankfully, no.  No offense.

2   **Q.**    Can you tell me how long it would take to implement adding

3   a driver to the Box Edit program?

4   **A.**    Probably not longer than about two to four weeks; about

5   that.  Something like that.

6   **Q.**    Okay.  And Mr. Ghods, do you know what a dialogue box is?

7   **A.**    I do.

8   **Q.**    Can you explain to us what a dialogue box is?

9   **A.**    Sure.  So a dialogue box is a window that can come up that

10  can either give the user some information or ask the user a

11  question.

12  **Q.**    And based on your knowledge of the software design of

13  Box Edit, could Box Edit be modified to add a dialogue box?

14  **A.**    Absolutely.

15  **Q.**    How could a dialogue box be added to Box Edit?

16  **A.**    A number of different ways.  It could be added when the

17  user saves a file.  The Box Edit application could pop up a

18  dialogue box that asks whether the user wants this change that

19  they've just saved to go to the Box server.

20  **Q.**    And how long do you think it would take to modify the

21  Box Edit design to add such a dialogue box?

22  **A.**    Not too long.  Probably about one to two weeks, because we

23  already used dialogue boxes in other parts of the application.

24  **Q.**    And you don't have any opinions as to whether this tweak,

25  or the modifications that Dr. Leonard talked to you about,

1  would avoid any patents; is that right?

2  **A.**   That's correct.

3  **Q.**   All right.  So other than the editing capability, can you

4  tell me some of the other capabilities and functionalities and

5  features of the Box Android mobile app?

6  **A.**   Sure.  So the Android application has a ton of different

7  functionality.  I mean, the main one is to be able to access

8  all of your files that are in your account and preview them

9  directly on the device.

10      So the example I like to use is if you are a construction

11  worker on a construction site and you need to see the

12  blueprints, the latest blueprints that have been uploaded to

13  Box, then you can actually use the Android application to view

14  those.

15      On top of that, you can share with others.  You can, you

16  know, manage your account.  You can rename files and folders.

17  You can move them around.  You can copy them.  We built a lot

18  of different functionalities into the Android application.

19  **Q.**   Great.  Thank you so much, Mr. Ghods.

20          **MS. HILGARD:**  I'm going to pass the witness.

21                          **CROSS-EXAMINATION**

22  **BY MR. FRIEL**

23  **Q.**   I guess it's good afternoon now.  Just a few questions for

24  you.

25      The demonstration that she played with respect to

1    Box Sync, can you confirm that that was using the latest

2    version of Box Sync?

3    **A.**    It was.

4    **Q.**    And that's version 4.0; right?

5    **A.**    Yes.

6    **Q.**    And you didn't prepare a video that showed how Box Sync

7    version 3.0 operates; is that correct?

8    **A.**    Right.  The video demonstration would have been the same

9    regardless of version.

10   **Q.**    Okay.  But we don't know that because you didn't prepare

11   it for us; right?

12   **A.**    No.

13   **Q.**    So let me ask you, you said that you use three different

14   tools to edit documents in Box.  And that was the manual

15   download, Box Sync, and Box Edit.  Did I get that right?

16   **A.**    That's correct.

17   **Q.**    And you select which of these three tools you use,

18   depending on your needs; is that right?

19   **A.**    Right.

20   **Q.**    Thank you.  And now certainly, Box has the ability to stop

21   allowing customers to download Box Edit; correct?

22   **A.**    Yes.

23   **Q.**    So you could just turn it off any given time; right?

24   **A.**    We could.

25   **Q.**    And, in fact, you've been creating new versions of

1    Box Edit throughout the life of this lawsuit; correct?

2    A.   That's right.

3    Q.   And the most recent one was about November, just a couple

4    months ago; right?

5    A.   That's possible.

6    Q.   Okay.  So if I went to the Box Web site and I were a Box

7    user, whether free, enterprise, paid, doesn't matter, I can go

8    download that latest version of Box Edit?

9    A.   Right.

10   Q.   All right.  And does Box do regular software updates of

11   all of its software?

12   A.   Yes.

13   Q.   And in some cases, is that updating automatic to users?

14   A.   In some cases, yes.

15   Q.   And in those cases, you could eliminate those users'

16   ability to use Box Edit; correct?

17   A.   Can you rephrase your question?

18   Q.   Sure.  In those circumstances, you could eliminate your

19   customers', the users' ability to use Box Edit; is that

20   correct?

21   A.   That's right.

22   Q.   Thank you.

23         MR. FRIEL:  Pass the witness.

24         THE COURT:  All right.  Short follow-up?

25         MS. HILGARD:  Very short, Your Honor.

1          <u>REDIRECT EXAMINATION</u>

2     BY MS. HILGARD

3     **Q.**   Would there have been any difference between the video

4     demonstration that you walked through here of editing a single

5     document using Box Edit, using the Box Sync 4 version versus

6     the Box Sync 3.x version?

7     **A.**   There would have been no difference.

8               **MS. HILGARD:**  Thank you.  Pass the witness.

9               **THE COURT:**  Any questions?  Okay.  You're excused.

10    Who do we have next?

11              **MR. DAIRE:**  We call Chris Yeh.

12              **THE COURT:**  How long will that go?

13              **MR. DAIRE:**  Ten, 15 minutes.

14              **THE COURT:**  Why don't we do that and take our break.

15    Is that all right?  Good.

16              **MR. DAIRE:**  Defendants call Chris Yeh to the stand.

17                    (Pause in the proceedings.)

18              **COURTROOM DEPUTY:**  Will you please take the witness

19    stand and stand and raise your right hand.

20                  <u>**CHRISTOPHER BINCHI YEH**</u>,

21    called as a witness for the Defendant, having been duly sworn,

22    testified as follows:

23              **COURTROOM DEPUTY:**  Please be seated.

24         Please state your full name for the Court and spell your

25    last name.

1      **THE WITNESS:**  Sure.  My name is Chris, Christopher

2   Binchi Yeh.  Last name is spelled Y-E-H.

3                    <u>**DIRECT EXAMINATION**</u>

4   **BY MR. DAIRE**

5   **Q.**    Good afternoon, Mr. Yeh.

6   **A.**    Good afternoon.

7   **Q.**    We didn't get much of a chance to talk about your

8   background the last time you were here, so I'd like to ask you

9   a few questions about that.

10        First, where are you from?

11  **A.**    I was born in Michigan.

12  **Q.**    And family?

13  **A.**    I grew up in Illinois and have gone to school both in the

14  Midwest and on the East Coast.

15  **Q.**    What brought you out to the Bay Area?

16  **A.**    This is my second time out to the Bay Area.  So the first

17  time was in 1990 when I graduated from college, came out to

18  join Oracle at the time.  And second time in 2000 when we moved

19  back out to join a different company.

20  **Q.**    And just to reorient everybody, where do you work now?

21  **A.**    I work at Box.

22  **Q.**    What's your current position for Box?

23  **A.**    My current title is Senior Vice President of Product and

24  Platform.

25  **Q.**    And what does a Senior Vice President of Product and

**YEH - DIRECT / DAIRE**

1  Platform do for Box?

2  **A.**    So my job sits between our engineering teams, our

3  technical teams and the marketplace, our customers, the people

4  who buy our software.

5      And so my job is to translate what they need into

6  requirements for engineering team to build so that they know --

7  so the company is building the right things, in essence.

8  **Q.**    Where did you work before you started at Box?

9  **A.**    Before Box, I worked at Yahoo.

10  **Q.**    What did you do for Yahoo?

11  **A.**    So at Yahoo, I was a product management lead for products

12  such as Yahoo Groups, our contacts products, a product we have

13  called Delicious.  And then before that, the head of the Yahoo

14  Developer Programs.

15  **Q.**    I think you may have mentioned it, but you left Yahoo for

16  Box sometime in mid-2011?

17  **A.**    That's right.  I joined Box in July of 2011.

18  **Q.**    Why did you make the job change?

19  **A.**    So I'd been at Yahoo for about four years.  I was ready

20  for something new and I'd been starting to talk to some new

21  companies and I, at that point, was introduced to Aaron.

22      And Box is just a super-interesting place.  The company

23  was growing really quickly in 2011.  We were at kind of the

24  center of a lot of really big trends in the business, right, so

25  there was a lot of momentum.  So that's why I joined the

1    company.

2    **Q.**   You said it was in the middle of trends.  What do you mean

3    by that?

4    **A.**   So in 2011, there were a lot of things that were moving in

5    Box's favor.  So in 2007, 2008, that was when the first iPhone

6    came out.  2010 was when the first iPad came out, I believe.

7         So there's just a lot of new mobile and computing devices

8    that were starting to emerge, and that was affecting companies

9    where employees bring these kind of devices in.

10        The second thing that was happening was people were

11   getting more and more used to the cloud.  So you'd see

12   consumers put photos in the cloud.  People were putting their

13   files in the cloud.  So just these two trends were just such a

14   very strong force in this business and Box was kind of riding

15   that wave in 2011.

16   **Q.**   And as Head of Product and Platform, can you give us your

17   kind of bird's-eye view of what the Box platform consists of?

18   **A.**   Yeah.  So think of our platform as a set of components

19   that process content as it comes into Box and then provides all

20   of that information out as a service.

21        So let me give you an example.  If you were to load a file

22   into Box, today what we do is we strip out the text of the file

23   and put it into our search engine so the search engine can be

24   used by the user to view content.

25        If you were to go use Box and see Box.com you'd see that

1  we convert lots of files so they can be used on a Web site.  So

2  we have a conversion pipeline.

3      If you were to look at the way we log data into Box, we

4  log all of the audit trail, the information people are using,

5  and all of that gets logged into our system so companies get

6  comfortable.

7      So there's a lot in the core platform of what we do that

8  we have to have in order to serve companies with our product,

9  and that's what I think of as our platform.

10 **Q.**   I'd like to ask you a little bit about a product called

11 "Box Sync."  Are you familiar with that product?

12 **A.**   I am.

13 **Q.**   How are you familiar with it?

14 **A.**   So Box Sync is one of our products.  And what Box Sync

15 does is it allows a user to synchronize a set of documents

16 to -- from their local machine to the cloud.  And so that these

17 two repositories of information are always kept in concert with

18 each other.

19 **Q.**   Are you aware that Box had some challenges with Box Sync

20 version 3.x?

21 **A.**   Yeah.  So like a lot of software products, we run into

22 challenges with our products from time to time.  And Sync, we

23 have a version of Box Sync called Sync 3 that we struggled with

24 when we worked with clients.

25 **Q.**   What kind of issues was Box seeing with Box Sync Version

**YEH - DIRECT / DAIRE**

1  3.x?

2  **A.**   So the main issue that we were seeing were that users or

3  people were synchronizing a lot more data than we ever

4  anticipated and files that were bigger than we ever

5  anticipated.  So I think we struggled at the edges with

6  performance and synchronizing large amounts of files, keeping

7  things consistent.  I think we struggled with that.

8  **Q.**   Did these problems also recur when end users were editing

9  single files at a time and uploading them to the Box cloud?

10  **A.**   No.  I mean, on a single-edit-use case where I just am

11  editing a single file, there are no issues in Box Sync with

12  "x."  I'm just taking the local version of the file and editing

13  it.  So there were not issues with individual editing of files

14  in Box.

15  **Q.**   And what, if anything, did Box do to address the

16  challenges you've identified with Box Sync Version 3.x?

17  **A.**   So at some point, I can't remember the time now, we

18  decided -- we made a decision as a company that we were going

19  to rebuild our Sync product.  That became what we called

20  Sync 4.  So we assigned a large engineering team to that

21  project and then essentially rebuilt the product from the

22  ground up so that it would be more reliable going forward.

23  **Q.**   Okay.  We've also heard about a feature called Box Edit in

24  this case.  Was Box Edit designed as part of the fix to

25  Box Sync version 3.x?

**YEH - DIRECT / DAIRE**

1    **A.**    So Box Edit is a product that solves an entirely different

2    problem.  What Box Edit does is it allows me to take a single

3    file from within Box and then edit it, and then when I'm done

4    editing it have it go right back to the location that it

5    started in in Box.  So it solves a very different problem than

6    Box Sync solves.

7            **MR. DAIRE:**  Permission to approach the witness with an

8    exhibit, Your Honor.

9            **THE COURT:**  Okay.

10   **BY MR. DAIRE**

11   **Q.**    I hand you what's when marked as TX 852, and if we could

12   just put it on Judge Donato's monitor, please, Beau.

13       I hand you a hard copy.

14           **THE COURT:**  I have the binder.  Thank you.

15   **BY MR. DAIRE**

16   **Q.**    Mr. Yeh, I just had a simple question.  Do you recognize

17   Exhibit 852?

18   **A.**    I do.

19           **MR. DAIRE:**  Move to admit, Your Honor.

20           **MR. STACY:**  No objection.

21           **THE COURT:**  Admitted.

22        (Trial Exhibit 852 received in evidence)

23   **BY MR. DAIRE**

24   **Q.**    Could we publish this for the jury, Beau.

25       You said you recognize this document.  Can you tell me

1   what it is?

2   **A.**   Yeah.   This document is an internal document which we sent

3   out to employees around the time we were launching Sync 4.   So

4   this is a document for internal consumption only.

5   **Q.**   So if we could zoom in, Beau, on the top right there.   You

6   mentioned "internal only."   Do those words have any

7   significance for Box?

8   **A.**   They do, in the sense that documents like this tend to

9   have language in them that we do not necessarily want customers

10  to be able to read.   This is something that employees are

11  supposed to kind of keep confidential.

12  **Q.**   Fair to say this reflects a candid discussion about

13  Box Sync Version 4?

14  **A.**   Yes, very frank conversation about Sync 4.

15  **Q.**   Okay.   I'd like to zoom in on the second page, if we

16  could.

17      There's a heading there indicating what makes Sync 4

18  better than previous versions.   Do you see that?

19  **A.**   I do.

20  **Q.**   And can you just, given your knowledge of the redesign of

21  Box Sync Version 4.0 and using this as a guide, can you tell us

22  what the improvements of Box Sync Version 4 versus Box Sync 3.x

23  were?

24  **A.**   Yeah.   So this is a pretty good list of the changes that

25  we were making.   As I mentioned, Sync is designed to take large

1   numbers of files and synchronize them between a PC or a laptop

2   and the cloud.  And so these things that we struggled with

3   Sync 3 are actually items that we are making better in Sync 4.

4   So you see things like "smarter and faster Sync for us."  Just

5   the speed of Sync was a big deal, an area of focus.

6       The scalability, which to us means just the sheer number

7   of files that somebody is putting into Box.  Notifications of

8   when files can be synced so a better experience for users.

9   Even simple things like characters, unusual characters like

10  exclamation points and question marks and other characters in

11  files.

12      So our focal point was just to make these pieces better

13  because these were the biggest pain points that we, as a

14  company, and our customers were feeling with Box Sync 3.

15  **Q.**   You mentioned scalability before.  I notice it says "now

16  Sync is tuned for 100,000 files."  Is that the same scalability

17  issue you were discussing earlier?

18  **A.**   Yeah, that's the same issue that we were discussing

19  earlier.  We had to contemplate syncing more files than we had

20  ever anticipated.

21  **Q.**   And if we flip over one more page to page 3 of the exhibit

22  and we zoom in on "What are some use cases Box Sync helps

23  with," first I notice that the Box Sync 4 is gone from that

24  question.  It just refers to Box Sync.  Is that significant?

25  **A.**   Yeah, that's significant in the sense that these use cases

1    that we had for Box Sync 3 are the same use cases that we have

2    for Box Sync 4 largely, and so I think this was just our

3    opportunity to remind our employees why it is that we have

4    Box Sync.

5    **Q.**   So is it fair to say that what follows in this section is

6    a description of use cases for Box Sync, regardless of whether

7    it's 3.x or 4?

8    **A.**   Yeah, looking at it, all three of these are true of

9    Box Sync 3 as well as Box Sync 4.

10   **Q.**   Okay.  And so the first sub bullet point to answer the

11   question "What are some of the use cases Box Sync helps with"

12   is something called "group editing."  Can you tell the jury

13   what group editing is in Box Sync?

14   **A.**   Yeah.  Group editing is that if we are all synchronizing

15   the same folder of content in Box, that multiple people can

16   edit that content, kind of concurrently or in sequence.  That

17   means that let's say that we shared a set of files together and

18   we were working on a project.  I could modify a file and then

19   have somebody else go into that same folder and modify that

20   same file following when I was done.  So it was the idea of

21   being able to concurrently work on things together or work on

22   things in sequence.

23   **Q.**   And that worked largely without issue in Version 3.x?

24   **A.**   Yeah, I mean, it was -- it worked well in 3.x just like it

25   did in 4.  That's why -- we did not add this kind of group

```
 1   editing capability to the list of things about why Sync 4 was

 2   better.  The nature of this didn't really change from version

 3   to version.

 4            MR. DAIRE:  Pass the witness, Your Honor.

 5            THE COURT:  Okay.  Mr. Friel?  Mr. Stacy.

 6                       CROSS-EXAMINATION

 7   BY MR. STACY

 8   Q.   Good to see you again, Mr. Yeh.

 9   A.   Good to see you.

10   Q.   I'll bring up 179.  It's already been admitted.

11            And Mr. Yeh, 179, again, already admitted in this case, on

12   the left-hand column you see the install month, the middle

13   column you see the name of the product, and in the right column

14   you see the install count.  You're familiar with this type of

15   document from Box?

16   A.   Yeah.  It's -- sure, I'm familiar with it in the sense

17   it's -- I'm not sure I'm familiar with this exact document, but

18   yeah, it looks like a table of installations, I guess, for

19   Box Edit.

20   Q.   Okay.  So I want to take you down to the bottom line.  It

21   says 9/1/2014.  So in that month, 23,744 people installed

22   Box Edit just from Box's data?

23   A.   Sure.  I have no reason to dispute that.

24   Q.   And Box has more recent data than 9/1/2014; correct?

25   A.   I would think so.
```

1  **Q.**   This is just the document that's in this litigation right

2  now.  So we can update that if we had the right document?

3  **A.**   I assume that we could update this if we had the right

4  information.

5  **Q.**   So I want to go back and ask when -- well, it was December

6  of 2013 when Sync 4 was released; correct?

7  **A.**   It was initially -- it started initial rollout in December

8  of 2013.

9  **Q.**   Okay.  So Chris, can we take the two call-outs down and

10  then blow out around December of 2013.  And blow out from there

11  down.

12      So in December of 2013, Sync 4.0 was released, and yet,

13  your customers continued to install Box Edit all the way

14  through the most recent data in September?

15  **A.**   Yes.

16  **Q.**   Okay.  Now, the most recent data shows 23,744 for that

17  month.  That's an additional number of users; correct?

18  **A.**   That is correct.

19  **Q.**   So for the total number of Box Edit installs, we'd add

20  them altogether?

21  **A.**   So if we were to try to find the cumulative number of

22  Box Edit installs, if this data is kind of listed the right

23  way, then yes, we would add all this up and we would come up

24  with the right number.

25  **Q.**   Okay.  So I want to put some perspective on this numbers.

1    23,744, we are going to keep that number in mind.  Let's look

2    at the other products that are in this data.

3          So Chris, can we go to page 2?  And I'd like to go to the

4    9/1/2014 Box Sync for Mac.

5          So we are looking at the same month, 9/1/2014.  That's

6    Box Sync for Mac.  And that's the Apple product; right?

7    A.    That is correct.

8    Q.    So you have a Box Sync for Microsoft Windows-type products

9    and you have one for Apple products?

10   A.    That's correct.

11   Q.    And Box Sync for Mac, we are looking at the same month

12   that we were looking at earlier, 25,800, roughly equivalent to

13   the number of downloads for Box Edit?

14   A.    This is information about Box Sync for Mac, and I have no

15   reason to think this is incorrect.

16   Q.    Okay.  Well, let's look at the other ones to be complete

17   with this document.

18         Page 3, Chris, the top.

19         And we will look at Box Sync for Windows.

20         Now, Box Sync for Windows more popular; right?

21   A.    Correct.

22   Q.    You see for that month 77,256 downloads, about three times

23   as many downloads as Box Sync for Mac or Box Edit for that same

24   month?

25   A.    Correct.

**YEH - REDIRECT / DAIRE**

1   Q.   Okay.  Now let's go to the last product on this list.  And

2   that's Box for Office.

3        And earlier, Mr. Ghods showed a demonstration that talked

4   about Box for Office as one of the editing products.

5        And for 9/1/2014, Box for Office had 5,116.  Do you see

6   that?

7   A.   I do.

8   Q.   Any reason to doubt that number?

9   A.   I have no reason to doubt that number, sitting here.

10           MR. STACY:  Thank you.  Pass the witness.

11           THE COURT:  Okay.  Very brief.

12           MR. DAIRE:  Very brief, Your Honor.

13                       REDIRECT EXAMINATION

14   BY MR. DAIRE

15   Q.   With respect to Trial Exhibit 179 that you were just

16   showed by counsel for Open Text, Mr. Yeh, I noticed that there

17   wasn't a demarcation for Box Edit for Mac and Box Edit for

18   Windows.

19   A.   That's correct.

20   Q.   Is that because those line items for Box Edit measured all

21   installations of Box Edit regardless of operating system or

22   platform?

23   A.   I can only guess that that is the case.  Not seeing what

24   actually breaks out under this number, that's all I can say.

25   Q.   Whereas in Box Sync, as indicated on the exhibit, that was

 1  marked out between Box Sync for Mac on the one hand and

 2  Box Sync for Windows on the other; correct?

 3  **A.**    Yeah.  I mean, I can spec- -- the way we do these --

 4          **MR. STACY:**  Your Honor, objection.  If he doesn't know

 5  the answer he shouldn't be guessing.

 6          **THE COURT:**  Mr. Yeh, you just need to tell us what you

 7  know.

 8          **THE WITNESS:**  I was just asking about --

 9          **THE COURT:**  Hold on.  Hold on.  Hold on.

10          **THE WITNESS:**  I'm sorry.

11          **THE COURT:**  No taking it beyond to the realm of

12  guessing or speculating; okay?

13      Let's ask the question again.

14  **BY MR. DAIRE**

15  **Q.**    Just with respect to Trial Exhibit 179, there were

16  separate line items for Box Sync for Mac and Box Sync for

17  Windows; is that right?

18  **A.**    That's correct.

19  **Q.**    So would you agree with me that to get a fair comparison

20  of the number of installations between Box Sync and Box Edit,

21  you would need to add up Box Sync and compare it to the

22  Box Edit installations; correct?

23  **A.**    Yes.  That would be an apples-to-apples comparison.

24  **Q.**    And can you tell me, do you know whether Box for Office is

25  the same as the Web app upload/download method for Box Editing?

1   **A.**   So Box for Office is not the same as the upload or

2   download method for the Web application.   So Box for Office is

3   a separate set of components that we download and that work

4   with Box -- that work with Microsoft Office on the desktop.

5           **MR. DAIRE:**   Nothing further, Your Honor.   Thank you.

6           **THE COURT:**   Any questions?   Okay.   We will take our

7   break and be back at 12:45.

8       You're excused, Mr. Yeh.

9           **COURTROOM DEPUTY:**   All rise for the jury.

10      (Recess taken at 12:28 p.m.)

11      (Proceedings resumed at 12:50 p.m.)

12          **THE COURT:**   All set?

13      Bring them in.

14          **THE CLERK:**   Okay.

15          **THE COURT:**   See you in about two minutes.

16      (Pause)

17      (Jury enters at 12:53 p.m.)

18          **THE COURT:**   Okay.   Who's next?

19          **MR. MITCHELL:**   Your Honor, we call Peter McGoff.

20          **THE CLERK:**   Mr. McGoff, would you please raise your

21   right hand.

22                          **PETER MCGOFF,**

23   called as a witness for the Defendants, having been duly sworn,

24   testified as follows:

25          **THE WITNESS:**   Yes, I do.

1          THE CLERK:  Please be seated.

2      Please state your full name for the Court.  Spell your

3  last name.

4          THE WITNESS:  Peter McGoff.  M-c-G-o-f-f.

5          THE CLERK:  Thank you.

6                    **DIRECT EXAMINATION**

7  **BY MR. MITCHELL**

8  **Q.**  Good afternoon, Mr. McGoff.

9  **A.**  Good afternoon.

10  **Q.**  Welcome back.

11  **A.**  Thank you.

12  **Q.**  Last time you had a chance to speak to the jury I'm not

13  sure you had a chance to fully introduce yourself.  Why don't

14  you start by telling us your title.

15  **A.**  Sure.  I am the senior vice president/general counsel at

16  Box.

17  **Q.**  And tell us a little bit about yourself.

18  **A.**  Sure.  I've been practicing law since 1996, always focused

19  on technology companies, always in Silicon Valley.

20      And I make my home with my wife and two boys in Walnut

21  Creek in the East Bay.  We -- my youngest son is in junior high

22  and my oldest is off to college.  He's a sophomore in Arizona.

23  **Q.**  And how long have you been at Box?

24  **A.**  Been at Box since April of 2012.

25  **Q.**  So, roughly, three years?

**MCGOFF - DIRECT / MITCHELL**

1  **A.**    Yes.

2  **Q.**    And why did you join Box?

3  **A.**    You know, I was at a public software company for 12 years.

4  So Box, you know, very fast-growing, exciting company, great

5  technology, innovative company, was a real draw for me.  So I

6  made the jump back in 2012.

7  **Q.**    Can you tell us a little bit about your responsibilities

8  at Box?

9  **A.**    Sure.  They, you know, vary from day-to-day, but as a

10  general matter I am focused on advising the company, its

11  management, including the board, on any matters, any legal

12  matters affecting the company and its business.

13  **Q.**    And can you tell us a little bit about your employment

14  prior to joining Box.

15  **A.**    Sure.  As I mentioned, I was at a public software company

16  for 12 years.  That company was called Informatica.  A little

17  over 12 years.

18      Prior to Informatica -- again, I was in-house.  I was the

19  first corporate counsel, first attorney for a technology

20  company called Omnicell which focused primarily on the

21  healthcare vertical.

22      And prior to my time at Omnicell, I was in two separate

23  law firms, again focused primarily on technology, intellectual

24  property, and some corporate securities work.  And both of

25  those firms were in Palo Alto in Silicon Valley.

MCGOFF - DIRECT / MITCHELL

1   Q.   Let's turn to the litigation at hand with Open Text.

2   A.   Sure.

3   Q.   When did you first learn of Open Text patents?

4   A.   The patents themselves, actually when Open Text filed suit

5   in June of 2013.

6   Q.   So Open Text hadn't notified Box of its patents before

7   that time?

8   A.   No, we had no -- no prior notice.

9   Q.   And were you familiar or had you heard of Open Text prior

10  to receiving the lawsuit?

11  A.   Generally, I was -- I was probably aware of the name.  I

12  definitely was not aware of their claims to be competitive with

13  Box.

14  Q.   And what did you do after learning of the lawsuit?

15  A.   I read the complaint.  I read each -- each of the patents

16  and all of their claims.  And then I engaged outside counsel to

17  help in the defense of the litigation.

18  Q.   That would have been, roughly, around -- shortly after

19  June 2013; is that right?

20  A.   Correct.  It would have been summer of -- early summer

21  2013.

22  Q.   Let's shift gears a little bit.

23       During your time at Box, are you aware of any agreements

24  that Box has entered into involving patents?

25  A.   Yes.  We've entered into a few, uhm -- there were

1  settlement agreements in connection with patent litigation or

2  threatened patent litigation.

3  **Q.**   And can you tell us how the -- not the monetary terms but

4  the -- just the structure, the financial terms of those

5  agreements, how they were structured?

6         **THE COURT:**  Before we do, let me just jump ahead.  Are

7  we all set on those exhibits now?

8         **MR. MITCHELL:**  Yes.  Those have been handed up with to

9  Your Honor, and we've worked it out with the --

10         **THE COURT:**  Mr. Friel?

11         **MR. FRIEL:**  I haven't seen the -- yeah, our team has

12  not seen the revised exhibits.

13         **THE COURT:**  You have not seen them?

14         **MR. FRIEL:**  Correct.

15         **THE COURT:**  Okay.  Can you make that happen, please.

16  Take mine.  Take mine.  You have them?

17         **MR. FRIEL:**  Thank you.

18         **THE COURT:**  Okay.  So let's let Mr. Friel look at

19  those before we get into them.

20         **MR. MITCHELL:**  Sure.

21         **THE COURT:**  Okay.  You can go ahead.

22  **BY MR. MITCHELL**

23  **Q.**   So what I was asking is, can you -- without giving the

24  amount, can you tell us how the financial terms of those

25  agreements were structured?

1   **A.**   Sure.  Each of those were structured as a lump sum

2   payment, or royalty.  So, in other words, Box would make a

3   single payment which would entitle Box to a fully paid-up

4   license and the ability to practice the patents for the

5   remaining life or term of those patents.

6   **Q.**   So by lump sum, the term -- the payment term would cover

7   the life of the patent; is that what I heard you say?

8   **A.**   That's correct.

9   **Q.**   And is this approach to patent licensing consistent with

10  your experience at Informatica?

11  **A.**   It is.  I spent -- you know, not only Informatica, but

12  like I said, I've been practicing for close to 20 years in

13  Silicon Valley, all for technology companies both in-house and

14  outside.  I cannot recall a single instance where I negotiated

15  something other than a lump sum, fully-paid-up license.

16  **Q.**   And would that apply both in competitive scenarios and

17  noncompetitive scenarios?

18  **A.**   So I've negotiated those deals where the company on the

19  other side was both a competitive company, a competitor, as

20  well as a noncompetitive company on the other side.

21  **Q.**   Thank you.

22      I'd like to turn to some of those agreements now.

23          **MR. MITCHELL:**  I want to make sure counsel is okay.

24          **THE COURT:**  All right.  Let's make sure.

25      So you've examined the four exhibits, Mr. Friel.  Any

1   objection?

2              MR. FRIEL:  None.  Thank you.

3              THE COURT:  Okay.  You can go ahead, Counsel.

4              MR. MITCHELL:  And if I may approach, Your Honor?

5              THE COURT:  Yes.

6              THE WITNESS:  Thank you.

7   BY MR. MITCHELL

8   Q.   Mr. McGoff, I've handed you what's been marked in this

9   case as Exhibit 742, Trial Exhibit 742.

10  A.   Yes.

11  Q.   Do you recognize this agreement?

12  A.   I do.  It was a license agreement, settlement agreement

13  with a company called IPMG, also known as Lodsys.

14  Q.   And this was entered in or around January 2013?

15  A.   Correct.

16             MR. MITCHELL:  Request -- move to admit that agreement

17  into evidence, Your Honor.

18             THE COURT:  It's admitted.

19        (Trial Exhibit 742 received in evidence.)

20             MR. MITCHELL:  May I approach, Your Honor?

21             THE COURT:  Sure.

22             MR. MITCHELL:  To make this move a little quickly,

23  I'll do it in a batch this time.

24             THE COURT:  Well, give him the next three.  Okay?

25             MR. MITCHELL:  Okay.

1          **THE WITNESS:**  Thank you.

2     **BY MR. MITCHELL**

3     **Q.**   All right.  I've handed you three documents, Mr. McGoff.

4     I'm going to start with Exhibit -- Trial Exhibit 743.  Do you

5     have that before you?

6     **A.**   I do.

7     **Q.**   Okay.

8          **THE COURT:**  Let me just jump in.  Mr. Friel has no

9     objection, so they're admitted.

10         (Trial Exhibits 743, 744, 745 received in evidence.)

11         **MR. MITCHELL:**  They're admitted?

12         **THE COURT:**  You can go ahead.

13         **MR. MITCHELL:**   Okay.

14    **BY MR. MITCHELL**

15    **Q.**   You recognize this document, sir?

16    **A.**   Yes.  It's a license agreement that was negotiated with a

17    company called Titanide.

18    **Q.**   And this agreement was entered in or around March 2013?

19    **A.**   That's correct.

20    **Q.**   Okay.  And why don't you turn to Exhibit 744, please.

21    **A.**   Okay.

22    **Q.**   Trial Exhibit 744.

23    **A.**   And this was a license agreement that was entered into

24    with Data Speed Technologies.

25    **Q.**   And that one was entered in or around January 2014; is

MCGOFF - DIRECT / MITCHELL

1  that right?

2  **A.**   That's correct.

3  **Q.**   Okay.  And then, finally, let's turn to Trial Exhibit 745,

4  please.

5  **A.**   Okay.  And that was a license agreement entered into, that

6  I negotiated with MacroSolve.

7  **Q.**   And that agreement was entered in or around December or

8  January 2013 time frame; is that right?

9  **A.**   That's correct.

10        **MR. MITCHELL:**  And just to make sure I've got my

11  housekeeping taken care of, move to admit Exhibit 742 through

12  745 into evidence.

13        **THE COURT:**  They're all in.

14        **MR. MITCHELL:**  We're all in.  Good.

15        **THE COURT:**  You're all set, so let's do the questions.

16  **BY MR. MITCHELL**

17  **Q.**   Mr. McGoff, all those agreements that we just discussed

18  were structured as lump sum agreements; is that right?

19  **A.**   That's correct.

20  **Q.**   I just have a couple more questions for you, Mr. McGoff.

21  **A.**   Sure.

22  **Q.**   Do you use Box Edit?

23  **A.**   I do not.  I've -- I downloaded it and used it probably

24  one time, maybe twice.  And I can't recall if that was before

25  or after this litigation was filed.

1  **Q.**   So how do you edit documents then?

2  **A.**   I -- I download the document into its native format.  So,

3  typically, as a lawyer I'm usually using Word.  So I download

4  it into Word.  I have the features of Word, and then I save it

5  up as a new version.

6            **MR. MITCHELL:**  Nothing further, Your Honor.

7            **THE COURT:**  Okay.  Mr. Friel.

8                      <u>**CROSS-EXAMINATION**</u>

9  **BY MR. FRIEL**

10  **Q.**   Good afternoon, Mr. McGoff.

11  **A.**   Good afternoon.

12  **Q.**   So each of these four licenses that Box signed, you're

13  offering them to show that Box has a predilection or desire to

14  have lump sum licenses; is that right?

15  **A.**   I think what we were showing is I've -- I've negotiated

16  four agreements while I've been at Box, and every one of them

17  included -- all of them were structured as a lump sum agreement

18  similar to all the agreements I negotiated in the past.

19  **Q.**   Sure.  And that's as opposed to a running royalty where

20  it's paid as you go?

21  **A.**   Correct.

22  **Q.**   All right.  And -- well, cut to the chase, does Box have a

23  preference for lump sum licenses?

24  **A.**   Yeah, most -- all the companies that I've worked for, the

25  preference would be a lump sum license.

MCGOFF - CROSS / FRIEL

1   **Q.**   And all the four licenses that you offered are with

2   nonpracticing entities; right?

3   **A.**   It's a pejorative term.  I would imagine it's they're

4   all -- would be considered nonpracticing entities.  They're

5   noncompetitive with Box.  They're companies that don't practice

6   the patents that they asserted against us.

7   **Q.**   Okay.  Thank you.

8        Is it true that the -- well, let me ask you this:  You're

9   a lawyer.  You went to law school here in California; right?

10  **A.**   Yes, sir.

11  **Q.**   All right.  And you studied at the London School of

12  Economics on your graduation from law school in California;

13  correct?

14  **A.**   I did a master of civil law in intellectual property from

15  the London School of Economics.

16  **Q.**   All right.  And you got that master's degree in 1996;

17  correct?

18  **A.**   Correct.

19  **Q.**   And one of the primary areas of study at the London school

20  is patents; correct?

21  **A.**   Uhm, I'm not aware that one of the primary studies -- are

22  you referring to my studies at LSE or --

23  **Q.**   I'm talking about the IP offerings at the London School.

24  So you have patents, trademarks, and copyrights; right?

25  **A.**   Correct.

MCGOFF - CROSS / FRIEL

1   **Q.**   Those are usually thought of as the main three areas in

2   intellectual property?

3   **A.**   Correct.

4   **Q.**   And that's --

5   **A.**   And trade secrets as well.

6   **Q.**   Okay.  And you studied those areas, correct?

7   **A.**   I studied -- I'm not sure I took a specific course of

8   patents while I was there, but it was an offering.

9   **Q.**   All right.  Now, if a patent is expired, there's no option

10  to do a running royalty for it; is that correct?

11  **A.**   Uhm, I would imagine there's -- there's not for a running

12  royalty.

13  **Q.**   Okay.  And are you aware that the patents that were

14  licensed to your company by Data Speed had already expired by

15  the time the license was signed?

16  **A.**   I think -- I'm not sure with Data Speed whether they had

17  multiple patents, but it could be the case.

18  **Q.**   Well, all the patents that were the subject of the license

19  were from the same family.  Certainly you remember that; right?

20  **A.**   I do, yes.

21  **Q.**   And in your studies as an intellectual property lawyer, a

22  lawyer specializing in intellectual property, you understand

23  that in the United States the patents came -- claim a common

24  priority date, and typically they expire the same date; right?

25  **A.**   I'm not sure I was aware of that from my days at LSE.  As

1   I mentioned, I'm not sure I took a specific patent course.

2   **Q.**   Okay.  Are you aware of that today?

3   **A.**   I am aware of that today.

4   **Q.**   Okay.  And then -- I don't want to waste a lot of time on

5   it, but you would concede that if all of the Data Speed patents

6   that were the subject of the license have the same priority

7   date, then they've expired; correct?

8   **A.**   I'd agree with that.

9   **Q.**   And they expired as of the date you signed the license?

10  **A.**   Could you say that again?  Could you repeat that?

11  **Q.**   Each of the Data Speed patents had already expired by the

12  time you signed the license on behalf of Box?

13  **A.**   As I sit here right now, I don't know if that's the case,

14  Mr. Friel, but it may be the case.

15  **Q.**   All right.  So the IPMG license, why don't we chat about

16  that for a little bit.  That's the one you also said is Lodsys

17  or Lodsys?

18  **A.**   Correct.

19  **Q.**   And that license covers four patents that were owned by

20  Lodsys; right?

21  **A.**   That's correct.

22  **Q.**   And Lodsys is also a nonpracticing entity; correct?

23  **A.**   I believe they are a nonpracticing entity; although, I

24  kind of thought they had a product early on in their existence.

25  But at the time we were talking to them, I do not think that

1    they were practicing the patents.

2    **Q.**   At the time you signed the IPMG-Lodsys patent license

3    agreement, were you aware that all four of the patents had

4    expired?

5    **A.**   I think they were -- when they were negotiated, I think

6    they expired right around the time we were negotiating the

7    license agreement.  But the amount was pretty small, so our

8    focus was just getting -- getting a settlement in place so we

9    didn't have any prior damages as well.

10   **Q.**   So running royalty was not an option for the IPMG-Lodsys

11   license; correct?

12   **A.**   It's never been an option with -- with patent licenses

13   that I've negotiated over the last 19 years.

14   **Q.**   Okay.  That wasn't what I asked.

15        I said, it wasn't an option for the Lodsys IPMG license;

16   correct?

17   **A.**   Yes, I never explored doing any kind of running royalty on

18   any of the four we mentioned.

19             **MR. FRIEL:**  Thank you very much.  Pass the witness.

20             **THE COURT:**  Okay.  Very briefly.

21             **MR. MITCHELL:**  Nothing further, Your Honor.

22             **THE COURT:**  All right.  You are excused.  Thank you.

23             **THE WITNESS:**  Thank you, Your Honor.

24        (Witness excused.)

25             **THE COURT:**  All right.  Who's next?

1          **MR. MITCHELL:**  Your Honor, we have a couple of brief

2    video clips that we're going to play from Open Text witnesses.

3    First Raja Hawa and then John Kaarid.

4          **THE COURT:**  All right.

5                          **RAJA HAWA**,

6    called as a witness for the Defendants, appeared and testified

7    via videotaped deposition testimony.

8         (Time: 1:10 to 1:19 p.m.)

9                        **JOHN KAARID**,

10   called as a witness for the Defendants, appeared and testified

11   via videotaped deposition testimony.

12        (Time: 1:19 to 1:22 p.m.)

13         **THE COURT:**  Okay.

14         **MR. HERRING:**  Defendants call Jeff Mannie.

15         **THE COURT:**  All right.

16         **MR. HERRING:**  Just some housekeeping.  I would like to

17   move Trial Exhibit 2150 into evidence, that was just shown

18   during the Hawa deposition testimony.

19         **THE COURT:**  Any objection?

20         **MR. FRIEL:**  None, Your Honor.

21         **THE COURT:**  All right.  Was there a 1200 mentioned?

22         **MR. MITCHELL:**  It's not on the Trial Exhibit list,

23   Your Honor.  It was from the deposition, so.

24         **THE COURT:**  Oh, okay.  Thank you.

25        (Trial Exhibit 2150 received in evidence.)

MANNIE - DIRECT / HERRING

1          THE CLERK:  Mr. Mannie, if you will please stand and

2     raise your right hand.

3                    **JEFFREY MANNIE**,

4     called as a witness for the Defendants, having been duly sworn,

5     testified as follows:

6          THE WITNESS:  I do.

7          THE CLERK:  Please be seated.  Please state your full

8     name for the Court and spell your last name.

9          THE WITNESS:  Jeffrey Richard Mannie.  M-a-n-n-i-e.

10         THE CLERK:  Thank you.

11                    **DIRECT EXAMINATION**

12    BY MR. HERRING

13    **Q.**   Good afternoon, Mr. Mannie.

14         Where do you work, sir?

15    **A.**   I work at Box.

16    **Q.**   And what's your title there?

17    **A.**   I am the VP controller and chief accounting officer.

18    **Q.**   Okay.  Before we jump into the substance of your testimony

19    today, can you tell the jury just a little bit about where

20    you're from and where you went to school?

21    **A.**   Absolutely, yeah.

22         I grew up in Santa Rosa.  My family has been there about

23    four generations up in Sonoma County.  I left there to go to

24    school.  I was the first one to go to school, and went to UC

25    Santa Barbara.

1   And while at UC Santa Barbara, my dad wanted me to be an

2   engineer.  But I actually had a passion for business so I went

3   ahead and got a business economics degree with an emphasis in

4   accounting, and went on to get my CPA working for Arthur Young

5   at the time, one of the Big Eight accounting firms.

6   And I worked for Arthur Young about four years, and then

7   left there to go to a client for a short period of time, a

8   small startup alternative energy company.  Spent a short period

9   of time there and went back to work with a partner that I had

10  worked with at Arthur Young for a long time, Comerica Bank.

11  And I was the controller for Comerica Bank California for about

12  five years.

13  From there, I wanted to get into technology, so I did a

14  short stint on consulting at Mac Store, and then went to

15  Integrated Device Technology, which is a semiconductor company

16  here in the Valley.  I spent just under ten years with them as

17  their global controller.

18  And after that I went to PayPal and spent a little over

19  six years as the global controller for PayPal.

20  And then after leaving PayPal, went to Box.  And I've been

21  at Box for about two years now.

22  **Q.**   Great.  And what are your job responsibilities at Box?

23  **A.**   So as the chief accounting officer and controller, my

24  first and most important responsibility is the integrity of our

25  financial statements.  And so my job is really to ensure that

MANNIE - DIRECT / HERRING

 1  the financial statements we report and file with the SEC are

 2  accurate and complete and with integrity.

 3      And in order to do that, I have a number of different

 4  functions that report in to me.  First and foremost, I have a

 5  technical accounting team.  And that team is responsible for

 6  ensuring all the research of our accounting is in accordance

 7  with GAAP, and that our financial statements are in accordance

 8  with GAAP.  And they also work with the auditors to ensure that

 9  our audit is complete and successful.

10      I've got a revenue operations team who's responsible for

11  processing all of our customer orders and then making sure that

12  those get reported and recorded with revenue correctly.  We

13  also do cash collections in that team in billing support.

14      I've got a systems team who is responsible for all the

15  financial accounting systems that we use to record our

16  transactions and make sure that those get reported correctly.

17      I've got an international controller team who really runs

18  a controllership function for our -- function for our

19  international operations.

20      And then I've got a shared services team as well who does

21  things -- all the general ledger accounting and things like

22  paying the bills and recording our fixed assets and things of

23  that nature.

24      And, lastly, I have the equity and the payroll function as

25  well for our equity accounting and equity management for our

**MANNIE - DIRECT / HERRING**

1  employees and making sure that our employees get paid.

2  **Q.**   Is tracking finances at Box -- is it important for that to

3  be accurate?

4  **A.**   Absolutely.

5  **Q.**   And are part of your responsibilities there, do they

6  relate to the development costs at Box, tracking those?

7  **A.**   Yeah.  So in our external financial statements we'll have

8  one financial statement that's referred to as an income

9  statement.  And there's different sections to a standard GAAP

10  income statement, and one of those is operating expenses.  And

11  then one of the standard lines within operating expenses is

12  research and development.  And so that is one of the lines that

13  my team tracks and reports.

14  **Q.**   Okay.  Are you aware of a Box feature called Box Edit?

15  **A.**   I am.

16  **Q.**   And are you familiar, generally, with how Box Edit was

17  developed?

18  **A.**   Yes.

19  **Q.**   And how was that?

20  **A.**   It was developed using outside resources.

21  **Q.**   Is that called outsourcing?

22  **A.**   Outsourcing, correct.

23  **Q.**   What was the name of the company that the development was

24  outsourced to?

25  **A.**   Globin.

1  **Q.**   Do you know where Globin is located?

2  **A.**   I believe they are a South American company.

3  **Q.**   For the purposes of this case, did you look into the costs

4  of the development for Box Edit?

5  **A.**   I did.

6  **Q.**   Okay.  What did you do in that regard?

7  **A.**   So we went through and added up the invoices for the

8  period of time that Globin Services was providing the work in

9  connection with Box Edit and then reported that.

10 **Q.**   And what was that number?

11 **A.**   Approximately $250,000.

12 **Q.**   And who did you communicate that number to?

13 **A.**   That went to Greg, the financial expert -- or the damages

14 expert.

15 **Q.**   Greg Leonard?

16 **A.**   Yes, Greg Leonard.

17     **MR. HERRING:**  Pass the witness.

18     **MR. STACY:**  No questions, Your Honor.

19     **THE COURT:**  Okay.  Any questions from the jury?  No?

20  All right.  Mr. Mannie, thank you.

21   (Witness excused.)

22     **THE COURT:**  Next.

23     **MR. MITCHELL:**  Defendants call Dr. Gregory Leonard.

24     **THE COURT:**  All right.

25     **THE CLERK:**  Mr. Leonard, if you would please stand.

1    Dr. Leonard, raise your right hand.

2                      **GREGORY LEONARD**,

3    called as a witness for the Defendants, having been duly sworn,

4    testified as follows:

5              **THE WITNESS:**  I do.

6              **THE CLERK:**  Please be seated.  Please state your full

7    name for the Court and spell your last name.

8              **THE WITNESS:**  Sure.  It's Gregory Leonard,

9    L-e-o-n-a-r-d.

10             **THE CLERK:**  Thank you.

11                    **DIRECT EXAMINATION**

12   **BY MR. MITCHELL**

13   **Q.**   Good afternoon, Dr. Leonard.

14   **A.**   Good afternoon.

15   **Q.**   Dr. Leonard, you prepared some slides to help with your

16   testimony today?

17   **A.**   I did, yes.

18             **MR. MITCHELL:**  Why don't we go ahead and pull up

19   slide 2 from Dr. Leonard's slides, Beau.

20        (Document displayed)

21   **BY MR. MITCHELL**

22   **Q.**   I was going to use this to let you introduce yourself.

23   **A.**   Sure.

24   **Q.**   What does this slide show here?

25   **A.**   Oh, it just summarizes my professional experience.

1   Q.   And so you're a partner at Edgeworth Economics?

2   A.   Yes.

3   Q.   Okay.  And this describes your educational background a

4   little bit too?

5   A.   It does, yes.

6   Q.   Okay.  And why don't you walk the jury through what

7   your -- your educational background.

8   A.   Sure.  So as an undergraduate at Brown University, I got

9   what is, in effect, a bachelor of science degree in applied

10  mathematics in economics.  It's called Sc.B for some reason

11  that I'm still not clear on.

12       From there I went to MIT, Massachusetts Institute of

13  Technology, where I got a Ph.D. in economics.

14  Q.   And what I'd like to do now is turn to your actual

15  curriculum vitae, which is Trial Exhibit 335.

16       MR. MITCHELL:  I don't know if there's any objection

17  to it, but we can go ahead and just publish it for the Court

18  and the witness, if that's okay?

19       How about I approach and hand one to the --

20       THE COURT:  Yes.

21  BY MR. MITCHELL

22  Q.   Do you recognize that, Dr. Leonard?

23  A.   I do, yes.

24  Q.   Okay.  And what is it?

25  A.   It's my curriculum vitae.

1          **MR. MITCHELL:**  Move to admit.

2          **THE COURT:**  Any objection?

3          **MR. STACY:**  No objection.

4          **THE COURT:**  Admitted.

5          (Trial Exhibit 335 received in evidence.)

6          (Document displayed)

7  **BY MR. MITCHELL**

8  **Q.**   All right.  So we talked about your educational background

9  a little bit.  Let me ask you this before we jump into some of

10 these things here.

11         Do you consider yourself to have any particular expertise?

12 **A.**   Well, my research specialties in economics are -- first of

13 all, it's called macroeconomics or applied macroeconomics,

14 which is the study of how consumers behave and how companies

15 behave in the marketplace; and then, secondly, econometrics,

16 which is the application of statistical methods to economics

17 data.

18 **Q.**   All right.  And page 2 of your curriculum vitae talks

19 about some teaching experience that you've had.

20         You were an assistant professor at Columbia University; is

21 that right?

22 **A.**   Yeah, that was my first job after getting my Ph.D. at

23 Columbia.  And I taught labor economics to undergraduates, and

24 then statistics and econometrics to the graduate students

25 there.

**LEONARD - DIRECT / MITCHELL**

1  **Q.**   And you've published a number of articles relating to

2  economics and patent damage; is that right?

3  **A.**   Yes, I've published over 60 articles in scholarly journals

4  and professional journals.

5  **Q.**   Okay.  And those are highlighted, I think, at pages 3

6  through 7 of your CV.  But some of them are also at page 1 of

7  your CV.  And I was just going to ask you if you could tell us

8  a little bit about a couple of them.

9       So one of them was for *The Columbia Science and Technology*

10 *Law Review*.  Can you tell us a little bit about that

11 publication?

12 **A.**   Yeah.  That actually specifically addressed an issue in

13 the area of patent damages.  In particular, you know, a lot of

14 products have a lot of features and a lot of technologies in

15 them and often, in a case such as this one, you're asked to

16 identify the value of just one of those features in a product

17 that has many features.  And that's a difficult problem that's

18 called apportionment.  And so the paper discusses aspects of

19 apportionment.

20 **Q.**   Any other articles or publications that might be useful to

21 describe for the jury here?

22 **A.**   Uhm, well, there's one I particularly am proud of, I

23 guess, which is in *The Journal of Econometrics*.  And it talked

24 about econometric methods for analyzing the value of patents

25 that can be used in licensing negotiations or -- in cases like

1    this.  Or if a company was trying to value its own assets,

2    patent assets, it could use those methods.

3    **Q.**  And you've been invited to speak at the FTC before?

4    **A.**  Yes.

5    **Q.**  And tell the jury a little bit about what the FTC is.

6    **A.**  Sure.  The FTC is -- it stands for the Federal Trade

7    Commission.  It's one of the two U.S. federal government

8    agencies that deals with the antitrust issues.  They also have

9    some responsibility for consumer protection as well, so you may

10   have heard of them in that realm.

11   **Q.**  And were you invited to speak on the issue of patent

12   damages before the Federal Trade Commission?

13   **A.**  Yes.  So one of the things they're concerned about is how

14   the patent laws and the way damages are calculated in cases

15   like this could affect innovation and competition since

16   innovation and competition is part of their purview there.

17       And so they held hearings in 2009, and they invited

18   various people who worked in the area to come and give their

19   views on what things are done right and what things are done

20   wrong in the system.  And I was part of that.

21       And then in 2011, the FTC issued a report with their own

22   views on things, and they ended up citing my work pretty

23   extensively in that report.

24   **Q.**  And I see on here, in 2005 it looks like you served as a

25   consultant, was tasked by Congress and the President.  Can you

1    tell us a little bit about that?

2    **A.**    Sure.   That was called the Antitrust Modernization

3    Commission, and it was a group of economists and lawyers who

4    were -- it was set up by the Congress, I guess, and the

5    President as well, to figure out ways to try to modernize the

6    antitrust laws in the United States.

7        And so that group then asked me to -- as well as a bunch

8    of other people, to again, kind of, give their views on a

9    particular topic.

10       And I ended up coauthoring a report that was submitted to

11   the Commission, and I testified before the Commission.   And,

12   you know, again, I think our work, as I recall, was recited in

13   the Commission's ultimate report.

14   **Q.**    And you've also been cited by the Federal Circuit Court of

15   Appeals; is that right?

16   **A.**    Yes.   The Federal Circuit is the appeals court that deals

17   with patent issues.   So there was a case in which the Federal

18   Circuit had deemed that a particular method some people had

19   used to try to calculate damages in cases like this, they

20   deemed that method to be unreliable and then, in an opinion,

21   they cited one of the articles that I had written that

22   addressed that issue.

23   **Q.**    And what was the specific method of damages that the

24   Federal Circuit was addressing in that case?

25   **A.**    It was called the 25 Percent Rule.   And it basically

1    involved -- you take the profit of a product and you'd say it

2    was covered by a patent and you'd say, well, 25 percent of that

3    profit should be the appropriate royalty.

4         And, you know, that was -- it was, sort of, a

5    one-size-fits-all methodology that couldn't possibly tell the

6    difference between a patent that was truly valuable and one

7    that was a lot less valuable.  And it certainly didn't work

8    well in a situation, you know, like a smartphone where you've

9    got thousands of patents covering it.  They all can't get

10   25 percent of the profit or you quickly exhaust the profit.

11   **Q.**   And what sort of work did the Federal Circuit Court of

12   Appeals cite from you?

13   **A.**   It was a chapter I had written on the appropriate way to

14   calculate damages.

15   **Q.**   We've talked a little bit about your current work.  I want

16   you to walk us through a little bit about -- and we talked,

17   kind of, where you started teaching, too.

18        Take us through a little bit of your experience before

19   Edgeworth Economics.

20   **A.**   Sure.  So after I was at Columbia, I went into economic

21   consulting, which is providing economic analysis for clients.

22   I joined a consulting firm, where I was for about probably 14

23   years.  And then I switched to another consulting firm.  And

24   then ultimately, again, switched to Edgeworth Economics, where

25   I am now.

1          **MR. MITCHELL:**  And we can go ahead and put slide 2

2     back up, Beau.

3          (Document displayed)

4     **BY MR. MITCHELL**

5     **Q.**   You've worked as an expert on cases involving patent

6     royalties before; right?

7     **A.**   Yes, I have.

8     **Q.**   And approximately how many cases have you been involved

9     with involving the issue of patent damages?

10    **A.**   It's probably over -- or maybe around 30 cases.

11    **Q.**   And you've given testimony at trial before on those

12    issues?

13    **A.**   Yes, I have.

14    **Q.**   Approximately how many cases?

15    **A.**   Uhm, well, I've testified at trial maybe 25 times.  And of

16    those, I don't know, maybe ten involved patents.

17    **Q.**   And then how many cases have you served as an expert

18    witness overall?

19    **A.**   Probably over 50.

20    **Q.**   Okay.  And so some of those may be patent cases.  What are

21    the other kinds of cases on which you've worked?

22    **A.**   Well, antitrust is another area I do a lot of work in.

23    I've done a little work in environmental economics cases.  And

24    some statistical issues have arisen, as well, in various

25    litigation.

**LEONARD - DIRECT / MITCHELL**

1   **Q.**   And you've worked as an expert on behalf of defendants in

2   patent lawsuits before?

3   **A.**   Yes.

4   **Q.**   And you've also worked as a damages expert on behalf of

5   patent holders, or owners, before too; right?

6   **A.**   Yes, I have.

7   **Q.**   And you're being paid for your work in this case; right?

8   **A.**   I am.

9   **Q.**   And how are you being compensated?

10  **A.**   On an hourly basis for the time that I put in.

11  **Q.**   Does your compensation depend at all on the outcome of

12  this case?

13  **A.**   Not at all, no.

14  **Q.**   You've worked with my law firm, Reed Smith, before; right?

15  **A.**   I have, yes.

16  **Q.**   And you've also worked with the Cooley law firm who's

17  representing Open Text in this case before; right?

18  **A.**   I have, yes.

19  **Q.**   Let me ask you this:  Before arriving at your opinions in

20  this case, did you seek either Box or Carahsoft's approval for

21  your opinions?

22  **A.**   No.

23  **Q.**   Do you believe you can assist the jury in understanding

24  the damages issues at stake here?

25  **A.**   I do.  I mean, they are complex issues, and what I'm

LEONARD - DIRECT / MITCHELL

1    hoping to do here is to provide some analysis that will help

2    the jury sort things out.

3            **MR. MITCHELL:**  Your Honor, at this time I'd like to

4    tender Dr. Gregory Leonard as an expert in economics and patent

5    damages in this case.

6            **MR. STACY:**  No objection.

7            **THE COURT:**  The witness is qualified.

8    BY MR. MITCHELL

9    **Q.**   Dr. Leonard, thank you for giving us that background.

10           Now let's turn to this case a little bit more.  Tell us

11   what your role is in this case.

12   **A.**   My role is to analyze, ultimately, really, the value of

13   the patented technology that's been asserted; and, in

14   particular, how Box has allegedly used that technology, the

15   value of that use; and, from there, to calculate what the

16   appropriate royalty is for Box's use of the technology.  And

17   that really is what would be Open Text's damages in the case.

18   **Q.**   And did you make any assumptions before reaching your

19   opinions?

20   **A.**   Yeah.  I mean, as part of my analysis I assumed that the

21   patents had -- were found to be valid and infringed.  So, as I

22   understand the law, if the patents are either not valid or not

23   infringed, you never get to the question of damages.  The

24   inquiry, kind of, ends there.

25           So it wouldn't make any sense for me to be up here talking

1   to you unless the patents had already been found to be valid

2   and infringed.  So I make that assumption even though, you

3   know, I understand, of course, Box is contesting those issues.

4   **Q.**   So just to make sure we've got full clarity here, is it

5   your opinion that the patents are, in fact, valid and

6   infringed?

7   **A.**   I really have no opinion.  That's a technical point.

8          **THE COURT:**  All right.  We're going to take a short,

9   five-minute break.

10          **THE CLERK:**  All rise for the jury.

11       (Recess for the jury 1:44 to 1:49 p.m.)

12       (Pause)

13          **THE COURT:**  Okay.

14          **MR. MITCHELL:**  Your Honor, I neglected to give

15   Dr. Leonard the slides he prepared.  Do you mind if I approach

16   to hand them to him?

17          **THE COURT:**  That's fine.

18   **BY MR. MITCHELL**

19   **Q.**   Dr. Leonard, I want to go back and just revisit a couple

20   things briefly.

21       I asked you about assumptions you made before reaching

22   your opinions.  Can you describe those for me, just once more,

23   to make sure we're all on the same page?

24   **A.**   Sure.  Just the main assumption is the patents are

25   actually valid and infringed.  I know that has yet to be

1  determined, but without that assumption, there are no damages

2  so there wouldn't be much point in my doing anything without

3  that assumption.

4  **Q.**    Okay.  So why do you make that assumption in a patent

5  damages case like this?

6  **A.**    Well, because we're doing it all at once.

7          Essentially, if you did it in parts, you could first

8  decide whether the patents are valid and infringed, and then I

9  could do my part.  But since we're doing it all at once, in one

10 big trial, my understanding is I just make that assumption.

11         The jury never gets to my part of it if they decide the

12 patents aren't valid or infringed.

13 **Q.**    Thank you.

14         And then, just to be clear here, is it your opinion that

15 the patents are, in fact, valid and infringed?

16 **A.**    No.  I've made no assessment of that because I'm not a

17 technical expert.

18 **Q.**    All right.  Can you tell us what it means to determine the

19 value of a patent?

20 **A.**    Sure.  So let me preface it by saying that economic

21 research has shown that patents vary widely in their -- their

22 value.  And, typically, what you see is that there are a few

23 patents that are worth a lot because they do something that's

24 really important.

25         And there are a lot of patents that aren't worth very much

 1    either because they don't do something very important or

 2    because there are a lot of alternative ways to do the same

 3    thing.

 4         So in a case like this, we're interested in, you know, the

 5    amount of royalty that Box should pay as damages should really

 6    reflect the value of the use of the patents that Box allegedly

 7    has done.

 8         And in doing that, we've got to figure out are the patents

 9    the type that, you know, are, sort of, a minor thing, that are

10    adding a little bit but not a heck of a lot, or are they one of

11    these few patents that are really super star patents.  But

12    that's really, in a broad view, what we're trying to do here.

13    **Q.**   And did you use any particular economic analysis in making

14    your determination of your opinions in this case?

15    **A.**   Well, there's a framework, I guess you can call it, that's

16    been laid out -- or that was laid out by -- in a court case

17    quite a while ago now called the *Georgia-Pacific* case.

18         And what they did in that case is to identify 15 factors

19    or things that you can look at to help you decide how much a

20    patent is worth and what the right reasonable royalty should

21    be.

22         And some of those factors might apply in a given case,

23    some might not, but it gives you at least a framework or a list

24    of things to think about.

25         **MR. MITCHELL:**  And, Beau, why don't we go ahead and

 1    pull up slide 3, please.

 2            (Document displayed)

 3    **BY MR. MITCHELL**

 4    **Q.**    You mentioned the Georgia-Pacific factors.   Is that what

 5    we're looking at here?

 6    **A.**    Yes, these are the 15 factors.

 7    **Q.**    And can you give us a little context for what these mean

 8    in evaluating patent damages?

 9    **A.**    Again, they are 15 things that you might want to look at

10    that could be helpful to help you figure out how much a patent

11    is worth.

12    **Q.**    And one of the factors, Factor 15, talks about the

13    hypothetical negotiation between the licensor and the licensee.

14    Can you help explain what that construct is in evaluating

15    patent damages?

16    **A.**    Yeah.   As an economist, this is the one I think is the

17    most important.   And in a certain sense, it in a way

18    encompasses most of the other factors as well.

19            So the idea here is, if we're trying to figure out what an

20    appropriate royalty would be, we go back to the time that the

21    alleged infringement first began and try to re-create a

22    negotiation between these parties and figure out what kind of

23    agreement they would have come to.

24            If by doing that -- if we do that right, then we're going

25    to end up with a royalty that makes a lot of sense, that

1   appropriately values the patent, and it mimics a market

2   transaction that would have occurred between the parties had

3   they ended up negotiating at that time.

4   Q.   And who are the parties to the hypothetical negotiation in

5   this case?

6   A.   Well, Box would be the -- what's called the licensee or

7   the person who would be -- or the entity that would be

8   negotiating to try to get a license to the patents.   And

9   Open Text S.A, who I understand is the owner of the patents,

10  would be the entity that was called the licensor.   And they

11  would be, of course, negotiating to give a license to the

12  patents in return for a royalty.

13  Q.   And while we're here, with respect to Open Text, we just

14  heard some testimony about nonpracticing entities.

15       Have you seen or heard any evidence in this case that

16  Open Text is practicing the patents it's asserting in this

17  litigation?

18  A.   I have heard no evidence of that at all.   They seem to not

19  be practicing the patents.

20  Q.   I just want to make sure I got this.   What time were the

21  hypothetical -- what was the date of the hypothetical

22  negotiation that you determined in this case?

23  A.   It would be March 2012, which is when the alleged

24  infringement began.

25  Q.   And turning back to the Georgia-Pacific factors, in some

1   cases are certain factors more relevant than others?

2   **A.**    Yes.   Yeah, absolutely.

3   **Q.**    And which Georgia-Pacific factors, if any, did you find

4   particularly relevant for this case?

5   **A.**    Well, in addition to number 15, which is the framework of

6   the hypothetical negotiation, to me, the other really useful

7   ones are -- for this case are 9, 10, and 11.

8       So 9, 10, and 11, there are a lot of words there, but what

9   it really boils down to is what did these patents bring to Box

10  that Box could not have achieved through some other method,

11  okay, through some other way.

12      And to an economist, you know, what determines the value

13  of something is whether there are alternatives to that

14  something.

15      So something is really valuable when it's unique, when it

16  brings something that there's no other way to get at it.   So

17  that's going to be an important issue to look at, in my view,

18  in this case.

19  **Q.**    And why don't we turn to slide 4, and maybe you can help

20  illustrate that construct.

21      (Document displayed)

22  **A.**    Sure.   So this is trying to illustrate this point of, when

23  you have alternatives, nobody can hold you over a barrel.   And

24  that's really what it comes down to, so.   And I've tried to

25  make it a driving analogy here that we're probably all familiar

1  with.

2      So you can think of Box, in March 2012, of being at a fork

3  at the road.  On the one hand, it could take the right-hand

4  fork, which would be to use Open Text patents, the patents at

5  issue in this case, and design its product and implement its

6  product using that technology.  Or it could take the right-hand

7  fork in the road, which is to implement some other alternative

8  approach.

9      And for the moment let's assume that both forks in the

10  road would take the same amount of time to drive; they're the

11  same distance so the gas cost would be the same; the views are

12  equally nice.  So in some sense Box would have no particular

13  preexisting preference about which way to go, right or left.

14      So in that kind of situation, if Open Text tried to charge

15  a huge amount of money, if they came in and said, Box, you

16  know, we want you to pay some large royalty, Box would say, I

17  don't need to pay that royalty; I can achieve the same outcome

18  taking the right-hand side of the road, taking this

19  non-infringing alternative.

20      And in that sense, if Open Text was rational about it,

21  they would say, well, you know what, that is actually true.

22  And then that would limit the amount that Open Text would even

23  seek.  And eventually the parties would reach a reasonable

24  outcome based on negotiation.

25  Q.  And just so we all stay on the same page, because I might

1    have heard a couple of right-hand roads there --

2    **A.**    Oops, sorry.

3    **Q.**    Yeah.

4        -- the bottom of the slide, which I think is the

5    right-hand path -- right?

6    **A.**    Right.

7    **Q.**    -- that's the noninfringing alternative path?

8    **A.**    Correct.

9    **Q.**    And the upper portion of the slide, or the left-hand fork

10   in the road, would be the path that -- if Box was to take a

11   license to Open Text patents; is that right?

12   **A.**    Right.  And you only want to take a license to a

13   technology, you know, if ultimately it's going to make you

14   better off to do so.  And that means a royalty can't be so

15   large that it completely exhausts the value, relative to

16   turning to an alternative that you could have done instead.

17       And you see this exact kind of thing arises in real

18   patent-licensing negotiations.  Companies who are thinking

19   about licensing technology are always thinking about what else

20   could they do to avoid having to pay a royalty.

21       If they have good alternatives, that's going to mean

22   they're not going to be willing to pay very much.

23   **Q.**    Now, before we jump into the details of your opinions, can

24   you briefly describe what information you considered in

25   formulating those opinions?

1    **A.**    Yes.   I reviewed the -- what's often called the record in

2    the case, which are all the business documents that were

3    produced by the parties.   I reviewed the deposition transcripts

4    of business personnel.

5        I talked to certain people at Box to get information.   And

6    I also reviewed third-party materials such as market analyst

7    reports.

8    **Q.**    And you spoke with Mr. Ghods; is that right?

9    **A.**    Yeah, he's one of the Box personnel that I spoke with.

10   **Q.**    And you also spoke with Mr. Mannie?

11   **A.**    Yes.

12   **Q.**    And you also had conversations with Dr. Jagannathan; is

13   that right?

14   **A.**    I did, yes.

15   **Q.**    Now, you've also attended the trial this past week; is

16   that correct?

17   **A.**    I have, yes, I have.

18   **Q.**    And you've heard all the testimony that's come in in this

19   case; right?

20   **A.**    Yes, I've been here for that.

21   **Q.**    Let's turn -- well, let's do it this way.   Tell us,

22   ultimately, what your opinion is in this case concerning the

23   value of the patents that Open Text is asserting.

24   **A.**    Well, overall, my view is, having examined the

25   noninfringing alternatives that Box had, that those were so

1    attractive that Open Text really wouldn't have been able to

2    demand a very high royalty in the hypothetical negotiation.

3        And, ultimately, my conclusion is that the appropriate

4    royalty, and thus the appropriate damages in the case, would be

5    a lump sum payment of $250,000.

6        MR. MITCHELL:  And why don't we turn to slide 5.

7    BY MR. MITCHELL

8    Q.  And just walk us through these bullets here and how this

9    influences your opinion.

10   A.  Yeah.  So, again, the first thing is that Box had not just

11   one but they had several very attractive noninfringing

12   alternatives that really would have allowed them to have the

13   same offering and reach the same business success that they

14   have but just not using the Open Text asserted patents.

15       So what that means is, again, Box wouldn't have been

16   willing to pay much to get a license to those patents.  And as

17   an important part of that, obviously it has to be the case that

18   each alternative was available and technically possible.  And

19   we've heard testimony that that was, in fact, the case.  And

20   that using one of those alternatives really wouldn't have

21   affected the user experience very much.  You know, that's -- we

22   also heard testimony about that.

23       And so really then what it comes down to is if my

24   alternative wouldn't really have an effect on users and,

25   therefore, demand for the Box product, it really comes down to

1    would doing one of those alternatives cost Box more money?

2        And to the extent it would cost more money, then taking a

3    license to the Open Text patents would allow them to avoid

4    those costs.  And that's really then what I focused on is the

5    cost avoidance that Box could have achieved by taking the

6    license.  And that's really what determines the amount they

7    would have been willing to pay.  Otherwise, they would pay the

8    cost of doing the non-infringing alternatives and be on their

9    way.

10   **Q.**   Okay.  Let's jump into --

11              **THE COURT:**  That's going to be it for today.

12        All right.  Ladies and gentlemen, see you at 8:30 tomorrow

13   morning.

14              **THE CLERK:**  All rise for the jury.

15        (Jury out at 2:03 p.m.)

16              **THE COURT:**  Okay.  What's our schedule?

17              **MR. MITCHELL:**  I think Dr. Leonard is our last

18   witness; right?

19              **MR. BOVICH:**  That's correct, yes.

20              **THE COURT:**  All right.

21              **MR. FRIEL:**  So confirming you won't be calling

22   Mr. Loomis?

23              **MR. MITCHELL:**  That's right.

24              **MR. FRIEL:**  Great.  And then we'll be recalling

25   Dr. Mayer-Patel.  And we probably will be recalling Mr. Carter.

PROCEEDINGS

```
 1        But we may ask the Court for a ruling that the witness has

 2   just opened the door on Tempo Box by stating that Open Text

 3   S.A. is a nonpracticing entity.  It's clearly not the case.  We

 4   have evidence to prove that.

 5             THE COURT:  All right.  Let's just focus on the

 6   schedule for right now.

 7        So you've got how long with Dr. Leonard tomorrow?

 8             MR. MITCHELL:  Probably another 45 minutes or so, Your

 9   Honor.

10             THE COURT:  All right.  So half an hour on cross,

11   Mr. Friel?  And Mr. Stacy?

12             MR. STACY:  At most.

13             THE COURT:  All right.  And defendant is going to

14   rest.  And then you have two folks you're going to call.

15        So we should be done by, maybe, noon tomorrow with

16   witnesses, uhm?

17             MR. FRIEL:  I think that's it.  Depending on cross of

18   Dr. Mayer-Patel, that's probably --

19             THE COURT:  It will be short.  Okay.  So both parties

20   will rest tomorrow.

21        All right.  So then we will probably -- let me just think

22   out loud.

23             MR. BOVICH:  Sorry to interrupt you, Your Honor.  We

24   would also put on Dr. Jagannathan in rebuttal on the issue of

25   invalidity.
```

**PROCEEDINGS**

1      **THE COURT:**  There's more from Dr. Jagannathan?  I

2  mean, he was on -- I'm not being glib.  He was on for six

3  hours.  Are you serious?  What is he going to say that he has

4  already not said five times?

5      **MR. BOVICH:**  Well, that depends on what

6  Dr. Mayer-Patel has to offer on the subject of invalidity.  And

7  I promise the Court --

8      **THE COURT:**  The witnesses are going to finish Tuesday.

9  Okay.  That's what we're going to do.  You're going to close on

10  Thursday morning.  At 8:30 a.m., plaintiff is going to go; then

11  you're going to go; and we're going to submit it to the jury by

12  11:00 a.m. by Thursday.

13      **MR. BOVICH:**  Yes, Your Honor.

14      **THE COURT:**  I told them this case is over on Friday.

15  Okay?

16      So you can do your few minutes with Dr. Jagannathan.  I do

17  not expect to have another marathon session with him.  Okay?

18      **MR. BOVICH:**  I understand.

19      **THE COURT:**  All right.  So you all get ready to close

20  Thursday morning.  You can bank on that.

21      I'm going to finish the jury instructions either today or

22  tomorrow.  And I'll give you your final set, and you'll be

23  ready to go.

24      And we'll have this in the jury's hand by noon, at the

25  latest -- hopefully, by 10:30 -- on Thursday morning.  Okay?

PROCEEDINGS

1          **MR. FRIEL:**  Thank you.

2          **MR. BOVICH:**  Thank you, Your Honor.

3          **THE CLERK:**  All rise.  The Court is in recess.

4      (At 2:05 p.m. the proceedings were adjourned until

5  Tuesday, February 10, 2015, at 8:30 a.m.)

6                          -   -   -   -

7

8                  <u>CERTIFICATE OF REPORTERS</u>

9

10         We certify that the foregoing is a correct transcript

11  from the record of proceedings in the above-entitled matter.

12

13  DATE:   Monday, February 9, 2015

14

15

16

17  _____

18         Katherine Powell Sullivan, CSR #5812, RMR, CRR
                  U.S. Court Reporter
19

20

21

22  _____

23         Joanne M. Farrell, CSR No. 4838, RPR, CRR
                  U.S. Court Reporter Pro Tempore
24

25