Volume 6

Pages 941 - 1127

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO, JUDGE

OPEN TEXT S.A.,                 )
                                )
          Plaintiff,            )
                                )
  VS.                           )   No. C 13-4910 JD
                                )
BOX, INC. and CARAHSOFT         )
TECHNOLOGY CORPORATION,         )
                                )
          Defendants.           )
_____ )   San Francisco, California
                                    Tuesday, February 10, 2015

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

For Plaintiff:          COOLEY LLP
                        101 California Street, 5th Floor
                        San Francisco, California 94111
                  BY:   **THOMAS J. FRIEL, JR., ATTORNEY AT LAW**

                        COOLEY LLP
                        380 Interlocken Crescent, Suite 900
                        Broomfield, Colorado  80021
                  BY:   **WAYNE O. STACY, ATTORNEY AT LAW**
                        **ORION ARMON, ATTORNEY AT LAW**
                        **SARAH J. GUSKE, ATTORNEY AT LAW**
                        **BRIAN J. EUTERMOSER, ATTORNEY AT LAW**

                        COOLEY LLP
                        11951 Freedom Drive
                        Reston, Virginia  20190
                  BY:   **FRANK PIETRANTONIO, ATTORNEY AT LAW**

 (Appearances continued on next page)

 Reported By:  Katherine Powell Sullivan, Official Reporter
               Joanne Farrell, Court Reporter Pro Tempore

<u>**APPEARANCES CONTINUED:**</u>

For Defendants:          REED SMITH LLP
                         101 Second Street, Suite 1800
                         San Francisco, California 94105
                    BY:  **JOHN P. BOVICH, ATTORNEY AT LAW**
                         **SCOTT DAVID BAKER, ATTORNEY AT LAW**
                         **JAMES A. DAIRE, ATTORNEY AT LAW**
                         **JONAH D. MITCHELL, ATTORNEY AT LAW**
                         **ADALINE J. HILGARD, ATTORNEY AT LAW**

<u>**I N D E X**</u>

Tuesday, February 10, 2015 - Volume 6

| <u>**PLAINTIFF'S  WITNESSES**</u> | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| <u>**MAYER-PATEL, PH.D., KETAN**</u> | | |
| (SWORN) | 1046 | 6 |
| Direct Examination by Mr. Pietrantonio | 1047 | 6 |
| Cross-Examination by Mr. Bovich | 1084 | 6 |
| Redirect Examination by Mr. Pietrantonio | 1103 | 6 |
| <u>**CARTER, NICHOLAS**</u> | | |
| (SWORN) | 1104 | 6 |
| Direct Examination by Mr. Friel | 1105 | 6 |
| Cross-Examination by Mr. Baker | 1108 | 6 |

| <u>**DEFENDANTS' WITNESSES**</u> | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| <u>**LEONARD, GREGORY**</u> | | |
| Direct Examination resumed by Mr. Mitchell | 956 | 6 |
| Cross-Examination by Mr. Stacy | 995 | 6 |
| Redirect Examination by Mr. Mitchell | 1042 | 6 |
| Recross-Examination by Mr. Stacy | 1045 | 6 |
| <u>**JAGANNATHAN, SRINIVASAN**</u> | | |
| (SWORN) | 1110 | 6 |
| Direct Examination by Mr. Bovich | 1111 | 6 |

- - - - -

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 54 | | 1127 | 6 |
| 328 | | 1054 | 6 |
| 329 | | 1054 | 6 |
| 330 | | 1127 | 6 |
| 343 | | 1054 | 6 |
| 2789 | | 1107 | 6 |

PROCEEDINGS

| | |
|---|---|
| 1 | **Tuesday - February 10, 2015**                              **8:50 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | (The following proceedings were held in open court, |
| 5 | outside the presence of the jury:) |
| 6 | **THE COURT:**  Okay.  What is the Tempo Box issue, |
| 7 | Mr. Friel? |
| 8 | **MR. FRIEL:**  I'm sorry, Your Honor, I didn't hear the |
| 9 | question. |
| 10 | **THE COURT:**  What is the Tempo Box issue that you |
| 11 | mentioned yesterday? |
| 12 | **MR. FRIEL:**  It's not the Tempo Box issue.  It's the |
| 13 | Core issue.  So the expert yesterday -- well, we know the door |
| 14 | has already been opened on Core -- |
| 15 | **THE COURT:**  You said Tempo Box yesterday.  You didn't |
| 16 | say Core. |
| 17 | **MR. FRIEL:**  Oh, I misspoke. |
| 18 | **THE COURT:**  What's the issue? |
| 19 | **MR. FRIEL:**  So the issue is the expert again opened |
| 20 | the door yesterday by stating that as of the time of the |
| 21 | hypothetical negotiation, and even now, there's no competition |
| 22 | between Box and Open Text and we're not using the file sync |
| 23 | patents to compete. |
| 24 | And the response is that Tempo -- |
| 25 | **THE COURT:**  Let me just pause.  Yesterday you said -- |

 1   somebody mentioned NPE, and that opened the Tempo Box door.

 2   This is a totally different theory now?

 3        **MR. FRIEL:**  Same issue.  So the experts made the claim

 4   that Open Text is really a nonpracticing entity, i.e. a patent

 5   troll, because it does not practice its own patents.

 6        **THE COURT:**  Who said that?

 7        **MR. FRIEL:**  Mr. Leonard.  Dr. Leonard, rather.

 8        **THE COURT:**  I remember Mr. McGoff saying -- you used

 9   the term -- somebody used the term NPE.  He said NPE is

10   pejorative.

11        **MR. FRIEL:**  Correct.

12        **THE COURT:**  I didn't remember Dr. Leonard saying

13   anything about it.  When did he say they didn't compete?

14        **MR. FRIEL:**  He testified that Open Text was not

15   practicing its own patents; therefore, it was a

16   nonpracticing --

17        **THE COURT:**  He did say that.

18        **MR. FRIEL:**  Yes.

19        **THE COURT:**  All right.

20        **MR. FRIEL:**  So that opened the door to the issue.  And

21   it's been our contention all along that Core does practice the

22   patents in question and does compete.  And it had been planned

23   and underway since 2012.

24        **THE COURT:**  He wasn't testifying about Core.  He was

25   testifying about --

1        **MR. FRIEL:**  He was not testifying about any particular

2    product.  I'll grant the Court that.

3        What he said was that Open Text does not practice its own

4    patents; therefore, it is a nonpracticing entity.  And inviting

5    all of us and the jury to conclude from that that Open Text is

6    really just a patent troll.

7            **THE COURT:**  So that's the fundamental concern?

8            **MR. FRIEL:**  Correct.

9            **THE COURT:**  I can fix that for you.

10       You are not planning, Mr. Bovich, to argue they are a

11   troll?

12           **MR. BOVICH:**  No.

13           **THE COURT:**  So the word "troll" is banned from the

14   courtroom.  It will not be mentioned at any time.

15           **MR. BOVICH:**  It will not.

16           **THE COURT:**  Not in closing, not in anybody's testimony

17   or anything else.

18           **MR. BOVICH:**  Correct.

19           **THE COURT:**  "Troll" is off the table.

20           **MR. BOVICH:**  Yes.

21           **THE COURT:**  That should fix the problem, Mr. Friel.

22           **MR. FRIEL:**  No.  What we need is to have

23   "nonpracticing entity" off the table, as well, because the

24   facts are we have been prohibited from proving that Open Text

25   is a practicing entity.  It sells products.  It even sells

**PROCEEDINGS**

1    products which compete with and embody the -- compete with Box

2    and embody the inventions in question.  So if Mr. Bovich were

3    also willing to agree not to argue that this is a nonpracticing

4    entity case.  And I think the Court should issue a curative

5    instruction to the jury saying that they should disregard --

6         **THE COURT:**  Okay.  You've been around long enough to

7    know that a curative instruction is sending up a large flare

8    saying please pay excess attention to the following words.  You

9    know that.  If you want me to do it, I will do it.  I think

10   it's a mistake, but it's up to you.

11        Mr. Bovich, we're okay with that, aren't we?  You didn't

12   open up with "this is a nonpracticing entity."  I haven't heard

13   that theme.  I heard two people maybe mention it.  So why don't

14   we take that off the table.

15        Is that good, Mr. Baker?

16        **MR. BAKER:**  That's fine, Your Honor.

17        **THE COURT:**  So defendants stipulate to that?

18        **MR. BAKER:**  Yes, Your Honor.

19        Well, the purpose of the testimony was that their

20   technical expert, in talking about their own products, which

21   were the Office Editor product --

22        **THE COURT:**  Right.

23        **MR. BAKER:**  -- said that they didn't practice the

24   patents.  And that was the point.

25        **THE COURT:**  All right.  So we have a deal.

1      **MR. BAKER:**  It wasn't talking about the company.  It

2  was talking about those products.

3      **THE COURT:**  All right.  So "troll" is out.

4  "Nonpracticing entity" is out.  Total victory for the

5  plaintiffs, okay.

6      **MR. STACY:**  I need to ask one more clarification

7  because what they're setting up with this -- so they'll take

8  the word "NPE" out, but they have a slide they're preparing

9  today on dated competition information.

10     And we heard Mr. Howatson talk expressly about Core.  And

11  the slide that they are going to put in, they show that there

12  are only 16 instances of Open Text competing.  And then they

13  want to rely on the fact that I can't ask anything in cross

14  about Core.

15     **THE COURT:**  Is Core on your slide?

16     **MR. BAKER:**  No.

17     **MR. STACY:**  He does not --

18     **MR. BAKER:**  That's historical data that predates Core.

19  All that information -- Core wasn't even released until, like,

20  a month ago.

21     **THE COURT:**  So what's the problem, Mr. Stacy?

22     **MR. BAKER:**  This is just evidence in the case.

23     **THE COURT:**  I don't get it.  Show me the slide.

24     I think you've got all you're going to get out of this.

25     Core came out 30 days ago; right?

PROCEEDINGS

1          **MR. BAKER:**  It came out less than 30 days ago.

2          **THE COURT:**  All right.  What's the problem?

3          **MR. STACY:**  So -- do you have 12 in front of you?

4      So if they put this data in, there's no meaningful

5   competition between Open Text and Box.  It is historical data.

6      We've heard Mr. Howatson talk expressly about Core in his

7   testimony.  And the fact that Core exists basically refutes

8   this.  And so if this slide goes in --

9          **THE COURT:**  It refutes it as of, what, 28 days ago?

10          **MR. STACY:**  Well, Core has been in the works since

11   early this year.

12          **THE COURT:**  In the works doesn't count.  You've got to

13   be out selling it.  Any antitrust lawyer knows that's what

14   competition is.

15      Let me ask a question.  Can't you put a date on this or

16   just call it historical?

17          **MR. BAKER:**  Absolutely.

18          **THE COURT:**  Or just do something so the plaintiff has

19   some comfort -- your concern is you're talking about today.

20          **MR. BAKER:**  This was as of the close of discovery in

21   this case, Your Honor.

22          **THE COURT:**  What was that date?

23          **MR. MITCHELL:**  Close of discovery would have been

24   October 15th or 16th.

25          **THE COURT:**  Of last year?

1              MR. MITCHELL:  2014.

2              THE COURT:  Can you just say something like number of

3    times listed as primary competitor prior to October 2014, okay.

4              MR. STACY:  I'm going to have to maintain the

5    objection because I think it leaves a false impression.

6              THE COURT:  Overruled.

7         Make that change.  Are you able to do it on the fly?

8              MR. MITCHELL:  I'm not sure.

9              THE COURT:  Don't show this unless you can doctor it

10   or amend it.

11             MR. MITCHELL:  Okay.

12             THE COURT:  That's overruled.

13        The other thing is NPE and troll are out.

14        Let's call in the jury, please.

15        Should the relevant date be March 2012?  Didn't

16   Dr. Leonard say that's the date of the hypothetical

17   negotiation?

18             MR. BAKER:  He said March of 2012.

19             THE COURT:  So why wouldn't that chart be dated

20   March 2012?  It goes to the negotiation point; right?

21             MR. BAKER:  It goes -- yes, it goes to the

22   hypothetical negotiation.

23             THE COURT:  All right.  Well, you should fix that date

24   so it reflects the state of competition as of March 12, 2012.

25   All right.  So if those numbers need to change, you need to fix

 1    that.

 2        I will do that, okay.  So you can use that competition

 3    chart only up to the date that Dr. Leonard said was the

 4    hypothetical negotiation.  All right?

 5            MR. BAKER:  Okay.  The information then will be zero

 6    because they were all after 2012.

 7        Is that right?

 8            MS. HILGARD:  I think the data on this reflects past

 9    the date of 2012; right.

10            THE COURT:  Why is it relevant?  It supposedly informs

11    the hypothetical negotiation as of March 2012.  This is the

12    competition.

13            MR. DAIRE:  Your Honor --

14            THE COURT:  There are too many people talking.  Just

15    Mr. Baker, please.

16            MR. BAKER:  Your Honor, there's also testimony from

17    Mr. Carter about competition.  There's been testimony elicited

18    about Box and Open Text customers competing.

19        I mean, it's important to understand the overall

20    competitive landscape --

21            THE COURT:  There is irrelevant -- this is relevant

22    only to the royalty rate; right?  This is what you all had in

23    mind when you were supposedly negotiating this mythical royalty

24    rate.

25            So post March 2012 is irrelevant.

1              **MR. BAKER:**  Well, Your Honor, obviously, there are at

2    least some facts post hypothetical that are pertinent to a

3    discussion of the -- that negotiation.  Because the question

4    is --

5              **THE COURT:**  But we're just talking about this, okay.

6              **MR. BAKER:**  Well, let me articulate it this way, then,

7    Your Honor:  Mr. Carter's position or Open Text's position is

8    they were unwilling to license a competitor, in this case Box.

9         The point is, the question is, you know, is that a

10   reasonable position?  And that's a damages issue.

11        And our point is we really weren't in a head-to-head

12   position with them either then or, as the facts showed, at

13   least through October of last year.  Out of all these potential

14   intersections, there are 16 instances where we ran into

15   Open Text.

16             **THE COURT:**  Who cares?  What difference does it make?

17   The royalty would have been negotiated as of March of 2012.  So

18   everybody sitting at this Georgia-Pacific table would have been

19   thinking about March 2012, where none of this apparently

20   existed.

21             **MR. BAKER:**  Well, I think, certainly, the plaintiff's

22   position is everybody at the table would be thinking about, you

23   know, what would be the competitive landscape with respect

24   to --

25             **THE COURT:**  That's fine.  You can think that.  But you

 1    can't put a chart up saying, "We mind read two years into the

 2    future and we saw this coming," because nobody could have done

 3    that.

 4            **MR. BAKER:**  But they've offered --

 5            **THE COURT:**  Mr. Baker, let me finish.

 6        That's not a possibility.  So I'll give you one last --

 7    this is all post March 2012?  All this data is post --

 8            **MR. BAKER:**  No, it's not all post.  Some of it is, I

 9    believe.

10            **THE COURT:**  Which part is not?  All right.  If you're

11    going to use this, you have to limit it to what was available

12    or what was competitive as of March 2012.  Anything after that

13    is irrelevant and potentially misleading to the jury, okay.

14            **MR. BAKER:**  All right.

15            **THE COURT:**  So this has to be capped out as of

16    March 2012, if you choose to use it.  I'm talking about

17    Exhibit -- what is this, a demo?  Demo 12.  Okay.

18            **MR. BAKER:**  Thank you, Your Honor.

19            **THE COURT:**  Yes.

20            **MR. BAKER:**  To the extent that Open Text then has been

21    testifying about the competitive landscape after March 2012,

22    that should be, likewise, irrelevant to the case.

23            **THE COURT:**  I haven't heard much of that.  Who has

24    said anything about that?

25            **MR. BAKER:**  Mr. Levie was shown a series of emails

**PROCEEDINGS**

 1  about approaches to Jazz Pharmaceutical where Box won a

 2  contract.   The claim there was that Open Text was displaced,

 3  and that was somehow relevant to the case.

 4       There was the emails --

 5            **THE COURT:**  You didn't object though.  You didn't

 6  stand up and say this is irrelevant because of the time.  You

 7  can't -- you can't create an exception because you failed to

 8  object.  You didn't make any objection about that.

 9       Okay.  He's objected.  He didn't object on the grounds of

10  articulated, but I fine-tuned that for him.  And I think I'm

11  right.  The hypothetical grounds is March 2012.

12       I mean, your expert testified to that yesterday.

13  Dr. Leonard said, clear as day, I'm imagining what would have

14  been the situation in March of 2012.

15       So, you know, you're planning to use this and say this is

16  what was in the minds of people in March 2012.  But the data

17  postdates that, so it can't be in the minds of people in

18  March 2012.

19       So you can limit it.  You just told me that you had some

20  competitive data prior to March 2012, that you can use, okay.

21       Now, to the extent things slipped in earlier, you didn't

22  object to, I would consider it.  But I think that objection has

23  been waived.

24            **MR. BAKER:**  All right.

25            **THE COURT:**  All right.  Let's go.

PROCEEDINGS

 1          THE CLERK:  All rise for the jury.

 2          (Jury enters at 9:07 a.m.)

 3          THE CLERK:  Please be seated.

 4          THE COURT:  Okay.  Ladies and gentlemen, we're

 5     starting a little bit late, but I have discussed our schedule

 6     with the lawyers for both sides.  They expect and I expect that

 7     we will finish with the evidence today.

 8          You'll have tomorrow out -- it's Wednesday -- as you did

 9     last week.  And then we will have closing arguments on

10     Thursday.

11          I will then instruct you, which will take a little bit of

12     time.  We'll talk more about that at the end of the day.  But

13     you should have the case in your hands maybe late morning

14     Thursday, okay, to begin deliberations.

15          Now, in case I forget, let me just mention now, once we

16     start that you should bank on full days, okay.  You want to get

17     this done and you want to be able to do it in an uninterrupted

18     fashion.  So plan on a full day Thursday and a full day Friday.

19     You may not need all of that.  You may need more.  I don't

20     know.  Plan on Thursday and Friday, you know, 8:30 to 5:00

21     here.  And that will help you get your deliberations lined up,

22     okay.

23          All right.  Let's call -- who do -- Dr. Leonard; right?

24          MR. MITCHELL:  Resume with Dr. Leonard, Your Honor.

25          THE COURT:  Okay.

1                          __GREGORY LEONARD__,

2    called as a witness for the Defendants, testified as follows:

3              **THE COURT:**  Okay.  Dr. Leonard, you are still under

4    oath.

5              **THE WITNESS:**  Yes, sir.

6                    __DIRECT EXAMINATION__ (Resumed)

7    **BY MR. MITCHELL**

8    **Q.**   Good morning, Dr. Leonard.

9    **A.**   Good morning.

10   **Q.**   I think we were getting ready to dive into the -- your

11   noninfringing alternative analysis.  Before we do that, I've

12   got a couple other follow-up questions just on the nature of

13   your work that you did on this case.

14        Was all the work that you did on this case done on your

15   own?

16   **A.**   No.  I have a group of people at Edgeworth Economics who

17   assist me in doing research on projects like this, just like I

18   do on my scholarly research.

19        So when I'm writing a paper for an economics journal I

20   typically have research assistants who help me do the

21   calculations, make the exhibits, do background research.  And

22   it's the same on a project like this.

23   **Q.**   And that's typical practice for you?

24   **A.**   Oh, absolutely, yeah.

25   **Q.**   And typical practice for other damages experts as well?

1    **A.**    Yes, yes.  And, you know, again, more widely in research.

2    Nobody does research on their own usually.

3    **Q.**    But the opinions you formed in this case, every single one

4    of those is your own; right?

5    **A.**    Absolutely.

6            **MR. MITCHELL:**   Beau, let's pull up slide 6, please.

7        (Document displayed)

8    **BY MR. MITCHELL**

9    **Q.**    And this is about where we were going to launch yesterday.

10   What does this slide reflect?

11   **A.**    This slide, each bullet point is one of the noninfringing

12   alternatives that we've heard about at trial so far.

13   **Q.**    And let's start with the "Box Sync" alternative.   Can you

14   tell us, briefly, what that is?

15   **A.**    Sure.   In a way, that's the easiest one.

16            So here, if Box was going to consider a way to not use the

17   patents that are at issue in this case one thing they could

18   have done is simply not have a Box Edit and simply have users

19   use the other methods of editing files.   And Box Sync, of

20   course, is probably the prominent one of those.

21   **Q.**    And then the second alternative listed here, the "upload

22   on close," can you tell us what that is.

23   **A.**    Yes.   As I understand it, upload on close, what happens is

24   you would still have Box Edit and it would work largely the

25   same way.   The only real difference is that the upload back to

1    the cloud would happen when the user closed the application

2    that they were editing.  And that would happen automatically.

3    By doing that, that simple tweak, you remove Box Edit from

4    being covered by the asserted patents.

5    **Q.**   And then the third one you have shorthanded here is the

6    "driver" alternative.  Can you describe that for us.

7    **A.**   Again, this would be a way to still have Box Edit.  It

8    would work in largely the same way, except you would now have

9    this driver that would help Box Edit, I guess, communicate with

10   other pieces of software.  So that, again, is something that

11   would remove Box Edit from being covered by the asserted

12   patents.

13   **Q.**   And then the last one listed here is a "dialogue box."

14   Can you briefly describe what that is.

15   **A.**   The dialogue box is the one where the user -- so still

16   have Box Edit again.  It would largely work the same way,

17   except when the user went to save the file in the application a

18   dialogue box would come up and say, Do you want to download it

19   to the cloud?  And the user could, of course, click yes or no.

20   **Q.**   And how do you know that these alternatives listed here

21   are not infringing?

22   **A.**   Dr. Jagannathan testified about each one of them.

23   **Q.**   And what about in the case of Box Sync?

24   **A.**   Oh, sorry.  In the case of Box Sync that one is easy

25   because Box Sync has not been accused of infringing the patents

1    in the case.  So it's pretty much automatically not infringing.

2    **Q.**   And it's your understanding that each of these

3    noninfringing alternatives would have been available to Box at

4    the time of the hypothetical negotiation in 2012; is that

5    right?

6    **A.**   Yes.

7    **Q.**   And it's your understanding that each of these

8    alternatives were technically feasible at the time of the

9    hypothetical negotiation in 2012; is that right?

10   **A.**   Yes.  We heard that both from Dr. Jagannathan and from

11   Mr. Ghods.

12   **Q.**   And just to be clear, the technical feasibility, what's

13   your opinion, what is that based upon?

14   **A.**   Again, Dr. Jagannathan's testimony.  And Mr. Ghods also --

15   who obviously was at Box and in charge of these kind of

16   things -- testified to that.

17   **Q.**   And is it your opinion that each of these noninfringing

18   alternatives would have been commercially acceptable at the

19   time of the hypothetical negotiation in 2012?

20   **A.**   Yes, I do.

21   **Q.**   And what's that opinion based on?

22   **A.**   Well, Dr. Jagannathan, first of all, noted that these

23   changes, the tweaks to Box Edit, really wouldn't have much of

24   an effect on the end user from a technical point of view.

25   There's a lot of data here showing that Box Sync is very

1  heavily used by Box users, much more so than Box Edit.

2      And, also, I mean, there's some common sense aspect to

3  this too.  Dialogue boxes are things we've all seen when we use

4  software.  And it wouldn't really be a big downside to have a

5  dialogue box.

6  **Q.**  All right.  Let's focus a little bit more on the Box Sync

7  alternative.  In looking at that as a noninfringing

8  alternative, one of the things you looked at was usage in

9  installation data; is that right?

10 **A.**  That's right.

11      **MR. MITCHELL:**  And let's go to slide 8, please, Beau.

12      (Document displayed)

13 **BY MR. MITCHELL**

14 **Q.**  And the source for this slide is TX179, which has already

15 been admitted into evidence.  And can you describe for the jury

16 what this slide illustrates, Dr. Leonard?

17 **A.**  Yeah.  So what this does is it takes the period March 2012

18 to September 2014, and it adds up the number of users who've

19 installed, respectively, Box Sync and Box Edit.

20      So by -- you might remember that when you sign up for Box

21 you don't automatically get either Box Sync or Box Edit.  A

22 user has to actually download them and install them.

23      And so this is the number of times each of these was

24 installed during that time period.  And you can see that, you

25 know, Box Sync, at about 2.7 million installations is

1   substantially greater, about six times more frequently

2   installed than Box Edit, which is only 476,000 times.

3           **MR. MITCHELL:**  And would you pull up TX330, Beau,

4   please.

5        (Document displayed)

6   **BY MR. MITCHELL**

7   **Q.**   And this exhibit has been preadmitted this morning.  Can

8   you just briefly describe what this is.

9   **A.**   It's a document that's created in the ordinary course of

10  business by Box.  And it gives various usage data on aspects of

11  Box.

12          **MR. MITCHELL:**  And let's go to slide 9, please, Beau.

13       (Document displayed)

14  **BY MR. MITCHELL**

15  **Q.**   And the source for this slide is TX330, which we just

16  looked at; right?

17  **A.**   That's right.

18  **Q.**   And can you describe for the jury what slide 9

19  illustrates?

20  **A.**   So the previous slide we looked at showed the number of

21  times Box Sync and Box Edit were installed.  But, of course,

22  somebody could install one of these things and never actually

23  end up using it, or maybe not use it very much.  So, in a way,

24  it would be better to get a measure of the actual usage, how

25  many times this thing is used.

**LEONARD - DIRECT / MITCHELL**

1            So what this does is it looks at uploads as a matter -- as

2    a measure of usage.  So every time somebody syncs a file using

3    Box Sync -- meaning it gets uploaded to the cloud -- we get a

4    tick in that box here.  And, similarly, when somebody edits in

5    Box Edit and saves it, and it gets uploaded, then again

6    something would get counted in the Box Edit column.

7            So over this time period if you compare the two, again you

8    see that Box Sync usage, as measured by uploads, far outweighs

9    the number of Box Edit uploads, almost by 80 times.

10   **Q.**   Now, are you aware of whether Box Sync had any issues or

11   problems?

12   **A.**   Well, we've heard that there were some issues that Box

13   Sync had at a point in time related to if you're trying to

14   upload or sync many, many files at once, that there were issues

15   with its ability to do that in a timely fashion.

16   **Q.**   Did you hear anything with respect to one at a time

17   though?

18   **A.**   No.  One at a time was not a problem with Box Sync.  It

19   was a problem when you had many, many files that you were

20   trying to sync at one time.

21   **Q.**   And what's your understanding as to what Box Edit is

22   directed at?

23   **A.**   Well, Box Edit is single file editing.  So if you were

24   going to replace Box Sync -- or Box Edit with Box Sync, again

25   you would be doing syncing of one file, which wasn't a problem

1    at all, at any time.  So, from this perspective, the issues Box

2    Sync had were not a problem in terms of being a replacement for

3    Box Edit.

4    **Q.**    Now, you said about quantifying the cost of implementing

5    the noninfringing alternatives that you're relying upon?

6    **A.**    Yes.  As I mentioned before and yesterday, I think, each

7    of the noninfringing alternatives, the real issue is how much

8    they would cost.

9         So if Box were confronted with, you know, a question of

10   how much royalty they were willing to pay to Open Text for a

11   license to those patents, they would say, We could use these

12   noninfringing alternatives, and the only issue is that it would

13   cost me something to do that.

14        So that might motivate Box to pay a royalty.  But the

15   amount of royalty they would be willing to pay would be limited

16   by the cost of implementing these noninfringing alternatives.

17             **MR. MITCHELL:**  Let's turn to slide 7, please, Beau.

18        (Document displayed)

19   **BY MR. MITCHELL**

20   **Q.**    And what does this slide illustrate, Dr. Leonard?

21   **A.**    This, sort of, summarizes what those costs are.

22        So if you were just going to go ahead and use Box Sync

23   because it already existed and it was already implemented, lots

24   of users were using it, there's really no cost to Box to use

25   that noninfringing alternative.

1          For the other three, which are all making tweaks to

2    Box Edit, what I looked at there is making a tweak of the type

3    we're talking about is certainly going to be less than it costs

4    to do Box Edit overall, right.  A tweak is going to be less

5    than the overall cost of Box Edit development.

6          So I went and talked to the accounting -- chief of

7    accounting person at Box, and he told me that the cost to

8    develop Box Edit in the first place was $250,000.  So making a

9    tweak to Box Edit to design around the patents would have been

10   obviously less than that.

11         So $250,000 is really the upper bounds, in my opinion, on

12   what Box would have paid.

13   Q.   Did you also talk to Mr. Ghods about the cost of

14   implementing the "upload on close" alternative?

15   A.   I did, yes.

16   Q.   What was the takeaway from that conversation?

17   A.   Well, it's consistent with what I was just saying.  It

18   turns out that to make that particular tweak to Box Edit would

19   have required about one to two weeks of programmer time.  And

20   the cost of a typical Box software engineer, we're talking

21   about a cost of $7,600.

22         I mean, it's very de minimus because these are minor

23   changes to Box Edit that would take it out of the realm of

24   being supposedly infringing the patents to being noninfringing

25   the patents.

1  **Q.**   And did these noninfringing alternatives factor into the

2  Georgia-Pacific analysis that you discussed in your testimony

3  yesterday?

4  **A.**   Yes.   As I mentioned, the Georgia-Pacific factors, several

5  of them relate to this issue of, you know, what is the value of

6  the patents really brought to the licensee over what they could

7  have done otherwise?

8       And so what we've seen in analyzing the noninfringing

9  alternatives is that, in the end, these patents don't really

10 bring a lot.   They're not responsible for Box Edit.   Box could

11 have had a version of Box Edit that was noninfringing and done

12 pretty much the same things.

13          **MR. MITCHELL:**   And let's go to slide 10, please, Beau.

14       (Document displayed)

15 **BY MR. MITCHELL**

16 **Q.**   So after considering all the noninfringing alternatives --

17 and this was a construct that you set up yesterday -- can you

18 describe for the jury what your ultimate opinion is?

19 **A.**   Sure.   So if you again imagine Box and Open Text at this

20 hypothetical negotiation, and Box has the alternative of taking

21 the right-hand side road and incurring a cost of, at most,

22 $250,000 to have a noninfringing alternative, what that means

23 is that if Open Text, for instance, demanded $500,000, Box

24 would say:   Forget it.   I would rather do the noninfringing

25 alternative.   Yeah, I have to pay $250,000, but I save money

1    because I'm not paying you the $500,000 in royalty.

2         What that really means is that Open Text, ultimately,

3    regardless of what they might want or anything else -- of

4    course, they want to get as much as they can, but they're going

5    to be limited by the fact that they're bargaining with somebody

6    who has alternatives.

7         And, again, we all know in life that having alternatives

8    gives you bargaining power.  And here it would create the

9    ability for Box to obtain a royalty of $250,000 or less from

10   Open Text.

11   **Q.**   And what sort of payment structure did you arrive at for

12   your royalty determination?

13   **A.**   Well, this would be what's called a lump sum payment.

14   **Q.**   And can you explain to the jury what a lump sum is?

15   **A.**   Yeah, sure.

16        In these license agreements sometimes they'll be

17   structured as a lump sum.  So that's where the licensee agrees

18   to pay a fixed amount of money in order to get the license to

19   the patents, usually, then, for the life of the patents.

20        Another alternative is what's called a running royalty.

21   And that's where the licensee might agree to pay a percentage

22   of its ongoing sales as a royalty.

23        But here I think the evidence strongly suggests that we'd

24   end up at a lump sum arrangement, that that's what the parties

25   would have negotiated.

LEONARD - DIRECT / MITCHELL

1   Q.   And why is that?

2   A.   Well, one thing is that we're -- again, what's really

3   going to be determining the amount of the royalty is Box's cost

4   to have a noninfringing alternative.  That's a lump sum amount

5   of money.  It takes a certain amount of money to design around

6   the patents.

7        And so I believe that, then, the negotiation would have

8   centered around that lump sum amount and maybe how to split it

9   between the parties.  But, again, at the very most it would

10  have been a lump sum.  And that's how it would have played out.

11  Q.   And did you look at patent licensing evidence from the

12  parties as well?

13  A.   Yes.  So both parties, if you look at their license

14  agreements, they are lump sum arrangements.

15       So that, again, suggests that the parties -- it's

16  something the parties have done in the past.  And it suggests

17  very strongly that that's something they would do in a

18  hypothetical negotiation as well.

19  Q.   And you looked at both Box and Open Text; is that right?

20  A.   That's correct.

21  Q.   Okay.  And one of the licenses you looked at was -- for

22  Open Text was with a company called Alfresco?

23  A.   That's correct, yes.

24  Q.   And is it your understanding that Alfresco and Open Text

25  are competitors?

1  A.   I would say that they aren't really competitors.   But I

2  would say Alfresco is a competitor of Box.   So in that sense

3  Alfresco and Box both have products that are in this enterprise

4  file sync and share space.   So if Open Text was willing to give

5  a lump sum to a company like Alfresco, in the end there is no

6  reason they wouldn't have given a similar lump sum arrangement

7  to Box.

8  Q.   In addition to your noninfringing alternatives analysis,

9  you looked at other evidence in the record; right?

10  A.   Yes.

11  Q.   And as -- as part of your damages analysis did you also

12  evaluate whether there was any competition between the parties?

13  A.   I did.

14  Q.   And at the time of the hypothetical negotiation in 2012,

15  did you find any evidence of competition between Open Text and

16  Box?

17  A.   No.   There really wasn't any meaningful competition.

18        MR. MITCHELL:   And let's bring up slide 11, which is

19  sourced from Trial Exhibit 40, which has already been admitted

20  into evidence.

21     (Document displayed)

22  BY MR. MITCHELL

23  Q.   And can you explain for us what this illustrates?

24  A.   Sure.

25     This is a page from a market research support -- report

1    put together by a company called Forrester, in which they were

2    analyzing this enterprise file sync and share market.

3        And what they did in this chart -- I think we had an

4    explanation of this earlier, so I won't go through.  But,

5    basically, it's listing the competitors in that particular

6    space, the file sync and share space.  You'll see that Box is

7    on the list.  You'll see Alfresco is on the list, the company

8    we were just talking about.  DropBox.  Microsoft.  Google.

9        Of course, nowhere do you find Open Text on this.  Now,

10   that's not surprising because, as we heard, Open Text was late

11   to the cloud.  And, in fact, at the point in time of the

12   hypothetical negotiation, they did not have a product that

13   competed in this space.

14       So it's not very surprising that they're not listed here

15   and that there wasn't any meaningful competition between Box

16   and Open Text at that point in time.

17   **Q.**   And how does the absence of meaningful competition between

18   Open Text and Box influence or impact your opinions in this

19   case?

20   **A.**   Well, it's actually one of the Georgia-Pacific factors

21   that we talked about.  And the idea, basically, is that if you

22   have a licensor and licensee who are competitors, then it's

23   possible that that could increase the size of the royalty

24   because the patent owner knows that if it gives a license to

25   the licensee, it could create more competition for itself.  So

1    it wants more -- bigger royalty to kind of offset that.

2        But in a situation like we have here, where there's no

3    meaningful competition, then that issue really doesn't come

4    into play.

5    **Q.**    Now, another thing you looked at was statistical data for

6    Box Edit in particular; right?

7    **A.**    That's right.

8    **Q.**    And you looked at Box Edit installation and usage data?

9    **A.**    I did.

10   **Q.**    And how does that fit in with your damages analysis?

11   **A.**    Well, again, we're trying to figure out here what's the

12   value of the patent to Box.

13       And I've shown you through the noninfringing alternative

14   analysis that the value really wasn't that great.  It's not the

15   value of Box Edit.  It's certainly not the value of editing

16   because there are many alternatives within Box that don't

17   involve using the patents to do all that.

18       It really came down to the value of having -- not having a

19   dialogue box or not having to use the driver or -- you know,

20   there's also the upload on save option.  So that's the kind of

21   value we're talking about.

22       I thought it was also useful to come at it a different

23   way, which is to say, just assuming for the moment, you know,

24   that it had something to do with Box Edit as a whole, how much

25   was Box Edit worth to Box?

1    And so one way of looking at that is let's look at the

2    impact that Box Edit had on Box's business.  Was it just kind

3    of a minor feature, or was it the main driver of Box's

4    business?  And very -- the data is very clear that it was not

5    the primary driver of Box's business.

6         MR. MITCHELL:  And let's go to slide 14, please, Beau.

7         (Document displayed)

8    **BY MR. MITCHELL**

9    **Q.**   Now, the sources for slide 14 are Trial Exhibit 54 and

10   Trial Exhibit 179, both of which have been admitted into

11   evidence.

12        Can you describe for us what we're seeing here on slide

13   14, Dr. Leonard?

14   **A.**   Yeah.

15        So the right-hand bar here, we're just counting up the

16   number of Box users, the number of people who have signed up

17   for Box.  And it's about 30 million.

18        The right-hand bar is the number of those people who have

19   downloaded and installed Box Edit.  Again, this isn't usage.

20   It's just installations.

21        But, again, we saw this number before.  476,000 people

22   have installed Box Edit.  So that means only 1.5 percent of Box

23   users overall have actually installed Box Edit.  It's kind of

24   hard to see how Box Edit could be the driver of the entire

25   business in this situation.

1    Q.   And this reflects installations; right?  And does that

2    number necessarily tell us whether everyone is actually using

3    it after they install it?

4    A.   No.  As we saw in the earlier charts, when you look at

5    usage, then Box Edit looks even less important, at least

6    relative to Box Sync.

7    Q.   And we hear Mr. McGoff testify yesterday --

8         THE COURT:  What are the dates for these figures,

9    Mr. Leonard?

10        THE WITNESS:  These, I think, are almost to date or at

11   the end of discovery, I believe.

12        THE COURT:  So late 2014?

13        THE WITNESS:  I believe so, yes.

14        THE COURT:  All right.  Thank you.

15   Go ahead.

16   BY MR. MITCHELL

17   Q.   And we heard Mr. McGoff describe that very scenario

18   yesterday; right?  He said he's only used it once or twice

19   since installing?

20   A.   That's what he testified to, yes.

21   Q.   And Box Edit is a free download.  We've heard testimony on

22   that?

23   A.   Yes, it's free.

24   Q.   So what's your takeaway from this information?

25   A.   Well, again, if we're just thinking about Box Edit -- and,

1   again, Box Edit and the patents are not, you know, synonymous

2   here because you could have Box Edit without the patents, as

3   we've seen.  But even just looking at Box Edit, again, it's not

4   the main driver of the business.

5           MR. MITCHELL:  And let's go to slide 17, please, Beau.

6       (Document displayed)

7   BY MR. MITCHELL

8   Q.   And can you tell us what this slide illustrates?

9   A.   This is really getting at the same point.  So the blue

10  line here represents the number of Box users cumulative over

11  time.  So, of course, it's marching up as more and more people

12  join Box.

13          And then the green line at the bottom is the number of

14  Box Edit installations.  And you'll see it starts in 2012, the

15  early part of 2012.  Before that, there was no Box Edit.

16          And so there's really three points, I think, to take away

17  from this.  One is the point we already saw, that Box Edit

18  installations are a very small percentage of overall Box users.

19          The second thing is you can see the slope of the Box user

20  line's a lot greater than the slope of the Box Edit line.  What

21  does that mean?  That means that most of the people who are

22  joining and signing up for Box as we go over time are not

23  installing Box Edit.

24          So it's just, I think, impossible logically for Box Edit

25  to be driving the growth of Box users when most Box users

 1   aren't installing Box Edit when they join up, or later, for

 2   that matter.

 3         And then the third point, in a way maybe the most

 4   important, is you can see that before Box Edit even arrived on

 5   the scene -- we don't have a lot of data points, but Box users

 6   were growing along at a nice clip for those couple points

 7   before Box Edit came on the scene.

 8         And, actually, for the early part of Box Edit, there

 9   weren't a lot of Box Edit installations, and users were still

10   growing.  And then afterwards, it's pretty much growing at the

11   same rate.  So what this tells you is before Box Edit and after

12   Box Edit, Box was doing well.  That means, really, Box Edit

13   didn't have a lot to do with it.

14         And it's very consistent with the idea that Box Edit is

15   one of many, many features that Box offers.  Some people use

16   it; some people don't.  Actually, most people don't.  But in

17   the end, it's just not that important.

18         Yes, it's -- you know, again, it's a nice thing to have.

19   They're glad to have another feature.  But it's not the

20   be-all-end-all of Box's business by any stretch of the

21   imagination.

22         **MR. MITCHELL:**  And why don't we turn to slide 13,

23   Beau.

24         (Document displayed)

25

1   BY MR. MITCHELL

2   Q.   And one of the things you also looked at -- and I think

3   you were just touching upon it -- is Box Edit relative to the

4   rest of Box's features and functionalities.

5       Why don't you describe for us what this illustrates.

6   A.   All right.  This, as I understand it, is a list of the

7   various features and functionalities within Box that make it

8   what it is.  So, again, Box Edit is one thing on this list.

9   It's definitely on the list.  There's no question about that.

10      But there are many, many things on this list that make Box

11  go.  And part of what we have to do in this kind of analysis is

12  say, you know, when you take everything into account, how big

13  of a piece of the pie does -- is Box Edit responsible for?  And

14  I think it's very clear it's a very small piece.

15  Q.   Now, we've spent some time talking about installation data

16  and looked at some usage data.  Let's move on to slide 15,

17  which is another reflection of usage data.

18      (Document displayed)

19  Q.   And can you describe for us what's reflected here?

20  A.   Well, this again goes back to the uploads measure.  So

21  every time somebody uploads a file, Box keeps track of how that

22  upload got accomplished.  And, in total -- that's the blue bar

23  in the far left -- there are about 34 million uploads over the

24  time period from November 2013 to February 2014.

25      Of those, 15 million, roughly, were Box Sync, 8 million

1   were via the WebApp -- that's the manual upload/download

2   approach -- and only 191,000 were Box Edit.  So, again, this

3   just shows you, first of all, that there are various ways to --

4   to edit and sync files.  And among those ways, Box Edit is

5   really not very frequently used relative to the other ways.

6   **Q.**   And it looks like this slide reflects data for Box

7   business users; right?

8   **A.**   Yes, that's right.  So this is Box business users.  If you

9   look at personal users, it's, you know, a very similar picture,

10  maybe even less Box Edit usage.

11  **Q.**   Why don't we do that.  I think that's the next slide.

12          **MR. MITCHELL:**  Slide 16, Beau.

13       (Document displayed)

14          **THE WITNESS:**  Right.  So these are personal users.

15  And, you know, it's the same basic pattern; although, again,

16  Box Edit is even less used by personal users.

17  **BY MR. MITCHELL**

18  **Q.**   I think that, kind of, summed up your opinion.  Why don't

19  we go back to slide 10, just so that you can summarize for the

20  jury your ultimate takeaways.

21  **A.**   Well, again, I think that what we've just been talking

22  about gives the flavor of the picture that, you know, Box Edit

23  is not a primary driver.  It's a small piece of the Box puzzle.

24       In terms of quantifying the amount that Box would have

25  been willing to pay, it really comes back to this noninfringing

1  alternatives that would have allowed them to actually have a

2  Box Edit that worked pretty well with minor tweaks that would

3  have been achievable at low cost.  And that, again, limits the

4  royalty.

5       So my conclusion, ultimately, is that the reasonable

6  royalty should be a lump sum of $250,000.

7  **Q.**   Now, Dr. Leonard, as we talked about yesterday, you've sat

8  through the trial and heard the testimony in this case; right?

9  **A.**   Yes, I have.

10  **Q.**   And you heard the testimony from Mr. Howatson and

11  Mr. Carter and Dr. Mayer-Patel?

12  **A.**   I have, yes.

13  **Q.**   I'd like to ask you a few questions about that.

14       Mr. Howatson gave some testimony concerning some Open Text

15  product offerings; LiveLink Explorer Pro, LiveLink Explorer,

16  Enterprise Connect, and Office Editor Module.  Do you recall

17  that testimony?

18  **A.**   I do, yes.

19  **Q.**   Now, before I jump into it, just to be clear, did you hear

20  any evidence with respect to those specific products that

21  Open Text had incorporated those -- the -- the patents that are

22  being asserted in this litigation into those products?

23  **A.**    No.  My understanding is none of those products practice

24  the -- the asserted patents.

25  **Q.**   And we're going to jump into some specific issues, but is

**LEONARD - DIRECT / MITCHELL**

1   there anything you heard from Open Text's presentation that

2   helps you understand their damages theory based on the

3   testimony?

4   **A.**   Not really.  I heard a lot of information, but, you know,

5   I'm an expert in this field and I confess I wasn't clear on

6   what their damages theory is.  There really wasn't a coherent

7   presentation of that.

8   **Q.**   Now, you heard Mr. Howatson testify regarding the price of

9   a product called LiveLink Explorer; right?

10  **A.**   Yes.

11  **Q.**   And you heard Mr. Howatson testify regarding pricing for

12  another product called LiveLink Explorer Pro; right?

13  **A.**   Correct.

14  **Q.**   And did you hear or see Mr. Howatson introduce any

15  documents in support of those prices?

16  **A.**   Not that I heard or saw, that I could tell.

17  **Q.**   And Mr. Howatson didn't say when these prices were

18  offered, did he?

19  **A.**   Not that I heard.

20  **Q.**   And did you do any investigation to try and figure out

21  where Mr. Howatson's pricing data came from?

22  **A.**   Yeah, I went back and looked at the documents that are

23  related to pricing that had been produced by Open Text in the

24  case.

25  **Q.**   And what did you find?

1   **A.**   Well, I found the -- the numbers that he seemed to be

2   talking about in a document that was dated 2004.

3   **Q.**   And that's before Open Text even owned these patents;

4   right?

5   **A.**   It's certainly before they owned the patents.

6   **Q.**   And Mr. Howatson testified that Open Text acquired them in

7   July 2009.  Is that what you remember?

8   **A.**   I believe so, yes.

9   **Q.**   So that pricing data would have been about four or five

10  years before Open Text even acquired the patents?

11  **A.**   It was, yes.

12  **Q.**   And then we talked about yesterday the date of the

13  hypothetical negotiation in this case; right?  And what's that?

14  **A.**   March 2012.

15  **Q.**   And so what's the delta between the hypothetical

16  negotiation date and the pricing information?

17  **A.**   Approximately eight years.  So, I mean, those are very,

18  very old prices and, incidentally, at a point in time when, you

19  know, the product offerings were completely different.  It was

20  a different world back then.

21  **Q.**   So what's wrong with that?

22  **A.**   Well, it just doesn't make any sense to look at a price

23  from eight years, for a product that wasn't even in the space

24  that we're talking about here, which is this enterprise file

25  sync and share market, and for a product offering by some other

1  company than Box, and for a product that doesn't even use the

2  patents.  The whole thing just doesn't make sense in the sense

3  that there's no connection to what we're trying to do in this

4  case.

5  **Q.**  Now, Mr. Howatson made a presentation or presented some

6  information to the jury using an easel.  Would it be helpful

7  for you to illustrate your comments to that evidence by using

8  an easel as well?

9  **A.**  Sure.  Yeah, I can do that.

10        **MR. MITCHELL:**  May the witness step down, Your Honor?

11        **THE COURT:**  You can, Dr. Leonard, but make sure you

12  talk in the direction of the reporter.

13        And I need to be able to see the easel too, so you're

14  going to have to angle that.

15        **THE WITNESS:**  Okay.  I will.

16  **BY MR. MITCHELL**

17  **Q.**  As best as you can, Dr. Leonard, why don't you illustrate,

18  at least, you know, in part, what you understood Mr. Howatson

19  was trying to do and where you thought he fell short.

20  **A.**  Okay.  I'll do that.

21        I must say that I'm trying to guess at what he's trying to

22  do, so it's quite possible that I don't get it.  But I'm going

23  to do my best here.

24        So, as I understood it, what he was saying is, let's take

25  a product called LiveLink Explorer Pro and then compare the

1    price of that to the price of a different product called

2    LiveLink Explorer, I think, Standard, or maybe nothing.

3        And I think he said that the difference between those two

4    is that Pro had editing capability and the Standard did not.

5    So it would -- if we did this with bars, just to keep it

6    simple, the -- if I drew two bars here, this is LiveLink

7    Explorer Pro and this is LiveLink Explorer Standard.

8        And he's saying that after he did some adjustments of

9    various kinds, that there was a delta of roughly $20, okay.

10   And that's what he testified to.

11       So the question is:  How does this $20, if at all, relate

12   to what we're interested in here, which is how much are these

13   patents worth?

14       So let's think about the problems with this, first of all.

15   Neither of these products actually has the patent in it.  So,

16   look, it might make sense to say, I'm going to take a product

17   that uses the patents and a product that is otherwise identical

18   but doesn't use the patents, and look at the price difference

19   between those.  That might reasonably isolate the value of the

20   patent.  Okay.  That would be fine.

21       But the problem is neither of these uses the patents.  So

22   what relevance could they possibly have to what we're trying to

23   do?  Now, maybe the relevance is, well, this $20 is the value

24   of editing, okay, because this one has editing and this one

25   doesn't.

**LEONARD - DIRECT / MITCHELL**

1    But then we get into the problems of the editing that

2    we're talking about here -- this is again for product from

3    2004.  These are 2004 prices.  It's a product that Open Text

4    offered in conjunction with their ECM product; whereas, Box's

5    price -- or Box's Box Edit product is 2012, and is being

6    offered in relation to their, you know, overall Box offering.

7    So we're really talking about apples and oranges for a

8    variety of reasons.  And I think one thing you can think about

9    here is what would happen if Box tried to charge $20 for

10   Box Edit?  We already saw very few people download it to begin

11   with.  How many people do you think are going to be downloading

12   it if it would cost them $20?

13   Or, going back to the idea of alternatives, how many are

14   going to say, shoot, I can use Box Sync to do this, I can use

15   the manual download method, as a lot of people do.  I'm not

16   going to pay $20 for this thing.

17   So I just think this price has no relationship to

18   Box Edit.  It certainly has no relationships to the patents

19   because, again, Box Edit could have been achieved without the

20   patents.  So it's just an irrelevant number.

21   **Q.**   And so LiveLink Explorer Pro, reflected there on the left,

22   doesn't have the patent?

23   **A.**   That's correct.

24   **Q.**   And LiveLink Explorer Standard doesn't have the patent?

25   **A.**   That's right.

1    **Q.**   And the delta then, does it tell us anything about the

2    patents?

3    **A.**   No, it doesn't -- it can't possibly, because neither

4    product has the patent in it.

5    **Q.**   Okay.  And so would -- I think you -- and maybe we should

6    illustrate it.

7         Would there be a way you could do this with products that

8    had the patent and didn't have the patent?

9    **A.**   Yeah, I mean, it's totally hypothetical, because we really

10   don't have the case here, but one thing you could do is you

11   could say, okay, I'm going to have a product, you know, A.

12   Product A is a certain product that doesn't have a particular

13   feature.  Product B is exactly the same as product A except it

14   has the feature.

15        So the only difference between the things --

16             **THE COURT:**  Hold on.  You need to face this way.

17             **THE WITNESS:**  The only true difference between A and B

18   is that B has the patented feature and A does not.

19        Okay.  In that case you could look at the delta between

20   them and say, okay, that's the value of the patented feature,

21   and then we can go from there.

22        We might have to do more analysis, but that would at least

23   be a reasonable starting point because you're comparing

24   something with the patent to something without the patent.

25   This is comparing something without the patent to something

1  without the patent.  It just doesn't make any sense.

2  **BY MR. MITCHELL**

3  Q.   And then the other question I had on LiveLink Explorer Pro

4  and LiveLink Explorer Standard, we also heard some testimony

5  from Dr. Mayer-Patel.  And were you here for that?

6  A.   Yes, I was.

7  Q.   And do you remember what his testimony was on those

8  products?

9  A.   Well, I think the testimony was -- you mean besides that

10 they didn't use the patent?

11 Q.   Didn't use the patents.  How did he describe them?

12 A.   Well, he described them as being, sort of, unacceptable to

13 Box, I think.  So, again, how -- what kind of relationship can

14 that have to the products that we're interested in here?

15 Q.   Okay.  You can go ahead and return.  Thanks.

16      All right.  Thank you.

17         MR. MITCHELL:  Beau, let's go back to Georgia-Pacific

18 factors.  Slide 3, please.

19      (Document displayed)

20 **BY MR. MITCHELL**

21 Q.   And take a look at Georgia-Pacific factor 12, Dr. Leonard.

22 A.   Yes.

23 Q.   Now, and you're familiar with that factor; right?

24 A.   Yes.

25 Q.   Would the analysis that Open Text presented through

1  Mr. Howatson and Dr. Mayer-Patel fit under that?

2  **A.**   I don't think so, no.

3  **Q.**   Why not?

4  **A.**   Well, again, it's certainly not for the use of the

5  invention because, as we saw, neither one has the invention in

6  it.  And there wasn't even any testimony that either of those

7  products had something that might be called an analogous

8  invention in terms of being a patented feature.

9       Again, just doesn't fit the facts of what we're trying to

10  do in this case, which is to value the particular asserted

11  patents.

12  **Q.**   And so from an economics perspective, have you heard

13  anything from Mr. Howatson or Dr. Mayer-Patel that would

14  indicate that LiveLink Explorer Pro is analogous to the patents

15  in this case?

16  **A.**   Certainly not in the use that Box has allegedly put them

17  to.  It's just not analogous to Box's product at all.  It's a

18  totally different ECM offering.

19  **Q.**   And the same would apply for LiveLink Explorer?

20  **A.**   Yes.

21  **Q.**   And just to make sure I've got this right, from an

22  economic perspective, does the price of comparing an unpatented

23  product like LiveLink Explorer with another unpatented product

24  like LiveLink Explorer Pro, tell you anything in terms of

25  valuing the patents that are being asserted in this litigation?

1   **A.**   I don't think in this case, no.

2   **Q.**   And so can you just briefly sum up your critique of

3   Open Text's presentation with respect to the LiveLink Explorer

4   Pro and LiveLink Explorer pricing information.

5   **A.**   I just don't think it even gets you to the first step of

6   the damage analysis, let alone the subsequent steps that would

7   need to be done.

8   **Q.**   All right.  I want to turn now to some other pricing

9   information that we heard from Mr. Howatson.

10       He talked about another product, Enterprise Connect.  Do

11   you remember that testimony?

12   **A.**   Yes, I do.

13   **Q.**   And Mr. Howatson gave testimony about an Open Text edit

14   product or module; do you remember that?

15   **A.**   I do, yes.

16   **Q.**   And, again, I think I heard him indicate that that

17   performed the editing functionality?

18   **A.**   That's what I heard, yes.

19   **Q.**   Excuse me.

20       And one of the exhibits that was brought up in

21   Mr. Howatson's testimony was Trial Exhibit 498, which was a

22   pricing sheet.  Do you remember that?

23   **A.**   I do.

24   **Q.**   And did you happen to notice the date on that?

25   **A.**   It was from 2009, as I recall.

LEONARD - DIRECT / MITCHELL

1   Q.   June 2009?

2   A.   Yes, yes.

3   Q.   And, again, Open Text acquired the patents in, what,

4   July 2009?

5   A.   Yeah, I believe that's right.

6   Q.   And you said the hypothetical negotiation in this case

7   would take place in March 2012; right?

8   A.   Correct.

9   Q.   So that pricing data was from three years prior?

10  A.   It was.

11  Q.   Now, in terms of the product within Enterprise Connect

12  that Mr. Howatson claimed performed the editing function,

13  Office Editor; right?

14  A.   Yes.

15  Q.   And did you review Trial Exhibit 498 to see if

16  Office Editor is even mentioned in there?

17  A.   I did, and I couldn't find it anywhere in there.

18  Q.   Now, you heard -- you were here for Mr. Hawa's video

19  deposition testimony yesterday, weren't you?

20  A.   I was.

21  Q.   And you heard him testify that Office Editor was not

22  incorporated into Enterprise Connect until 2013?

23  A.   That's what I heard.

24  Q.   So what's your takeaway from this?

25  A.   Well, Office Editor wasn't in Enterprise Connect in 2009.

1    And so whatever price was being charged for Enterprise Connect

2    didn't have any relationship at all to Office Editor.

3    Q.   Now, do you remember Mr. Howatson gave testimony

4    concerning maybe file editing being worth one-third of the

5    Enterprise Connect price?

6    A.   I did hear that.

7    Q.   Did he present any documents or evidence to support that

8    testimony?

9    A.   No.  Pretty much seemed to be either -- it does three

10   things, so I'm going to divide by three.

11   Q.   Does that sound familiar to you at all?

12   A.   Yeah, it sounds a lot like that 25 percent rule that the

13   Federal Circuit said is unreliable.

14       And, from my point of view, it's unreliable just to divide

15   by number of functionalities.  You actually have to look at

16   what the functionalities do and evaluate them.

17   Q.   Can you briefly summarize your critique of Mr. Howatson's

18   Enterprise Connect calculation?  And I didn't have you come

19   down to use the easel.  If you want to, you certainly can.  You

20   tell me.

21   A.   It's probably not necessary.  I mean, the main thing is

22   that the prices, again, are for a product in this ECM space,

23   which is different than the Enterprise file sync and share

24   space.

25       It's obviously an Open Text price and product, not a Box

1    product.  It's from three years before the hypothetical

2    negotiation.  And probably, most importantly, I think the

3    reason it was supposed to be relevant was that it included

4    Office Editor.  And it doesn't include Office Editor, at least

5    as far as I could tell.

6    **Q.**    I want to switch gears a little bit, Dr. Leonard.

7         Can you describe for the jury the concept of apportionment

8    and how it factors into a *Georgia-Pacific* or a damages analysis

9    in a patent case?

10   **A.**    The apportionment, again, is just this idea that if you

11   have a product with many, many features, like the Box offering,

12   that you've got to figure out how the patent fits into that,

13   taking into account all those other functionalities and the

14   value that they've created.

15        In other words, you want to really identify just the value

16   that's contributed by the patent, not give it too much, because

17   when we start doing that, then we, you know, undermine really

18   the incentives in the -- in the system.  For people innovating

19   and developing products, we're messing around with the

20   incentive.

21        So we want to make the patent gets the right amount of

22   royalty that reflects the true value it's bringing, taking into

23   account the fact that there are many other functionalities and

24   features that are often required in a product like this, or a

25   smartphone or things like that.

**LEONARD - DIRECT / MITCHELL**

1   **Q.**   And do you believe that the information or evidence that

2   Open Text has presented reflects the required apportionment?

3   **A.**   No, I don't.  I mean, again, if you take that $20 is what

4   they could charge somebody for editing, we've seen that the

5   patents don't cover editing.  I don't think anyone claims,

6   hopefully, that the patents cover editing.  They don't.

7        So that $20, at the very least, would have to be

8   apportioned between all the other functionalities, would have

9   to be apportioned between noninfringing ways of achieving the

10  same thing.  And, of course, that's what my damages analysis

11  did.

12  **Q.**   Now, Enterprise Connect, Office Editor, LiveLink Explorer

13  Pro, LiveLink Explorer, all software products; right?

14  **A.**   That's right.

15  **Q.**   Can you explain what Box would be getting in a patent

16  license that would result from the hypothetical negotiation?

17  **A.**   Yeah.  I mean, it also goes to the apportionment issue.

18  You know, at the end of a patent license what you have is a

19  piece of paper that says you have the right to use the

20  technology in question.

21       It doesn't provide you a working piece of software.  It

22  doesn't provide you, you know -- yeah, working piece of

23  software.  So you've got to go out and develop that yourself.

24  You've got to retain the people to do it.  Then you've got to

25  go out and sell it, integrate it into your existing products.

 1          So, in a way, a patent is like getting a blueprint for one

 2     room of your multiroom house; right?  You still need to get the

 3     blueprints for the other rooms, you need to actually build the

 4     house, all before you can live in it.

 5          That's why it's important in apportionment analysis to

 6     make sure that you don't attribute too much value to the patent

 7     owner, because the implementer has to get sufficient returns to

 8     be able to cover obtaining those other blueprints, the building

 9     the house and everything that goes into that.

10     **Q.**   And did Open Text present any evidence or information to

11     suggest that it engaged in that exercise?

12     **A.**   No, not at all.

13     **Q.**   Now, I'd like to turn to some other testimony we heard

14     from Open Text, from Mr. Nicholas Carter.

15          He gave testimony that Open Text wouldn't have been

16     willing --

17          **THE COURT:**  Counsel, just ask the question.  You don't

18     need to summarize what the jury has already heard.  Okay?  So

19     just ask the question of the witness.  All right.

20          **MR. MITCHELL:**  Okay.

21     **BY MR. MITCHELL**

22     **Q.**   Dr. Leonard, what's your reaction to the idea that

23     Open Text would have been unwilling to license Box?

24     **A.**   Well, you know, I think what happened here, historically,

25     is -- I mean, we heard it -- that Open Text was late to the

1    cloud.  They clearly missed the boat here.

2         You know, we saw 16 or 17 companies that are present as of

3    the time of the hypothetical negotiation in the file sync and

4    share marketplace.  Open Text wasn't one of them.  They really

5    did miss the boat.  Okay.  So they're a bit upset about that

6    I'm sure.

7         And this idea they would be unwilling or refuse to license

8    Box, I think, is really, kind of, an emotional reaction to

9    their situation.  Understandable, but when we're here trying to

10   figure out the right royalty, it's really, unfortunately, the

11   cold hard economic facts that we have to look at.

12        And in the end, you know, why would somebody refuse to

13   license someone else?  Because when you do that, you don't get

14   a royalty from them.  That's money you're not getting.  So the

15   reason you might do it is if you could improve your own

16   competitive position.

17        But the problem that we've seen is that, you know, by the

18   time of the hypothetical negotiation Open Text didn't have a

19   product.  There were at least 17 other companies that did.  The

20   only one that they were unwilling to license was Box.

21        Even assuming for the moment they could stop Box, they

22   couldn't stop the other 16 companies.  Right?  So instead of

23   being, you know, at best, 17th place, now they'd be in 16th

24   place.  That's not really a big improvement.

25        And then, more importantly perhaps, they couldn't even

1   stop Box because, as we saw, Box was growing very well and

2   being successful without Box Edit.  They had noninfringing

3   alternatives that they could have used to have a Box Edit

4   product.  So in the end there's really just no way that

5   Open-Text could have improved its situation by refusing to

6   license.

7        Even though it might be an emotional reaction, you don't

8   want to license these guys, in the end, if you were rational

9   about it, you'd say, you know, I'm not going to be able to

10  improve my own situation if I refuse to license, so I might as

11  well license them and get whatever money I can in terms of a

12  royalty.  And so that's really what would have happened if

13  everyone was acting rationally.

14  **Q.**  Now, there's been some testimony in this case about Box's

15  growth rate, retention rates, profit margins, and other

16  company-wide financials.  What's your reaction to that?

17  **A.**  I mean, it's totally irrelevant, because, again, Box Edit

18  wasn't driving those figures.  Box has been successful for all

19  the other reasons we saw in the slide and for reasons even

20  beyond that; just their, you know, happening to be at the right

21  place at the right time.

22       They had a good idea at a time that there's this wave

23  coming, and they rode it and all that stuff.  That's really why

24  they were successful.  And it's not -- really has nothing to do

25  with the patents that are asserted in this case.

**LEONARD - DIRECT / MITCHELL**

1    **Q.**   And, Dr. Leonard, from an economics perspective -- I want

2    to sum this all up -- does the LiveLink Explorer and LiveLink

3    Explorer Pro pricing information support a viable theory of

4    damages?

5    **A.**   No.

6    **Q.**   In your opinion, from an economics perspective, does the

7    Enterprise Connect and Office Editor pricing information

8    support a viable theory of damages?

9    **A.**   Not that I saw, no.

10   **Q.**   In your opinion, Dr. Leonard, has Open Text presented any

11   viable theory of damages?

12   **A.**   Not a reliable one, no.

13   **Q.**   And, Dr. Leonard, has any testimony that you've heard

14   during trial changed any of your expert opinions?

15   **A.**   Not at all, no.

16   **Q.**   And let's just go back to slide 10 to reinforce and let

17   you finish here in terms of what your ultimate opinion is on

18   damages in the event that the jury was to find that they were

19   necessary to be awarded in this case.

20   **A.**   Uhm, well, again, if you -- if you find that the patents

21   are either invalid or not infringed, there's no damages, so

22   that's the end of it.

23       But assuming you were to find both of those things, then,

24   in my opinion, the damages should be $250,000 or less.

25       **MR. MITCHELL:**  Pass the witness.

```
 1                THE COURT:  Cross.

 2                MR. STACY:  Can we start with 498.  Pull up 498.

 3           (Document displayed)

 4                THE CLERK:  Is that the exhibit number?

 5                MR. STACY:  Excuse me?

 6                THE CLERK:  Is that the exhibit number?

 7                MR. STACY:  Yes, ma'am.

 8           And Page 4.  Bottom.  A little wider.

 9             (Document displayed)

10                        CROSS-EXAMINATION

11   BY MR. STACY

12   Q.    So, Dr. Leonard, I want to start with Exhibit 498.  This

13   is the exhibit you gave testimony about?

14   A.    Yes.

15   Q.    And you were specifically commenting on Enterprise

16   Connect; correct?

17   A.    Yes.

18   Q.    And this document lists the sales price for Enterprise

19   Connect?

20   A.    Uhm, I think it's a list price; but, yes.

21   Q.    Fair enough.  The list price for Enterprise Connect?

22   A.    I believe so, yes.

23   Q.    And you can see that is $190.22?

24   A.    It's very small, but I think that's right.  Much better.

25                MR. STACY:  Chris, can you give me a little more?
```

1          **THE WITNESS:**  No, that's fine.  I can see it.

2     **BY MR. STACY**

3     **Q.**   Okay.  So your position is that Enterprise Connect, as

4     listed in this document, does not include Office Editor?

5     **A.**   My understanding is -- this is from 2009, and at that

6     point, according to the testimony of the Open Text witness,

7     Enterprise Connect had not included Office Editor at that point

8     in time.

9     **Q.**   And you're basing that on what you recall that Mr. Hawa

10    said?

11    **A.**   Yes.

12    **Q.**   But you heard Mr. Howatson say that Office Editor was

13    included?

14    **A.**   I heard him say that, yes.

15    **Q.**   And do you understand that Mr. Hawa was actually referring

16    to the pricing method for the entire content server product?

17    **A.**   It didn't sound that way to me, but --

18    **Q.**   Let's go to page 1, 49801.  And I'll try to get it big

19    enough for you, Mr. Leonard.

20         (Document displayed)

21    **Q.**   So on the front of this --

22         **MR. STACY:**  Up at 1, Chris, select "Baseline Package."

23    **BY MR. STACY**

24    **Q.**   So at this point in time you understand that Open Text

25    sold all of its software ala carte; you bought the base

1   package, and then you added on the features that you wanted?

2   **A.**   Yeah.  I mean, the base package had obviously some

3   features in it, yes.

4           **MR. STACY:**  And then, Chris, can we go down to number

5   2.

6   **BY MR. STACY**

7   **Q.**   The base package was approximately $1,044 per user?

8   **A.**   You're talking about the number at the very top?

9   **Q.**   Correct.  The far right-hand side, PPU.

10  **A.**   Right.  Okay.  Add a hundred users.  I assume that means

11  if you have a hundred users, this is the price per user?  Yeah,

12  that probably is correct.

13  **Q.**   Correct.  I believe that is correct.

14          So at this point in time Open Text charged a

15  thousand-dollar base fee, and for that fee you got to own the

16  software forever, correct?

17  **A.**   I guess so.  Of course, if you wanted upgrades, you'd

18  probably had to pay for those.

19  **Q.**   But it was different than Box's model.  You owned the

20  software; you didn't have to pay a monthly fee to just keep

21  using it?

22  **A.**   Yes, but, you know, again, I wouldn't want the 1995

23  version of Word and be using that today --

24  **Q.**   I understand --

25  **A.**   -- so it depreciates reasonably quickly, which is why

1  people do upgrades.

2  **Q.**   I understand, Mr. Leonard, but my question was:  You paid

3  the thousand dollars, you owned it?

4  **A.**   I guess so, yes.

5  **Q.**   You weren't leasing it?

6  **A.**   You weren't leasing it, that's correct.

7  **Q.**   There we go.  Just make sure our language is the same.

8       And then on that thousand dollars, you added the $190 for

9  Enterprise Connect if you wanted to add that feature?

10 **A.**   I believe so, yes.  Again, these are list prices; but,

11 yes.

12 **Q.**   And you understand from Mr. Hawa's testimony that

13 Open Text now prices its product differently?

14 **A.**   Uhm, yes.  I guess so, yes.

15 **Q.**   And you understand that from the review of the documents

16 in this case?

17 **A.**   Yes.  There was a point in time when certain features were

18 included at a zero price.

19 **Q.**   And now Open Text charges one price for all of the feature

20 set.  It's all bundled together, in other words?

21 **A.**   Right.  They started charging zero for certain things.

22 And that occurred well before the hypothetical negotiation.

23 **Q.**   And wasn't Mr. Hawa saying that Enterprise Connect is now

24 included in the bundled price and it wasn't before?

25 **A.**   Uhm, that's not what I heard, no.

1   **Q.**  Could you have misunderstood Mr. Hawa?

2   **A.**  It's possible.  I heard -- what he said is they included

3   the Office Editor in Enterprise Connect as of 2013.  That's

4   what I thought I heard.

5   **Q.**  Now, did you look at any of the technical documents to try

6   to understand this?

7   **A.**  I did look at some of them, yes.

8   **Q.**  And did you find any evidence that Office Editor wasn't

9   included in Enterprise Connect back in 2009?

10   **A.**  Well, that sounds like a negative.  I don't think the

11   documents, at least that I looked at, were clear one way or the

12   other.

13   **Q.**  Okay.  So your opinion or your statement about what was

14   included in Enterprise Connect is solely based on your

15   understanding of Mr. Hawa?

16   **A.**  Yeah, from his testimony.  That's right.

17   **Q.**  So the next thing I'd like to do is take you to one of

18   your slides.  It's the slide with the Georgia-Pacific factors.

19      (Document displayed)

20      **MR. STACY:**  And can we blow up number 12.

21   **BY MR. STACY**

22   **Q.**  Now, number 12 is one of the factors you can consider in

23   coming up with a royalty; correct?

24   **A.**  Yes.

25   **Q.**  And this factor specifically says you can consider "the

1  use of the invention."  And that would be the patented

2  technology; correct?

3  **A.**   Yes.

4  **Q.**   "Or analogous inventions."  That would be unpatented

5  technology; that is, analogous?

6  **A.**   I don't think it necessarily means it's unpatented at all.

7  **Q.**   Well, it's at least analogous technology, not necessarily

8  the invention in the suit?

9  **A.**   Well, analogous inventions, I think, means -- it's

10 supposed to mean -- in the Georgia-Pacific factors invention,

11 for instance, earlier you said that relates to the patent at

12 issue in the case.  So analogous inventions, I think, means

13 other patented features.

14      And, also, I'll note that it says customary, too, which I

15 didn't talk about before.  But this really -- what this factor

16 is really about is, is this something that people in the

17 industry do?  It's not, you know, sort of, picking out one

18 price and trying to apply it to the situation.

19          **MR. STACY:**  Do you still have the chart?

20          **MR. BOVICH:**  Yes.

21          **MR. STACY:**  Could I have it back?

22 **BY MR. STACY**

23 **Q.**   So assuming that content server, you sold it for a

24 thousand dollars?

25 **A.**   Right.

1   Q.   There's the add-on piece that cost $190, Enterprise

2   Connect?

3   A.   Again, list price, because we did hear that it's uniformly

4   discounted, so.

5   Q.   Absolutely.  List price $190.

6   A.   Right.

7   Q.   Assume that Enterprise Connect includes Office Editor.

8   A.   Okay.

9   Q.   We'll just take that assumption for now.

10      Office Editor was Open Text's editing technology; correct?

11  A.   It was, yes.

12  Q.   Okay.  And I want to go over to LiveLink Explorer and

13  LiveLink Explorer Pro.  Okay?  This is what you put on the

14  board here; correct?

15  A.   Correct.

16  Q.   Move over here.  So for LiveLink Explorer, the Standard

17  product, it didn't include editing technology?

18  A.   That's what I understand, yes.

19  Q.   And that was sold here in this bar for what you were

20  saying?

21  A.   As I remember, yes.

22  Q.   And then LiveLink Explorer Pro, separate price, was

23  roughly $20 difference between these two?

24  A.   After you took into account discounts and that kind of

25  thing.

1    **Q.**   Correct.  After you took into account discounts.

2         So the editing functionality that Open Text could charge

3    for was $20?

4    **A.**   I'm not sure, actually, that that was the only difference

5    between Pro and Standard too.  So that would be another

6    problem, but.

7    **Q.**   Well, what do you mean you're not sure?  Are you guessing?

8    **A.**   Well, I've seen a document that actually says there were

9    two things, at least.  I think the other one was related to

10   dealing with email, as I remember.  So there were at least two

11   things in Pro that were different than Standard.

12   **Q.**   And you saw that document in this lit- --

13   **A.**   Yes, a Open Text document.

14   **Q.**   But you heard testimony about that?

15   **A.**   I can't recall whether someone testified about it.

16   **Q.**   But what we know is there was Pro products that were sold

17   and you can value editing, and it's either 20 or something less

18   than 20 in your world?

19   **A.**   You know, again, assuming the various assumptions the

20   Court has to get us to go through, but bottom line, I'm willing

21   to take your assumption on that.

22   **Q.**   And these are not only the prices that Open Text charged,

23   these are the prices that Open Text customers paid; correct?

24   **A.**   Well, I think that's another issue is what people actually

25   paid.  So yeah, there's no testimony about the number of people

```
 1    who paid.

 2    Q.    So you mentioned the discounting; correct?

 3    A.    Yes.

 4    Q.    So if we can pull up 498 at 1.

 5          Referring to the right-hand side, the discounting.  Sorry,

 6    further right.

 7          So in the documents that were presented, the discount was

 8    expressly mentioned; correct?

 9    A.    Yes.

10    Q.    Okay.  So this is Open Text's pricing document, and it

11    reflects the discounts they would have given customers?

12    A.    I don't think there's any testimony about where these

13    numbers came from, but I mean, it's labeled what appears to be

14    software discount, for instance.

15    Q.    And you remember the testimony that discounting was a

16    regular part of Open Text's practices?

17    A.    Oh, yes, yes.

18    Q.    And it was approximately the 70 percent range?

19    A.    Yes.

20    Q.    And you see the 68 percent range right there?

21    A.    Yes.

22    Q.    So this document does reflect what actually would have

23    been charged to Open Text customers?

24    A.    Well, first of all, I think what we are looking at here is

25    the line of -- this isn't the same, the right line, I think.  I
```

1   guess if you pull it out, maybe we can see.  Anyway, that

2   column certainly is meant to reflect discounts.  I just don't

3   know where the numbers came from, that's all.

4   **Q.**   Okay.  Let's go to your Slide number 10.

5        So your basic opinion is that if Open Text asked Box to

6   pay more than $250,000, Box would have thrown up its hands and

7   said "we are just going to implement the alternate design.  We

8   won't pay you any more than 250"?

9   **A.**   Yes, I think that's what would have happened.

10  **Q.**   You recall Dr. Jagannathan indicating that he has

11  personally charged Box almost $750,000?

12  **A.**   Yes.

13  **Q.**   You don't work for free, do you?

14  **A.**   I don't, no.

15  **Q.**   You're 750 an hour?

16  **A.**   Yes.

17  **Q.**   Box's lawyers don't work for free, do they?

18  **A.**   That's correct.

19  **Q.**   How many lawyers from Box have you seen working on this

20  trial this week?

21  **A.**   I don't think I've tried to count, but I don't know, ten.

22  **Q.**   How many do you recognize in the courtroom?  Eight, nine?

23  **A.**   Yeah, eight, nine, probably.

24  **Q.**   So you've got a team of eight or nine here.  Are there

25  people that you don't recognize or that you've been working

1   with that aren't in the courtroom?

2   **A.**   I don't think so, no.

3   **Q.**   Okay.  So they've got their entire team, eight, nine

4   lawyers, and they don't work for free, you don't work for free.

5   We know Dr. Jagannathan has already charged three quarters of a

6   million.  But you're saying that Box would, if faced with a

7   choice to pay $250,000 plus one extra dollar, would have

8   implemented the design-around, but Box has already spent a

9   million-plus dollars at least defending this litigation on

10  these three patents?

11  **A.**   That's right, because there's -- of course, if you don't

12  put forward a case, there's a danger --

13           **THE COURT:**  Counsel, don't interrupt.  Slow down.  Let

14  the witness finish.

15           **MR. STACY:**  My apologies.

16           **THE COURT:**  Take it from the top.  Ask the question

17  again, Dr. Leonard will answer.

18           **THE WITNESS:**  If you don't defend yourself in court,

19  you can be found to wrongly infringe patents.  The patents

20  could be wrongly found to be valid.  There could be a large

21  damage award that isn't really commensurate with the facts of

22  the case.  So of course you have to defend yourself.

23  BY MR. STACY

24  **Q.**   Okay.  Well, I want to look again at this charge.  I want

25  to take you back in time.

1          So you heard testimony that Box said they first learned

2     about these patents in June of 2013?

3     **A.**   I think that's right, yes.

4     **Q.**   And in June of 2013, they could have taken your lower road

5     at that point in time; correct?

6     **A.**   Well, I mean, that's an interesting point is that once

7     you've introduced a product, you're in a different situation

8     than before you introduced a product, which is when the

9     hypothetical negotiations.

10         You know, it's obviously harder to retract a product and

11    reissue it.  That doesn't have anything to do with the value of

12    this technology, though.  That has to do with the fact you've

13    already started offering a product and people started using it.

14         And then on top of that, of course, Box believes that it

15    hasn't infringed or the patents are invalid, so there isn't a

16    reason to make a change until a time comes when either of those

17    things has been proven.

18    **Q.**   I understand, sir, but my question was:  June of 2013 all

19    of these design-arounds were available to Box?

20    **A.**   They were, yes.

21    **Q.**   And Box could have implemented in June of 2013 rather than

22    starting this fight or continuing this fight?

23    **A.**   No, I think that there was still li- -- so-called

24    liability at that point.  So plus, again, there's principle.

25    You don't want to have to change things.  You want to, you

**LEONARD - CROSS / STACY**

1  know, prove that you haven't infringed a patent.

2  **Q.**   Do you recall Mr. Ghods saying that he could have

3  implemented a design-around in one to two weeks?

4  **A.**   Yes.

5  **Q.**   So in 2013, they could have implemented a design-around in

6  one to two weeks?

7  **A.**   That's right.

8  **Q.**   And now, you've heard a lot about Sync 4.0?

9  **A.**   Yes.

10  **Q.**   And how that supposedly fixed the problems with Sync 3.0?

11  **A.**   It did, I think, yes.

12  **Q.**   It did.  Have you analyzed Sync 4.0 and how it fixed the

13  problems?

14  **A.**   I just heard testimony about how it has or talked to the

15  people, so I haven't particularly analyzed that specific issue.

16  **Q.**   So you have no opinion on whether Sync 4.0 actually fixed

17  the problems of Sync 3.0?

18  **A.**   I guess my opinion would be that there are no problems

19  with Sync 3.0 relative to being a substitute for Box Edit, so

20  it sort of doesn't really matter.  But I understand, yes, Box

21  had to fix those issues.

22  **Q.**   But your understanding is based on the same thing we've

23  heard in this courtroom this week?

24  **A.**   Largely, yes.

25  **Q.**   And that's your understanding as an economist, not as an

**LEONARD - CROSS / STACY**

1   engineer?

2   **A.**   Yes.

3   **Q.**   So you're not offering any expert testimony about the

4   technology?

5   **A.**   Not about the technical aspects, no.

6   **Q.**   And you first rendered this opinion in December of 2014

7   about the $250,000 design-around; correct?

8   **A.**   Yes.

9   **Q.**   So just a couple months ago?

10  **A.**   Yeah, November, I believe.

11  **Q.**   And since that time, Box hasn't implemented any

12  design-around, have they?

13  **A.**   Not yet, no.   That I know of, I should say.

14  **Q.**   And as of today, Box continues to offer each and every

15  customer Box Edit?

16  **A.**   I believe so, yes.

17  **Q.**   So I'm going to go back to these alleged noninfringing

18  alternatives.

19       Now, again, you're not an engineer.   You're not a computer

20  scientist; correct?

21  **A.**   Correct.

22  **Q.**   Not to take away from what you are.   I'm just trying to

23  understand where you're offering your opinions.

24  **A.**   Yes.

25  **Q.**   So you're not offering any opinions on the technology?

1   **A.**   You mean the technical aspects?  No, I'm not.

2   **Q.**   You have no opinion one way or the other whether these

3   alternatives infringe or don't infringe?

4   **A.**   Yeah, I mean, as a technical expert, no.  I understand

5   what the arguments are.

6   **Q.**   So you didn't prepare claim charts comparing the asserted

7   claims against the noninfringing alternatives?

8   **A.**   That's correct, I did not.

9   **Q.**   So you're just taking Dr. Jagannathan's word that the

10   noninfringing alternatives are truly noninfringing?

11   **A.**   He's the technical expert, yes.  I would say with the

12   exception of Box Sync because Box Sync hasn't been alleged to

13   be infringing, so I think just by virtue of that fact, it's

14   automatically a noninfringing alternative.

15   **Q.**   Are you making a legal conclusion, there, sir?

16   **A.**   No.  Just my understanding of the way this works.  If you

17   haven't that alleged it infringes, it doesn't infringe for our

18   purposes here.

19   **Q.**   So you know Sync 4.0 was released after this lawsuit was

20   started?

21   **A.**   Yes.

22   **Q.**   So you have no opinion on whether Sync 4.0 was part of

23   this litigation or should be part of the next litigation?

24   **A.**   I'm talking about -- Box Sync 3.0 is what I'm talking

25   about.

LEONARD - CROSS / STACY

1  **Q.**   3.0?

2  **A.**   Right.

3  **Q.**   You have no opinion on whether 4.0 should legally be part

4  of the litigation?

5  **A.**   I'm certainly not a legal expert, either.

6  **Q.**   So now I'm going to talk about, I guess, the commercial

7  acceptability of these alleged alternatives.

8       So as part of your decision, you assume that each of the

9  alternatives would have resulted in comparable performance to

10  Box Edit?

11  **A.**   I think the way to think about it is it really wouldn't

12  have affected users very much from a technical point of view

13  and, of course, that translates, to, you know, an economic

14  commercial acceptability.

15  **Q.**   So wouldn't affect users.  And have you seen any tests

16  that prove that these alleged alternatives wouldn't have

17  affected users?

18  **A.**   Tests?  What do you mean by that?

19  **Q.**   Has Box built the alternative and demonstrated that it

20  wouldn't affect users?

21  **A.**   Not that I'm aware of, no.

22  **Q.**   Have you interviewed any Box customers to determine

23  whether these alternatives are acceptable?

24  **A.**   No.

25  **Q.**   Okay.  Now, we've heard the differences in Box customers.

1    You have some users and then some, what I would consider

2    buyers, like the IT directors?

3    **A.**   That's correct.

4    **Q.**   So that the user is the person that -- would be an

5    employee of the company that's using Box and Box Edit?

6    **A.**   In that context, yes.

7    **Q.**   So I want to make this clear.  You didn't talk to any

8    Box Edit users to evaluate the comparability of these options?

9    **A.**   I mean, other than the Box employees that we've heard

10   from.

11   **Q.**   So basically Mr. McGoff?

12   **A.**   No, I believe -- I think all of the Box witnesses that I

13   remember, and maybe not all of them, but most of them talked

14   about what they did themselves in terms of editing.

15   **Q.**   Okay.  So other than the Box employees that they brought

16   to trial, you haven't talked to anyone about the acceptability,

17   any end user about the acceptability of these alleged

18   alternatives?

19   **A.**   That's correct.

20   **Q.**   And now for the other end, the IT directors that buy the

21   Box product, you heard Ms. Bouck talk about that?

22   **A.**   Yes, I did.

23   **Q.**   And so if it's a large company like General Electric, as

24   an employee of General Electric, I don't buy the Box product,

25   do I?

LEONARD - CROSS / STACY

1   **A.**   That's correct.

2   **Q.**   So --

3   **A.**   But you don't make the decision about buying it, yes.

4   **Q.**   So I don't make the decision.  There's an IT director that

5   makes the decision?

6   **A.**   It sounds like for big companies, certainly, that's the

7   way it goes.

8   **Q.**   And did you interview any IT directors in determining or

9   in adopting the position, I should say, that the alleged

10  alternatives are actually acceptable?

11  **A.**   Well, I think, again, we heard from the Box head of

12  marketing that when she talks to those folks, you know,

13  security is an important thing, other bigger features are, and

14  that Box Edit doesn't really rise to that situation.  So that's

15  further evidence that Box Edit is not really contributing to

16  Box's success.

17  **Q.**   Dr. Leonard, I appreciate your advocacy here in repeating

18  other people's testimony, but I asked you a question.

19       Have you interviewed any of the IT directors in any of

20  Box's customers and asked them about the alternatives?

21  **A.**   No, I didn't.

22  **Q.**   So we heard testimony about General Electric.  They made a

23  big deal about 300,000 seats were sold to General Electric, the

24  biggest customer they have.  You didn't talk to anybody at

25  General Electric?

**LEONARD - CROSS / STACY**

1   A.   No.

2   Q.   So I'd like to talk a little bit about Box Sync now.

3        You assume that Box Sync is a substitute for Box Edit?

4   A.   I don't assume it, it is.

5   Q.   So it's your opinion or your stated opinion that Box Sync

6   is a substitute for Box Edit?

7   A.   Yes.  People use Box Edit to do the same things they can

8   do with Box Edit (verbatim).

9   Q.   And you're aware that Sync 3.0 was a deeply flawed

10  product?

11  A.   I think I talked about that.  There are issues about it

12  having to do with syncing many files at once that really don't

13  relate to how it would serve as a substitute for Box Edit.

14  Q.   When Box Edit was designed, it was designed to be an

15  alternative to Sync; correct?

16  A.   It was designed to be another way that people could edit

17  adding to the list of already existing methods by which people

18  could edit.  So in that sense it was, you know, another

19  feature, another way to do things.  It's very typical to have a

20  wide variety of features in a product.

21  Q.   But when Box Edit was originally conceived and designed,

22  it was designed to fill a gap in Box's offerings; correct?

23  A.   You know, again, it's another way to do things.  Because

24  it didn't exactly duplicate what they already had, you could

25  say that it filled a gap, but it's a gap that was obviously not

1    very large because not many people use it, really, in the grand

2    scheme of things.

3    Q.   Chris, could we bring up 125?

4         Now, you remember Mr. Dorman; correct?

5    A.   Yes.

6    Q.   He's the inventor of Box Edit?

7    A.   Yes.

8    Q.   He was the head of development for Box Edit?

9    A.   That's correct.

10   Q.   And he was also a major portion of the development of

11   Box Sync; correct?

12   A.   I think he testified to that, yes.

13   Q.   Okay.  Now let's go right up top.

14        Now, this is around the time of the hypothetical

15   negotiations they were beginning to rollout this product.  And

16   remember, Open on Desktop is now Box Edit.  See under the

17   introduction?

18   A.   I'm sorry, what's the date of this document?

19   Q.   You can see the update history at the top.  8/3/2011 is

20   the most recent date.

21   A.   Okay.  All right.

22   Q.   And you see the introduction?

23   A.   Yes.

24   Q.   "The Open on Desktop project is planned to fill a gap in

25   Box's product offering."

LEONARD - CROSS / STACY

1          Do you see that?

2     A.   Yes.

3     Q.   So I'd like to go down a little further on that one.

4          It's actually the 1.2, Chris.

5          It says "Sync alternative.  Use Open on Desktop for files

6     that you don't need to edit often.  If it becomes popular, this

7     could take some pressure off capacity demands caused by Sync

8     usage."

9          Did I read that correctly?

10    A.   Yes.

11    Q.   Do you recall -- I'll leave that one at that, sir.

12         So you testified about Sync 4 fixing the problems with

13    Sync 3?

14    A.   That's my understanding, yes.

15    Q.   And that's your understanding based on what Box employees

16    told you?

17    A.   I think it's what they've also said publicly.

18    Q.   Okay.  So it's your opinion, based on what Box employees

19    have stated, either publicly or in this courtroom?

20    A.   I think so, yes.

21    Q.   Okay.  And you didn't do any independent investigation on

22    Sync 4.0?

23    A.   You mean in terms of actually trying to upload a bajillion

24    files or something?  No, I did not.

25    Q.   And you didn't talk to any of the IT directors/customers?

 1   **A.**   I did not, no.

 2   **Q.**   You didn't talk to any of the end users?

 3   **A.**   Not about that, no.

 4   **Q.**   You know that Sync 4.0 still has serious problems, don't

 5   you?

 6   **A.**   I'm not sure what you're referring to.

 7   **Q.**   Can we pull up 259?  Go to page 1 to start.

 8        So Sync 4.0 was released in December of 2013?

 9   **A.**   I think that's right.

10   **Q.**   Now, this presentation "Friday Launch - All Hands

11   February 21st, 2014."  That's after Sync 4.0 was released.

12   You'll agree?

13   **A.**   Yes.

14   **Q.**   Can we go to 10, Chris?  Let's blow that up.

15        Sync 4 has been released.  And what do we see immediately,

16   or what do see we see several months later?  "Most often cited

17   areas for improvement.  Sync performance and user interface are

18   clearly the top three."

19        So after Sync 4.0 was released, you're still seeing

20   problems about it; correct?

21   **A.**   I think -- well, first of all, it doesn't say there are

22   problems.  But second of all, I think this just underscores

23   exactly the point that Sync is what really people are using.

24   So, you know, of course, if they are getting feedback, they

25   want to improve Sync.  That's where they want to put their

LEONARD - CROSS / STACY

1  resources.  That's consistent with the fact they did Sync

2  internally, whereas they outsourced Box Edit, which they

3  considered to be much less important.

4      So I mean, this is just sort of typical software stuff.

5  You can always improve your product.  You never stop or you get

6  left in the dust.

7  **Q.**  What this document says, "Sync - performance and user

8  interface are clearly the top three."

9      And that's most often cited areas for improvement;

10 correct?

11 **A.**  Yeah, again, because people are using Sync, so we want to

12 improve that as we go along.

13 **Q.**  So --

14     **THE COURT:**  We are going to take our morning break.

15 See you at 10:45.

16     **COURTROOM DEPUTY:**  All rise for the jury.

17              (Recess taken at 10:28 a.m.)

18          (Proceedings resumed at 10:45 a.m.)

19     **THE COURT:**  Okay.  Bring them out.

20              (Pause in the proceedings.)

21     **COURTROOM DEPUTY:**  All rise for the jury.

22              (Pause in the proceedings.)

23     **COURTROOM DEPUTY:**  Please be seated.

24     We are back on the record in civil case 13-4910, Open Text

25 versus Box, Inc.

1              **MR. STACY:**  Good to go, Your Honor?

2              **THE COURT:**  Yes.

3    **BY MR. STACY**

4    **Q.**   Dr. Leonard, this is your Slide A; correct?

5    **A.**   Correct.

6    **Q.**   And what you're showing here is for Box Sync, there are

7    2,730,000 downloads versus Box Edit, 476,000 downloads?

8    **A.**   During this time period, yes.

9    **Q.**   During this time period from March through September of

10   2014.

11   **A.**   Correct.

12   **Q.**   So those numbers have grown since then, but --

13   **A.**   Well, if you at a longer time period, of course, both

14   numbers will at least be this big and maybe higher.

15   **Q.**   Now, Dr. Leonard, maybe there's some confusion, you didn't

16   quite understand what you heard this week.

17         You understand that Open Text is not seeking damages on

18   the Box Sync installations on the left, the 2,730,000 that's

19   not part of the damages model in this case?

20   **A.**   I'm not sure what your damages model is, but I'm glad to

21   hear you're that not seeking damages on that because my

22   understanding is that it's not infringing.

23   **Q.**   Well, now, let's be clear.  Every sale to a customer is

24   infringing; correct?

25   **A.**   A sale of what?

Q.   Box offers every customer that signs up, gets Box Edit for
free, correct, or as an add-on feature?

A.   No, they have to actually download it.

Q.   It's available to every customer; correct?

A.   It's available, yes.

Q.   So these 2 million people could download Box Edit if they
wanted to?

A.   They could, yes.

Q.   But you understand that the damages issues in this case
are solely limited to the 476,000 people that downloaded
Box Edit?

A.   Yes.

Q.   Okay.  And it's actually not 476,000 as of today, is it?

A.   Again, it's probably, because we are after September 2014,
so it might be more, yes.

Q.   So what you know is, I think, what, it's what 23,000 a
month so far have been downloading Box Edit?

A.   I don't know if that's right if you look on average over a
bunch of months.  That might have been true of one month or
might have been true of several months, but we'd want to
calculate an average before doing that.

Q.   For now, your counsel can walk through an average with
you, but let's just go through the last month, which was
approximately 23,000.

A.   Okay.

1   Q.   So if I added that together, it would be September,

2   October, November, December, January, and whatever piece of

3   February.  So five-ish months extra at 23,000.

4   A.   Again, making an assumption that 23,000 is the right

5   number, but then would multiply that by the number of months

6   that have transpired since September 2014.

7   Q.   So that's an additional 115,000 people that have expressly

8   downloaded Box Edit since the data on your chart?

9   A.   Again, assuming --

10          MR. MITCHELL:  Objection, Your Honor.  Foundation.

11          THE COURT:  Overruled.

12       Go ahead.

13          THE WITNESS:  Again, under the assumptions that we

14   talked about, that would be the math.

15   BY MR. STACY

16   Q.   So 115 plus 476, how many users are we roughly talking

17   about today?

18   A.   590,000, again, under those assumptions.

19   Q.   Okay.  So 590,000 users that have expressly downloaded

20   Box Edit?

21   A.   Right.

22   Q.   Okay.  And again, you understand for all my questions,

23   those are the only users that are part of the damages model in

24   this case?

25   A.   Again, I don't know what you mean because you haven't,

1  that I've seen, put on a damages module.  I would agree that,

2  you know, somebody who didn't install Box Edit couldn't

3  possibly have been a user that used the patented features, so

4  we certainly agree there.

5  **Q.**   Okay.  So we are in agreement the 2,730,000, Open Text

6  isn't seeking damages on those?

7  **A.**   Again, I certainly hope not and glad to hear that that's

8  the case.

9  **Q.**   I just want to make sure --

10  **A.**   Sound economics.

11  **Q.**   My apologies.  I didn't mean to speak over you.

12      I want to talk now about business users.  And you know for

13  the business users that's where Box generates most of its

14  revenue; correct?

15  **A.**   That's correct.

16  **Q.**   And by "most," a vast majority of its revenue comes from

17  business users?

18  **A.**   I don't know what "vast" means, but I think a majority,

19  and I'm not sure of the exact percentage.

20  **Q.**   For these business users where the majority of Box's

21  revenue comes from, Box Sync is the number one way of editing

22  shared files; correct?

23  **A.**   Box Sync.

24  **Q.**   Did I say Box Sync?

25  **A.**   Yes, you did.

1   **Q.**   My apologies.

2   **A.**   Sure.

3   **Q.**   So for -- let me get this crystal clear.

4        For the business users --

5   **A.**   Right.

6   **Q.**   -- for shared files, Box Edit is the number one way that

7   is used for editing?

8   **A.**   You know, I think what you're referring to is a document

9   that was talked about earlier that said something along those

10  lines.  You know, of course, that was a particular point in

11  time.  I don't think we've seen comprehensive data that allows

12  us to answer that question.

13  **Q.**   Chris, can we pull up TX 161, second page?

14       So first let's go back to the first page so you can see

15  where we are.

16  **A.**   Sure.

17  **Q.**   So you referred to a document.  This is an e-mail from

18  Griffin Dorman.  You can see to Matthew Self and Mr. Yeh and

19  Mr. Ghods were on the cc line?

20  **A.**   Yes.

21  **Q.**   And this was the document you were thinking about?

22  **A.**   Yes, exactly.

23  **Q.**   Okay.  Now, Chris, let's go to the second page.

24       So Mr. Dorman is the inventor of Box Edit and one of the

25  main designers; correct?

 1   **A.**   Right.

 2   **Q.**   Mr. Yeh was the senior vice president of product?

 3   **A.**   I think so, yes.

 4   **Q.**   And Mr. Ghods is one of the cofounders and gave testimony

 5   in this case, I believe, a couple times?

 6   **A.**   Yes.

 7   **Q.**   Okay.  So this is the chart that was presented to them.

 8   And it says "How business enterprise users edit files."  And it

 9   shows Box Edit at 37 percent.  And that's greater than any of

10   the other percentage for the shared files?

11   **A.**   It is certainly greater, yes.

12   **Q.**   Okay.  So now let's go back to the first page.

13        And you understood that these individuals who are all

14   heavily involved with Box Edit and Box Sync, if we go right to

15   the bottom, how they interpreted the data.  It says "I think

16   this validates that Box Edit is an important part of our

17   overall collaboration work flow."

18        Did I read that correctly?

19   **A.**   Yes, you did.

20   **Q.**   So I'd like to take you back to 2012 to the time of the

21   hypothetical negotiation.  We are sitting in Box's shoes.

22   We've got two sides of the table.  We are sitting in Box's

23   shoes.  Box was excited about Box Edit; correct?

24   **A.**   You know, I think they are probably excited about a lot of

25   features they were adding to the product.  They seem like an

1    excited group of people.

2    **Q.**    Well, they called Box Edit a game changer.

3    **A.**    You know, again, people write e-mails, they write things.

4    There's a lot of hyperbole.  The reality is it's not a game

5    changer and that's, I think, what we have to deal with, the

6    reality of the situation.

7    **Q.**    So Chris, let's pull up 257.

8           So again, I want to show you what's involved here.  You

9    see Mr. Dorman, you see Mr. Self, you see both of them in the

10   line?

11   **A.**    I do, yes.

12   **Q.**    Okay.  So let's go to page 2.  And let's go right under

13   "Hi There."

14          So this e-mail was a summary from what happened in

15   offsite.  Do you recall seeing this in the trial?

16   **A.**    I do, yes.

17   **Q.**    So right up top it says "Following up on the discussion

18   from Box Edit on the offsite, here is a summary of the feedback

19   I received from my team, unscientifically, as well as the more

20   detailed comments below."

21   **A.**    I think "unscientifically" is the key word there.

22   **Q.**    Okay.

23   **A.**    Each the numbers we looked at before with the shared

24   files, what's striking about that is that if you look at the

25   personal files, the personal files looks a lot like what we

1    know the overall data looks like.  So what does that tell you?

2    That tells you the shared files that must be the focus of those

3    bars have to be a tiny part of what's going on.

4         So if you took an average of the shared and the personal

5    and the result you get looks like the personal, it must mean

6    the shared files are very small.  So that's my personal

7    take-away.

8         Besides the fact that there were other methods that were

9    very heavily used as well as Box Edit, even for shared files.

10   And so again, it's really reflecting the same situation that we

11   see for everything.

12   **Q.**   So Mr. Leonard, your counsel is going to get to ask you

13   questions, but my question was:  Did I read that correctly?

14   **A.**   I think so, yes.

15   **Q.**   You'll get plenty of time on redirect to put out your

16   points.

17   **A.**   Okay.

18   **Q.**   I just want to go through my stuff for time reasons.

19   **A.**   Sure.  Understood.

20   **Q.**   And as we read the words that came from this offsite, what

21   Box was thinking in 2012 around the time of the negotiations,

22   what does it say?  "Box Edit is a potential and, in some cases,

23   actual game changer."

24   **A.**   No --

25   **Q.**   My question is:  Did I read that correctly?

1  **A.**  But I can't accept -- okay.  I can't answer the question

2  yes or no given the way you asked it.

3  **Q.**  Let me try that again.

4      I've highlighted on the screen "Box Edit is a potential

5  and, in some cases, actual game changer for clients who have

6  been reliant on Sync," period.  Did I read that correctly?

7  **A.**  Yeah, as long as you say it's not Box saying it because

8  it's not Box saying it, it's an individual, and there are other

9  people on the e-mail who expressly would have disagreed with

10  this, so....

11  **Q.**  I read that correctly?

12  **A.**  Yes; yes, you did.

13  **Q.**  Okay.  And did you hear anything in this trial or, more

14  importantly, did you see another document that called something

15  else a game changer?

16  **A.**  Well, I heard, for instance, that security is a must-have.

17  **Q.**  Have you seen a document that refers to another feature as

18  a game changer?

19  **A.**  I haven't looked through the documents with that question

20  in mind, so I can't really tell you.

21  **Q.**  I think you can answer my question.  My question is:  Have

22  you seen another document from Box that refers to any of their

23  other features as a game changer?  If you haven't seen one,

24  just answer --

25  **A.**  I can't recall, as I'm sitting here.  It's not something I

1    looked for specifically.

2    **Q.**   So that's a no, you haven't seen one?

3    **A.**   That I can recall, but I wasn't looking to find that very

4    phrase.

5    **Q.**   So I'd like to go back to 161 in the chart.

6         So 161, this is the chart from Box, put together based on

7    Box data.  You see 37 percent of the business users are using

8    Box Edit, according to this chart.  You'll give me that, won't

9    you?

10   **A.**   Yes; yes.  I mean to added files, yes.

11   **Q.**   Did you interview any customer included in that

12   37 percent?

13   **A.**   I don't think so unless, again, Box personnel are included

14   in there; but otherwise, no.

15   **Q.**   So again, you talked to the Box employees, but you didn't

16   talk to anyone else?

17   **A.**   Not end users, no.

18   **Q.**   So you don't know why any of the outside customers, other

19   than the Box employees, would have used Box Edit for shared

20   files instead of Box Sync?

21   **A.**   I didn't interview someone for that purpose, no.

22   **Q.**   And on 161, if we can go back to the first page.

23        So again, we are back with Mr. Dorman and all of the other

24   top-level Box executives that are on this e-mail chain.

25        "We also need to," Chris.

1      And what was Mr. Dorman telling folks at this time?  Do

2  you recall him testifying about this particular passage "We

3  also need to drive up the metrics for Sync," right?  He's

4  talking about Sync.  He wants to help improve Sync?

5  **A.**   Yes.

6  **Q.**   But right above it, "We're about halfway there with

7  Box Edit.  Ideally, we should be able to convert almost all the

8  users in the red column, Web App, to green, Box Edit."

9      Do you remember Mr. Dorman talking about that?

10 **A.**   I remember he said that this didn't actually happen,

11 so....

12 **Q.**   I don't believe Mr. Dorman said that at all.

13 **A.**   Okay.  I think he did.  Or something like that.

14 **Q.**   Well, right now we will stick with the text of the

15 document.  This was Mr. Dorman's goal and this is what he

16 communicated to several people, including Mr. Yeh?

17 **A.**   It's certainly in this document, yes.

18 **Q.**   Okay.  So I'd like to talk about your damages model.

19      Your single lump sum payment would give Box the right to

20 Open Text's three patents until those patents expire?

21 **A.**   That's correct.

22 **Q.**   So your $250,000 number covers from 2012, going backwards,

23 to what year going forward?

24 **A.**   I can't recall the exact expiration date of all the

25 patents.  I'd have to --

**LEONARD - CROSS / STACY**

1   **Q.**   Can you give us the expiration date for one patent?

2   **A.**   I can't remember.  It would go to the latest to expire of

3   the patents, and I just don't recall, actually, what any of the

4   expiration dates are.

5   **Q.**   So your $250,000, you have no idea how many years in the

6   future you're giving Box the right to use Open Text's patents?

7   **A.**   I do.  It's in my report.  I just don't recall as I'm

8   sitting here.

9   **Q.**   So you came up here and testified $250,000, but you don't

10  know how many years that covered?

11  **A.**   It doesn't really matter because it's the design-around

12  costs that going to motivate somebody to pay that amount of

13  money.

14  **Q.**   So you understand, or maybe I can refresh your

15  recollection, the patents expired in 2023.

16  **A.**   Okay.  I was going to say 2021, but I'll take your

17  representation.

18  **Q.**   So take eight more years.

19  **A.**   Right.

20  **Q.**   So your 250,000 gives Box the right to use the patents

21  going backwards from 2012 until today, and then --

22  **A.**   Yes, yes, right.

23  **Q.**   And then the rights for the next eight years going

24  forward?

25  **A.**   That's right.

**LEONARD - CROSS / STACY**

1  **Q.**   And Box doesn't have to implement that design-around to

2  have the rights going forward, do they?

3  **A.**   That's right.  If Open Text has been paid the appropriate

4  royalty in a lump sum, then that's what you get in return for

5  making that payment.  You would get the right to practice the

6  patents from here to expiration.

7  **Q.**   So under your opinion, for $250,000, Box gets the right to

8  use these patents from 2012 to 2023 for any purpose they want

9  for any number of sales or downloads they want?

10  **A.**   Right.  They may also, for instance, decide to drop the

11  Box Edit product or change it in a way for some reason that no

12  longer infringes.  So that's the point about a lump sum payment

13  is Open Text gets that money regardless of what happens with

14  usage later on.

15  **Q.**   So you got Box would have the right to continue using

16  Box Edit for Windows without changing the design at all?

17  **A.**   That's correct.

18  **Q.**   And they'd have the right to continue using Box Edit for

19  Mac for eight more years without changing the design at all?

20  **A.**   That's correct.

21  **Q.**   And they'd have the right to continue using that Android

22  editing feature for eight more years?

23  **A.**   Absolutely.

24  **Q.**   And they'd have the right to introduce some new products?

25  **A.**   In principle, that's possible, yeah.

1  **Q.**   So, for example, they could introduce an infringing

2  editing feature for the iPad?

3  **A.**   Yes, it's possible.

4  **Q.**   For the iPhone?

5  **A.**   Could.

6  **Q.**   For any devices that Google makes?

7  **A.**   Well --

8  **Q.**   Chromebook?

9  **A.**   Okay.  I guess in principle, yes.

10  **Q.**   For BlackBerry?

11  **A.**   If that was actually going to happen, yes.

12  **Q.**   And they could do all that without paying any additional

13  fees?

14  **A.**   That's the purpose of a lump sum.  Because once you've

15  designed around, you can design-around everything else, as

16  well.

17  **Q.**   So can we pull up Slide 2?

18      So Dr. Leonard, I wanted to look at this front sheet.  You

19  said you've been in over 50 cases as an expert witness.

20  **A.**   Yes, I believe so.

21  **Q.**   That sells you a little short, doesn't it?

22  **A.**   I don't know.  I actually haven't counted recently.  I

23  knew I was safe with 50, but I haven't counted.

24  **Q.**   Let's pull up your CV.  That's TX 335.  Let's start at

25  page 13.

1      So I just want to look through this.  This starts at the

2  beginning of your time.  So this would be the first page.

3  **A.**   Okay.  Yes.

4  **Q.**   Now let's go to the next page, your second page.  This

5  gets us through --

6  **A.**   2008, it looks like.

7  **Q.**   2008.  Let's go to the third page.

8      This gets us through 2011?

9  **A.**   Right.

10  **Q.**   Fourth page.  This gets us through 2012?

11  **A.**   Right.

12  **Q.**   Let's go to the next page.  Again, we are still on 2012.

13  Two pages of 2012.

14      Let's go to the next page.  We are through 2013?

15  **A.**   Right.

16  **Q.**   And so let's go to the final page here.  Oh, wait, it's

17  not the final page.  This gets us some of 2014, and now let's

18  go to the final page.

19      Okay.  So that was everything.

20      2014 hasn't even been updated, has it?

21  **A.**   I don't know.  It might actually be complete.  Maybe aside

22  from this case.

23  **Q.**   So -- well, I counted all those up.  It came to 98 cases

24  where you've given testimony.

25  **A.**   Not really, no.  I haven't counted, as I said.

1   Q.   Is that about right?

2   A.   They aren't all cases I gave testimony.  Some were

3   reports, and things like that.

4   Q.   You've got 98 cases listed on your CV?

5   A.   Yes.  I mean, I'll take your word for it.  Again, I

6   haven't counted.

7   Q.   I just want to get a feel for what you do in a typical

8   year and a typical basis.  So I want to pull out 2012.  Let's

9   start at the bottom of 17.

10       Do you remember how many cases you worked on in 2012?

11  A.   Again, I haven't counted.  2012 was probably the middle of

12  the Smartphone wars and I did a fair amount of work on

13  Smartphone cases, so there may well have been a lot of them.

14  Q.   Okay.  So this is part of 2012.  And then we will go to

15  the next page and get the rest of 2012.  I think I counted 16

16  cases in 2012.

17  A.   Okay.  Yeah, I can believe that.

18  Q.   How many court cases do you work on in any one particular

19  time?

20  A.   Court cases or everything?

21  Q.   Everything.

22  A.   And by "one time," you mean in a given day?

23  Q.   Never mind.  We will just pass.

24       I guess it's fair to say when you look at the 98 cases and

25  the 16 in a single year, your primary profession is giving

1    testimony in legal cases?

2    **A.**    Well, actually, if you look at my publications, I've got a

3    lot of publications, too.  I've been -- and those are all

4    generally scholarly endeavors.  So of course, I'm an editor for

5    publications and serve as a referee.  So I do a lot of things,

6    but certainly the litigation consulting is one of those.

7    **Q.**    So now I just want to kind of sum up what you didn't do to

8    come up with your report.

9        We've seen Mr. Griffin Dorman testify in this case;

10   correct?

11   **A.**    Yes.

12   **Q.**    He was author of many of the e-mails that we just talked

13   about?  He was the inventor of Box Edit?

14   **A.**    Yes.

15   **Q.**    And major player on Box Sync?

16   **A.**    As I understand it, yes.

17   **Q.**    You didn't interview him?

18   **A.**    I didn't interview him, no.

19   **Q.**    We heard from Mr. Levie.  He's the CEO of Box?

20   **A.**    Right.

21   **Q.**    You didn't interview him?

22   **A.**    I did not, no.

23   **Q.**    You didn't talk to him about the alleged alternatives?

24   **A.**    Him, no, I did not.

25   **Q.**    And you didn't talk to Mr. Dorman about the alleged

**LEONARD - CROSS / STACY**

1   alternatives?

2   **A.**   That's correct.

3   **Q.**   Okay.  We heard from Mr. Yeh.  Do you remember Mr. Yeh?

4   **A.**   Yes.

5   **Q.**   He is the Senior Vice President of Product?

6   **A.**   Right.

7   **Q.**   And he oversees Box Edit, Box Sync, and the Android

8   editing feature; agreed?

9   **A.**   I think he said that, yes.

10  **Q.**   And you didn't interview him in coming up with your

11  opinions?

12  **A.**   I did not.

13  **Q.**   Okay.  And we heard from Dylan Smith, one of the

14  cofounders?

15  **A.**   Yes.

16  **Q.**   And you didn't interview him in coming up with your

17  opinions?

18  **A.**   I'm not sure about that because there was some information

19  about financial stuff.  I don't know whether I talked to him

20  personally.  I just don't recall at this point.

21  **Q.**   It's not in your report.

22  **A.**   Okay.  Then I know we did get some information on

23  financial, the meaning of some financial information.  I

24  believe it was from him, but it might have been one of my

25  colleagues who spoke with him.

LEONARD - CROSS / STACY

1    Q.   You don't recall speaking to him?

2    A.   I don't.

3    Q.   Now, we heard from Whitney Bouck.  You didn't speak to her

4    in coming up with your opinions?

5    A.   That's correct.

6    Q.   And she's the senior vice president of marketing

7    worldwide?

8    A.   I believe so, yes.

9    Q.   Okay.  And we heard from Pete McGoff.

10   A.   Correct.

11   Q.   And he's the general counsel?

12   A.   Yes.

13   Q.   And you didn't speak with him in coming up with any of

14   your opinions in this case?

15   A.   I did not.

16   Q.   You didn't interview any business customers that use

17   Box Edit?

18   A.   That's correct.

19   Q.   Other than the Box employees?

20   A.   Right, right; of course, yes.

21   Q.   You didn't interview any IT directors that use Box Edit?

22   A.   That's correct.

23   Q.   You didn't interview any business customers about the

24   problems with Box Sync?

25   A.   Correct.

**PROCEEDINGS**

1  **Q.**   You didn't interview any business customers about Sync 4.0

2  and if it actually improved the prior problems?

3  **A.**   Correct.

4  **Q.**   You didn't do any surveys of any potential Box business

5  customers about the alleged alternatives?

6  **A.**   That's correct.

7             **MR. STACY:**  Your Honor, can we have five minutes to

8  address one of the documents he brought up for the first time

9  in his rebuttal?

10            **THE COURT:**  Address it with me?

11            **MR. STACY:**  No, to pull and get ready for because it's

12  brand-new because we are rebutting some of this live.

13            **THE COURT:**  You want to take a five-minute break?

14            **MR. STACY:**  If I could have five.

15            **THE COURT:**  Okay.  Five-minute break.

16            **COURTROOM DEPUTY:**  All rise for the jury.

17                    (Pause in the proceedings.)

18            **COURTROOM DEPUTY:**  You may be seated.

19                    (Recess taken at 11:11 a.m.)

20                  (Proceedings resumed at 11:19 a.m.)

21        (Proceedings were heard out of presence of the jury:)

22            **THE COURT:**  Yes.

23            **MR. STACY:**  So as you know, you permitted the expert

24  to testify outside of his report, and we do have a --

25            **THE COURT:**  Just ask me the question.  No, I don't

1    agree with that Mr. Stacy.  Just give me your question.

2        **MR. STACY:**  He addressed Mr. Howatson and the issue of

3    whether Office Editor was ever part of Enterprise Connect.

4    We'd like to cross him on a document that's not a Trial

5    Exhibit.

6        **THE COURT:**  No, I looked up Mr. Howatson's testimony

7    and I don't think the characterization you were trying to

8    suggest was quite accurate.  I don't want a back and forth on

9    what Mr. Howatson said.  That testimony will stand, and I

10   expect somebody will bring it up to the jury at some point in

11   closing.

12       Now, if you want to show him a document, that's fine.  You

13   can show him a document.  I don't have a problem with that.

14       **MR. MITCHELL:**  We haven't seen it, Your Honor.  It's

15   not part of the Trial Exhibits.

16       **THE COURT:**  What is it?

17       **MR. STACY:**  It -- it was a production document, just

18   wasn't part of the case until this issue came up.  We just gave

19   them the number.

20       **THE COURT:**  Why isn't it in the Trial Exhibits.

21       **MR. STACY:**  It had no bearing to this case until

22   impeachment.

23       **THE COURT:**  You can bring it up in impeachment.  Are

24   you going to use it for impeachment?

25       **MR. STACY:**  We are going to use it for impeachment and

**PROCEEDINGS**

 1   then we will call Nick Carter for rebuttal and we'd like to

 2   introduce it, lay a foundation for it and make it a Trial

 3   Exhibit.

 4        **THE COURT:**  You can use it for impeachment.

 5        **MR. MITCHELL:**  Your Honor, this is symptomatic of the

 6   whole problem.

 7        **THE COURT:**  It is not symptomatic of anything,

 8   Counsel.  He can use it for impeachment.  Let's get rolling;

 9   okay?

10        **MR. STACY:**  Can we introduce Mr. Carter?

11        **THE COURT:**  You can impeach the witness with this and

12   then you can try to introduce it if you lay a proper foundation

13   with the sponsoring witness.  That's how you do it.  Okay?

14        **MR. STACY:**  Thank you.

15        **THE COURT:**  By the way, I don't want to hear from any

16   side anymore summarizing people's testimony.  That is an

17   appropriate form of the question.  You do not do that.  You do

18   not say "Do you remember when witness W said X?"  You don't say

19   it.  Just ask the question.

20        **MR. STACY:**  Understood.

21        **THE COURT:**  That is not a proper set-up; okay?  And

22   don't do it -- on this subject, you riled me up.  On this

23   subject, don't start off questions with deposition cites; okay?

24   Don't say "do you remember in your deposition you said X," when

25   you're cross-examining someone.  That is completely

1    inappropriate impeachment.

2        I'm looking at you because you're the one that's been

3    doing that, to my recollection, although I think Open Text

4    people have, too.  You ask the question first.  If they fail to

5    embrace their prior testimony in the way that you believe is

6    correct, then you give them the part of the depo.  You don't

7    lead with the depo.  Okay?  That's not the right way to

8    impeach.  That's trial practice 101.  All right.  Let's get

9    them in.

10            **MR. STACY:**  Thank you.

11            **COURTROOM DEPUTY:**  All rise for the jury.

12       (Proceedings were heard in the presence of the jury:)

13            **COURTROOM DEPUTY:**  Please be seated.

14            **THE COURT:**  Go ahead.

15   **BY MR. STACY**

16   **Q.**  Dr. Leonard, one of the issues that was raised earlier in

17   your testimony was Enterprise Connect.  And one of the

18   assumptions you offered was that Enterprise Connect does not

19   include Office Editor.

20   **A.**  That is my interpretation of the Open Text witnesses'

21   testimony, yes.

22   **Q.**  And the Office Editor is the editing functionality within

23   Open Text's larger products of Content Server?

24   **A.**  Again, I think that it's an important comment, that's

25   correct.

1  **Q.**   You had access to all of Open Text's documents in this

2  case?

3  **A.**   I did, plus the ones that were produced, yes.

4  **Q.**   And you didn't search the Open Text documents to actually

5  determine whether or not Office Editor was sold as part of

6  Enterprise Connect?

7  **A.**   I just said I think it was sold at one point in time.  I

8  think the question is when it was incorporated.

9  **Q.**   And your assumption is that Office Editor was incorporated

10  in Enterprise Connect in 2012?

11  **A.**   I can't -- as I'm sitting here, I can't remember the right

12  testimony.  I think that's when it began to be incorporated.  I

13  think it was 2013 by the time it was.

14  **Q.**   I'd like to pull up OTEX 8612843.  We have an electronic

15  version.

16       Mr. Leonard -- my apologies, Dr. Leonard, you can see this

17  is an Open Text document in the upper right-hand side?

18  **A.**   Correct.

19  **Q.**   And you see the date on this is 11/16/2010?

20  **A.**   Yes, I see that.

21  **Q.**   And it's Open Text's Enterprise Connect release notes?

22  **A.**   I see that, yes.

23  **Q.**   And you understand release notes indicate what features

24  are in a particular software product?

25  **A.**   It may do that, yes.

1    Q.   Chris, can we go to the site?

2         So I'm going to take you to page 16.  So in 2010, the

3    release notes state "Launching the Office Editor through

4    Enterprise Connect and canceling the edit session on a

5    multi-lingual Microsoft Office document might cause data loss."

6         Did you read that?

7    A.   Yeah, I see that.

8    Q.   So there's 2010 documents from Open Text with references

9    to Enterprise Connect and specifically indicates that Office

10   Editor is part of the 2010 release?

11   A.   I don't think it says that.

12        MR. STACY:  Pass the witness, Your Honor.

13        THE COURT:  Okay.  You got a little follow-up?

14        MR. MITCHELL:  Yes.

15        THE COURT:  All right.

16                  <u>**REDIRECT EXAMINATION**</u>

17   BY MR. MITCHELL

18   Q.   The document you were just shown, Dr. Leonard, looked like

19   it had a date of 2010?

20   A.   Yes.

21   Q.   And the pricing spreadsheet, TX 498, again, that was 2009;

22   right?

23   A.   It was, yeah.

24   Q.   Let's just -- excuse me -- assume for a moment, even if

25   Office Editor was in Enterprise Connect in 2009 or 2010 or

**LEONARD - REDIRECT / MITCHELL**

1   whenever, does that fix the problems?

2   **A.**   No, not at all.   That's just one of the problems, not the

3   only problem.

4   **Q.**   Yeah.   Why not?

5   **A.**   Well, it's all the other things we talked about.   It

6   doesn't include the patented feature.   It's not comparing

7   something with the patented feature to something without to

8   isolate the value of the patented feature.

9        It's for a product, an ECM product, which is not even in

10  the Enterprise File Sync and Share Market that's at issue in

11  this case.   So -- and it's 2009, a long time before the

12  hypothetical negotiation.

13  **Q.**   Counsel asked you some questions about whether you talked

14  with customers about alternatives, and things of that nature.

15       You did look at data from customers; right?

16  **A.**   Yeah.   I mean, data, when you have it, is a much better

17  thing to look at because it's a comprehensive view of what's

18  going on.   It's not, you know, selected small samples of

19  customers, it's what people are actually doing.   And therefore,

20  it's often much more informative to do that.

21       So for instance, in my own work when I'm studying

22  competition between, you know, Gatorade and Powerade, you know,

23  you can go out and talk to customers about it, but you can also

24  look at the actual data about what happens when Gatorade goes

25  on sale and does it pull sales away from Powerade or not, and

1    that's the kind of research I've done, and I've had published

2    in scholarly journals.  And, you know, I'm a real expert in

3    that area, and this is just another example of that, looking at

4    data to see what's going on.

5    **Q.**   And that usage data and installation data is what you

6    presented to the jury as part of your testimony earlier today?

7    **A.**   That's correct.

8    **Q.**   And then counsel asked you some questions from a document

9    about Box Edit being a game changer.

10       Based on the installation data, the usage data, do you

11   think that's a fair characterization of what's actually

12   happened with Box Edit?

13   **A.**   No, it's not a fair characterization.  When you look at

14   the data, it's very clear Box Edit, again, is a minor piece of

15   the overall puzzle.  It's not a game changer.  And there are

16   people at Box at that time who were recipients of that e-mail,

17   even, who didn't agree with that characterization.

18   **Q.**   And counsel said something about, did Box start this

19   fight?

20   **A.**   No.

21   **Q.**   And are you aware of any evidence that Open Text even came

22   to Box so that they can consider not having to engage lawyers

23   to defend itself in this litigation?

24   **A.**   No.  I think actually, the way it went was Box got, you

25   know, a Complaint in the mail, or however it works, saying they

1   are being sued by Open Text, and never even had an opportunity

2   to negotiate a royalty.

3   **Q.**   And you agree that Box has a right to defend itself, of

4   course?

5   **A.**   I hope so.

6           **MR. MITCHELL:**  Pass the witness.

7           **MR. STACY:**  Two questions?

8           **THE COURT:**  Okay.  You said two questions; right?

9           **MR. STACY:**  Two questions.

10          **THE COURT:**  Okay.

11                        <u>**RECROSS-EXAMINATION**</u>

12  **BY MR. STACY**

13  **Q.**   The data that you relied on was collected by Box?

14  **A.**   Yes.

15  **Q.**   And the data that you relied on for your opinions was

16  provided to you by Box's attorneys?

17  **A.**   No.  Some of it was actually just from business documents

18  that Box had produced in their ordinary course of doing their

19  own internal analyses and business analysis.

20          **MR. STACY:**  One other question, Your Honor?

21          **THE COURT:**  Okay.

22  **BY MR. STACY**

23  **Q.**   You didn't do any independent data collection and

24  analysis, did you?

25  **A.**   I certainly did independent analysis, yes.  I didn't -- I

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1   didn't independently try to collect the data.  That's, again,

2   something that Box's systems are doing.

3           **MR. STACY:**  Thank you.

4           **THE COURT:**  Okay.  Thank you, Dr. Leonard.

5      All right.  Is that it on the defense side?

6           **MR. BOVICH:**  Yes, Your Honor.  We rest.

7           **THE COURT:**  Okay.  Defense rests.

8      Ladies and Gentlemen, we will now have a very brief

9   rebuttal portion from the plaintiffs.  So there might be a

10  couple more witnesses.  I don't know.  What's next, Mr. Friel?

11         **MR. FRIEL:**  Subject to motions that we can discuss

12  later, we are going to call Dr. Mayer-Patel to the stand.

13         **THE COURT:**  Okay.

14         **COURTROOM DEPUTY:**  Please stand and raise your right

15  hand.

16                 **<u>KETAN MAYER-PATEL, PH.D.</u>,**

17  called as a rebuttal witness for the Plaintiff, having been

18  duly sworn, testified as follows:

19         **COURTROOM DEPUTY:**  Please be seated.

20     Please state your full name for the Court and spell your

21  last name.

22         **THE WITNESS:**  Ketan Dasharath Mayer-Patel, M-A-Y-E-R

23  hyphen P-A-T-E-L.

24

25

1      <u>DIRECT EXAMINATION</u>

2    BY MR. PIETRANTONIO

3    Q.   Good morning, Dr. Mayer-Patel.

4    A.   Good morning.

5    Q.   Welcome back.

6    A.   Thanks.

7    Q.   You testified last week about your infringement opinions;

8    is that correct?

9    A.   I did.

10   Q.   And did you hear Dr. Jagannathan's opinions about

11   noninfringement?

12   A.   I did.

13   Q.   Can we put up Slide 260 of Dr. Jagannathan's?

14       You see these four elements referring to determining in

15   the four patent claims?

16   A.   Yes.

17   Q.   What's your understanding as to Dr. Jagannathan's opinion

18   about whether those elements are satisfied?

19   A.   My understanding is that those elements are -- what is my

20   understanding of whether they are satisfied?

21   Q.   What's your understanding of Dr. Jagannathan's opinion?

22   A.   My understanding is Dr. Jagannathan points to this as not

23   being satisfied.

24   Q.   Having heard his explanation and his testimony, do you

25   still believe that all three accused Box products determine

1   whether a cached file has been modified based on a notification

2   from the file management system of the operating system?

3   **A.**   It is.

4   **Q.**   And why do you think that?

5   **A.**   I think that because we've clearly seen in the source code

6   for all three accused products places where the notification

7   from the operating system, from the file manager of the

8   operating system received, and because of that notification, a

9   determination step is performed involving SHA1 hashes.

10  **Q.**   Can we put up slides 262 and then 263 from

11  Dr. Jagannathan's?

12       Is this the source code that you were talking about?

13  **A.**   It is.

14  **Q.**   Okay.  If we could go to 263.  And these are the steps

15  that are performed by that source code; is that correct?

16  **A.**   That is correct.

17  **Q.**   Now, in your opinion, do the accused Box products do the

18  hash value comparison only when they receive a notification

19  from the operating system?

20  **A.**   That is correct.

21  **Q.**   And can you explain why you believe that?

22  **A.**   Again, we have to look at the source code.  And there, in

23  the source code, is clearly a place where the SHA1 hash

24  calculation is being made, and that portion of the source code

25  is only executed when a notification is delivered to the

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1   software.

2   **Q.**   Now, does the polling operation in Box Edit for Windows

3   satisfy the notification limitations of the claim?

4   **A.**   Yes, it does.

5   **Q.**   And how does it do that?

6   **A.**   When in Box Edit for Windows, when the Box Edit asked for

7   the file information, the response from the operating system,

8   from the file management system in the operating system, that

9   is the notification.

10  **Q.**   Was there any testimony about this particular aspect of

11  polling as it relates to the patent by Dr. Jagannathan?

12  **A.**   I believe there was.

13  **Q.**   Could we bring up exhibit -- Trial Exhibit 1092.

14      And in the juror notebook, it's the '515 patent and it's

15  at column 10 and it's line, I believe, 31 to 34.

16      There was talk about -- I'm sorry, I think I might have

17  the wrong citation.

18      Do you recall what the testimony was about polling and how

19  it related to the patent application?

20  **A.**   Yes.  Dr. Jagannathan pointed to a place in the patent

21  specification where this polling technique was described as one

22  possible embodiment of the patent and tried to compare the

23  polling technique used in the Box Edit for Windows to this

24  particular description within the patent.

25  **Q.**   Now, do you have any understanding of whether the claims

MAYER-PATEL - DIRECT / PIETRANTONIO

1   of the patent are limited to the embodiments in the

2   specification?

3   **A.**   I do.

4   **Q.**   And what's that opinion?

5   **A.**   My opinion is that -- or my understanding is that the

6   patent does not have to describe every possible embodiment.

7   That the patent has described some embodiment of the patent but

8   in fact, the claims of the element can be satisfied in ways

9   that are not specifically described by the embodiments

10  described in the specification.

11  **Q.**   Now, what do you consider when determining the scope of

12  the claims?

13  **A.**   Well, you have to read the claims themselves, obviously,

14  and then you have to understand the Court's construction of the

15  elements within those claims, and then you have to take into

16  consideration what a person of ordinary skill in the art would

17  have understood, given the -- at the time of the patent,

18  including the intrinsic evidence within the patent itself.  So

19  the patent specification and the file history, for example.

20  **Q.**   So in your opinion, does the polling operation in Box Edit

21  for Windows satisfy the notification element of the claims?

22  **A.**   It does.

23  **Q.**   Now, does the patent specification refer to using a SHA1

24  hash?

25  **A.**   It does not.

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1  **Q.**   Does that affect your opinion about infringement at all?

2  **A.**   It does not.

3  **Q.**   And why not?

4  **A.**   Just because the patent specification doesn't describe the

5  SHA1 hash as a particular way of doing the determination step

6  doesn't mean that somebody implementing the patent can't use

7  the SHA1 hash in order to satisfy that element of the claim.

8  **Q.**   So in your opinion, the use of the SHA1 hash for

9  determination in connection with the Box products still falls

10  within the determination claim limitations of the patents; is

11  that correct?

12  **A.**   Absolutely.

13  **Q.**   So is it still your opinion that Box Edit for Mac and

14  Box Edit for Windows infringe each of the asserted claims?

15  **A.**   It is.

16  **Q.**   And is it still your opinion that Box Android infringes

17  Claim 27 of the '515 patent?

18  **A.**   It is.

19  **Q.**   All right.  I'd like to turn our attention to the

20  validity.  Dr. Jagannathan provided some opinions.

21      Have you been asked to consider whether the asserted

22  claims are valid?

23  **A.**   I have.

24  **Q.**   And did you develop any opinions concerning validity?

25  **A.**   I did.

MAYER-PATEL - DIRECT / PIETRANTONIO

1   **Q.**   And what are those opinions at a high level?

2   **A.**   It is my opinion that the claims of the asserted patents

3   are valid because they are not anticipated by any prior art

4   reference, they are not obvious in light of a person of

5   ordinary skill in the art, and that Dr. Jagannathan has not

6   satisfied his burden of proof.

7   **Q.**   We will get into these in a little bit more detail, but

8   before we do, have you ever testified before that a patent was

9   invalid?

10  **A.**   I have.

11  **Q.**   And are you presently working for any party that is

12  challenging the validity of a patent?

13  **A.**   Actually, I want to amend my prior answer.  I don't think

14  I've testified to that in a court.  I have worked with clients

15  and told them that a patent has been invalid, yes.

16       And I am currently working with a client to analyze a

17  patent for being invalid.

18  **Q.**   And who's that client?

19  **A.**   I believe that client is Apple.

20  **Q.**   And what's your role in that matter?

21  **A.**   Apple is bringing a -- what's known as an Inter Partes

22  review challenging the validity of certain patents being

23  asserted against them, and I am assisting them by providing

24  expert consultation.  And presumably, I will also write an

25  expert report analyzing the validity of those patents.

1    **Q.**    Thank you.

2         Before we turn to the validity opinions in more detail, I

3    have three documents I want to show you.  We won't publish them

4    to the jury yet.

5              **MR. PIETRANTONIO:**  If I may approach the witness, Your

6    Honor?

7              **THE COURT:**  Let me see them first.

8              **MR. PIETRANTONIO:**  Sure.

9              **THE COURT:**  Have you shown these to the defendant?

10             **MR. BOVICH:**  Your Honor, if it's true copies of the

11   file history, there's no objection.

12             **THE COURT:**  All right.  Go ahead, Counsel.

13   **BY MR. PIETRANTONIO**

14   **Q.**    Dr. Mayer-Patel, I've handed you three documents.

15        Exhibit 328, have you seen this document before?

16   **A.**    I have.

17   **Q.**    Did you rely on it for performing your analysis?

18   **A.**    I did.

19   **Q.**    And Exhibit 329, have you seen this one before?

20   **A.**    I have.

21   **Q.**    And did you rely on it for performing your analysis?

22   **A.**    I did.

23   **Q.**    And Exhibit 343, have you seen that one before?

24   **A.**    I have.

25   **Q.**    And have you relied on it for performing your analysis?

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1    **A.**    I did.

2              **MR. PIETRANTONIO:**  We move to enter 328, 329 and 343.

3              **MR. BOVICH:**  No objection.

4              **THE COURT:**  All right.  Admitted.

5              (Trial Exhibits 328, 329 and 343 received in evidence)

6    **BY MR. PIETRANTONIO**

7    **Q.**    So Exhibit 328, is this the file history for the '665

8    patent?

9    **A.**    That is correct.

10   **Q.**    What is Exhibit 329?

11   **A.**    I believe it's the file history for the -- is it the '515?

12   **Q.**    '515, perhaps?

13   **A.**    '515.

14   **Q.**    And the last one, 343?

15   **A.**    Is the file history for the '152.

16   **Q.**    And you looked at those, as you mentioned before, that you

17   would consider the file histories as part of your assessment of

18   the scope of the claims; is that correct?

19   **A.**    That's correct.

20   **Q.**    Now, I think you said, when you gave us the high-level

21   view of your opinion, that -- well, maybe you could repeat that

22   for us again.  What are your opinions on validity?

23   **A.**    So it is my opinion that the patents are valid because

24   they have not been anticipated by a prior art reference.  It

25   would not have been obvious to a person of ordinary skill in

MAYER-PATEL - DIRECT / PIETRANTONIO

1   the art.  And Dr. Jagannathan has not met his burden of proof.

2   **Q.**   Okay.

3        **THE COURT:**  So Ladies and Gentlemen, the burden of

4   proof issue, I'm not sure what the witness is referring to, I'm

5   going to instruct you on the burden of proof.

6        You really shouldn't be referring to it and I don't want

7   any questions that discuss it.

8        You will get that instruction on Thursday when we close;

9   okay?

10        **THE WITNESS:**  Sure.

11  **BY MR. PIETRANTONIO**

12  **Q.**   What's your understanding of "anticipation"?

13  **A.**   So my understanding of anticipation is that within a

14  single prior art reference that qualifies as prior art, you

15  need to be able to find each and every element of the claim in

16  question.

17  **Q.**   And what's your understanding of obviousness?

18  **A.**   So my understanding of obviousness is that a patent could

19  be invalid even if, in one single prior art reference, we don't

20  find the claims of or the elements of each claim, as long as a

21  person of ordinary skill in the art at the time would have --

22  and in light of the various prior art would have been motivated

23  to combine those elements in the way described by the patent.

24  **Q.**   Is it enough to just show that all the claimed elements

25  are independently known in the art?

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1   **A.**   No.   The extra step is that motivation in order to combine

2   in the -- those two elements in the specific way that is

3   described by the patent, and that the person of ordinary skill

4   in the art could have done so.   That you have to show that how

5   a person of ordinary skill in the art could have combined those

6   elements in that way.

7   **Q.**   Now, how did you go about analyzing obviousness for these

8   claims?

9   **A.**   I read the claims and understood -- I read the claims and

10  understood the claims, I understood the prior art that

11  Dr. Jagannathan is pointing to, and I analyzed the difference

12  between what was in the prior art and what is in the claims.

13  **Q.**   Did you consider anything else?

14  **A.**   I also considered other secondary concerns --

15  considerations for obviousness like commercial success of the

16  patent, a long-felt need, praise by others, and failure by

17  others to solve that same problem.

18  **Q.**   Okay.   We will get to those secondary considerations

19  later.   Let's jump into your top three or so with respect to

20  each of the references.

21       Let's talk about the WS_FTP manual.   What's your opinion

22  as to whether or not that manual renders the claims -- the

23  asserted claims obvious?

24  **A.**   It is my opinion that the manual does not render the

25  asserted claims obvious.

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1    **Q.**   Can you identify specific pieces from Dr. Jagannathan's

2    analysis that are missing?

3    **A.**   Sure.  So just my top three would be, first and foremost,

4    there's no source code, so we don't know how WS_FTP is doing

5    anything.

6         Second, there's no database in the FTP systems.

7         And third, there's no determination step for determining

8    whether the file has changed.

9    **Q.**   So what's your view on whether it's possible to understand

10   what happens in the WS_FTP manual without having access to the

11   source code?

12   **A.**   So the best you can do is take WS_FTP's description at

13   face value, but you can't look under the hood.  You can't know

14   how it is accomplishing the things it claims to accomplish.

15   **Q.**   Now, do you have a top three for Coda, as well?

16   **A.**   I do.

17   **Q.**   And what is that?

18   **A.**   Again, first and foremost, source code was not considered,

19   even though the source code was available.

20        Second of all, there's a kernel component in the Coda

21   solution which precludes it from running entirely in user

22   space.

23        And finally, the operating system is not asked to open the

24   file in the locally running application.

25   **Q.**   So we will jump into each one of these top three in just a

1   little bit.

2        But in connection with Coda, there was code that was

3   available; is that correct?

4   **A.**   That's my understanding.

5   **Q.**   And you ran code for Coda; is that right?

6   **A.**   I ran the code, yes.

7   **Q.**   And in connection with that, did you have a team of people

8   help you in connection with the preparation of your report?

9   **A.**   No.  I have a close personal friend who is a Cisco

10  engineer who I did hire to help me set up an experimental test

11  bed, basically finding all of the different -- or taking all of

12  the different software for the prior art that was provided,

13  creating instances of the old operating systems that would be

14  required, installing things so that I would have an ability to

15  run the experiments I wanted.  His name was Bill Eubanks.

16  **Q.**   Do you have an estimate of how many hours Mr. Eubanks

17  worked on this project with you?

18  **A.**   About 20.

19  **Q.**   So other than those approximate 20 hours, was the rest of

20  the work on this project all done by you?

21  **A.**   Yes.

22  **Q.**   Did you look at all the same things Dr. Jagannathan looked

23  at, in terms of validity?

24  **A.**   I did.

25  **Q.**   Did you look at anything Dr. Jagannathan did not look at?

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1  **A.**   I did not.

2  **Q.**   And why not?

3  **A.**   I understood that that was not my responsibility.

4  **Q.**   So you didn't do any additional searching?

5  **A.**   No, I didn't.

6  **Q.**   You took -- where did you get the documents from that you

7  used for your assessment of validity?

8  **A.**   From the defendants.

9  **Q.**   If we could go to Trial Exhibit 2788, please, which is, I

10  believe, in the juror's notebook.

11  We are just going to take a quick overview of the claims,

12  and then we will step through the two primary pieces of prior

13  art.

14  Page 6.  Right.

15  So this is Claim 10 of the '515 patent.  Could you use

16  this claim, Dr. Mayer-Patel, to step us through the invention

17  of the File Sync patents?

18  **A.**   Sure.  So the main part of all three of the asserted

19  claims of three different patents is pretty much the same.  And

20  essentially what it's describing is a cache manager that

21  provides the user the ability to edit a remote database asset.

22  And in order to do so, it makes a request for that asset.  It

23  receives that asset.  It stores a local copy of the file.  It

24  then prompts the operating system to open an application which

25  is associated with that kind of file in order to -- for -- to

1    allow the user to edit it.

2        In the meantime, it also arranges to receive notifications

3    from the file management system of the operating system.  And

4    based on those notifications, it then determines whether the

5    file has been changed.  And if the file has been changed, it

6    communicates the file back to the database.  So that part is in

7    common across all the different claims.

8    **Q.**   So I think that takes us from element (a) through element

9    (j).

10       Could you talk a little bit about the last two elements in

11   this claim?

12   **A.**   Sure.  For Claim 10, there's some additional steps.  In

13   particular here, if another user has modified that same file

14   while the first user is working with the file, then the first

15   user is informed about that modification.

16   **Q.**   If we were to go to page 5 of this exhibit, please, and

17   look at the last two elements here of Claim 4 of the '665

18   patent, what additional functionality, if any, is added by

19   these claim limitations?

20   **A.**   So for the '665 patent, Claim 4, the additional steps

21   beyond the basic operation is that if the connection to the

22   database has been disrupted for some reason, then the cache

23   manager restores that connection when connectivity is resumed

24   later.

25   **Q.**   Do you have an understanding of when the File Sync patents

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1    were filed?

2    **A.**    I believe that it was at the end of 2001.

3    **Q.**    And when the File Sync patents were filed, were there

4    other ways in existence at that time to synchronize files with

5    a remote database?

6    **A.**    There were.

7    **Q.**    Did the patent describe any of those?

8    **A.**    They did.

9    **Q.**    Could we put up the patent again, the '515 patent,

10   Exhibit 1092.   And I think I've got the right cite this time in

11   the jurors' notebook in the '515 patent.

12         We will look at the bottom of column 2, line 65, and then

13   carry over until column 3.

14         Is that an example of one of the systems that was

15   available for synchronizing files at the time of the filing of

16   this application?

17   **A.**    Yes.

18   **Q.**    Can you describe this technique for us, please?

19   **A.**    Sure.   What's being described here in the patent itself is

20   an approach which uses a driver or an operating system-level

21   component.

22   **Q.**    And were there any pros or cons associated with using a

23   driver-level component?

24   **A.**    Yes.   And, in fact, that's what the patent authors were

25   trying to address.   When you use an approach that includes a

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1    kernel level component like a driver, then you risk

2    destabilizing the operating system.  Drivers are executing in

3    kernel space along with the operating system, and it interacts

4    with the operating system in a very privileged mode.

5         There might be other drivers, other third-party drivers in

6    that same kernel space.  And so the interaction of these pieces

7    of code can cause instability.  So the authors of the patent

8    point out several such disadvantages.

9         First, you have to program the driver, which is more

10   sophisticated and additional programming.  And then you have to

11   worry about keeping that driver operational, even as the

12   operating system gets updated.  And then you may have to

13   maintain multiple different versions of the driver for

14   different people who are using different versions of the

15   operating system.

16        All of this can lead to a destabilized system and lead to

17   crashes or otherwise causing the computer to not perform well,

18   which then could possibly lead to loss of data, as well as loss

19   of productivity, since the user now has to deal with that

20   issue.

21   **Q.**   All right.  Is that what's being referred to in the

22   sentence that starts at line 11 "This system presents

23   shortcomings"?

24   **A.**   Exactly.

25   **Q.**   Okay.  Thank you.

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1    Let's turn to the details now.  Let's get down into the

2    pieces of prior art.

3    What is your understanding of Dr. Jagannathan's opinions

4    about the asserted claims based on the WS_FTP Pro manual?

5    **A.**   My understanding is that WS_FTP Pro does not anticipate

6    each and every element, but that Dr. Jagannathan is making an

7    obviousness argument.

8    **Q.**   And do you agree with him that the claims are obvious?

9    **A.**   I do not.

10   **Q.**   And why not?

11   **A.**   Well, again, there's no source code, so we don't know how

12   WS_FTP is operating.  But, more importantly, there's no

13   database in an FTP system and there's no determination whether

14   the file has been changed, as described in the WS_FTP manual.

15   **Q.**   Why would it be important to have source code?

16   **A.**   Without source code, we don't know exactly how the program

17   is accomplishing the steps that it says it's accomplishing.

18   **Q.**   Now, what operation does Dr. Jagannathan point to in terms

19   of performing the determining step of the claims?

20   **A.**   He points to the fact that the WS_FTP Pro manual describes

21   clicking "save" in the local application and then having the

22   file be saved to the remote site.

23   **Q.**   How would having the source code for the WS_FTP actually

24   help you understand that save operation?

25   **A.**   Well, then we would be able to understand exactly how

1    WS_FTP is being informed that the user has clicked "save" on

2    the application.  Without the source code, we don't know the

3    connection between the actions of the user clicking "save" in

4    the local application and the actions of WS_FTP of saving the

5    file back to the server.

6    **Q.**   Did Dr. Jagannathan use the software itself as part of his

7    analysis?

8    **A.**   No, he did not.

9    **Q.**   You didn't use the source code or executable code for

10   WS_FTP version 5 either, did you?

11   **A.**   No.  It was not provided to me.

12   **Q.**   At a high level, what does the WS_FTP manual describe?

13   **A.**   So the WS_FTP manual describes an FTP client.  FTP was

14   well-known, and it's basically a simple system by which the

15   user can direct the transfer of files to and from a server.

16   **Q.**   Can we put up Slide 30 from Dr. Jagannathan's

17   presentation, please?

18       Could you maybe describe for us what we see on this screen

19   and how it relates to this notion of a typical file transfer

20   protocol?

21          **THE COURT:**  We've had a lot of FTP.  Let's move it

22   along; okay?  Let's get to the next area.  We've done FTP to

23   death.

24          **MR. PIETRANTONIO:**  Okay.  Well, we'd like to just at

25   least address the notion of what is a definition of a database.

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1  BY MR. PIETRANTONIO

2  **Q.**    So did you apply the Court's definition of a database?

3  **A.**    I did.

4  **Q.**    Can you explain to us why it is that you believe that what

5  Dr. Jagannathan has not pointed to is not a database?

6  **A.**    Sure.  Dr. Jagannathan basically points to the files and

7  directories in the FTP server as the database.  But that's not

8  a database because if you look at the Court's construction, the

9  keyword is "predetermined."

10      So with FTP, you can move files wherever you want, create

11  files, take a file from a particular folder, then upload it,

12  not necessarily to that folder, but to a different folder.  It

13  looks just like your hard drive; right?  It's really no

14  different than that.

15      And so there's no predetermined organization of those

16  files, how those files relate to each other or to users or to

17  versions or to any of the other kinds of information that would

18  be necessary to have a predetermined organization and structure

19  that -- for enabling searching and retrieval.

20  **Q.**    So in your opinion, is an FTP structure variable?

21  **A.**    Yes.

22  **Q.**    Can a user effect that structure?

23  **A.**    Arbitrarily.

24  **Q.**    Does that variability take it outside the scope of the

25  claim's definition, the Court's definition of database?

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1  **A.**   Exactly.

2  **Q.**   Do the Box products have a database?

3  **A.**   Yes.

4  **Q.**   And how do the Box database differ from the FTP structure?

5  **A.**   The Box product has a back end which includes many

6  components that are all operating in order to provide the user

7  with an interface to their assets stored in the database.

8      So we have saw, in an architecture diagram, we saw a "my

9  sequel" database for meta data, including user names and user

10 passwords.  We saw a storage area for actual file data.  We saw

11 FTP servers to provide an interface to the database and a

12 user's interaction with Box Edit, or any other products that

13 interacts with the Box database, or the Box system has to go

14 through that -- those set of severs and ask those severs to

15 perform functions.  And those servers then perform those

16 functions of organizing that data in a way that's been

17 predetermined by Box and implemented by all of those components

18 in the Box back end.

19 **Q.**   Can we put up page 5 of 2788 again, please?  And we will

20 just do this once and we won't do it for each one of the

21 claims.

22     But what is your opinion as to how extensively this

23 dispute over database affects the claim dispute between the

24 parties over the applicability of the WS_FTP Pro to the

25 asserted claims?

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1    **A.**   Basically, any element that talks about a database is

2    affected by this analysis.  So in this particular case, we see

3    element (a), element (b), element (g), element (i), element

4    (j), and element (k).  All of those are affected by this

5    understanding of database.

6    **Q.**   And if we were to go through the other three claims, we'd

7    see similar elements; is that correct?

8    **A.**   Yes, we would.

9    **Q.**   Okay.  Let's turn to the determining step.

10         Do you believe -- what is your opinion as to whether or

11   not the determining step is disclosed by the WS_FTP manual?

12   **A.**   The WS_FTP manual says nothing about determining whether

13   the file has changed.

14   **Q.**   So based on the WS_FTP manual, can you tell whether the

15   WS_FTP checks to see whether a file has been modified before

16   saving it to the server?

17   **A.**   You cannot.

18   **Q.**   And based on the WS_FTP manual, can you tell what happens

19   when a user clicks "save" without having made any changes to a

20   document?

21   **A.**   You can't.

22   **Q.**   How would you find that out?  What information would you

23   need to find that out?

24   **A.**   You would need the code itself in order to -- the product

25   itself in order to run it.  You could run experiments that way

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1  in order to decide that, or you could -- and additionally, you

2  could examine the source code in order to find out exactly how

3  WS_FTP operates.

4  **Q.**    Now, what is Dr. Jagannathan's obviousness theory?

5  **A.**    Dr. Jagannathan's obviousness theory is to combine WS_FTP

6  with the notification feature of Windows file systems that were

7  revealed within the patent specification itself.

8  **Q.**    Do you agree with him on that point?

9  **A.**    I do not.

10 **Q.**    And why not?

11 **A.**    Because, one, the patent office already had the -- in the

12 exhibit specification a reference to those features and had

13 decided that the patents were valid already.  I mean despite

14 that.

15       And two, there's no indication for what would motivate a

16 person of ordinary skill in the art to combine WS_FTP with this

17 feature.  Again, WS_FTP was a file transfer protocol client and

18 it operated as such perfectly well on its own.  There was no

19 problem to be solved here.  And so there's no motivation for a

20 person of ordinary skill in the art to make this combination.

21       Furthermore, we don't know how a person of ordinary skill

22 in the art could have made that combination.  Without the

23 source code, we can't know whether this would have been an easy

24 thing to do, a very difficult thing to do, maybe it's

25 infeasible to do.  Again, there's no evidence that a person of

1    ordinary skill in the art would have understood how to make

2    that combination.

3         So it's my opinion that Dr. Jagannathan's attempt to use

4    this notification feature of Windows with WS_FTP is an example

5    of hindsight.

6    **Q.**    And what is hindsight?

7    **A.**    So hindsight is basically using what you know now, after

8    many years have passed, inadvertently keeping that in mind when

9    you're thinking about what somebody in the past would have

10   done.

11   **Q.**    And is that a proper part of an obviousness analysis?

12   **A.**    No, it's not.

13   **Q.**    So what is your opinion about the determining step?

14   **A.**    I believe the WS_FTP Pro does not make a determination,

15   nor would it have been obvious to combine it with the Windows

16   file notification.

17   **Q.**    So with reference to the '665 patent, that appears in

18   which element?

19   **A.**    That appears in element (f), I believe.

20   **Q.**    And then that element carries through in other claims, as

21   well?

22   **A.**    Yes.  All the claims have a determining step based on

23   notification.

24   **Q.**    Now, if we were to go to Slide 6, please.

25        And the last two steps --

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1    **A.**    Yes.

2    **Q.**    -- talks about notifying a user about another user having

3    modified?

4    **A.**    That's correct.

5    **Q.**    Do you have an opinion about Dr. Jagannathan's opinion on

6    those two elements?

7    **A.**    Yes.

8    **Q.**    And what is your opinion?

9    **A.**    So I believe he's incorrect in his analysis of those two

10   elements.

11   **Q.**    And why is he incorrect?

12   **A.**    So he points to the feature for prompting a user if they

13   are about to transfer a file that where the server has a file

14   that has a same or newer time stamp.  That's the feature within

15   the manual that he is pointing to as being related to these

16   elements.  I do not believe that that feature is related to

17   these elements when you use the remote editing feature of

18   WS_FTP.

19   **Q.**    Can we put up Slide 52 of Dr. Jagannathan's?

20        So you mentioned prompt for overwrite.  Is this the

21   feature that he's talking about?

22   **A.**    That is correct.

23   **Q.**    In the box, in the second line of the box, it says

24   "Transfer a directory or a file."  Does that language have any

25   meaning for you?

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1   **A.**   Yes, it does.  So what I understand this feature, from its

2   description in the manual, to do is when a user in the normal

3   course of asking a file to be transferred has selected a file

4   that has a time stamp that is older than what is on the server,

5   that this feature will prompt the user and warn the user about

6   what they are doing, confirm that the user really wants to do

7   this.

8        This is not a feature that is necessarily integrated with

9   the remote editing feature of WS_FTP.  And even if you -- even

10  if those two features are being used at the same time, if you

11  just think about it for even a moment, you will -- I think you

12  would come to the conclusion, like I have, that when I use the

13  remote editing feature described in WS_FTP, I will never get a

14  prompt, no matter what happens with another user or not.

15  **Q.**   Okay.  So what is your opinion about whether the manual

16  discloses these last two elements of Claim 10?

17  **A.**   It's my opinion that the manual does not disclose these

18  two elements.

19  **Q.**   Did Dr. Jagannathan offer an alternative theory for these

20  last two elements?

21  **A.**   He did.  He also offered a theory that involved combining

22  WS_FTP manual with DocuShare.

23  **Q.**   And what's your opinion about that proposed combination?

24  **A.**   My opinion is that proposed combination does not relate to

25  these elements, either.

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1   **Q.**   And why do you believe that?

2   **A.**   I believe that because DocuShare fundamentally operates in

3   a completely different way where this problem doesn't even

4   exist.  It's a checkout system.

5        So with DocuShare, when user one checks out the resource

6   or the file, user two can't possibly make an edit.  And because

7   user two can't possibly make an edit, the problem that these --

8   the elements of this claim are addressing just doesn't happen.

9        And so that's why I think that DocuShare has nothing

10  relevant to combine with WS_FTP manual with respect to these

11  elements.

12  **Q.**   So there was some testimony -- let me ask you, do you have

13  an understanding of whether it's required that the first user

14  actually have the cached file to satisfy this claim limitation

15  about an additional user notifying them?

16  **A.**   That's my understanding, from having read the patent

17  specification, that these elements are addressing the notion of

18  contention between two users where the first user has the

19  cached file.

20  **Q.**   So if we could bring up 1092 again, please, and column 8.

21       So that's the '515 patent in the juror notebook, column 8.

22       And you see at line 32 it starts talking about the notion

23  of contention?  What's contention?

24  **A.**   So my understanding of contention is when two people are

25  making changes to the file at the same time.

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1   **Q.**   And how does the last two steps of Claim 10 relate to the

2   notion of contention?

3          **MR. BOVICH:**   Objection.   Outside the claim

4   construction.

5          **THE COURT:**   Let's just keep it short, Counsel.   You

6   can go ahead, but keep it short.

7          **MR. PIETRANTONIO:**   Yes, Your Honor.

8          **THE WITNESS:**   So my understanding is those elements

9   are addressing this problem of two users who are editing the

10  file at the same time or using the file at the same time.

11  **BY MR. PIETRANTONIO**

12  **Q.**   In the next paragraph, it talks about the user receiving

13  notifications if they are no longer working on the file; is

14  that right?

15  **A.**   That is true.   The next paragraph does describe the idea

16  of receiving notifications even when you're done working with

17  the file.   But the point is is that it's because user one still

18  has the cached file.   If you look at the DocuShare system, as

19  soon as I check the file back in, I no longer have a cached

20  file.

21  **Q.**   So in your view, does the check in-check out model used by

22  DocuShare satisfy the elements (l) and (m) of Claim 10?

23  **A.**   No.

24  **Q.**   All right.   Let's sum up with regard to WS_FTP.

25          In your opinion, does the WS_FTP manual anticipate the

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1   asserted claims?

2   **A.**   No.

3   **Q.**   And does the WS_FTP manual plus the feature of Windows

4   render obvious the asserted claims?

5   **A.**   No.

6   **Q.**   Let's turn to Coda.  Did you hear Dr. Jagannathan testify

7   about Coda?

8   **A.**   Yes.

9   **Q.**   What's his opinion about the relationship between Coda and

10   the asserted File Sync claims?

11   **A.**   I believe he believes that Coda anticipates the asserted

12   file -- asserted claims.

13   **Q.**   Do you agree with that opinion?

14   **A.**   No.

15   **Q.**   And why not?

16   **A.**   Because Coda includes a kernel level component, and its

17   use of that kernel level component prevents it from satisfying

18   a number of different elements across the claims.

19   **Q.**   Did you analyze the source code for Coda?

20   **A.**   I did not.

21   **Q.**   Did you have the source code for Coda?

22   **A.**   I did not.

23   **Q.**   Did Dr. Jagannathan organize -- analyze the source code

24   for Coda?

25   **A.**   No.

1   **Q.**   Do you know whether the source code for Coda was

2   available?

3   **A.**   It is my understanding the source code for Coda was

4   available.

5   **Q.**   And what do you base that understanding on?

6   **A.**   Dr. Satyanarayanan's testimony.

7   **Q.**   And why didn't you obtain a copy?

8   **A.**   Was not my responsibility.

9   **Q.**   Okay.  Let's talk about the kernel component issue.

10   **A.**   Sure.

11   **Q.**   What are you referring to when you're talking about a

12   kernel component?

13   **A.**   So in all the diagrams that describe Coda, we see very

14   clearly a part of Coda that is operating in kernel space called

15   Coda FS.  And that is the component of Coda which is -- is

16   the -- is preventing Coda from satisfying many of the elements

17   of the claims.

18          **MR. PIETRANTONIO:**  If we could just put up a board.

19          **THE COURT:**  Counsel, we're on rebuttal, okay.

20          **MR. PIETRANTONIO:**  I'm trying --

21          **THE COURT:**  Move it along.

22          **MR. PIETRANTONIO:**  I'm moving it along, Your Honor.

23   But I'm trying to rebut based on of all the points it is that

24   we've pointed out are not present in the art.

25          **THE COURT:**  I'm not asking for argument.

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1          **MR. PIETRANTONIO:**  Yes, I understand.

2          **THE COURT:**  I'm telling you what we're doing.

3          **MR. PIETRANTONIO:**  Let's put up the board.

4    **BY MR. PIETRANTONIO**

5    **Q.**   Is this a replica of a picture that Dr. Jagannathan used?

6    **A.**   Yes.

7    **Q.**   Could you highlight for us by labels what you're talking

8    about in terms of the components of Coda and where it is that

9    they sit in this system?

10   **A.**   Sure.  There are two components to Coda on the client side

11   that cannot operate without each other.  They have to be

12   installed.  They have to be installed together.

13         One is Coda FS, which we can clearly see in the kernel.

14   And the other is the Venus cache manager, which does operate in

15   user space.  These are not separate pieces that are completely

16   independent.  They must come together.  Venus will not operate

17   without Coda FS.  And Coda FS's only job is to talk to Venus.

18   **Q.**   Is the kernel the same thing as the operating system?

19   **A.**   It is not.  So the kernel is a special place of memory

20   within a computer where the operating system does, in fact,

21   reside and execute.  That is true.  The operating system is

22   part of the kernel.  And there might be drivers that come along

23   with the operating system that also execute in kernel space.

24   But, there can also be third-party drivers installed in the

25   kernel interacting with the operating system in order -- as

1    well.

2         Those third-party drivers are not written or developed by

3    whomever created the operating system.  They're not delivered

4    with the operating system.  And when they get installed into

5    the kernel, even though they're running in the same kernel

6    space with the operating system, they are not part of the

7    operating system.

8    Q.   So if you were to install a driver along with a Windows

9    operating system, a driver for a printer, does that become part

10   of the Windows operating system?

11   A.   It does not.

12   Q.   Okay.  So based on your understanding of the architecture

13   of Coda, does Coda satisfy the element of being executable to

14   run in user space?

15   A.   It does not.

16   Q.   Okay.  Venus, however, is a portion of Coda; is that

17   right?

18   A.   That is correct.

19   Q.   And Venus runs in user space, doesn't it?

20   A.   It does.

21   Q.   Now, will Venus work without the Coda FS component?

22   A.   It will not.

23   Q.   Okay.  Is this at all similar to the shortcomings that

24   were described in the patent about the prior art?

25   A.   It is exactly similar, yes.

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1   Q.   And what are those shortcomings?

2   A.   Well, the -- by using a driver, you have additional

3   programming for the driver, and you have to worry about

4   destabilizing the operating system and causing problems and

5   updating with any changes to the operating system, all the same

6   things that were in the specification.

7   Q.   All right.  We have two more elements to talk about with

8   regard to Coda.

9   A.   That's right.

10  Q.   Let's talk about the element where the cache manager is to

11  notify the operating system to open the cached file.

12  A.   Sure.

13  Q.   Do you understand that -- what's your opinion as to

14  whether Coda satisfies that?

15  A.   It does not.  Venus does not notify the operating system

16  to open the file in the local -- in the associated application.

17  Q.   Can you talk us through, from there -- I don't want to

18  take too much more time.

19  A.   Yeah.

20  Q.   But if you could talk us through how it is that in Coda

21  the file actually gets opened, and what the steps are.

22  A.   Sure.  So before we even get to step one that's on this

23  diagram, there's a step zero.  And Dr. Jagannathan does

24  describe it.  Essentially, the user has to go through a user

25  interface like a window manager, Window Explorer on Windows,

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1    Finder on the Mac.  In Linux, in the Coda world, it would have

2    been called window manager.

3        You have to find the file, the icon for the file you want

4    to open, and you double click on the icon.  Right?  It is at

5    that point that the window manager, not Venus -- Venus is not

6    even involved yet -- but the window manager, the user interface

7    to the files, that is what informs the operating system, please

8    open this file in the associated locally running application.

9        Okay.  And then the local running application gets started

10   and the local running application, the file -- after the

11   operating system figures out which locally running application

12   should be -- should be started, should be associated with that

13   file, and then the local -- that application is provided the

14   file name to open.

15       And so that's when we get to step one here.  So when step

16   one is occurring here -- and we can see client program is

17   already there, right, the client program is up, it's running,

18   and has been informed which file to open.  And so then it

19   issues this system call.  It asks the operating system, please

20   open this file.  Right.

21       So then the operating system takes that instruction to

22   open the file and recognizes this is a file that is a Coda

23   file.  And the Coda FS driver needs to be the one to handle

24   this open.  And so that we see as step two.

25       So the operating system then asks Coda FS, please handle

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1    this, this is one of your files.  And at that point Coda FS, a

2    component that is not the operating system but operating in the

3    kernel space, does its job, which is to communicate to the

4    Venus cache manager, we need this file; make sure it's cached.

5         And if the file is there or not there, then Venus does its

6    job.  It might go to the server, which here it's step four, and

7    retrieve the file, which is step five.  And then Venus informs

8    its partner, Coda FS, I've got the file all set up, ready to

9    go.

10        And then Coda FS then handles whatever opening operation

11   it needs to handle on the cached file, and then informs the

12   operating system, here in step seven, we're good to go, that

13   file is open.  And then, at that point, the opening is

14   complete.

15        But the key component here, the part that doesn't match

16   the elements, is the elements say that Venus needs to ask the

17   operating system, please start the locally running -- the

18   application associated with this file.  Please start that

19   application and have it open this file.  And that part is

20   already done the way Coda does it.

21        **MR. PIETRANTONIO:**  So if we could bring up page 5 of

22   2788, please.

23        (Document displayed)

24   **BY MR. PIETRANTONIO:**

25   **Q.**   What element does that correspond to?

**MAYER-PATEL - DIRECT / PIETRANTONIO**

1  **A.**   So that element corresponds to -- let me see here --

2  notifying an operating system -- [d], notifying an operating

3  system to open a cached file.

4  **Q.**   So, in your opinion, does Coda satisfy that element?

5  **A.**   It does not.

6  **Q.**   And does it satisfy that element as it appears in any of

7  the other claims?

8  **A.**   It does not.

9  **Q.**   Okay.  Last piece, the determining piece.

10      What is your opinion as to whether or not Coda actually

11  discloses the determining operation in the claims?

12  **A.**   Coda does not disclose determining the cached file has

13  been modified based on notification from the operating system.

14  **Q.**   And why do you believe that?

15  **A.**   Because Venus, the cache manager -- that's what they're

16  claiming is the part that is satisfying these elements -- never

17  talks to the operating system.  Venus only communicates with

18  Coda FS, a component that is in kernel space that is designed

19  specifically to talk to Venus and be that bridge between Venus

20  and the operating system.  All communication with the operating

21  system goes through Coda FS.

22  **Q.**   Is there any disclosure in any of the documentation or the

23  code that you've seen as to how Venus actually determines that

24  a file has been modified?

25  **A.**   I have not seen any disclosure that Venus determines the

1    file has been modified.

2    **Q.**   So is it your opinion that it does not -- that Coda does

3    not satisfy either the notifying or the determining operations?

4    **A.**   That is correct.

5    **Q.**   And so, in your opinion, looking at, again, page 5 in the

6    '665 patent, what element does that refer to?

7    **A.**   Here it's element [f].

8    **Q.**   So, in your opinion, is element [f] missing from Coda?

9    **A.**   It is.

10   **Q.**   And the corresponding element in the other four claims to

11   this step are also missing; is that correct?

12   **A.**   Exactly.

13   **Q.**   So to sum up, in your opinion, does Coda anticipate the

14   asserted claims?

15   **A.**   Does not.

16   **Q.**   And, in your opinion, are the asserted claims valid over

17   the Coda-based theories presented by Dr. Jagannathan?

18   **A.**   The claims are valid.

19   **Q.**   All right.  Last piece.  You mentioned secondary

20   considerations as they relate to obviousness.

21   **A.**   I did.

22   **Q.**   What secondary considerations did you consider?

23   **A.**   Commercial success of the patented product.  A long-felt

24   need for people that the patent satisfies.  Failure by others

25   to solve that same problem in some other method.  And can't

1   remember the other -- secondary consideration.  Certainly,

2   those three at least.

3   **Q.**   Long-felt need.  Failure --

4   **A.**   Oh, failure by others, yeah.  I already mentioned that.

5   **Q.**   Commercial success and praise?

6   **A.**   Oh, that's right, and praise for the patent.

7   **Q.**   In your testimony on direct, did you present any evidence

8   about usage that might relate to any of the secondary

9   considerations?

10  **A.**   I did.  I showed graphs indicating that Box Edit was being

11  downloaded and being used, and increasingly so as time goes by.

12  **Q.**   And in connection with the notions of either long-felt

13  need or failure by others, do you have an opinion as to whether

14  there are -- there's any evidence you've seen or heard that

15  relates to that?

16  **A.**   Yes.  I believe that the problems that Box Sync

17  encountered -- that their customers encountered with Box Sync

18  represents both a long-felt need as well as a failure to

19  address that need in another way.

20  **Q.**   And considering all of the secondary considerations, how

21  did they affect your opinion about obviousness?

22  **A.**   It would not have been obvious.

23  **Q.**   So, to summarize, what is your opinion regarding the

24  validity of the asserted patents of the file sync patents?

25  **A.**   It is my opinion that they are all valid.

**PROCEEDINGS**

1   Q.   And what is your opinion concerning the infringement of

2   the asserted claims of the file sync patents?

3   A.   It is my opinion that all of the -- that Box Edit for Mac,

4   Box Edit for Windows infringe all of the asserted claims, and

5   that Box for Android editing feature infringes the -- the claim

6   27.

7              MR. PIETRANTONIO:  Pass the witness.

8              THE COURT:  Cross.

9              MR. BOVICH:  One second, Your Honor.  Grab a board.

10             THE COURT:  Okay.

11                     <u>CROSS-EXAMINATION</u>

12   BY MR. BOVICH

13   Q.   Sir, let's start by talking about --

14             THE COURT:  We're actually going to take our

15   mid-morning break -- our last break.  Okay.

16             MR. BOVICH:  Yes.

17             THE CLERK:  All rise for the jury.

18        (Jury out at 12:22 p.m.  Proceedings in jury absence.)

19             THE COURT:  Both of you come back up here to the

20   podiums.  Defense, plaintiff.

21        I don't want to replow old ground.  Okay?  So you can do

22   your rebuttals.  That's fine.  But keep it rebuttal focused.  I

23   don't want to go back.  We've heard a lot about kernels and

24   everything else.  We don't need to go back and reset the table

25   every time.

PROCEEDINGS

```
 1        You can do your thing.  You're perfectly free to do your
 2  thing on rebuttal.  Knock yourselves out on that.  But let's be
 3  efficient and not keep doing the setup we've already gone over.
 4  It's only been a week and a half of trial.  It's all fresh.
 5            MR. BOVICH:  Yes, Your Honor.
 6            THE COURT:  Do you understand?
 7            MR. PIETRANTONIO:  Yes.
 8            THE COURT:  I'm not singling everybody out.  It's for
 9  everybody.
10            MR. BOVICH:  I understand.
11            THE COURT:  Now, what are you planning to do after?
12            MR. BOVICH:  A very brief --
13            THE COURT:  No, wait, the rebuttal case is still going
14  on.
15        What are you planning to do after this?
16            MR. FRIEL:  Planning to recall Mr. Carter for a very
17  brief line of questioning.  And that is to rebut the expert,
18  Dr. Leonard's, assumption with respect to Office Editor being
19  part of Enterprise Connect.
20            THE COURT:  Being part of?
21            MR. FRIEL:  Enterprise Connect.
22            THE COURT:  Is he going to date the fusion of the two
23  products --
24            MR. FRIEL:  Yes.
25            THE COURT:  -- so to speak?
```

PROCEEDINGS

1        **MR. FRIEL:**  Yes.

2        **THE COURT:**  Okay.  And then?

3        **MR. FRIEL:**  Then -- this is technically not a rebuttal

4    case for us.  We are opposing the case on invalidity.

5        **THE COURT:**  Yes, I know.

6        **MR. FRIEL:**  And then we may have a rebuttal after

7    that, but I don't think so.

8        **THE COURT:**  You don't think so?

9        **MR. FRIEL:**  I don't anticipate it unless a surprise

10   comes up.

11       **THE COURT:**  A bombshell goes off.

12       All right.  So Mr. Carter, and then that's it.

13       **MR. BOVICH:**  And then a very brief rebuttal by

14   Dr. Jagannathan.

15       **THE COURT:**  What are you going to do with

16   Dr. Jagannathan?

17       **MR. BOVICH:**  He's going to discuss some of the

18   opinions that are currently being rendered by Dr. Mayer-Patel.

19       **THE COURT:**  Look, we're in a downward spiral where

20   everyone just keeps saying, No, you're wrong.  No, you're

21   wrong.  No, you're wrong.

22       When are we going to cut that off?

23       **MR. FRIEL:**  Well, it's their -- it's the plaintiff's

24   case.  I mean --

25       **MR. BOVICH:**  Well, invalidity is our burden of proof.

```
 1              THE COURT:  I'm going to ask this rhetorically, then

 2   I'm going to walk out of the room.  Okay.  Never mind.  I'm not

 3   going to ask it.  That's fine.

 4              MR. BOVICH:  I'll make it brief, Your Honor.

 5              THE COURT:  Make it brief.

 6              MR. BOVICH:  I will do so.

 7              THE COURT:  All right.

 8              THE CLERK:  All rise.  Court's in recess.

 9         (Recess taken at 12:24 a.m.)

10         (Proceedings resumed at 12:35 a.m.)

11              THE COURT:  Okay.  Ready?

12              MR. BOVICH:  I am, Your Honor.

13              THE CLERK:  All rise for the jury.

14         (Jury enters at 12:35 p.m.)

15              THE CLERK:  Please be seated.

16              THE COURT:  Counsel.

17              MR. BOVICH:  Thank you, Your Honor.

18   BY MR. BOVICH

19   Q.   Sir, I'd like to talk, first, about your infringement

20   allegations and Box's noninfringement position.

21   A.   Sure.

22   Q.   Okay.  So turning back to the products as they operate,

23   you understand that there's a hash value calculation that's

24   done?

25   A.   That is correct.
```

**MAYER-PATEL - CROSS / BOVICH**

1   **Q.**   And your opinion, the opinion that you are offering, is

2   that that hash value calculation is not the notification of the

3   claims; right?

4   **A.**   That is correct.

5   **Q.**   And if I asked you the same question about the hash value

6   comparison, in other words, that's not the notification of the

7   claims either, you'd give me the same answer; right?

8   **A.**   That is correct.

9   **Q.**   Okay.  Now, you talked a little bit about polling in the

10  specification.  You do understand that there is a claim in the

11  '515 patent that relates to polling; right?

12  **A.**   Yes.

13  **Q.**   It's claim 26?

14  **A.**   I believe so.

15  **Q.**   And it's not part of this lawsuit, is it?

16  **A.**   That's correct.

17  **Q.**   So there are no claims covering polling that are involved

18  in this lawsuit; right?

19  **A.**   Uhm, beyond the answer of a poll being an example of the

20  notification that Box Edit for Windows uses, no.

21  **Q.**   I'm talking about the words in the claims.  If I went

22  through my four boards here and looked for the word "polling"

23  in the claims, I wouldn't find it; right?

24  **A.**   Sure.

25  **Q.**   Were you here for the patent video at the beginning of the

**MAYER-PATEL - CROSS / BOVICH**

1    case?

2    **A.**   Yes.

3    **Q.**   You understand that they used an analogy of a fence and a

4    boundary line for property?

5    **A.**   Sure.

6    **Q.**   And so you read the claims and you look at the words, and

7    that's the boundary of the claims; right?

8    **A.**   That is correct.

9    **Q.**   Okay.  And looking at the boundary of these four claims

10   that are involved in this case, they don't set the boundary at

11   polling, do they?

12   **A.**   They don't set the boundary at polling.  I believe they

13   set the boundary at notification.

14   **Q.**   Now, you talked a little bit about the meaning of a

15   specification.  Would you agree with me an interpretation of

16   the claims that is inconsistent with a specification -- in

17   other words, one that is inconsistent with an embodiment -- is

18   usually the wrong interpretation?

19   **A.**   If it was inconsistent with the specification, sure.

20   **Q.**   Okay.  Now, in the specification, after they discuss the

21   notification --

22   **A.**   Sure.

23   **Q.**   -- there's no further discussion of any further processing

24   that's done; right?

25   **A.**   Other than -- are you talking about the embodiments

**MAYER-PATEL - CROSS / BOVICH**

1  described?

2  **Q.**  Yes, I am.

3  **A.**  That's correct.

4  **Q.**  Okay.  So let's now talk about WS_FTP.

5  **A.**  Sure.

6  **Q.**  Okay.  And I'd like to go to --

7       **MR. BOVICH:**  Beau, Dr. Jagannathan's slide 45, please.

8       (Document displayed)

9  **BY MR. BOVICH**

10  **Q.**  So you do understand that Dr. Jagannathan's opinion is

11  that the determination -- let me set up the claim for you.  Use

12  the '665 claim 4 as an example.

13  **A.**  Sure.

14  **Q.**  Here's our determining step.  You do understand that he

15  concedes that this element is not specifically described in the

16  manual; right?

17  **A.**  Yes.

18  **Q.**  All right.  And you've done prior art analysis before;

19  right?

20  **A.**  Sure.

21  **Q.**  Okay.  Agree or disagree?  A written publication on its

22  own may be a prior art reference.

23  **A.**  A publication, yes.

24  **Q.**  Right.  So the WS_FTP Guide, in other words, if someone

25  wrote that guide word for word, but it was a book -- in other

**MAYER-PATEL - CROSS / BOVICH**

1    words, it wasn't trying to describe software, it was just a

2    book, would that be a prior art reference?

3    **A.**   If it was published.

4    **Q.**   Right.  Even if there was no product; right?

5    **A.**   Sure.

6    **Q.**   Even if there was no source code; right?

7    **A.**   That is correct.

8    **Q.**   Okay.  So, now, turning back to the inherent feature, you

9    understand that Dr. Jagannathan is basing his obviousness

10   analysis of this element on the inherent feature; right?

11   **A.**   Yes.

12   **Q.**   And on slide 45, you can see the paragraph that we're all

13   pointing to as describing the inherent feature; right?

14   **A.**   Yes.

15   **Q.**   Okay.  You testified that the Patent Office obviously read

16   the specification, so they saw what this inherent feature was;

17   right?

18   **A.**   That's right.

19   **Q.**   Do you think the Patent Office understood it?

20   **A.**   I don't understand -- I don't know what the Patent Office

21   understood necessarily.  I'm not the Patent Office.

22   **Q.**   Okay.  What do you think?

23   **A.**   I would have no basis for coming to a conclusion one way

24   or the other.

25   **Q.**   Okay.  You understand that this is a well-known feature?

**MAYER-PATEL - CROSS / BOVICH**

1    **A.**    I understand that it's a well-known feature, yes.

2    **Q.**    It was a well-known feature at the time of the invention?

3    **A.**    I believe so.

4    **Q.**    Okay.  Do you think a person of skill in the art would

5    understand how it works?

6    **A.**    Sure.

7    **Q.**    And do you understand how it works?

8    **A.**    Yes.

9    **Q.**    Okay.  How is it possible that a person of skill in the

10   art would understand how this works without looking at source

11   code?

12   **A.**    Uhm, I mean, they would understand this feature of

13   Windows.  It's probably documented in Windows -- in the Windows

14   API.

15   **Q.**    I agree.  All right.  Let's look at the database issue.

16        Now, you have opined with regard to WS_FTP that the files

17   on the remote host, that actually is a database, haven't you?

18   **A.**    No, I don't believe I have.

19   **Q.**    Okay.  Not at all in this case?

20   **A.**    I don't think so.

21   **Q.**    Okay.  So you've worked hard on this case, and you've

22   written reports and you've written declarations; right?

23   **A.**    Sure.

24        **MR. BOVICH:**  Okay.  So, Beau, can we have image 78A.

25

MAYER-PATEL - CROSS / BOVICH

1   BY MR. BOVICH

2   Q.   So one of the declarations you signed in this case was in

3   October of 2013.  Do you remember that?

4   A.   I believe so.

5            MR. BOVICH:  MP 78A, Beau.

6      (Document displayed)

7   BY MR. BOVICH

8   Q.   At the bottom -- this is October 7, 2013.  You wrote this

9   and you signed it; right?

10  A.   Yes.

11  Q.   And you say:

12          "I swear that the facts set forth in this declaration

13       are true and correct to the best of my knowledge."

14       Right?

15  A.   Yes.

16  Q.   And then up above, we've got your paragraph 78.  And I'll

17  read the highlighting.  You say:

18          "WS_FTP discloses saving the file back to the remote

19       host."

20       Right?

21  A.   Yes.

22  Q.   And then you went on.  And there's other highlighting and

23  you say:

24          "The file is saved directly back to the remote

25       database."

MAYER-PATEL - CROSS / BOVICH

1   **A.**   That's -- yeah, I do see that.

2   **Q.**   That's what you said about WS_FTP?

3   **A.**   It -- it is the word I used in that sentence.  And it is

4   not -- it's an incorrect word.  Nowhere else do I talk about

5   why WS_FTP's files would be a database.

6   **Q.**   Did you just say that this is incorrect?

7   **A.**   It's misleading.  I -- what I'm meaning in this sentence

8   is that this does not satisfy the element of determining the

9   file to be saved back to a remote database.

10  **Q.**   I agree, you were trying to make a different point; right?

11  **A.**   Yes.

12  **Q.**   But one of the points you did make, one of the words you

13  did use is "database"; right?

14  **A.**   Sure, I used the word.

15  **Q.**   Okay.  Now, the patent itself actually has a discussion of

16  what the database is; right?

17  **A.**   I believe so.

18  **Q.**   Okay.  So why don't we --

19       **MR. BOVICH:**  Beau, let's go to -- bear with me --

20  Trial Exhibit 1092.

21       (Document displayed)

22       **MR. BOVICH:**  That's the '515 patent, column 6, 7 to

23  11.

24  **BY MR. BOVICH**

25  **Q.**   So starting at line 7, there's a discussion here of the

1   database in the patent; right?

2   **A.**   Yes.

3   **Q.**   And what it says is:

4          "In the well-known Microsoft Windows operating system,

5      database could appear as an additional drive in a

6      directory tree of the Windows Explorer display, and each

7      database asset could appear as a file under the database

8      directory."

9      Is that how the inventors described it here?

10  **A.**   The inventors describe how a database could appear --

11  **Q.**   Right.

12  **A.**   -- to the user.

13  **Q.**   Okay.  And what they're talking about is the appearance of

14  all those files that are stored remotely; right?

15  **A.**   Right, the appearance.

16  **Q.**   Right.  Okay.

17          **MR. BOVICH:**   So let's go now to Jagannathan direct

18  slide 30.

19      (Document displayed)

20  **BY MR. BOVICH**

21  **Q.**   All right.  This is a picture out of the WS_FTP manual;

22  right?

23  **A.**   Sure.

24  **Q.**   And on the right side, what you're seeing is a

25  representation of how the files appear on the remote server;

**MAYER-PATEL - CROSS / BOVICH**

1    right?

2    **A.**   It is both appearance and reality.   That is how the files

3    are on the server.

4    **Q.**   Okay.   And are those directories?

5    **A.**   On the right-hand side?

6    **Q.**   Yeah.

7    **A.**   I believe /pub/win32 is a directory.

8    **Q.**   Okay.   And would you call that a hierarchy?

9    **A.**   It would be a path, yes.

10   **Q.**   Would you call that a hierarchy?

11   **A.**   It can be.   I mean, the -- is it implemented as a

12   hierarchy?   I don't know.   It is a file path.

13   **Q.**   Okay.   So using the knowledge of the patent, how they

14   described the database was going to look to the local client,

15   looking at the same thing on WS_FTP, that representation, is

16   that a hierarchy?

17   **A.**   It is an appearance of a hierarchy, yes.

18   **Q.**   Okay.   And are those files organized in alphabetical

19   order?

20   **A.**   I don't know whether -- they happen to be alphabetical.

21   **Q.**   Okay.   Was alphabetical order predetermined before the

22   publication of the WS_FTP manual?

23   **A.**   Again, what do you mean by alphabetical order being

24   predetermined?

25   **Q.**   I mean, did you know how the alphabet worked before 1998?

MAYER-PATEL - CROSS / BOVICH

1    **A.**    Sure.

2    **Q.**    Okay.  Are these files in alphabetical order?

3    **A.**    They are.

4    **Q.**    Okay.  And that's the way they are organized; right?

5    **A.**    I don't know how the server is organizing them.  They

6    appear in alphabetical order.

7    **Q.**    Okay.  All right.  Now, looking at the date stamps, you

8    could click on those sort buttons and you could resort this

9    information according to time as well; right?

10   **A.**    Maybe.  Without having the software, I can't click on the

11   date.

12   **Q.**    So you don't know if those are sort buttons or not?

13   **A.**    I don't know.

14        **MR. BOVICH:**  Okay.  So let's go, Beau, to the WS_FTP

15   manual that's Exhibit -- Trial Exhibit 618.  Page 22.

16      (Document displayed)

17        **MR. BOVICH:**  And blow up the figure, please.

18   **BY MR. BOVICH**

19   **Q.**    Now, that's another different figure showing -- from the

20   WS_FTP manual, and it's showing how things are displayed;

21   right?

22   **A.**    Sure.

23   **Q.**    Okay.  So now look up at the top right and you can see

24   there's a key there in the manual?

25   **A.**    Yeah.

**MAYER-PATEL - CROSS / BOVICH**

1   **Q.**   Okay.  Are those sort buttons?

2   **A.**   Apparently.

3   **Q.**   Okay.  So let's talk about -- you talked about -- I want

4   to switch gears and talk about the element in WS_FTP about

5   getting a notification that another user has modified the file.

6   **A.**   Sure.

7   **Q.**   Actually, let's group your analysis on Coda and WS_FTP.

8   **A.**   Okay.

9   **Q.**   All right.  I think you said that what this claim requires

10  is notice that simultaneously another user has modified the

11  file; right?

12  **A.**   Yes.

13  **Q.**   Okay.  And do you remember the fence analogy?  The patent

14  defines the boundary; right?

15  **A.**   Sure.

16  **Q.**   And are we going to find the word "simultaneously" in here

17  anywhere?

18  **A.**   No.

19  **Q.**   You read the Court's claim construction?

20  **A.**   I did.

21  **Q.**   Okay.  And is there a claim construction of these two

22  elements which legally requires the notice to be

23  simultaneously?

24  **A.**   No.

25          **MR. BOVICH:**  Let's go to Dr. Jagannathan's direct

 1    slide 250, please.

 2              (Document displayed)

 3              **MR. BOVICH:**  251.  On direct 250, do we not have that

 4    one?  Maybe a different deck.  Why don't you go to 249.

 5         Can we get the ELMO on?

 6         Sorry, this will take one second.

 7              (Document displayed)

 8    **BY MR. BOVICH**

 9    **Q.**   Old-school technology, but do you see what I'm referring

10    to here?

11    **A.**   Sure.

12    **Q.**   Okay.  This is a window from DocuShare where you get

13    notifications about modifications; right?

14    **A.**   It is a -- I believe it is showing DocuShare's interface

15    for viewing file history.

16    **Q.**   Right.  And in that file history, you can see that

17    different users have modified the file?

18    **A.**   Sure.

19    **Q.**   Okay.  Now, it may not tell you this simultaneously, but

20    it tells you that different users have modified the file;

21    right?

22    **A.**   Of a particular file on the server.  It may not be in your

23    cache.

24    **Q.**   Okay.  A file on the server, did you say?

25    **A.**   Or on the DocuShare server, yeah.

**MAYER-PATEL - CROSS / BOVICH**

1   **Q.**   Isn't that the same thing as the database asset?

2   **A.**   For DocuShare, yes.

3   **Q.**   I mean, in the claims, the database asset is the file on

4   the server; right?

5   **A.**   Sure.

6   **Q.**   Okay.  All right.  Now let's talk about Coda.

7        Now, you've already agreed that Venus is the cache manager

8   for Coda; right?

9   **A.**   It is the cache manager component of Coda, yes.

10  **Q.**   Right.  And you agree that it resides, if you will, in

11  user space?

12  **A.**   Venus does, yes.

13  **Q.**   Okay.  Now, an example of one of these user space claims

14  is in the '515 patent, claim 10, element [d] here; right?

15  **A.**   Sure.

16  **Q.**   And what it says is that it has to be a software program

17  executable in user space; right?

18  **A.**   That is correct.

19  **Q.**   Okay.  Now, can you find anything in this claim where it

20  says you're not allowed to have a kernel component?

21  **A.**   Uhm, the cache manager program cannot be in the kernel.

22  **Q.**   Can you find anything in this claim here that says you're

23  not allowed to have a kernel component?

24  **A.**   Does not say that in -- in that element.  But the patent

25  specification clearly teaches this is why the patent was

**MAYER-PATEL - CROSS / BOVICH**

1   invented, to get away from solutions like the ones that have

2   kernel components.

3   **Q.**   You've read the Court's claim construction of user space?

4   **A.**   I have.

5   **Q.**   Is there anything in that construction of user space that

6   says you're not allowed to have a kernel component?

7   **A.**   There is not.

8   **Q.**   This is a diagram of Coda?  You've seen it before; right?

9   **A.**   Sure.

10  **Q.**   Your point is Coda is not going to work unless I've got

11  this blue stuff here; right?

12  **A.**   No, not just the blue stuff, the Coda FS component in the

13  blue stuff.

14  **Q.**   Right.  Now, let's draw an analogy to the invention.  All

15  right?

16  **A.**   Sure.

17  **Q.**   Let's compare blue in Coda to blue in the invention.  Is

18  the invention going to work if I don't have the blue stuff?

19  **A.**   So this is the problem:  You've drawn blue for the kernel

20  and you've drawn blue for the operating system.  Those are not

21  one and the same.

22  **Q.**   Is the invention going to work if I don't have the blue

23  stuff?

24  **A.**   Which one, the operating system or the kernel?

25  **Q.**   Either.  On the left side.

1   **A.**   On the left side?  The invention will not work if there's

2   no operating system.

3   **Q.**   Okay.  Now, moving back over to Coda, when a user makes a

4   change --

5   **A.**   Sure.

6   **Q.**   -- you understand that a write command gets sent along

7   line 3 here?

8   **A.**   Yes.

9   **Q.**   Okay.  And it comes from the kernel?

10  **A.**   It comes from Coda FS in the kernel, yes.

11  **Q.**   Coda FS, what does FS stand for?

12  **A.**   I believe it stands for file system.

13  **Q.**   Now, Venus gets that write command; right?

14  **A.**   Sure.

15  **Q.**   And let's go back to the patent specification.  You would

16  agree with me that in the patent specification it says, "One

17  example of determination is receiving the notice."  Doesn't it

18  say that?

19  **A.**   I believe so, yes.

20  **Q.**   Okay.  And does Venus receive this?

21  **A.**   It receives it from Coda FS, yes.

22  **Q.**   Okay.  And, again, Coda FS means file system?

23  **A.**   It does.

24  **Q.**   Okay.

25           **MR. BOVICH:**  Pass the witness, Your Honor.

MAYER-PATEL - REDIRECT / PIETRANTONIO

```
 1            THE COURT:  Okay.  Any follow-up?

 2            MR. PIETRANTONIO:  Three questions.

 3            THE COURT:  Sure.

 4                    REDIRECT EXAMINATION

 5   BY MR. PIETRANTONIO

 6   Q.    Is Coda FS part of the file management system of the

 7   operating system?

 8   A.    It is not.

 9   Q.    In connection with a database asset, where does that sit?

10   Does it sit in a server or a database?

11         Is there something that you can explain for us on where a

12   database asset sits?

13   A.    Sure.  The database asset is in a database server and is

14   managed by a database management program.

15   Q.    Now, you were pointed to a declaration you submitted in

16   September of 2013; is that correct?

17   A.    Yes.

18   Q.    When -- do you have an idea of when the Court's

19   construction of "database" was actually issued?

20   A.    Uhm, yes.  Much more recent than that.

21   Q.    So did you apply the Court's construction of "database" in

22   connection with your analysis of the claims?

23   A.    At the time in 2013?

24   Q.    No.

25   A.    Now?
```

1  **Q.**   In connection with the opinions you've rendered here for

2  the jury, have you applied the Court's construction of

3  "database"?

4  **A.**   Yes.

5          **MR. PIETRANTONIO:**  No further questions.

6          **THE COURT:**  All right.

7          **MR. BOVICH:**  Nothing further, Your Honor.

8          **THE COURT:**  Okay.  Thank you.  You're excused.

9      Mr. Friel.

10         **MR. FRIEL:**  Yes, we're recalling Mr. Nicholas Carter.

11         **THE COURT:**  All right.  Is he here?

12         **MR. FRIEL:**  He's here, yes.  He's the company

13 representative.

14         **THE CLERK:**  Would you please raise your right hand.

15                        **<u>NICHOLAS CARTER</u>**,

16 called as a witness for the Plaintiff, having been duly sworn,

17 testified as follows:

18         **THE WITNESS:**  I do.

19         **THE CLERK:**  Please be seated.

20         **THE WITNESS:**  Thank you.

21         **THE CLERK:**  Please state your full name for the Court

22 and spell your last name.

23         **THE WITNESS:**  Nicholas Michael Quincy Carter.

24 C-a-r-t-e-r.

25         **THE CLERK:**  Thank you.

CARTER - DIRECT / FRIEL

| | |
|---|---|
| 1 | <u>DIRECT EXAMINATION</u> |
| 2 | **BY MR. FRIEL** |
| 3 | **Q.**   I want to ask you a few questions about Office Editor and |
| 4 | Content Suite. |
| 5 |    Can you confirm that Open Text Enterprise Connect is a |
| 6 | part of Open Text's Content Suite product? |
| 7 | **A.**   Yes, it is. |
| 8 | **Q.**   When did Open Text Enterprise Connect launch?  When was it |
| 9 | first available? |
| 10 | **A.**   2009. |
| 11 | **Q.**   When Enterprise Connect launched in 2009, was Open Text |
| 12 | Office Editor program offered as a feature of Enterprise |
| 13 | Connect? |
| 14 | **A.**   Yes. |
| 15 | **Q.**   At that time, how was it offered, as an add-on or bundled |
| 16 | with the product? |
| 17 | **A.**   At that time it was offered as an add-on. |
| 18 | **Q.**   Did that subsequently change? |
| 19 | **A.**   Yes. |
| 20 | **Q.**   How -- |
| 21 | **A.**   Sorry. |
| 22 | **Q.**   Go ahead. |
| 23 | **A.**   It was bundled in 2010. |
| 24 | **Q.**   Okay.  And how is it offered today?  That is, how is |
| 25 | Office Editor offered as part of Enterprise Connect today? |

CARTER - DIRECT / FRIEL

1    A.   It's bundled with Enterprise Connect and a factor,

2    therefore, in the Content Suite.

3         MR. FRIEL:  Thank you.  Pass the witness.

4         THE COURT:  Okay.  Next?  More?

5         MR. BAKER:  Just one question, Your Honor.

6         THE COURT:  Mr. Friel --

7         MR. FRIEL:  I have one question -- or a couple of

8    questions.

9         THE COURT:  Yes.

10   BY MR. FRIEL

11   Q.   I'd like to hand you a copy of Trial Exhibit 2789.

12        MR. FRIEL:  If I may approach?

13        THE COURT:  Yes.

14   BY MR. FRIEL

15   Q.   Can you identify Trial Exhibit 2789 as an Open Text

16   document?

17   A.   Yes.

18   Q.   Titled --

19   A.   Sorry, yes.

20   Q.   And it's titled "Open Text Enterprise Connect Release

21   Notes"; correct?

22   A.   Yes.

23        MR. FRIEL:  Your Honor, I'd like to move this into

24   evidence.

25        MR. BAKER:  I haven't even seen it yet, Your Honor.

1      **THE COURT:**  One second.

2          Do you have a copy handy, Mr. Friel?  I don't need to keep

3      it.  I'll just page through it.  Thank you.

4          (Pause)

5          **MR. FRIEL:**  I believe it's page 16 that we saw during

6      the cross-examination of Dr. Leonard.

7          **THE COURT:**  16?

8          **MR. FRIEL:**  Trial director 16.

9          **MR. BAKER:**  No objection, Your Honor.

10         **MR. FRIEL:**  It's halfway down.

11         **THE COURT:**  Oh, okay.  All right.  It's admitted.

12         (Trial Exhibit 2789 received in evidence.)

13         **MR. FRIEL:**  Thank you.

14         May we publish this to the jury then?

15         **THE WITNESS:**  Yes.

16         **THE COURT:**  Yes.

17         (Document displayed)

18     **BY MR. FRIEL**

19     **Q.**   These are release notes for Open Text Enterprise Connect

20     product that you've been testifying about; right?

21     **A.**   Yes.

22     **Q.**   And I want to have you turn to page 16 of the release

23     notes.  And I've highlighted a portion of that.

24         Could you read that?

25     **A.**   Yes.  It says, "NGD-5230 - Launching the Office Editor

 1    through Enterprise Connect and canceling the edit session on a

 2    multilingual Microsoft Office document might cause data loss."

 3    Q.   What does that tell you about whether Office Editor was

 4    offered as a part of Open Text's Enterprise Connect?

 5    A.   Well, that NGD-5230 group is -- is a juror entry, so it's

 6    an entry in our backlog management system.  So, therefore, this

 7    is a bug that has been reported in the software by one of our

 8    customers.  So, therefore, the software must have been

 9    available at that time.

10         MR. FRIEL:  Thank you.  Pass the witness.

11         THE COURT:  Cross.

12                      **CROSS-EXAMINATION**

13    BY MR. BAKER

14    Q.   Good morning again, Mr. Carter.

15    A.   Good morning, Mr. Baker.

16    Q.   Quickly, so I'm clear, so the Office Editor feature you're

17    telling me was an add-on to Enterprise Connect in 2009?

18    A.   It was included with Enterprise Connect in 2009.

19    Q.   It was part of the Enterprise Connect product in 2009?

20    A.   It was part of the bundled Enterprise Connect.  It

21    contained a number of components, yes.

22    Q.   I thought you testified that it was offered as an add-on.

23    A.   So later on, when the new Office Editor came out, we

24    unbundled it, so it's now available as a separate download.

25    But it's only -- it's only for people who just want to install

 1   that.  So we changed the way we installed it.  It's as simple

 2   as that.

 3   **Q.**   I see.  So, in June of 2009, the Office Editor feature

 4   was, as you said, an add-on to Enterprise Connect?

 5   **A.**   Yes.

 6   **Q.**   Is that right?

 7   **A.**   Yes.

 8           **MR. BAKER:**  Nothing further, Your Honor.

 9           **THE COURT:**  Let me make sure I understand, Mr. Carter.

10   So in June 2009, if I'm sitting in my home or business and

11   I wanted to get Office Editor, how would I get that?

12           **THE WITNESS:**  So at the time you probably -- I think

13   you would have been able to download Enterprise Connect from

14   our Knowledge Center.  And at the time it was -- when you went

15   to the installation screen, you'd say install Enterprise

16   Connect.  There were two options -- at least two; there may

17   have been more.  I don't remember them all.  So install

18   Enterprise Connect; install Office Editor; maybe install other

19   things.

20           A little bit later on, so when we came out with the new

21   Office Editor, we unbundled it slightly so it's now -- you can

22   go to our Knowledge Center and download it separately.  It's

23   just a change in the installation procedure.

24           **THE COURT:**  And when did that happen?

25           **THE WITNESS:**  That happened in June 2013, is my

1   understanding.

2           **THE COURT:**  Okay.  But if I did want --

3           **THE WITNESS:**  June 2014.  Sorry.

4           **THE COURT:**  2014.  All right.

5      So if I did want to get Office Editor in June of 2009, I

6   could have done so by downloading Enterprise Connect?

7           **THE WITNESS:**  Yes.

8           **THE COURT:**  All right.  Anything else?

9           **MR. BAKER:**  Nothing further, Your Honor.

10          **MR. FRIEL:**  No questions.

11          **THE COURT:**  Okay.

12          **MR. BOVICH:**  Very brief rebuttal, Your Honor.  Calling

13  Dr. Jagannathan.

14          **THE COURT:**  All right.  On invalidity only; right?

15          **MR. BOVICH:**  Yes, sir.

16          **THE COURT:**  Okay.

17          **MR. BOVICH:**  It will be brief.

18          **THE COURT:**  All right.

19          **THE CLERK:**  Please raise your right hand.

20                  <u>**SRINIVASAN JAGANNATHAN**</u>,

21  called as a witness for the Defendants, having been duly sworn,

22  testified as follows:

23          **THE WITNESS:**  I do.

24          **THE CLERK:**  Please be seated.

25      Please state your full name for the Court and spell your

**JAGANNATHAN - DIRECT / BOVICH**

 1   last name.

 2          **THE WITNESS:**  Srinivasan Jagannathan.

 3   J-a-g-a-n-n-a-t-h-a-n.

 4          **THE COURT:**  Do you want some water?

 5          **MR. BOVICH:**  Beau, may we have Dr. Jagannathan's slide

 6   45, please, from direct.

 7      I think my monitor is down.  Do others see this?

 8          **THE WITNESS:**  It's a colored line.

 9          **MR. BOVICH:**  I don't think the jury sees it, Beau.

10      (Document displayed)

11          **MR. BOVICH:**  Thank you.

12                        <u>**DIRECT EXAMINATION**</u>

13   **BY MR. BOVICH**

14   **Q.**   What you see in front of you is the inherent feature

15   that's described in the patent specification based on Microsoft

16   Windows; is that correct?

17   **A.**   That is correct.

18   **Q.**   Okay.  And like Dr. Mayer-Patel, were you also able to

19   understand how this feature works without reference to source

20   code?

21   **A.**   Yes, I was.

22   **Q.**   Okay.  Let's move over to Coda.  Okay.  You heard

23   Dr. Mayer-Patel's description of how Coda works.  Okay.

24      Now, putting aside the legal dispute, do you and

25   Dr. Mayer-Patel agree on how Coda works?

**JAGANNATHAN - DIRECT / BOVICH**

1  **A.**   I think, from whatever I've heard of what Dr. Mayer-Patel

2  described there's no disagreement in terms of how technically

3  it operates.  Where we are differing significantly, it appears,

4  is what the terms mean in terms of the operation.

5  **Q.**   The terms of the patents?

6  **A.**   The terms of the patents, yes.

7  **Q.**   Okay.  And let's talk a little bit about one of the claim

8  elements requires notifying the operating system to open the

9  local file.  I don't have the boards, but you have that

10  limitation in mind?

11  **A.**   Yes.

12  **Q.**   Okay.  Now, I heard testimony from Dr. Mayer-Patel that

13  what the claims require is a notification to open the local

14  application.  Is that the way the claims read?

15  **A.**   No.

16  **Q.**   Okay.  What do the claims require?

17  **A.**   I don't have the claims in front of me, but basically it

18  says open the file in the locally running application or open

19  the file using the local application.  The reference is to use

20  the application that's running, open the file.

21  **Q.**   So I'm going to point you to this.  I don't have an easel.

22  '515, claim 27.  And it says:

23          "Notify the operating system to open the first cached

24      file using a first locally running application."

25      Is that right?

1   **A.**   That is correct.

2   **Q.**   Okay.  So in this claim does it matter whether the

3   application is already running?

4   **A.**   It does not.

5   **Q.**   Okay.  Does the claim require the cache manager to tell

6   the operating system to open the file?

7   **A.**   The claim only requires to notify the operating system to

8   open the file.  It literally says that.

9   **Q.**   How does that occur in Coda?

10  **A.**   In Coda -- so both Dr. Mayer-Patel and I agree there's an

11  application that's running and it passes what is called an open

12  system call.  It's basically telling the operating system, go

13  get me that file; open it for the editing purposes.

14      So that request goes through the kernel.  It goes into

15  Venus.  And Venus goes and gets the file from the remote

16  database and then stores it in the cache, and then it returns

17  back control to the operating system.

18      So it -- there's a response back to the operating system

19  saying, here's the file.  So that's arrow number 6 from Venus

20  into Coda and from there back.

21      So when it's returning from that function call into Venus,

22  so Venus is telling, here's the file, which means the operating

23  system then proceeds to give what is called a handle to the

24  file back to the client program.  But that could not have

25  happened if the file wasn't there.  So you cannot open a file

1    that doesn't exist.

2       So when Venus brings back the -- brings back the file, it

3    tells the Coda FS, which is inside the kernel, saying continue

4    on; I got the file.

5    **Q.**   Okay.  Now, as to the determination element, do you agree

6    with Dr. Mayer-Patel that, along line 3, when the user clicks

7    save, a write command gets sent to the cache manager?

8    **A.**   Yes, it says so right there.  It says "read/write" there

9    directly in the figure, yes.  So there's a write command that's

10   sent from the kernel to the Venus cache manager.

11   **Q.**   Okay.  And do you also agree with him that in the patent

12   specification they provide one of the examples of determination

13   being receiving that command?

14   **A.**   Yes.

15            **MR. BOVICH:**  Okay.  Nothing further.

16            **THE COURT:**  Okay.  Mr. Friel.

17            **MR. PIETRANTONIO:**  No questions, Your Honor.

18            **THE COURT:**  No questions?

19            **MR. PIETRANTONIO:**  No.

20            **THE COURT:**  Okay.  Anyone else to be called by

21   anybody?

22            **MR. BOVICH:**  I don't think so, Your Honor.

23            **MR. FRIEL:**  No, Your Honor.

24            **THE COURT:**  All right.  The parties have now rested.

25   So -- yes, you're excused.  Thank you.

PROCEEDINGS

1      (Witness excused.)

2          **THE COURT:**  We will have you back in on Thursday for

3    closings.  And then I'm going to forewarn you that I need to

4    read the jury instructions to you.  They are very long, by the

5    nature of the case.  So just be prepared for that.  Okay?  You

6    need to listen to them very carefully.

7          You will have a copy in the jury room, but I need to make

8    sure that I say them to you.  And you're going to have to

9    listen to me for about 44 pages.  All right?  It's a long time,

10   so just settle in and be prepared for that.  Okay?

11         And then, as I said, make sure you have Thursday and

12   Friday booked all day.  If we have to go into next week, we

13   will see where we are.  But at least count on those two days.

14         And, as usual, no research, no talking, no anything to do

15   with this case.

16         I'll see you on Thursday morning.

17          **THE CLERK:**  All rise for the jury.

18       (Jury out at 1:08 p.m.)

19          **THE COURT:**  Okay.  I have a couple of questions.

20         So just on that last issue, there are no documents other

21   than that one exhibit about Office Editor and Office -- and

22   Enterprise Connect?  Nothing that says debut launch or --

23          **MR. FRIEL:**  Well --

24          **THE COURT:**  -- here it is or anything like that?

25          **MR. FRIEL:**  I don't see this seriously in dispute

 1   other than one expert who, for whatever reason, decided --

 2           THE COURT:  I don't care what he decided.  I just want

 3   to know is there anything else?

 4           MR. FRIEL:  No, there's no contradictory evidence.

 5           THE COURT:  Well, but there's no -- there's no clearer

 6   document, in other words?  There's no --

 7           MR. FRIEL:  I'm sure I could find one.

 8           THE COURT:  Well, it's too late now.

 9           MR. FRIEL:  Yes, exactly right.

10           THE COURT:  I was just curious that that was -- all

11   right.  It's not a -- I was just interested in the issue,

12   that's all.

13           MR. FRIEL:  Yes, I'm surprised it's in contention.

14   May be one of those things we should have sat down and

15   stipulated that it was available as of mid 2009.  It's not a

16   serious dispute.

17           MR. DAIRE:  We actually do disagree.

18           THE COURT:  Yes, I know.  Mr. Friel is icing the cake.

19   I get it.  Okay.  I know there's a dispute.  It's not going to

20   be for me to solve.  There are other people who are going to

21   handle that.  I was just wondering if there was something more

22   express.  But if there isn't, there isn't.  It's fine.  The

23   evidence is what it is.

24           All right.  I have a couple of questions for you.

25           First, I need to get the -- these are on the jury

**PROCEEDINGS**

 1   instructions.  So I need to get your inserts on the prior art,

 2   which you should have seen in the draft that I sent, in the

 3   document I sent last night or filed last night.

 4       Now, I had two questions for you.  So one on reasonable --

 5   on the Georgia-Pacific factors in Instruction 35.  We can

 6   certainly cut some of them out.  Is there any reason not to?

 7          **MR. DAIRE:**  Cut some Georgia-Pacific factors out, Your

 8   Honor?

 9          **THE COURT:**  Yeah.  I mean, there are 15 of them, I

10   think we addressed four or five.

11       How do you all feel about that?

12          **MR. DAIRE:**  Take a quick minute and review them and

13   see, if you'd like.

14          **THE COURT:**  Okay.

15        (Pause)

16          **THE COURT:**  All right.  How can we relieve -- how can

17   we reduce this?

18          **MS. GUSKE:**  Sarah Guske for plaintiff Open Text, Your

19   Honor.

20       I think there's a bit of a concern that there's been

21   slides that have all of the Georgia-Pacific factors.  I think

22   the jury is expecting to see those.  And I think we've seen

23   evidence on nearly all of them except for maybe Factors 1 and

24   2.

25          **THE COURT:**  Uh-huh.  All right.

1      Defendants?

2           **MR. DAIRE:**  So, in our view, 2, 6, and 8 can be

3   excluded.  There hasn't been evidence on that.  The rest of the

4   factors should be included in the instruction.

5           **THE COURT:**  I think 2 makes sense.  You both seem to

6   agree on that.  What about 6?

7           **MR. DAIRE:**  2 is --

8           **THE COURT:**  What about 6, Ms. Guske?

9           **MS. GUSKE:**  I would disagree on 6.  We've heard lots

10   of testimony about maintenance and other such things that are

11   tied in with sales.  I think that there's evidence out there

12   that's relevant to 6, the jury should be able to consider.

13           **THE COURT:**  Okay.  8?

14           **MR. DAIRE:**  May I be heard on 6, Your Honor?

15           **THE COURT:**  I'm going to leave it in.

16           **MR. DAIRE:**  Okay.

17           **THE COURT:**  8?

18           **MS. GUSKE:**  With 8, the established profitability of

19   the product made under the patents and commercial success, we

20   actually just heard testimony about that today, including from

21   Dr. Mayer-Patel.  So we think that that's one example.  There's

22   evidence that the jury ought to be able to consider that factor

23   as well.

24           **THE COURT:**  All right.  But you both agree and

25   stipulate to taking out number 2?

1          **MR. DAIRE:**  That's correct, Your Honor.

2          **MR. FRIEL:**  Correct.

3          **THE COURT:**  You know what, let's leave them all in.

4      (Laughter)

5          **MS. GUSKE:**  Might as well.

6          **THE COURT:**  There goes efficiency.

7      Okay.  Let's go to Number 36.  I don't think we need this.

8   I've heard nothing about this issue.  Date of Commencement

9   Products?  I think it's confusing.  I just don't see any upside

10  to having it in there.

11         **MR. DAIRE:**  We agree.

12         **THE COURT:**  Defendants agree.

13         **MR. DAIRE:**  (Nods head.)

14         **THE COURT:**  Okay.

15         **MS. GUSKE:**  One point that may be helpful for the jury

16  is simply that damages begin when infringement begins in this

17  case.  I think that can be distilled down to just the -- I

18  guess it's the fourth paragraph of the model instruction.

19         **THE COURT:**  Isn't that already in the damages

20  instruction?

21         **MR. DAIRE:**  It is.

22         **THE COURT:**  This will be on -- this is a damage

23  instruction, and it's on the verdict form.  If you're worried

24  about that, I think those two will handle it for you.

25         **MS. GUSKE:**  Okay.  I don't know offhand if it's in

1    either of those things, but if that's the case it should be --

2         THE COURT:  Okay.

3         MS. GUSKE:  Yeah, I don't think we've seen a verdict

4    form yet.

5         THE COURT:  You haven't, because I still have it.  But

6    it's in the damage instruction, so that's going to go out.

7    Okay.  So I'm not hearing any reason to keep it in.

8         MR. DAIRE:  One other possible deletion, Your Honor.

9         THE COURT:  Yes.

10        MR. DAIRE:  Instruction Number 13, we didn't end up

11   reading interrogatory responses into the record.

12        THE COURT:  I thought we had one.

13        MR. DAIRE:  We did.  We ended up not using it.  It was

14   the interrogatory response.

15        THE COURT:  Okay.

16        MS. GUSKE:  That's fine by us.

17        THE COURT:  All right.  13, the interrogatory is out.

18   Okay.

19        MS. GUSKE:  And, to be clear, we have up until 4:00 to

20   submit any additional objections?

21        THE COURT:  Yes, yes.

22        All right.  Now, on the verdict form, which I'm going to

23   release shortly, based largely on the work the parties have

24   done, I just -- the last question on damages is how much, if

25   any, is attributable to Carahsoft.

**PROCEEDINGS**

1    There's been no discussion of assigning Carahsoft any

2    portion of liability, and I don't see how you're going to do

3    that at this point.  It's a baffling question, but it's never

4    come up.

5        I don't see how the jury can possibly answer it in a

6    rational/reasoned way because there's been no evidence of it.

7    So what are you going to do with that?

8        **MR. STACY:**  The way it's set up, Box has taken all the

9    liability on that.  So we're okay with taking Carahsoft off,

10   but not the liability portion of it, just the damages.

11       **THE COURT:**  No, just the apportioning of the damages.

12   I don't think they can do that.  Okay, Box?

13       **MR. DAIRE:**  (Nods head.)

14       **THE COURT:**  Are you okay with that?  You have to use

15   the words.

16       **MR. DAIRE:**  Agreed.

17       (Laughter)

18       **THE COURT:**  That question will be taken out of the

19   damages page.

20       And then there's another one.  Oh, Enablement.  I didn't

21   hear much of anything, so want to drop that one?

22       **MS. GUSKE:**  Agreed by Open Text, Your Honor.

23       **MR. BOVICH:**  May we be heard on that?

24       **THE COURT:**  All right.

25       **MR. DAIRE:**  We do think there is an enablement issue

**PROCEEDINGS**

1    here.

2        If we could pull up the enablement piece, Beau.

3        So open Text is correct that this did not come up in

4    Dr. Jagannathan's report.  That's true.  It came up during

5    Dr. Mayer-Patel's deposition.

6        And we've heard additional testimony today that something

7    more is required, and said last week, something more is

8    required to satisfy this determination element.

9            **THE COURT:**  That's literally all he said.

10           **MR. DAIRE:**  True.

11           **THE COURT:**  He literally said only "something more."

12   That's it.  So what's the jury supposed to do with that?

13           **MR. DAIRE:**  Well, we intend to argue that there is not

14   anything more in the patents because this piece of the patent

15   here is the sum total of what he pointed to as the something

16   more during his deposition.  He said nothing different at

17   trial.

18       So the point really here is, Your Honor, is Open Text

19   can't have it both ways in the sense that more is required to

20   prove the determination element for purposes of invalidating

21   the claims than what is disclosed in the specification of the

22   patent.

23           **THE COURT:**  Mr. Pietrantonio.

24           **MR. PIETRANTONIO:**  Dr. Mayer-Patel answered a question

25   about his understanding as to would there be more necessary.

**PROCEEDINGS**

 1  There was no follow-up on whether or not anybody -- we haven't

 2  heard from either expert on whether a person of ordinary skill

 3  in the art would understand the present specification to be

 4  able to do this.  They have to prove more than the fact that

 5  something wasn't there.

 6          **THE COURT:**  Why did he say that?

 7          **MR. PIETRANTONIO:**  He had no opinion evidence --

 8          **THE COURT:**  Counsel, stop.

 9      Why didn't he say something more?  He said it a couple

10  times.

11          **MR. PIETRANTONIO:**  Pardon?

12          **THE COURT:**  He said it a couple times.  He said it at

13  least two times or three, something more was needed.  What was

14  he trying to communicate?

15          **MR. PIETRANTONIO:**  He was being asked if there -- more

16  description about how to determine something should be -- would

17  be necessary.  It wasn't asked in the context of would someone

18  of ordinary skill in the art know how that could happen.

19          **MR. BOVICH:**  Your Honor, the reason he said it is

20  because he's hanging his whole infringement theory, as well as

21  his attempt to distinguish the prior art on it.  So he needs to

22  say it to get the patent to mean what he wants.  And the

23  problem is that then if the patent does mean something else, we

24  are left with no disclosure to support it.  That's the bind

25  that they are in.

**PROCEEDINGS**

1          **MR. PIETRANTONIO:**  Your Honor, they've tried to

2   back-door an issue that their own expert never even raised, and

3   they haven't even address it in an appropriate fashion.

4          **THE COURT:**  It was your witness who said it.

5          **MR. PIETRANTONIO:**  Our witness indicated that

6   something -- further understanding of determining or a step for

7   determining would be necessary.  But --

8          **MR. BOVICH:**  Your Honor, the reason our expert didn't

9   opine on it is because he doesn't agree with this claim, this

10  claim interpretation.  It's their creation.  So what we told

11  them in their infringement contention, in our invalidity

12  contentions, is we told them if you told them you try to

13  distinguish the prior art on this basis, you are going to walk

14  yourselves right into an enablement problem, and then we did

15  it.  And then we made a record of it.  It's their own doing.

16         **THE COURT:**  I think this is a close call, so you both

17  are going to submit no more than two pages of any dispositive

18  Federal Circuit case law on this issue by tomorrow morning,

19  10:00 a.m. tomorrow morning.  Just the cites.  I don't need any

20  argument or anything else; all right?

21         **MR. PIETRANTONIO:**  Yes, Your Honor.

22         **THE COURT:**  I think it's a close call.  I haven't

23  decided it yet.

24         After I do that, I'll get this form out to you by noon or

25  so.  You'll have plenty of opportunity to look at it.  All

```
 1   right.

 2       And pursuant to the agreement of the parties, I will take

 3   off the question about damages, if any, attributable to

 4   Carahsoft in the damages section, not the liability section.

 5           MR. FRIEL:  We agree.

 6           THE COURT:  Okay.

 7           MR. FRIEL:  One matter, Your Honor, if I may.

 8           THE COURT:  Yes.

 9           MR. FRIEL:  JMOL, can we file our JMOL tomorrow by

10   5:00?

11           THE COURT:  You can.  I'm taking all JMOLs under

12   submission pursuant to FRCP 50(b).

13           MR. DAIRE:  We have some more JMOLs to make.

14       We submitted our five-pager, and we understand Your Honor

15   wanted additional briefing.

16           THE COURT:  More?  The five pages was the limit,

17   limited to five pages, not to be supplemented.  What else do

18   you have?

19           MR. DAIRE:  So we would renew our motions as submitted

20   on damages and noninfringement, and also make a motion for

21   judgment of matters of law of no willfulness.

22       Open Text, I think, has put on its best evidence regarding

23   Box's alleged infringement and validity of the patents, and

24   they cannot meet the threshold requirement of objective

25   recklessness under the *Seagate* standard.
```

1    And if that's true and if that's Your Honor's inclination,

2  there's no reason to submit this issue at all in a bifurcated

3  fashion to the jury.  It's appropriate just to grant the JMOL

4  today.

5           **THE COURT:**  Okay.  Next?

6           **MR. DAIRE:**  Fourth, motion on invalidity.  We

7  understand we are at Your Honor's limits on page limits, but we

8  think, particularly in view of the Court's construction last

9  week or two weeks ago, I suppose, of database, that the prior

10  art at trial either anticipates in the form of Coda or renders

11  obvious WS_FTP User's Guide the asserted claims of the patents.

12  And I can run through those, just for purposes of the record,

13  so that it's clear what the grounds are.

14    So first, all asserted claims obvious over WS_FTP Pro

15  user's guide and one of ordinary skill in the art; Claim 10 of

16  the '515 patent, obvious over the user's guide; the WS_FTP Pro

17  user's guide and the knowledge of person of ordinary skill in

18  the art and DocuShare; all asserted claims anticipated by Coda;

19  Claim 10 of the '515 obvious to a person of ordinary skill in

20  the art, in view of Coda and DocuShare; and then all asserted

21  claims not enabled due to this issue presented through

22  Dr. Mayer-Patel's testimony.

23           **THE COURT:**  All right.  Thank you.

24    Okay.  So you get your jury responses in by 4:00 today,

25  your two-pagers on Federal Circuit and enablement jury

**PROCEEDINGS**

 1   instruction by tomorrow morning at 10:00, and I will get the

 2   verdict form out a couple hours after that.  All right?

 3         **MR. DAIRE:**  Thank you, Your Honor.  One last

 4   housekeeping, and I swear it's housekeeping.

 5         **THE COURT:**  Yes.

 6         **MR. DAIRE:**  The exhibits that were referred to during

 7   Dr. Leonard's testimony as preadmitted, we assume, will be

 8   admitted.  Those --

 9         **THE COURT:**  Did you preadmit those, Ms. Guske?

10         **MR. STACY:**  To be specific, 330 and 54.

11         **THE COURT:**  All right.  330 and 54 are admitted.

12         **MR. DAIRE:**  Thank you.

13       (Trial Exhibits 330 and 54 received in evidence)

14         **THE COURT:**  See you Thursday.

15         **COURTROOM DEPUTY:**  All rise.  Court's in recess.

16       (At 1:24 p.m. the proceedings were adjourned until

17   Thursday, February 12, 2015, at 8:30 a.m.)

18                           -   -   -   -

1

2                     **<ins>CERTIFICATE OF REPORTERS</ins>**

3

4          We certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Wednesday, February 11, 2015

8

9

10

11   _____

12        Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter

13

14

15

16   _____

17        Joanne M. Farrell, CSR No. 4838, RPR, CRR
                 U.S. Court Reporter Pro Tempore

18

19

20

21

22

23

24

25