UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OPEN TEXT S.A.,

          Plaintiff,

    v.

BOX, INC., et al.,

          Defendants.

Case No.  13-cv-04910-JD

**ORDER RE POST-TRIAL MOTIONS**

Re: Dkt. Nos. 600, 614, 615

A jury trial was held in this patent case from February 2-13, 2015, resulting in a verdict of $4,918,661, in favor of plaintiff Open Text S.A.  This order resolves the post-trial motions the parties have filed, and directs entry of judgment.

**PROCEDURAL HISTORY**

Plaintiff Open Text S.A. is a Luxembourg corporation, and a subsidiary of a Canadian software company called Open Text Corporation.  *See* Complaint ¶¶ 6-7, Dkt. No. 1.  On June 5, 2013, Open Text S.A. filed suit in the Eastern District of Virginia against Box and a Box reseller named Carahsoft, alleging infringement of twelve patents:  U.S. Patent Nos. 7,062,515; 7,590,665; 8,117,152; 7,647,372; 7,975,007; 6,223,177; 6,917,962; 7,287,055; 7,299,258; 7,320,018; 7,734,694; 8,176,122.  *See id.* ¶¶ 43-54.  These patents fall into three families:  the first three are referred to as the "File Synchronization patents"; the next two as the "Marketing Dialogue patents," and the remainder as the "Groupware patents."

On September 13, 2013, Open Text filed for a preliminary injunction on a subset of the asserted patent claims.  *See* Dkt. No. 64.  On October 18, 2013, while the motion was still pending, the court transferred the case to this district.  *See* Dkt. No. 123.  A judge in this district denied Open Text's motion for a preliminary injunction on April 9, 2014, finding that defendants had raised substantial questions regarding the validity of the claims that formed the basis of the

1    preliminary injunction motion.  *See* Order Denying Preliminary Injunction at 7:2-3, Dkt. Nos. 192-

2    93.

3           Later that same month, the case -- along with a related case against a company called

4    Alfresco involving the same patents -- was reassigned to the undersigned judge.  Alfresco had

5    previously moved to dismiss Open Text's infringement claims involving the Marketing Dialogue

6    patents on the basis that the asserted claims in that family were directed to patent-ineligible subject

7    matter and therefore invalid under 35 U.S.C. § 101.  *See* Dkt. No. 35 in Case No. 3:13-cv-04843-

8    JD.  On September 19, 2014, the Court granted the motion.  *See* Dkt. No. 204 in Case No. 3:13-

9    cv-04843-JD.  Not long afterwards, Open Text and Alfresco reached a settlement, and on October

10   3, 2014, the Court granted Open Text's motion to dismiss its claims against Alfresco with

11   prejudice.  *See* Dkt. No. 225 in Case No. 3:13-cv-04843-JD.

12          This case proceeded quickly to trial.  On November 21, 2014, the Court held a *Markman*

13   hearing, and issued a claim construction order on December 1, 2014.  *See* Dkt. Nos. 289, 294.  On

14   January 20, 2015, the Court granted a motion for judgment on the pleadings, finding that the

15   asserted claims of the Groupware patents were, like the Marketing Dialogue patents, invalid under

16   35 U.S.C. § 101, leaving only the File Synchronization patents in the case.  *See* Dkt. No. 454.  On

17   January 23, 2015, the Court excluded the opinions of Open Text's damages expert, Krista Holt.

18   *See* Dkt. No. 464.  (Open Text was allowed to attempt to prove damages through non-expert

19   testimony.)  On January 28, 2015, the Court issued a supplemental claim construction order to

20   address a dispute that had developed between the parties regarding the proper construction of

21   "database."  *See* Dkt. No. 480.  On January 29, 2015, the Court granted in part a motion to exclude

22   opinions by defendants' technical expert, Srinivasan Jagannathan.  *See* Dkt. No. 487 at 10:13-

23   11:23.  On January 30, the Court granted partial summary judgment in Open Text's favor, holding

24   that the TreeComp 3.6 reference was not prior art.  *See* Dkt. No. 494.  On February 4, 2015, the

25   Court granted summary judgment of no willfulness for the patent claims on which Open Text had

26   not moved for a preliminary injunction.  *See* Dkt. No. 527.  After Open Text rested its case in

27   chief, the Court granted defendants' motion for judgment as a matter of law of no willful

28   infringement for the remaining patent claim, on which Open Text had moved for a preliminary

United States District Court
Northern District of California

2

1    injunction.  *See* Dkt. No. 588.

2         On February 13, 2015, the jury reached a verdict, finding direct, contributory, and induced

3    infringement of each asserted claim, and finding that the asserted claims were not anticipated or

4    obvious.  *See* Dkt. No. 582.  The jury awarded Open Text lump-sum damages of $4,918,661.  *See*

5    *id.*

6                    **PATENTS-IN-SUIT AND ACCUSED PRODUCTS**

7         At trial, Open Text asserted four claims, all from the File Synchronization patents:  claims

8    10 and 27 of the '515 patent, claim 4 of the '665 patent, and claim 11 of the '152 patent.

9    According to Open Text, two Box products -- Box Edit for Mac and Box Edit for Windows --

10   infringed each of the asserted claims, and the Box Android application additionally infringed

11   claim 27 of the '515 patent.

12        The File Synchronization patents involve centralized databases that store electronic files.

13   *See* '515 patent, 1:14-15.  They attempt to improve on prior art methods for allowing multiple

14   users to access and modify such files at the same time by providing for bi-directional

15   synchronization of a cache on the users' client machines with the server, allowing the user to edit

16   the locally-cached file, which is then synchronized with the server copy after it has been modified.

17   *See id.* at 2:13-15, 3:22-49.  Claim 1 of the '515 patent, from which asserted claim 10 depends, is

18   representative:

     A system for synchronizing a cached file with a database:
             a computer processor;
             a network connection device operable to establish a
             connection with a database;
             a computer readable memory containing a local cache; and
             a software program, executable to run in user space on a
             client computer, stored on a computer medium and
             executable by the computer processor to:
                     send a request to the database for a file; receive the
                     file at the client computer directly from a database;
                     store the file as a cached file in the local cache;
                     notify the operating system to open the cached file
                     using a locally running application associated with
                     the file type for the cached file;
                     determine if the cached file at the client computer has
                     been modified by a user using the locally running
                     application based on a notification from a file
                     management system of an operating system; and
                     if the cached file has been modified, save the cached
                     file from the cache directly to the database.

United States District Court
Northern District of California

3

'515 patent, claim 1.

Box offers a subscription-based cloud computing service whereby users can, among other things, store and share files on Box's servers, which can then be accessed in various ways from client computers. *See* Trial Transcript ("Trial Tr.") 103:1-10 (defendants' opening statement); *id.* at 162:17-163:2 (testimony of Adam Howatson); *id.* at 229:21-25 (testimony of Griffin Dorman), Dkt. Nos. 525, 526, 536, 549, 564, 565, 581, 583.  Box Edit is one way of editing files stored in Box's servers. *See* Trial Tr. 212:3-4 (testimony of Griffin Dorman).  Box makes Box Edit available to its users as a free add-on that subscribers to the overall Box platform can download and install on their computers. *See* Trial Tr. 227:8-14 (testimony of Griffin Dorman); TX303. Box Edit is used from within the Box "Web App."  The Box Web App is the web interface that a user is presented with when she logs into the Box website, and allows her to see and move her files, view the version history for the files, add comments, share the files with other users, and so forth. *See* Trial Tr. 238:20-239:1 (testimony of Griffin Dorman).  Box Edit allows a user to edit a file by clicking a button from within the Web App, which results in the file being downloaded to the user's computer and opened in a local editor, and then saved back to the server once the user makes a change. *See* TX849; Trial Tr. 342:23-343:2, 344:14-345:3 (testimony of Chris Yeh). Box offers other ways of editing files stored in its servers:  for example, it offers a feature called Box Sync that ensures that a group of files on a user's hard drive is synchronized with the server, similar to Dropbox or Google Drive. *See* Trial Tr. 345:10-19 (testimony of Chris Yeh). Alternatively, users could use the Web App to download files to their computer, open and edit them with a local program, and then use the Web App to select and upload the file. *See* Trial Tr. 242:7-11 (testimony of Griffin Dorman).

Box users can also edit files using Box's Android application.  Users can select documents to edit from the Android application, which results in the file being downloaded and opened in a local Android application. *See* Trial Tr. 419:13-18; 421:13-422:2 (testimony of Ketan Mayer-Patel).  When the file is edited and closed, the file is saved back to Box's servers. *See* Trial Tr. 419:19-23 (testimony of Ketan Mayer-Patel).  The Android application has other, non-accused functionality besides the editing functionality. *See* Trial Tr. 437:20-438:16 (testimony of Ketan

United States District Court
Northern District of California

4

1    Mayer-Patel).

2                                    **LEGAL STANDARD**

3            Rule 50 allows a district court to grant judgment as a matter of law "when the evidence

4    permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury."

5    *Ostad v. Oregon Health Sciences Univ.*, 327 F.3d 876, 881 (9th Cir. 2003).  A party seeking

6    judgment as a matter of law after a jury verdict must show that the verdict is not supported by

7    "substantial evidence," meaning "relevant evidence that a reasonable mind would accept as

8    adequate to support a conclusion."  *Callicrate v. Wadsworth Mfg.*, 427 F.3d 1361, 1366 (Fed. Cir.

9    2005) (citing *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992)).  The Court must "view

10   the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable

11   inferences in that party's favor."  *See E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th

12   Cir. 2009) (internal quotations and citations omitted).

13                                      **DISCUSSION**

14           Defendants seek judgment as a matter of law on four issues:  whether the accused products

15   meet one of the limitations of the asserted claims; whether Open Text introduced evidence of

16   infringement by Carahsoft and any resulting damages; whether the asserted claims are invalid in

17   light of the prior art; and whether the asserted claims are enabled.  In addition, the parties dispute

18   the form of judgment, which party prevailed and whether that party should be awarded costs, and

19   prejudgment interest.

20   **I.    DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF
             LAW**
21

22           **A.    Infringement of the Asserted Claims**

23           Claim 11 of the '152 patent requires that the cache manager "determine if the cached file

24   has been modified *based on a notification* from a file management system of the operating

25   system," '152 patent, claim 11 (emphasis added), and each of the other asserted claims have or

26   depend from independent claims that have similar limitations.[1]  Box argues that it is entitled to

27   _____

28   [1] *See* '665 patent, claim 1 ("determining if the cached file has been modified based on a
     notification from a file management system of the operating system); '515 patent, claim 1
     ("determine if the cached file at the client computer has been modified by a user using the locally

United States District Court
Northern District of California

United States District Court
Northern District of California

judgment as a matter of law of non-infringement because its accused products do not meet these limitations.

The relevant characteristics of the accused products -- Box Edit for Mac, Box Edit for Windows, and the Box Android application -- are undisputed, but vary slightly by product.  In Box Edit for Mac, the Box software registers for notifications of changes to the directories containing the files downloaded using Box Edit.  *See* Trial Tr. at 396:16-399:2; *id.* at 682:16-22, 695:24-696:8 (testimony of Srinivasan Jagannathan); TX292.2.  Box Edit for Windows, by contrast, "polls" the file being edited:  it periodically checks the file's properties to see if the file's last modified time has changed.  Trial Tr. at 458:19-459:6 (testimony of Ketan Mayer-Patel); Trial Tr. at 696:11-17 (testimony of Srinivasan Jagannathan).  Finally, Box for Android monitors for when the file being edited is closed, or a file that is named the same thing as the file being edited is moved, and upon detecting those events, uploads those files to the server.  *See* Trial Tr. 685:3-8 (testimony of Srinivasan Jagannathan).

In all three products, however, the program does not conclude that the file has been modified based solely on the results of this monitoring.  Rather, once the monitoring suggests that the file may have been modified, the program goes on to perform a "hash comparison" to verify that the file has been changed.  *See* Trial Tr. at 458:2-18 (testimony of Ketan Mayer-Patel); *id.* at 680:10-17 (testimony of Srinivasan Jagannathan).  A hash comparison makes use of a family of mathematical functions called hash functions, which take a file (or other input) and produce a number -- usually much smaller -- known as a "hash."  *See* Trial Tr. at 309:19-25 (testimony of Ketan Mayer-Patel).  Input files that differ even slightly will almost always result in a completely different hash.  *See* Trial Tr. 309:25-400:3 (testimony of Ketan Mayer-Patel); *id.* at 680:20-23 (testimony of Srinivasan Jagannathan).  The accused Box products use a hash function called SHA1, and compare the SHA1 hash of the local file with the SHA1 hash of the file as it existed when it was downloaded from Box's servers.  *See* Trial Tr. 400:4-15, 459:18-22 (testimony of

running application based on a notification from a file management system of an operating system"); *id.*, claim 27 ("determine if the [first/second] cached file has been modified by the [first/second] locally running application based on a notification from a file management system of an operating system").

Ketan Mayer-Patel).  If the hash values are different, the accused products conclude that the file has been modified and upload it to the server.  *See id.*; Trial Tr. at 680:24-681:10 (testimony of Srinivasan Jagannathan).

Defendants argue that the fact that the accused products use a hash comparison means that they do not "determine if the cached file has been modified based on a notification from a file management system of the operating system," even if the hash comparison is triggered by the notification from a file management system.  But it is undisputed that a notification from a file management system is necessary, though not sufficient, for the accused products to determine if a local file has been modified.  Defendants' argument boils down to a claim that "based on a notification" necessarily means "based *only* on a notification."   Whatever the merits of this argument, it is essentially a claim construction argument that defendants failed to make pre-verdict and therefore cannot make post-verdict.  *See Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1320 (Fed. Cir. 2003) ("When issues of claim construction have not been properly raised in connection with the jury instructions, it is improper for the district court to adopt a new or more detailed claim construction in connection with the JMOL motion.").

Consequently, the Court denies judgment as a matter of law of non-infringement on this issue.

### B.        Infringement and Damages as to Carahsoft

Carahsoft is a distributor and reseller of products, including the Box platform, mainly to government customers.  *See* Trial Tr. 86:12-13 (Open Text's opening); Dkt. No. 543-1 at 24:3-6 (testimony of Craig Abod).  The evidence at trial showed that there were 65 sales of the Box platform through Carahsoft.  *See* TX171; Dkt. No. 543-4 at 127:11-128:6 (testimony of Matthew Rattigan).

Defendants argue that the jury never saw evidence that Carahsoft infringes the patents-in-suit.  Carahsoft sells the Box platform, but Open Text does not contend that the Box platform as a whole infringes -- only Box Edit and the Box for Android application.  *See* Pretrial Conference Statement at 2:19-21, 8:4-6, Dkt. No. 390.  As previously noted, Box Edit is a free add-on that Box subscribers must affirmatively download on their own through Box's website.  *See* Trial Tr.

1    227:8-14 (testimony of Griffin Dorman); TX303.  The same is true of Box for Android.  *See* Trial

2    Tr. 325:19-22 (testimony of Dylan Smith).  There appears to be no dispute that most Box users do

3    not, in fact, install Box Edit:  Box has over 30 million users, but there have been fewer than

4    480,000 installations of Box Edit.  *Compare* TX54 (total Box users) *with* TX179 (Box Edit

5    installations).  In addition, defendants argue that there is no evidence that Carahsoft indirectly

6    infringed the patents-in-suit, and that even if there was evidence of some infringement by

7    Carahsoft, Open Text did not introduce evidence as to its extent -- meaning the jury had no basis

8    to award damages.

9         Defendants are correct, and Open Text's arguments to the contrary are ill taken.  First of

10   all, Open Text argues that Carahsoft directly infringed because "[e]very Box product sale is a sale

11   of Box Edit, and ever offer to sell Box is an offer to sell Box Edit."  Dkt. No. 621 at 4:14-15.  That

12   is evidently not the case:  Open Text never accused the Box platform as a whole of infringing, just

13   Box Edit.  The fact that some of the buyers of the Box platform may later go download an

14   infringing add-on does not retroactively transform the sale of the platform into an infringing sale.

15        Open Text also points out that a Carahsoft employee, Matthew Rattigan, testified that he

16   uses Box for Android on his phone for his personal photos.  *See* Dkt. No. 543-4 at 109:15-110:3.

17   But the mere fact that a Carahsoft employee may have infringed the patent in his personal

18   activities is not, by itself, a basis for direct infringement liability by Carahsoft.  His actions might

19   be attributable to his employer if Carahsoft directed or controlled his performance, or if he and

20   Carahsoft formed a joint enterprise.  *See Akamai Techs., Inc. v. Limelight Networks, Inc.*, Nos.

21   2009-1372, 2009-1380, 2009-1416, 2009-1417, 2015 WL 4760450, at *1-2 (Fed. Cir. Aug. 13,

22   2015) (en banc).  There was no evidence that Mr. Rattigan's use of Box for Android for his

23   personal photos fit into either of these categories, and Open Text does not argue that it does.

24        Carahsoft is also entitled to judgment as a matter of law on Open Text's indirect

25   infringement claims, not least because indirect infringement must be predicated on an instance of

26   direct infringement by Carahsoft or its customers, which Open Text has not shown here.  *See*

27   *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 & n.3 (2014).  Open Text

28   argues that the jury was entitled to infer that at least one of Carahsoft's customers had used Box

United States District Court
Northern District of California

8

Edit or Box for Android, because 37% of Box's business and enterprise users used Box Edit to edit shared files (though only 9% of users used Box Edit to edit private files).  *See* TX161.2.  That statistic, however, is for Box users as a whole, rather than Carahsoft's users -- which, as can be seen from TX171, are largely associated with governmental entities and may not be representative of Box's user base.  Circumstantial evidence can certainly be relied upon to establish an instance of direct infringement, but only if it does, in fact, meet the threshold of substantial evidence.  In *Lucent Technologies, Inc. v. Gateway, Inc.*, the Federal Circuit found that "the extensive sales of Microsoft products and the dissemination of instruction manuals for the Microsoft products" plus corresponding testimony from Lucent's expert "was just barely sufficient to permit the jury to find direct infringement by a preponderance of the evidence."  580 F.3d 1301, 1318 (Fed. Cir. 2009).  Where, in contrast to Microsoft's "extensive" sales, Carahsoft's can be numbered in the dozens, there is no substantial evidence that at least one of Carahsoft's customers directly infringed by downloading Box Edit.

Open Text's indirect infringement against Carahsoft claims fail for additional, independent reasons.  To show contributory infringement, the patentee must show that the accused infringer sold, offered to sell, or imported "a component of a patented machine" which was "not a staple article or commodity of commerce suitable for substantial noninfringing use."  35 U.S.C. § 271(c).  The only component Carahsoft sold was the Box platform, and it is undisputed that the Box platform as a whole has many substantial noninfringing uses, as should be clear from the fact that only a minority of Box users use Box Edit.  *See* TX54; TX179; Trial Tr. 241:9-20 (testimony of Griffin Dorman); 245:1-5 (testimony of Aaron Levie).  Carahsoft is therefore entitled to judgment as a matter of law of no contributory infringement.

As for induced infringement, Open Text had to show that Carahsoft "knowingly induced infringement and possessed specific intent to encourage another's infringement."  *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005) (quotations and citations omitted).  Open Text made no such showing with respect to Box Edit.  Although Open Text's expert, Dr. Mayer-Patel, opined that Box encouraged users to use Box Edit after the suit was filed, he opined only that Carahsoft encouraged users to use Box -- not Box Edit.

United States District Court
Northern District of California

1    *See* Trial Tr. 408:23-409:3 (testimony of Ketan Mayer-Patel).  Since the jury did not have

2    sufficient evidence to conclude that Carahsoft had the necessary scienter for induced infringement,

3    Carahsoft is entitled to judgment as a matter of law of no induced infringement on that basis as

4    well.

5    Open Text finally argues that Carahsoft is jointly and severally liable for Box's damages,

6    citing *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1364 (Fed. Cir. 2001).  *Shockley* held that where

7    accused infringers "Sunex, Telesis, and Arcan benefited from a manufacturing, supply and

8    distribution relationship" and "[e]ach infringing Z-Creeper made by Sunex was imported by

9    Telesis into the United States and resold to Arcan," Telesis was "a joint tort-feasor and is jointly

10   and severally liable for damages assessed against Arcan." *Id.* at 1364.  But *Shockley* does not

11   provide an independent basis for liability where none exists; the decision explicitly held that one

12   of the accused infringers, Sunex, was not jointly and severally liable because its activities took

13   place abroad and therefore did not constitute infringement. *See id.*  Similarly, Carahsoft cannot

14   share in Box's liability when it otherwise does not infringe the patents-in-suit.  Moreover,

15   *Shockley* held that Telesis was jointly and severally liable for the damages assessed against its

16   downstream reseller, Arcan, but it noted that Arcan was not liable for Telesis sales to entities other

17   than Arcan. *See id.*  By the same token, Carahsoft does not share in Box's liability for making

18   Box Edit available to others.

19   Consequently, the Court grants judgment as a matter of law of no infringement as to

20   Carahsoft.

21   **C.      Invalidity of the Asserted Patents**

22   Defendants argue that they are entitled to judgment as a matter of law of invalidity, and

23   advance four theories as to why.  The first two center around the WS_FTP Pro 5.0 User's Guide

24   reference:  defendants assert that the user's guide, in combination with the knowledge of a person

25   of ordinary skill in the art, renders all four asserted claims invalid, and additionally that the user's

26   guide, in combination with the knowledge of a person of ordinary skill in the art and Xerox's

27   DocuShare version 2.2 software, renders claim 10 of the '515 patent obvious.  Next, defendants

28   argue that the Coda version 5.3.10 software anticipates each of the asserted claims, and that Coda,

1    in combination with DocuShare, renders claim 10 of the '515 patent obvious.  Finally, defendants

2    argue that the asserted claims are not enabled.

3            The Court denies judgment as a matter of law.  The jury could legitimately have found that

4    defendants did not show by clear and convincing evidence that the WS_FTP Pro 5.0 User's Guide

5    was publicly available before the File Synchronization patents' December 28, 2001 priority date,

6    or that Coda satisfies the asserted claims' requirement that the cache manager notify the operating

7    system to open the cached file.  Defendants' enablement argument, which the jury was not asked

8    to decide, also fails because defendants presented no evidence that undue experimentation would

9    be necessary in order for a person of ordinary skill in the art to practice the claimed invention.

10                      **1.      WS_FTP Pro 5.0 User's Guide**

11            Both of defendants' obviousness theories involving the WS_FTP Pro 5.0 User's Guide,

12    introduced as TX618, depend on the assumption that the user's guide is, in fact, prior art under 35

13    U.S.C. § 103.  It is important to note that the prior art reference in question is just the user's guide,

14    and not the actual software that the user's guide describes.  *See* Trial Tr. at 550:22-25 (testimony

15    of Srinivasan Jagannathan).  Defendants claim that the WS_FTP user's guide is a prior art "printed

16    publication."  In order to constitute prior art, a printed publication must have been "publicly

17    accessible" before the priority date of the asserted claims.  *See SRI Int'l, Inc. v. Internet Sec.*

18    *Systems, Inc.*, 511 F.3d 1186, 1194-95 (Fed. Cir. 2008).  To show that a reference is publicly

19    accessible, the party asserting invalidity must show that the document "has been disseminated or

20    otherwise made available to the extent that persons interested and ordinarily skilled in the subject

21    matter or art exercising reasonable diligence, can locate it."  *Id.* at 1194.

22            The problem is that all of the evidence introduced by defendants to show public

23    accessibility refers to the WS_FTP software itself, rather than the user's guide.  TX619 is a

24    product review discussing WS_FTP Pro 5.0 from November 9, 1999, but it never refers to the

25    WS_FTP Pro user's guide.  TX620 is a press release announcing version 5.0 of WS_FTP Pro, but

26    it likewise does not refer to the user's guide.  TX712 shows a description of WS_FTP Pro 5.0 on

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

the website of the company that created it, but again, it contains no mention of the user's guide.[2]

The user's guide introduced by defendants does feature a 1998 copyright date, as well as a "printing history" giving the dates of four editions, the last of which is listed as being printed in February 1998.  *See* TX618 at ii.  Copyright and printing dates may indicate when the document was created, but they do not prove the necessary predicate to establishing "public accessibility" -- that the document was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it."  *See SRI Int'l*, 511 F.3d at 1194; *CNET Networks, Inc. v. Etilize, Inc.*, 584 F. Supp. 2d 1260, 1273-74 (N.D. Cal. 2008).  Defendants' counsel asked the jury to draw the "common sense" inference that the manual was given out to users of WS_FTP Pro, *see* Trial Tr. 1191:16-25, but the jury was entitled not to draw that inference -- or to conclude that the evidence defendants pointed to did not rise to the "clear and convincing" level necessary to establish patent invalidity, *see Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).

The Court therefore denies judgment as a matter of law on defendants' invalidity theories involving the WS_FTP Pro 5.0 User's Guide.

### 2.      Coda

Coda is a distributed file system developed by a team at Carnegie Mellon University led by Professor Mahadev Satyanarayanan.  *See* Dkt. No. 553-1 at 12:18-10 (testimony of Mahadev Satyanarayanan); TX1558 at DEFS000125; TX1557 at DEFS000199.  Defendants assert Coda version 5.3.10, introduced into evidence at TX690, as both an anticipating reference and, together with the Xerox DocuShare version 2.2 software, as an obviousness combination.  (For simplicity, all subsequent references to "Coda" should be understood to refer to version 5.3.10.)  Coda consists of a number of components:  a server component called "Vice," a cache manager program called "Venus," and a kernel component that is part of the operating system.  *See* Trial Tr. 627:11-

---

[2] When defendants previously moved for summary judgment of invalidity, they attached a declaration from Melissa Mack, an operations manager at Ipswitch, the company that made WS_FTP, to try and establish that the WS_FTP Pro 5.0 User's Guide was publicly accessible, *see* Declaration of Melissa Mack ¶ 5, Dkt. No. 315-19, but no testimony from Ms. Mack was introduced at trial.

18, 632:8-634:4 (testimony of Srinivasan Jagannathan); Dkt. No. 553-1 at 25:19-26:5 (testimony

of Mahadev Satyanarayanan); TX1557 at DEFS000126; TX1557 at DEFS000200 & Fig. 3.  A

schematic of the operation of the Coda system, as found in an article by Peter J. Braam describing

Coda, is shown below:



TX700 at 47.  As described by defendants' expert, and as shown in screenshots he took that were

introduced into evidence at TX600.11-18, Coda creates a directory on the client computer that

shows a representation of the files and file structure stored on the server.  *See* Trial Tr. 635:13-

636:4 (testimony of Srinivasan Jagannathan); TX600.11.  When the client computer is told to open

a file, the file is downloaded to the local computer from the server and opened on the client

computer.  *See* Trial Tr. 636:11-19 (testimony of Srinivasan Jagannathan); TX600.11.

Modifications to the file, when saved, are propagated back to the server.  *See* Trial Tr. 650:14-

651:3 (testimony of Srinivasan Jagannathan); TX600.17-18.

   The jury declined to find, in the face of this evidence, that the asserted claims were invalid,

and it was entitled to do so.  Each of the asserted claims has a limitation requiring (in slightly

varying language) that the cache manager "notify the operating system to open the cached file

using a locally running application associated with the file type for the cached file."  '515 patent,

claim 1.[3]  The evidence at trial established solely that Venus, which defendants claim corresponds

---

[3] Similar limitations are found in the other asserted claims:
   - claim 27 of the '515 patent ("a software program … executable by the computer processor to … notify the operating system to open the [first or second] cached file using a [first or second] locally running application associated with the file type for the cached file"),
   - claim 4 of the '665 patent ("notifying an operating system to open the cached file using a local application associated with a file type for the cached file, wherein the cache manager

United States District Court
Northern District of California

to the claimed cache manager, fetches the remote file and saves it to the local system. *See* Trial Tr. 636:13-19 (testimony of Srinivasan Jagannathan). Defendants' expert claimed that when Venus fetches the remote file, it tells the operating system, "Here's the file; open it," which constitutes the claimed notification. *See* Trial Tr. 647:2-16 (testimony of Srinivasan Jagannathan). But apart from this statement, the evidence regarding Coda's operation presented at trial showed only that the remote file was saved on the local machine and that it was subsequently opened by a locally-running application; although the file was unquestionably received by the local computer, there was no evidence in Dr. Jagannathan's screenshots or the various documents describing Coda of an additional notification from Venus corresponding to Dr. Jagannathan's "open it," prompting the operating system to open the saved file. *See* Trial Tr. 648:5-10 (testimony of Srinivasan Jagannathan). That additional notification is what is required by the asserted claims. The patents-in-suit treat receipt of the file from the server and notifying the operating system to open the file as two separate events, as is apparent from Figure 2 of each of the patents, which shows "receive copy of the database asset and save as cached file" (item 76) and "prompt operating system to open file" (item 82) as different steps. *See, e.g.*, '515 patent, Fig. 2. Dr. Jagannathan may have testified that after the file was received, Venus notified the operating system to open it, but juries are entitled to disregard an expert's unsupported say-so. (Indeed, juries should not rely on an expert's conclusory statements. *See MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015).)

Defendants relied on Coda to establish the "notification" limitation in each of their invalidity theories involving Coda. Since the jury was entitled to conclude that Coda does not include that element, the Court denies judgment as a matter of law of invalidity based on those theories.

### 3. Lack of Enablement

Defendants renew their pre-verdict motion for judgment as a matter of law that the File

---

notifies the operating system to open the cached file"), and
- claim 11 of the '152 patent ("causing the cache manager to prompt the operating system to open the cached file using a local application associated with a file type for the cached file").

United States District Court
Northern District of California

1   Synchronization patents are not enabled, based on an argument that was gestured at, but not

2   explicitly made, at trial.  *See* Dkt. No. 600.  Defendants presented no evidence or testimony during

3   their own case regarding enablement, but did elicit testimony from Open Text's expert on cross-

4   examination that in order to "determine if the cached file at the client computer has been modified

5   by a user using the locally running application based on a notification from a file management

6   system of an operating system," the cache manager must do "something more" in addition to

7   receiving a notification from the operating system.  *See* Trial Tr. at 463:17-24 (testimony of Ketan

8   Mayer-Patel).  According to defendants, since this "something more" is not disclosed in the

9   specification of the patents, the patents are invalid for lack of enablement.

10      In order to establish that the asserted claims are not enabled, defendants would have to

11   show that "one skilled in the art, having read the specification, could [not] practice the invention

12   without 'undue experimentation.'"  *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d

13   1269, 1288 (Fed. Cir. 2012).  It is not enough that the procedure for performing a "determination"

14   not be found in the specification, since "[a] patent need not teach, and preferably omits, what is

15   well known in the art."  *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1365 (Fed. Cir. 2006)

16   (quoting *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1534 (Fed. Cir. 1987)).

17      Defendants argue (albeit without citation to the record) that Open Text cannot take the

18   position that a "determination" was known in the prior art, because Open Text distinguished

19   defendants' prior art references based on their not teaching a "determination" step.  *See*

20   Defendants' JMOL re Enablement at 5:18-21, Dkt. No. 600.  Be that as it may, defendants neither

21   elicited nor introduced any testimony or evidence regarding the amount of experimentation that

22   would be necessary in order to practice the invention if it required a separate "determination" step

23   -- much less the clear and convincing evidence that would be needed to invalidate a patent claim.

24   *See Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1337 (Fed. Cir. 2013) ("Because we

25   must presume a patent enabled, the challenger bears the burden, throughout the litigation, of

26   proving lack of enablement by clear and convincing evidence.").

27      Consequently, the Court denies defendants' renewed motion for judgment as a matter of

28   law that the four asserted claims are not enabled.

United States District Court
Northern District of California

15

United States District Court
Northern District of California

## II.     FORM OF VERDICT

Rule 58 requires that judgments be set forth in a separate document.  "[I]t is common for courts to ask the parties to stipulate to the form of the final judgment," *Taylor Brands, LLC v. GB II Corp.*, 827 F.3d 874, 877 (Fed. Cir. 2010), and this Court asked the parties to do so after the jury verdict.  Unfortunately, the parties proved unequal to the task, with both sides filing their own proposed form and accompanying briefing.  *See* Dkt. Nos. 592, 593, 598.  The competing forms differ on a number of particulars:  whether the judgment should say that the defendants directly infringed or merely their products did, whether the particular prior art references that were tried should be listed, and whether the judgment should address enhanced damages, the availability of injunctive relief, costs, and the prejudgment interest rate.

All this misses the point.  Rule 58 judgments do not exist to give the parties a chance to gloss the jury verdict or spin issues for appeal.  "The sole purpose of the separate-document requirement, which was added to Rule 58 in 1963, was to clarify when the time for appeal under 28 U.S.C. § 2107 begins to run."  *Bankers Trust Co. v. Mullins*, 435 U.S. 381, 385 (1978).  Disputes over what the jury verdict means can be taken up when a party seeks to enforce the judgment, or when the preclusive effect of the verdict is later asserted.

The Court could not enter judgment immediately after trial, since the request for an injunction that Open Text included in its complaint remained pending.  Until that issue was resolved, the Court could not issue a judgment that would be "final" under 28 U.S.C. § 1295, because a final judgment is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."  *Ultra-Precision Mf'g Ltd. v. Ford Motor Co.*, 338 F.3d 1353, 1356-57 (Fed. Cir. 2003); *see also PODS, Inc. v. Porta Star, Inc.*, 484 F.3d 1359, 1365 (Fed. Cir. 2007) (finding that judgment that addressed infringement and damages, but not permanent injunction, was not final); *Natron Corp. v. Borg Indak, Inc.*, No. 2012-1292, 2012 WL 10242279 (Fed. Cir. Aug. 3, 2012) (unpublished) (dismissing appeal because "Nartron sought an injunction in its complaint and the trial court has not yet resolved the dispute over injunctive relief"); *Creative Compounds, LLC v. Starmark Labs.*, 2009 WL 5171738, *1 (Fed. Cir. 2009), *denying reconsideration*, 2010 WL 1140884, *1 (Fed. Cir. Mar. 24, 2010) (same); *Advanced

16

*Cardiovascular Sys. v. Medtronic Vascular, Inc.*, 231 Fed. App'x 962, 963 (Fed. Cir. 2007) (unpublished) (holding that appeal was "premature" because plaintiff's "request for permanent injunctive relief in its complaint remains pending and thus the case is not final except for an accounting"). In a motion in limine ruling, the Court already expressed its view that an injunction is not available when a jury awards lump sum damages covering past and future infringement. *See* Dkt. No. 478 at 3:1-3; *see also Carborundum Co. v. Molten Metal Equipment Innovations, Inc.*, 72 F.3d 872, 881 (Fed. Cir. 1995) ("[O]nce a patentee has been fully compensated by an infringer for the use of a device embodying the patented invention, a court may not grant an injunction preventing the infringer from using or repairing that device."); *Trans-World Mf'g Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552 (Fed. Cir. 1984) ("Where the damage award is based upon an assumed license for the life of the patent, there is no need to enjoin use, because the license fee authorizes use."); *Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1549 (Fed. Cir. 1987) ("Having been awarded full compensation for the making and using of existing infringing thickeners, therefore, Amstar is not entitled to enjoin their use."). But it never explicitly ruled on a motion for a permanent injunction, because Open Text never brought one. *See Ultra-Precision*, 338 F.3d at 1357 (holding that "[a] motion *in limine* is by nature a preliminary ruling … and therefore is not appealable" or even reducible to an appealable judgment under Rule 54(b)).

At the post-trial conference, however, Open Text moved under Rule 15 to amend its complaint to drop the request for an injunction, and the Court granted the motion, disposing of the request for an injunction, and permitting final judgment to be entered. *See* Post-Trial Hearing Tr. 4:8-17, Dkt. No. 630.

Defendants also ask for the jury verdict to note that Open Text is not entitled to enhanced damages for willfulness, given the fact that the Court has determined that there is no willful infringement. *See* Dkt. Nos. 527, 588. That is unnecessary to include in a judgment. A final judgment is one "from which an appeal lies," *see* Fed. R. Civ. P. 54, and the Federal Circuit (unlike other courts of appeals) has jurisdiction over appeals from judgments that are final "except for an accounting." 28 U.S.C. § 1292(c)(2). The Federal Circuit has ruled that, as a result, claims for enhancement of damages do not have to be addressed in order to have a final judgment. *See*

17

*PODS*, 484 F.3d at 1365 n.4.  There is therefore no need to resolve the issue until and unless Open Text seeks enhanced damages for whatever reason.

It is also unnecessary for the Court to adjudicate the parties' remaining disputes concerning the meaning of the jury verdict; instead, it will direct the clerk to enter judgment noting the prevailing party for each claim and the relief awarded, as contemplated by Rule 58.  *See, e.g.*, *In re Cendant Corp. Secs. Litig.*, 454 F.3d 235, 245 (3d Cir. 2006) ("For judges, the separate judgment should be as minimal as possible to comply with Rule 58's requirements, and should include little more."); *Kidd v. District of Columbia*, 206 F.3d 35, 38 (D.C. Cir. 2000) (holding that the Federal Rules of Civil Procedure insist on "simplicity and brevity in judgments"); *Otis v. City of Chicago*, 29 F.3d 1159, 1163 (7th Cir. 1994) (en banc) (Easterbrook, J.) (holding that a Rule 58 judgment "should be a self-contained document, saying who has won and what relief has been awarded, but omitting the reasons for this disposition").

### III.   PREVAILING PARTY AND COSTS

Both sides claim to be the prevailing party:  Defendants point to the fact that most of the originally-asserted patent claims were either dropped from this litigation or declared invalid, Open Text's motion for a preliminary injunction was denied, and the damages awarded by the jury was a small fraction of what Open Text originally sought.  Open Text, on the other hand, points out that it won an infringement verdict with respect to some of the asserted claims.

Under Federal Circuit precedent, "[a] court must choose one, and only one, 'prevailing party' to receive any costs award."  *Shum v. Intel Corp.*, 629 F.3d 1360, 1367 (Fed. Cir. 2010). The prevailing party is one that obtains relief that "materially alters the legal relationship between the parties by modifying one party's behavior in a way that 'directly benefits' the opposing party," but it need not prevail on all claims.  *Id.* at 1367-68.

A defendant that wins a declaration that a competitor's patent is invalid can be a prevailing party, *Manildra Milling Corp. v. Ogilvie Mills, Inc.*, 76 F.3d 1178, 1183 (Fed. Cir. 1996), but defendants have not cited, and the Court has not found, a case that has held that a defendant who wins on invalidity as to a subset of the asserted patents can be a prevailing party.  In fact, *Manildra* suggests that the law is to the contrary.  *See id.* at 1182 ("a judgment for damages in any

United States District Court
Northern District of California

1    amount modifies the defendant's behavior to the plaintiff's benefit").  The Court therefore finds

2    that Open Text is the prevailing party, however paltry the verdict was compared to Open Text's

3    ambitions.

4        Whether Open Text is entitled to costs is determined according to the law of the regional

5    circuit.  *See id.* at 1183.  In the Ninth Circuit, there is a presumption that the prevailing party is

6    entitled to costs, but the district court has discretion not to award them.  *See Escriba v. Foster*

7    *Poultry Farms, Inc.*, 743 F.3d 1236, 1247 (9th Cir. 2014).  A non-exhaustive list of appropriate

8    reasons for denying costs includes: "(1) the issues in the case were close and difficult; (2) the

9    prevailing party's recovery was nominal or partial; (3) the losing party litigated in good faith; and,

10    perhaps, (4) the case presented a landmark issue of national importance."  *Champion Produce, Inc.*

11    *v. Ruby Robinson Co.*, 342 F.3d 1016, 1023 (9th Cir. 2003).

12        The Court finds that the presumption has been overcome in this case.  By dint of Federal

13    Circuit precedent, a prevailing party must be chosen, but any unbiased observer would have to

14    conclude that the result in this case is close to a draw.  The Court found the patent claims

15    belonging to two of the three initially-asserted patent families to be invalid.  *See* Dkt. No. 454;

16    *Open Text v. Alfresco*, Case No. 13-cv-04843-JD, Dkt. No. 204 (N.D. Cal. Sept. 19, 2014).  And

17    even with respect to the claims from the File Synchronization patents on which Open Text

18    eventually prevailed at trial, the judge who previously presided over this case found that

19    defendants had raised a substantial question as to their validity.  *See* Dkt. Nos. 192-93.  In

20    addition, defendants prevailed on both Open Text's claims for willful infringement and on its

21    claim for injunctive relief, which (as previously explained) was dropped after trial.  *See* Dkt. Nos.

22    527, 588; Post-Trial Hearing Tr. 4:8-17.  Finally, Open Text was awarded a lump sum of

23    approximately $4.9 million, *see* Jury Verdict at 9, Dkt. No. 582, a mere fraction of the over $268

24    million it initially sought.  *See* Dkt. No. 593-5.

25        Consequently, based on the "closeness and difficulty of the case," Open Text's "partial"

26    recovery, and the fact that defendants undisputedly litigated in good faith, the Court finds that

27    each party should bear its own costs.

28

United States District Court
Northern District of California

19

## IV.   PREJUDGMENT INTEREST

Under 35 U.S.C. § 284, after a finding of infringement, the court "shall award . . . damages . . . together with interest and costs."  Prejudgment interest should ordinarily be awarded absent some justification for withholding such an award.  *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1263 (Fed. Cir. 2014) (citing *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983)); *see also Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1358 (Fed. Cir. 2012) ("The award of pre-judgment interest is the rule, not the exception.").  The purpose of awarding prejudgment interest is "to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement." *Gen. Motors*, 461 U.S. at 655.

While the parties do not dispute the propriety of awarding prejudgment interest, they disagree as to the proper rate.  Defendants believe that prejudgment interest should be awarded at the one-year Treasury bill rate.  The problem with using this rate is that it does not fully capture the harm that Open Text suffered by being paid in 2015 rather than in March 2012.  The T-bill rate may capture the time value of money -- the fact that if Open Text had received the damages award in 2012, it could have invested the money and earned interest.  But it does not capture default risk -- the possibility that something would happen between 2012 and 2015 that would prevent Open Text from being paid at all.  "At any time before actual payment or collection of the judgment the defendant may default and the plaintiff come up empty-handed.  The plaintiff is an unsecured, uninsured creditor, and the risk of default must be considered in deciding what a compensatory rate of interest would be."  *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436-37 (7th Cir. 1989) (Posner, J.).

The correct measure, therefore, is the interest rate that Open Text would have demanded had it charged defendants for a loan at the time of the alleged infringement, which captures the possibility that it would get stiffed by defendants. *See Sealant Sys. Int'l, Inc. v. TEK Global S.R.L.*, No. 5:11-cv-00774-PSG, 2014 WL 1008183, at *6 (N.D. Cal. Mar. 7, 2014), *rev'd on other grounds*, 2015 WL 3622097 (Fed. Cir. Jun. 11, 2015); *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, C 03-1431 SBA, 2008 WL 928535, at *3 (N.D. Cal. Apr. 4, 2008); *Atmel*

United States District Court
Northern District of California

United States District Court
Northern District of California

*Corp. v. Silicon Storage Tech., Inc.*, 202 F. Supp. 2d 1096, 1101 (N.D. Cal. 2002); *see also Gorenstein*, 874 F.2d at 436 ("The defendant who has violated the plaintiff's rights is in effect a debtor of the plaintiff until the judgment is entered and paid or otherwise collected.").  Applying this principle, Open Text urges an interest rate of 8.375% compounded annually, plus an end of term payment of 4.5%, based on a $5 million "Loan and Security Agreement" that Box entered into in March 2012 with a venture debt provider called Hercules Technology Growth Capital, Inc. *See* Box's 2015 Form 10-K at 90, Dkt. No. 614-3.  The Hercules agreement was the only loan that Box had taken at the time infringement began, and therefore, according to Open Text, represents the best available data as to the interest rate Box would have been forced to cough up if it had taken a loan from Open Text in March 2012.  According to the description of the loan in Box's Form 10-K, Hercules got a security interest in "equipment financed under the agreement and all of [Box's] patents, patent applications, copyrights, trademarks and trademark applications."  *Id.* Separately, around the same time, Hercules purchased 220,751 shares of Box's Series D-2 redeemable convertible preferred stock.  *See id.*  Box and Hercules had entered into two prior Loan and Security Agreements.  *See id.*  The Hercules loan was repaid in August 2013, when Box entered into a two-year $100.0 million secured revolving credit facility and drew $34 million at an interest rate of 3.4% (the six-month LIBOR plus 3.0%).  *See id.*

There is something to the approach advocated by Open Text.  Courts often use an index, such as the prime rate, to calculate prejudgment interest, *see Sealant Sys.*, 2014 WL 1008183, at *6; *Fresenius*, 2008 WL 928535, at *3, but this is largely a matter of convenience, as "a more precise estimate would be the interest rate paid by the defendant for unsecured loans," *Gorenstein*, 874 F.2d at 437.  The Hercules loan arguably provides a Box-specific estimate, which would be more relevant than a market-wide index, and the high interest rate the loan provides for arguably just reflects the fact that in March 2012, Box was a risky startup.  And while it is true that the terms of the Hercules loan differ in certain respects from the terms of a hypothetical 2012 loan from Open Text to Box, some of those differences cut against Box's position:  for example, the Hercules loan was secured by Box's intellectual property, which would tend to drive the interest rate down in comparison to an unsecured loan.  *See* Declaration of Gregory Leonard ¶ 7, Dkt. No.

618-4.

Nevertheless, the Court is unwilling to treat the Hercules loan as a reflection of the terms on which Open Text would have made Box a loan in March 2012 based simply on the description of the loan in Box's Form 10-K.  Without the loan agreement itself and testimony from those who negotiated it, it is difficult to know whether Box agreed to the terms of the agreement because they were the best it could get at that stage, or for other reasons.  The evidence Open Text has presented regarding the agreement is too uncertain to justify awarding the over $1 million more in interest (including the end of term payment provided for in the Hercules loan) that Open Text would get if the Hercules loan agreement were used instead of the prime rate.  *See* Declaration of Douglas Ellis Exs. 1A-1B, Dkt. No. 614-14.  In addition, the Court notes that in August 2013 (as noted above) and September 2014, Box took out loans at rates much closer to the annual prime rate of 3.25%.  *See* Leonard Decl. ¶ 10.  Based on those facts, and the lack of a sufficiently reliable basis to depart from the prime rate, the Court awards Open Text prejudgment interest at the prime rate, compounded annually.  The Court also awards post-judgment interest pursuant to 28 U.S.C. § 1961, which is fixed by statute at "the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding."  28 U.S.C. § 1961.

## CONCLUSION

Defendants' renewed motion for judgment as a matter of law that Carahsoft does not infringe the asserted patents is granted, and their remaining Rule 50(b) motions are denied.  The Court finds that Open Text is the prevailing party, but that each side should nevertheless bear its own costs.  Open Text will be awarded prejudgment interest at the prime rate.  The clerk is directed to sign and enter judgment.

**IT IS SO ORDERED.**

Dated: August 19, 2015

_____
JAMES DONATO
United States District Judge